**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| **Nicholas S. Hunter,** | ) | |
| **Plaintiff** | ) | |
| | ) | **Cause No.:** |
| **v.** | ) | |
| | ) | **TRIAL BY JURY REQUESTED** |
| **Myron Woodson,** | ) | |
| **in his individual capacity,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **City of Sturgeon, Missouri,** | ) | |
| | ) | |
| **Defendants** | ) | |

### COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Nicholas S. Hunter, by and through undersigned counsel, and, for his Complaint for Damages against the above-named Defendants for violations of his guaranteed and protected federal constitutional rights, states as follows:

### STATEMENT OF CASE

1.  Plaintiff Nicholas S. Hunter hereby brings this case against Defendant Myron Woodson, in his individual capacity as an empowered police officer of the City of Sturgeon, Missouri and state official, for the unlawful seizure by killing and destruction of Teddy, Mr. Hunter's beloved dog and companion animal, in violations of Mr. Hunter's protected Fourth Amendment

1

rights, pursuant to and as authorized under 42 U.S.C. § 1983, and against Defendant City of Sturgeon Missouri, a municipal corporation and body politic, for its failures to properly and adequately train and supervise Defendant Woodson as an empowered police officer and agent in its employ, pursuant to and under theories of municipal liability ("*Monell*" liability).

2. As pleaded and set forth in detail below, on or about May 19, 2024, Defendant Myron Woodson responded to a call from a neighbor of Plaintiff Hunter who had found Teddy, a small, blind and deaf, 13 lb. Shih Tzu dog, in her yard and was seeking assistance in locating Teddy's owner and keeping Teddy safe until that happened. Rather than keeping Teddy safe until Plaintiff Hunter could be notified and retrieve Teddy, Defendant Woodson "resolved" the call by shooting Teddy at point blank rage and thereby executing the small dog. Moreover, Defendant Woodson's warrantless seizure of Teddy was unnecessary, callous, and egregious as it was unwarranted by law and violative of Plaintiff Hunter's most fundamental and guaranteed of constitutional rights. At no time during the encounter between Teddy and Defendant Woodson did Teddy show any aggression towards Defendant Woodson. Teddy never barked, growled, or even moved towards Defendant Woodson. Instead, the small, blind and deaf dog simply kept trying to walk away, oblivious to the danger that Defendant Woodson posed to him. In fact, Defendant Woodson himself

admitted to Plaintiff Hunter that he had no fear that Teddy presented any threat to him or anyone else. Indeed, the small Teddy could not have harmed the much larger and stronger Defendant Woodson even if he had been so inclined. Defendant Woodson initially told Plaintiff Hunter that his reasoning for killing Teddy was because he believed Teddy may have been injured. However, Defendant Woodson quickly abandoned this position, acknowledging that he simply had no idea whether Teddy was injured or not and Teddy, in fact, was not acting in the manner as would an injured dog. Most incredibly, Defendant Woodson seemed unaware that he was even responsible for performing animal control duties, stating "we don't have freaking animal control here." Ultimately, Defendant Woodson has no legal excuse or justification for his actions and his killing of Teddy was the direct result of his own ineptitude in improperly using his issued catch-pole, a device routinely and successfully used by countless animal control officers across this country on a daily basis, to perform the simplest municipal task of safely taking custody of a small, lost, blind and deaf dog.

3. As further pleaded and set forth in detail below, Defendant City of Sturgeon bears municipal liability for its part and actions in Defendant Woodson's unlawful seizure and killing of Teddy. Defendant City of Sturgeon's training and supervision of Defendant Woodson was so woefully inadequate

that Defendant Woodson, an allegedly trained and capable law enforcement officer entrusted with a firearm and public safety, could not even properly use the most common and simplest of animal control devices, namely his city-issued catch-pole, to catch a 13 lb., blind and deaf dog. Moreover, based on information and belief, statements made by Defendant Woodson, and subsequent public statements issued by Defendant City of Sturgeon officials, it appears that the city engaged in no or almost no training, supervision, or discipline of its officers. Further, based on statements made by Defendant Woodson to Plaintiff Hunter, while the city had ordinances and procedures for the safe impoundment of lost or stray animals, it neither trained their officers on these ordinances and procedures nor put in place any mechanism for implementing them. Indeed, as claimed by Defendant Woodson, even if he had been able to catch Teddy, he had no place to take him and thus had no other option but to execute the small dog. Ultimately, Teddy's death and Defendant Woodson's egregious violation of Plaintiff Hunter's protected Fourth Amendment rights were the direct result of Defendant City of Sturgeon's failures to properly train, supervise, and discipline its officers and failures to maintain proper mechanisms for the completing of the most basic and common of municipal tasks of catching and impounding lost and stray dogs.

**PARTIES**

4.      Plaintiff Nicholas S. Hunter (herein "Mr. Hunter") is a citizen of the United States and resident of the State of Missouri, with his principal place of residence located within the established geographical boundaries of the City of Sturgeon, Missouri.

5.      Upon information and belief, Defendant Myron Woodson (herein "Defendant Woodson") is a citizen of the United States and resident of the State of Missouri. At all times relevant to this cause of action, Defendant Woodson was acting as a law enforcement officer in the employment of Defendant City of Sturgeon, Missouri. Further, at all times relevant to this cause of action, Defendant Woodson was acting under color of state law. For purposes of this cause of action, Defendant Woodson is named in his individual capacity.

6.      Defendant City of Sturgeon, Missouri (herein "Defendant City of Sturgeon"), is a municipal corporation and body politic, organized and existing pursuant to the Missouri Constitution and state law. At all times relevant to this cause of action, Defendant Sturgeon was a governmental entity and/or municipality subject to claims for municipal liability, as recognized in Monell v. New York Dept. of Social Services, 436 U.S. 658 (1978) and City of Canton, Ohio v. Harris, 489 U.S. 378 (1989).

5

## JURISDICTION AND VENUE

7.      Jurisdiction in this matter is proper to this Honorable Court, pursuant to 28 U.S.C. §§ 1331 and 1343, with this cause of action presenting federal question jurisdiction, arising the Fourth Amendment and cognizable pursuant to 42 U.S.C. § 1983.

8.      Venue is proper to this Honorable Court pursuant to 28 U.S.C. § 1391(b), as Defendants are located within, and the events giving rise to this cause of action occurred within, the boundaries of this judicial district.

## FACTUAL ALLEGATIONS

9.      At all times relevant to this cause of action, Mr. Hunter owned Teddy, a small white dog, of the Shih Tzu breed and had owned Teddy for approximately five (5) years, starting from the time that Teddy was twelve (12) weeks old.

10.     At the time of Teddy's death, on or about May 19, 2024, Teddy weighed approximately 13 lbs., had been deaf since birth or shortly thereafter, and went partially or totally blind at a few years of age.

11.     On or about May 19, 2024, Defendant Woodson was employed as law enforcement officer by Defendant City of Sturgeon and on-duty and acting within the scope of his employment with Defendant City of Sturgeon.

12. On the evening of or about May 19, 2024, between approximately 4:30 to 5:00 p.m., a nearby neighbor (herein "the neighbor") of Mr. Hunter's noticed a small white dog (now known to have been Teddy) in her yard.

13. Upon information and belief, the neighbor gave Teddy water and got him to lay next to her while she used social media to attempt to locate Teddy's owner.

14. Upon information and belief, after spending approximately an hour with Teddy, the neighbor contacted the police department for the purposes of seeking assistance in locating Teddy's owner and ensuring that Teddy was safe and secure until his owner could be located.

15. Upon information and belief, the police dispatch officer who received the neighbor's call for assistance inquired as to whether Teddy was acting aggressively and to which the neighbor replied "No, not at all."

16. Upon information and belief, Teddy was well-known to others in the neighborhood as a happy, friendly, and well-socialized dog whom they knew and had seen walking with Mr. Hunter.

17. Based on the neighbor's call for service, Defendant Woodson was dispatched and responded to the neighbor's address.

7

18.     At approximately 5:38 p.m., Defendant Woodson arrived at the reporting neighbor's residence in a vehicle which was readily identifiable and clearly marked as belonging to Defendant City of Sturgeon.

19.     At approximately 5:38 p.m., Defendant Woodson arrived at the reporting neighbor's address attired in a uniform and clothing clearly identifying him as a police officer of Defendant City of Sturgeon.

20.     Defendant Woodson made no effort or attempt to speak to the reporting neighbor upon his arrival and/or prior to his interactions with Teddy.

21.     Upon his arrival, Defendant Woodson parked his vehicle near the neighbor's residence and/or on her property, walked to the back of his marked police vehicle, put on a pair of latex or rubber gloves, and removed a catch-pole (sometimes also referred to as a "dog snare") from his vehicle issued by and marked as belonging to Defendant City of Sturgeon.

22.     A catch-pole is a piece of equipment commonly used by animal control and police officers to safely catch and control loose dogs.

23.     A catch-pole, as its name suggests, is a long pole, which if used properly, can safely capture a loose dog (with the pole carried by Defendant Woodson being approximately 5 ½ feet to 6 feet in length). At one end of the pole, a wire is fashioned into loop or lasso for placement over a dog or animal's head and around his/her neck. The loop/lasso is connected by wire to a tension

control at the opposite end of the pole. If operated correctly, the device allows the user to first place the loop/lasso over the dog's head and then gently pull back on the tension control, thereby tightening the loop/lasso and effectively collaring and leashing the animal. While the device is simple to use, its safe and effective operation requires some basic training and requires that that the operator use two hands, with one hand guiding and steadying the pole and the other hand pulling on the wire to increase the tension and tighten the loop/lasso.

24.    At approximately 5:40 p.m., Defendant Woodson reached the area of the yard where Teddy was located.

25.    Upon reaching Teddy's location, Defendant Woodson initially attempted to capture Teddy using his catch-pole.

26.    In using the catch-pole, Defendant Woodson repeatedly did so in an improper and ineffective manner.

27.    In using the catch-pole, Defendant Woodson made numerous attempts to operate the device one-handed and/or by holding the pole loosely and casting it towards Teddy like a fishing pole rather than holding it firmly and directing it deliberately.

28.    Even though Defendant Woodson was able to direct the loop/lasso over Teddy's head on multiple occasions, the fact that he was using the catch-pole in an improper manner and often one-handed allowed Teddy to simply pull

9

his head out of the loop/lasso and walk away before Defendant Woodson could properly position his second hand on the tension control to tighten the loop/lasso.

29.     Due to Defendant Woodson's inability to properly use his catch-pole, Teddy was easily able to outsmart Defendant Woodson and evade capture.

30.     Defendant Woodson did not appear concerned or frightened by Teddy, at any time during his encounter with the little dog.

31.     Rather than appearing concerned or frightened by Teddy, Defendant Woodson appeared annoyed and frustrated by his inability to catch the little dog.

32.     Defendant Woodson's inability to catch Teddy was due to his own improper use of, and/or inability to properly use, the catch-pole.

33.     By improperly using the catch-pole, Defendant Woodson was essentially and effectively achieving nothing more than repeatedly poking at Teddy the dog with a long stick rather than properly utilizing the simple tool for its designed and intended purpose of safely capturing loose dogs.

34.     Despite Defendant Woodson repeatedly and ineffectively poking Teddy with his catch-pole, Teddy did not respond aggressively and did not even bark or growl at his provoker.

35.     Teddy did not show or display any signs of aggression towards Defendant Woodson at any point during their short, approximately three (3) minute encounter.

36.     During their approximately three (3) minute encounter, Teddy appeared disinterested in Defendant Woodson, continually attempting to simply turn and walk away from his pursuer.

37.     There were no other persons in the area or vicinity of the encounter and thus no other person(s) for whom Defendant Woodson could have had any concerns for.

38.     Due to the clear size differential between Teddy and Defendant Woodson and Teddy's small stature (i.e., being a 13 lb. Shih Tzu), Teddy could not have harmed nor presented any risk of harm to Defendant Woodson, a full-grown adult male, who was attired in full police uniform, wearing gloves, and carrying a catch-pole.

39.     After being poked with the catch-pole several times, Teddy began to trot away in order to escape his antagonist.

40.     In trotting away from Defendant Woodson, Teddy's head was completely facing away from Defendant Woodson with Teddy's rear (and most vulnerable part of his body) fully exposed to Defendant Woodson and Teddy's tail wagging in the air.

11

41.     Teddy's attempt to simply walk away from Defendant Woodson indicated a total lack of aggression on Teddy's part as well as his desire for avoidance rather than confrontation.

42.     As he walked after Teddy, Defendant Woodson audibly remarked "Maybe I'll get a blanket and just wrap you up," indicating that he perceived no threat or danger and believed that he could possibly get close enough to just reach down and safely pick Teddy up by covering him with a blanket.

43.     Despite contemplating simply using a blanket to safely capture Teddy, Defendant Woodson did not return to his vehicle to obtain a blanket but rather transferred his catch-pole from his right hand to his left hand and followed after Teddy.

44.     In transferring the catch-pole from his right to his left hand, Defendant Woodson effectively abandoned his attempts to capture Teddy, as he had flipped the catch-pole around, thereby pointing the loop/lasso (and effective end) of the catch pole away from Teddy and rendering the device utterly useless for its intended purpose of safely capturing Teddy.

45.     In transferring the catch-pole from his right to left hand, Defendant Woodson freed up his gun hand for use, with his firearm present on his right hip and with his right-hand hovering over his weapon.

46. Defendant Woodson continued to walk after Teddy, with Teddy continuing to trot away from Defendant Woodson, seemingly unaware or unconcerned with his pursuer.

47. In walking after Teddy, Defendant Woodson did so in a calm manner, even whistling and calling out to Teddy.

48. Even with Defendant Woodson following after him, Teddy showed no signs of aggression, did not turn around to face his pursuer, and did not bark or growl.

49. Rather than attempt to confront the pursuing Defendant Woodson, Teddy simply again continued to trot away, indicative again of a desire to evade rather than confront his pursuer.

50. With his longer legs and stride, Defendant Woodson was quickly able to close the short distance between himself and the fleeing Teddy.

51. Upon reaching within feet of Teddy, Defendant Woodson made no further attempts to use his catch-pole (which he had facing the wrong way rendering the device effectively useless and abandoned anyway) and instead unholstered his firearm.

52. On May 19, 2024, at 5:43:27 p.m. (five-forty-three p.m. and 27 seconds or 17:43:27 in military time), Defendant Myron Woodson – while in the employ of Defendant City of Sturgeon, while on-duty and attired in the uniform

13

of his department, and while acting under color of state law – calmly and deliberately removed his firearm from his holster and fired a single shot into Teddy from near point-blank range.

53.     At the time Defendant Woodson fired his fatal shot into Teddy, Teddy was seemingly unaware of the mortal danger presented by Defendant Woodson and was angled away from Defendant Woodson and again simply attempting to walk away.

54.     Defendant Woodson's shot caused the little dog's body to jerk backwards and fall to the ground.

55.     At the moment he shot Teddy, Defendant Woodson was not in fear for his safety or the safety of anyone else.

56.     Approximately five (5) to seven (7) seconds later, Defendant Woodson fired a second point blank shot into Teddy's body.

57.     Defendant Woodson's killing of Teddy was effectuated without a warrant or judicial authorization.

58.      There was no urgency, emergency, or exigency necessitating Teddy's destruction as Teddy was neither aggressive nor posing any threat to Defendant Woodson or anyone else.

59. Defendant Woodson knew that Teddy was not seriously injured nor had any reason to believe that Teddy was seriously injured at the time when he shot Teddy.

60. Upon hearing the shots, the neighbor exited her house onto her back porch.

61. Upset by Defendant Woodson's actions, she attempted to confront him as he walked back to his car.

62. In response to the neighbor's questioning of his actions, Defendant Woodson simply and flatly stated "I'll pick it up" while continuing to walk to his car without bothering to even look in her direction.

63. Upon information and belief, the neighbor later submitted a written statement to Defendant City of Sturgeon officials, stating "I cannot stress enough that this animal was in no way a threat to others!"

64. Upon reaching his patrol vehicle, Defendant Woodson retrieved a plastic bin from the rear of his vehicle, walked back to where Teddy's body lay in the grass, picked the little dog up by his tail, and dumped his body into the plastic bin where Defendant Woodson normally kept his food and beverages.

65. Approximately one (1) hour after shooting Teddy, Mr. Hunter went to Defendant Sturgeon's City Hall to discuss the incident with Defendant Woodson.

66. During their conversation, Defendant Woodson stated to Mr. Hunter that he had spent a "whole ten minutes" attempting to catch Teddy.

67. Defendant Woodson's statement was simply false and untrue, with the actual timing between Teddy first coming into Defendant Woodson's view from a distance of at least approximately seventy-five (75) feet or more to Defendant Woodson's firing of his fatal shot into Teddy lasting about three (3) minutes and twenty (20) seconds or less.

68. During his conversation with Mr. Hunter, Defendant Woodson stated that he did not believe that Teddy ever posed or presented any threat of harm to him.

69. While Defendant Woodson initially told Mr. Hunter that he thought Teddy was injured, he then admitted that Teddy was not showing any signs of serious injury and did not whimper when poked at with the catch pole, which Defendant Woodson acknowledged would have been the case if Teddy had actually been injured.

70. The fact that Teddy was trotting around the neighbor's backyard, had the ability to walk and trot away from Defendant Woodson, and had the ability to evade Defendant Woodson's attempts to trap him with a catch-pole were and should have been indicative to Defendant Woodson that Teddy was not injured.

16

71.    In attempting to justify his actions, Defendant Woodson stated to Mr. Hunter that "we [Defendant City of Sturgeon] don't have a freaking animal control here."

72.    In attempting to justify his actions, Defendant Woodson stated to Mr. Hunter that, even if he had been able to catch Teddy, he had no place to take him since the city did not have a pound nor was he aware of any humane society where he could have taken Teddy.

73.    Pursuant to Defendant City of Sturgeon Ordinance § 205.070(A): "Police Officers and their delegates shall serve as Animal Control Officers for the City of Sturgeon."

74.    Pursuant to Defendant City of Sturgeon Ordinance § 217.070(B), animal control officers [i.e., city police officers pursuant to § 217.070(A)] are to address and resolve lost and stray dogs as follows: "If the City shall, at that time, have and maintain a lawful animal pound, the officer shall initially impound the animal there. Otherwise, the officer shall transport the animal to the nearest Missouri Humane Society for disposition in according to its policies and rules."

75.    Defendant City of Sturgeon was clearly aware of the need for animal control and the proper resolution of issues involving lost and stray dogs, designating its law enforcement officers to fulfill that role (§ 217.070(A)); designating a place and process for where and how to house lost and stray

17

animals (§ 217.070(B)-(E); and specifying a policy and mechanism for owners to reclaim lost dogs who had been impounded by the city (§ 217.080).

76.     Contrary to Defendant Woodson's denial of the fact that Defendant City of Sturgeon had an animal control, Defendant City of Sturgeon did have animal control and, pursuant to Defendant City of Sturgeon ordinance, it was Defendant Woodson himself, as a police officer of Defendant City of Sturgeon.

77.     While speaking to Mr. Hunter, Defendant Woodson made statements indicating that he had not received, been given, or had "taken" any training regarding dogs, evaluating the condition of dogs, evaluating dog behavior, and/or basic animal control functions, including simply catching loose dogs.

78.     Defendant Woodson's improper use of the catch-pole, incompetence using the device, clear lack of understanding of how the device operated, and inability to even catch a small, blind and deaf dog with the catch pole, (particularly in that he had Teddy effectively corralled and pinned in near an abandoned vehicle with multiple opportunities to catch Teddy) displayed a clear and obvious lack of training regarding his job duties, local ordinances, and best and proper animal control practices.

79.     Defendant Woodson's lack of knowledge of where to take stray or lost dogs whom he impounded displayed a clear and obvious lack of training

18

regarding his job duties, local ordinances, and best and proper animal control practices.

80.  Upon information and belief and statements made by Defendant City of Sturgeon officials after the shooting of Teddy, Defendant City of Sturgeon had not previously provided any training to Defendant Woodson or its officers on the safe, effective, and proper performance of their animal control duties.

81.  Despite its knowledge that its officers would regularly and routinely encounter lost or stray dogs in the course of their duties, Defendant City of Sturgeon failed to properly train its officers in their animal control duties and function and, upon information and belief and Defendant Woodson's statements, failed to even provide a place for its officers to take lost or stray animals impounded pursuant to city ordinances.

82.  The fact that Defendant Woodson claimed to be unaware that he was even supposed to act as in an animal control capacity for the City (stating to Mr. Hunter that "we don't have a freaking animal control here") and claim that he had no place to take Teddy, even if he had caught him, evinces Defendant City of Sturgeon's clear lack of training of its officers and employees and utter disregard for the rights of the citizens of Sturgeon and their pets and animals.

83.  On or about May 20, 2024, Mr. Hunter filed a complaint with Defendant City of Sturgeon regarding Defendant Woodson's shooting of Teddy.

84.     On or about that same day of May 20, 2024, then-City Mayor Kevin Abrahamson released a statement that the city had "reviewed the dispatch report and body camera video" and cleared Defendant Woodson of any wrongdoing.

85.     On or about May 25, 2024, Defendant City of Sturgeon announced that Mr. Abrahamson had resigned as mayor and from the city council.

86.     In its announcement of or about May 25, 2024, the Board of Alderman acknowledged the "investigation" into Defendant Woodson's killing of Teddy had not been conducted by them and, contrary to the then-Mayor's claim that the City had reviewed the body camera video, none of the Board members had seen the body camera video prior to it being shown on the local television news, on or about May 24, 2024, and only after then-Mayor Abrahamson had already cleared Defendant Woodson of any wrongdoing.

87.     Upon information and belief, in the brief six (6) month period that Defendant Woodson had worked for Defendant City of Sturgeon, city officials had received multiple citizen complaints regarding Defendant Woodson and his job performance, including but not limited to complaints of aggressive behavior and demeanor, oppressive and improper conduct, excessive force, and other acts of disregard for the rights of the citizenry.

88.     Upon information and belief, Defendant City of Sturgeon hired Defendant Woodson despite knowledge of previous performance and/or

disciplinary issues and having been a defendant in at least one civil rights lawsuit, all while employed as a law enforcement officer and including complaints of aggressive behavior, excessive force, oppressive and improper conduct, and other acts of disregard of the rights of the citizenry.

89.     Upon information and belief, none of the citizen complaints were reviewed by the Board of Alderman.

## **LEGAL CLAIMS**

*Count I – Unlawful Seizure in Violation of the Fourth Amendment, Cognizable Pursuant to 42 U.S.C. 1983*

*Against Defendant Myron Woodson*

90.     Plaintiff Nicholas S. Hunter hereby incorporates the preceding paragraphs by reference and as if set forth fully herein.

91.     As secured and guaranteed by the Fourth Amendment to the Constitution of the United States of America, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .."

92.     As defined by the United States Supreme Court, a Fourth Amendment seizure of property occurs whenever the is "some meaningful interference with an individual's possessory interests in that property." See Soldal v. Cook Cnty., Ill., 506 U.S. 56, 61-62 (1992)(citing United States v. Jacobsen, 466 U.S. 109, 113 (1984)).

93.     As repeatedly recognized and well-established by the federal courts, the seizure of a family pet and dog by killing him/her can give to a claim for an unlawful seizure in violation of the Fourth Amendment. See Zorich v. St. Louis County, *Doc. # 114*, *Order,* p. 33 (E.D. Mo. Dec. 18, 2018)("The Eighth Circuit has held that '[a] dog is considered property for Fourth Amendment purposes.")(citing Andrews v. City of West Branch, Iowa, 454 F.3d 914, 918 (8th Cir. 2006); San Jose Charter of the Hell's Angels v. City of San Jose, California, 402 F.3d 962, 975 (9th Cir. 2005) ("We have recognized that dogs are more than just a personal effect. The emotional attachment to a family's dog is not comparable to a possessory interest in furniture.")(holding that "the killing of a person's dog constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest")(internal citations omitted).

94.     As well-established by the federal courts, warrantless searches and seizures are considered, warrantless *searches* and *searches* are *per se unreasonable* unless they fall within a one of the few and "well-defined" exception to the warrant requirements. United States v. Place, 462 U.S. 696, 700-702 (1983); See also Katz v. United States, 389 U.S. 347, 357 (1967); Robbins v. City of Des Moines, 984 F.3d 673, 680 (8th Cir. 2021)(citation omitted).

95.     On or about May 19, 2024, Plaintiff Hunter was the lawful owner of Teddy, Plaintiff Hunter's pet and companion animal, and Plaintiff Hunter had

protected Fourth Amendment rights in Teddy as his property and constitutional effect.

96.     On or about May 19, 2024, Defendant Myron Woodson, while acting under color of state law, meaningfully interfered with Plaintiff Hunter's protected possessory interests in Teddy by shooting and killing the little dog.

97.     Defendant Woodson's killing of Teddy was effectuated in the absence of a lawfully issued warrant and/or without judicial authorization, thereby rendering his actions presumptively *per se* unreasonable.

98.     Teddy, at no time on or about May 19, 2024, posed or presented any danger to Defendant Woodson nor anyone else.

99.     Rather than resorting to shooting and killing Teddy, Defendant Woodson would have been able to be capture the small, blind and deaf, dog with less-intrusive and non-lethal methods, including through the proper and reasonable use of the catch-pole, which Defendant Woodson had on hand, or even simply throwing a blanket over the little dog, which Defendant Woodson audibly contemplated.

100.    Based on the facts and circumstances of this matter, Defendant Woodson is not entitled to any claim of qualified immunity as it is clearly well-established within this Circuit as well as other circuits that "an officer commits an unreasonable, warrantless seizure of property, in violation of the Constitution,

23

when he shoots and kills an individual's family pet when that pet presented no danger and when non-lethal methods of capture would have been successful." <u>Andrews v. City of West Branch, Iowa</u>, 454 F.3d 914, 918 (8th Cir. 2006)(citing <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 210-11 (3rd Cir. 2001); <u>Fuller v. Vines</u>, 36 F.3d 65, 68 (9th Cir. 1994)).

101.   As a direct and proximate result of Defendant Woodson's conduct and action, Plaintiff Hunter has suffered and continues to suffer injuries and damages, including but limited to: infringements and deprivations of his constitutional rights; great fear for his liberty and security; pain of the mind as well as the body; mental anguish and distress anxiety; injury to his faith in his society; and consternation.

102.   The acts of Defendant Woodson, as described herein, were intentional, wanton, malicious, oppressive, reckless, outrageous, and/or callously indifferent to the rights of Plaintiff Hunter, thus entitling him to an award of punitive damages against Defendant Woodson.

103.   As a result of Defendant Woodson's unlawful actions and infringements of his protected rights, Plaintiff Hunter has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE Plaintiff Nicholas S. Hunter respectfully prays that this Court enter judgment in his favor, under 42 U.S.C. §§ 1983 and 1988, against Defendant Myron Woodson, in his individual capacity, and award Plaintiff Hunter any and all compensatory damages, pre-judgment interest, post-judgement interest, punitive damages, attorneys' fees, expenses, costs, and any other such relief to which he is entitled and that this Court deems just, appropriate, and consistent with the important purposes of 42 U.S.C. § 1983.

*Count II – Municipal ("Monell") Liability*

*Against Defendant City of Sturgeon, Missouri*

104.   Plaintiff Nicholas S. Hunter hereby incorporates the preceding paragraphs by reference and as if set forth fully herein.

105.   As described herein, Defendant Myron Woodson, while acting under color of state law, deprived Plaintiff Nicholas Hunter of his rights, privileges, and immunities as secured by the Constitution of the United States of America in the unlawful seizure of Teddy, Plaintiff Hunter's pet and companion animal, by shooting killing him.

106.   Defendant City of Sturgeon's training program and disciplinary policies regarding its police and animal control operations was non-existent, inadequate, and/or failed to provide Defendant Woodson and city employees with the necessary knowledge and skills to carry out their duties (including that

they operated as animal control), and/or allowed them to routinely violate the rights of individuals without fear of repercussion or sanction, including but not limited to failures to train Defendant Woodson on the proper use of a catch-pole and the proper process and procedures for impounding animals and failures to maintain a reasonable and adequate disciplinary process.

107.   Defendant City of Sturgeon knew that its police officers and city employees and staff would routinely be in a position of responding to calls and reports of lost or stray animals.

108.   By failing to properly train its officers and employees regarding these encounters, Defendant City of Sturgeon acted with deliberate indifference to the fact that its failure to provide such training, supervision, and discipline would result in the unlawful killings and deaths of family pets and, thereby, result in deprivations of the constitutional rights of the citizenry, such as those suffered by Plaintiff Hunter.

109.   As a direct and proximate consequence of the acts of Defendant City of Sturgeon, Plaintiff Hunter has suffered and continues to suffer damages in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Fourth and Fourteenth Amendments and as protected by 42 U.S.C. § 1983.

110.   As the result of the actions of the individually-named Defendant Woodson and Defendant City of Sturgeon, Plaintiff Hunter has suffered and

26

continues to suffer injuries and damages, including but limited to: infringements and deprivations of his constitutional rights; great fear for his liberty and security; pain of the mind as well as the body; mental anguish and distress anxiety; injury to his faith in his society; and consternation.

111.    As a result of Defendant City of Sturgeon's unlawful actions and infringements of his protected rights, Mr. Hunter has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE Plaintiff Nicholas S. Hunter respectfully prays that this Court enter judgment in his favor, under 42 U.S.C. §§ 1983 and 1988, against Defendant City of Sturgeon, and award him any and all compensatory damages, attorneys' fees, expenses, costs, and any other such relief to which he is entitled and that this Court deems just, appropriate, and consistent with the important purposes of 42 U.S.C. § 1983.

Respectfully submitted on this 28th day of May, 2024.

/s/ Eric C. Crinnian
Eric C. Crinnian, MO 66536
The Crinnian Law Firm, LLC
9212 N. Garfield Ave.,
Kansas City, MO 64155
Tel: (816) 459-0649
eric@crinnian.law

27

_/s/ Daniel J. Kolde_
Daniel J. Kolde, #64965
9506 Olive Blvd., # 418
Olivette, MO 63132
Tel: (636) 675-5383
daniel.kolde.law@gmail.com

_(Mr. Kolde's application for admission pro hac vice to be filed with the Court)_

28