**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| NICHOLAS HUNTER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-CV-04081-WJE |
| | ) | |
| MYRON WOODSON, and | ) | |
| CITY OF STURGEON, MISSOURI | ) | |
| | ) | |
| Defendants. | ) | |

## SUGGESTIONS IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Nicholas Hunter offers the following suggestions in support of his motion for summary judgment.

Respectfully submitted,

*/s/ Eric C. Crinnian*
Eric C. Crinnian, MO 66536
The Crinnian Law Firm, LLC
9212 N. Garfield Ave.,
Kansas City, MO 64155
Tel: (816) 459-0649
eric@crinnian.law
**COUNSEL FOR PLAINTIFF**
**NICHOLAS HUNTER**

## Statement of Uncontroverted Material Facts

### *Plaintiff Nicholas Hunter*

1.    Plaintiff Nicholas Hunter is a resident of Sturgeon, Missouri, and resided there at the time of the shooting at issue. Deposition of Nicholas Hunter, attached as Exhibit 1, 7:1-5.

2.    As of May 19, 2024 (the date of Teddy's death) Mr. Hunter was the owner of a small, white Shih-tzu dog named "Teddy." Ex. 1, 40:3-15, 85:2-14.

3.    Teddy was approximately five years old at the time of his death. Ex. 1, 85:9-14.

4.    Teddy was born with neurological issues that resulted in deafness at birth, and which developed into slight head tremors and significant blindness. As a result of his neurological issues, Teddy walked with his head turned. Ex.1, 33:6-44:15

### *Defendant Myron Woodson*

5.    Defendant Woodson became an officer for Hallsville, Missouri in November 2022. Deposition of Myron Woodson, attached as Exhibit 2. 34:5-7.

6.    Defendant Woodson was hired by Defendant City of Sturgeon and began work as a police officer on or about September 11, 2023. Ex. 2, 9:13-15.

7.    Defendant Woodson knew animal control duties were within the scope of his job responsibilities as an officer for the City of Sturgeon. Ex. 2, 37:16-19, 112:15-113:24, 115:6-16; Woodson Admission #1.

8.    Defendant Woodson has no veterinary training. Ex. 2, 11:9-11.

9.    Defendant Woodson has no professional training in animal abuse or cruelty aside from an investigations class at the academy that included a section on animal issues. Ex. 2, 118:14-119:7.

10. Defendant Woodson has no formal training on rabies or rabies recognition in dogs. Ex. 2, 21:6-22.

11. Defendant Woodson's only education on rabies came twenty years ago as part of training with an animal rescue. Ex. 2, 117:13-118:1.

12. Defendant Woodson's only knowledge of rabies symptoms is "pretty much stuff you got on the cartoons" like foaming at the mouth. Ex. 2, 21:23-22:9.

*Defendant City of Sturgeon, Its Police, and Its Policies*

13. Defendant Sturgeon is a "fourth class" city under the laws of the State of Missouri that operates with a Mayor and Board of Aldermen. Deposition of Corporate Representative, attached as Exhibit 3, 11:12-12:8.

14. Defendant Sturgeon's Mayor and Board of Aldermen are its final policymakers. Sturgeon Response to Request for Admission, attached as Exhibit 5, ¶25-26

15. Sturgeon's board of aldermen was responsible for the hiring and termination of city employees, including police officers. Ex. 3, 8:13-17.

16. Sturgeon's mayor was responsible for the daily operation of the city. Ex. 3, 8:1-7.

17. Sturgeon's mayor was responsible for the police department's operations, including supervisory oversight and discipline. Ex. 3, 8:1-7.

18. Following a lawsuit by the prior Sturgeon Chief of Police, the city went without its own law enforcement until 2022. Deposition of Kevin Abrahamson, attached as Exhibit 6, 10:9-16.

19. Defendant City of Sturgeon hired Thomas Crawford, who began working as its sole officer, in August 2022. Deposition T. Crawford, attached as Ex. 7, 14:5-9.

20. Thomas Crawford is the son of Dorrie Crawford, a board of aldermen member during the time of this incident. Ex. 7, 24:5-7

21. Then-Officer Crawford answered directly to then-Mayor Kevin Abrahamson. Ex. 7, 16:5-16.

22. Defendant City of Sturgeon wanted to rebuild its police department and needed a supervisor, resulting in Crawford's promotion. Ex. 7, 16:20-17:20.

23. Defendant City of Sturgeon promoted Thomas Crawford from officer to Sergeant on July 1, 2023. Ex. 7, 16:2-19.

24. Sergeant Crawford was responsible for supervising and training his subordinate officers, including Defendant Woodson. Ex. 7, 33:8-13.

25. Sergeant Crawford continued reporting directly to Mayor Abrahamson. Ex. 7, 25:10-19.

26. Defendant Sturgeon's Police Department manual was created by Sergeant Crawford. Ex. 7, 62:23-24.

27. Sergeant Crawford was given the authority to create the manual by Mayor Kevin Abrahamson. Ex. 7, 70:1-3.

28. Sergeant Crawford has no training or experience writing police manuals. Ex. 7, 62:25-63:5.

29. To create Defendant Sturgeon's police manual, Sergeant Crawford took the Hallsville police manual and changed "Hallsville" to "Sturgeon." Ex. 7, 62:13-24, 63:24-64:6, 64:23-65:1, 69:20-25; Ex. 2, 116:12-117:1.

30. Sergeant Crawford believes the Hallsville policies were written by Hallsville's Chief Bryan Schultz and then-Sergeant Jeff Voss. Ex. 7, 64:12-22.

4

31. Bryan Schultz and Jeff Voss became reserve officers for Sturgeon under Crawford's supervision in August 2023. Ex. 7, 18:7-14.

32. Sergeant Crawford was under the impression that the policies were constitutionally or legally sound because they came from another department's policy manual. Ex. 7, 65:2-9.

33. Sergeant Crawford has no formal training in constitutional law. Ex. 7, 63:6-10.

34. Sergeant Crawford was unsure if the law treats wild animals differently than owned pets. Ex. 7, 67:5-9.

35. Sergeant Crawford was unaware that people's animals were property for the purposes of the Constitution until he was informed after this incident. Ex. 7, 67:5-24.

36. Despite creating the police policies for Defendant Sturgeon, Sergeant Crawford can only recall the "gist" of when it is acceptable to shoot an animal under the policy. Ex. 7, 66:10-18.

37. Sergeant Crawford's understanding is the Sturgeon policy permits an officer to euthanize an injured or hurt animal, "like you do with a deer." Ex. 7, 66:19-67:1.

38. Sergeant Crawford does not recall any limitations in the policy on how serious an injury must be to merit euthanasia. Ex. 7, 67:2-4.

39. Defendant Sturgeon's police policy on shooting animals states: "Officers may use deadly force to destroy an animal that represents a threat to public safety or as a humanitarian measure where the animal is seriously injured, when the officer reasonably believes that deadly force can be used without harm to the officer or others." Ex. 5, #12.

40. Sergeant Crawford knows that internal policies are different from laws. Ex. 7, 65:10-13.

*Animal Control*

41. Defendant City of Sturgeon has, by ordinance, designated its police officers to also serve as animal control officers. Ord. 205.070(A), attached as Exhibit 8; Ex. 5, #1.

42. Sturgeon's ordinance provides for the police officer, as animal control, to take possession of animals at large and impound them with the city pound or the nearest Humane Society. Ex. 8; Ex.5, #2

*43.* Defendant Sturgeon's police department "typically would get at least one or two calls a week" for animal control calls. Ex, 7, 29:10-15.

44. Defendant Sturgeon has also, by ordinance number 960 enacted October 23, 2023, entered into and executed an "Animal Control Enforcement Cooperative Agreement" with Boone County, Missouri to provide limited animal control services. Cooperative Agreement, attached as Ex. 9; Ex. 5, #4

45. The Cooperative Agreement's "service expectations" allows Sturgeon PD to meet Boone County Animal Control officers in Columbia to transfer "any dog that Sturgeon PD has impounded." Ex. 9, p. 4; Ex. 5, #5; Ex. 7, 79:15-80:4; Ex. 6, 48:1-6.

46. The Cooperative Agreement's "service expectations" provides Boone County Animal Control "…will respond to animal control service requests from Sturgeon Police Department only; County will not respond to calls directly from citizens of Sturgeon." Ex. 9, p. 4; Ex. 6,. 47:11-25

47. The Cooperative Agreement provides emergency response by Boone County Animal Control "…upon request from Sturgeon PD…with emergencies such as… injured animals." Coop Agreement p. 4; Ex. 6, 48:7:22.

48. Defendant Sturgeon's Ordinance 960 also adopts, verbatim, Chapter 2 of the Boone County Health Regulations ("BCHR"), which deals with animal control. Ex. 5, #6.

49. BCHR provides for impoundment and redemption of animals, including those found off the owner's property. Ex. 5, #7.

50. BCHR provides for observation of animals that have bitten or injured humans to see if they develop rabies symptoms. Ex. 5, #8.

51. BCHR provides for isolation and quarantine of animals for observation for communicable diseases regardless of whether the animal has bitten or injured a human. Ex. 5, #9.

52. BCHR does not provide for an animal control officer to immediately kill or euthanize an animal suspected of rabies, other illness, or injury. Ex. 5, #10.

53. No Sturgeon ordinances provide authority for an officer to immediately kill an animal solely on suspicion of rabies, other illness, or injury. Ex. 5, #11.

54. To help perform their animal control duties, Defendant Sturgeon provided its officers a Ketch-All brand extendible/collapsable "catch pole" to safely secure animals from a distance. Ex. 5 #23; Deposition of James Crosby, attached as Exhibit 10, 50:6-18; Ex. 2, 104:3-5.

55. Catch poles, including the one used by Defendant Woodson, operate via an adjustable loop at one end of a pole, with the free end running through the back of the pole to create a means of tightening or loosening the loop. Ex. 10, 50:6-23.

56. To close the loop at the end of the catch pole and ensnare the animal, the user simply pulls the cord on the back of the pole. Ex. 7, 32:14-17; Ex. 10, 10:8-10, 50:6-23, 61:24-62:9; Ex. 3, 107:15-23.

57.    To open the loop at the end of the catch pole, the user pulls a knob on the back of the

pole, which mechanically springs the loop open. Ex. 10, 61:24-62:9, 65:15-22; Ex. 3,

107:15-23.

*Defendant Sturgeon Did Not Train Defendant Woodson*

58.    Sergeant Crawford was aware of the police department's animal control responsibilities.

Ex. 7, 79:15-25.

59.    Sergeant Crawford was aware of the Sturgeon-Boone Cooperative Agreement for animal

control services. Ex. 7, 79:15-25.

60.    Sergeant Crawford was aware of his designated responsibility to train Defendant

Woodson. Ex. 7, 33:8-10.

61.    Defendant Woodson was completely unaware of the agreement with Boone County,

Missouri for provision of animal services. Ex. 2, 38:2-39:10.

62.    Defendant Woodson was aware that he could take animals from Sturgeon and meet

Boone County Animal Control in Columbia. Ex. 2, 38:21-39:10; Ex. 7, 79:11-80:15.

63.    Defendant Woodson believed Boone County only accepted animals from Sturgeon as a

courtesy. Ex. 2, 38:21-39:10.

64.    Defendant Sturgeon did not train Defendant Woodson to perform his animal control

duties, including impounding stray animals. Ex. 2, 25:5-7, 115:24-116:1; Admissions of

Myron Woodson, attached as Exhibit 3, #2; Ex. 5, #21

65.    Defendant Woodson was not trained on the Sturgeon police department policy on

shooting animals. Ex. 2, 25:8-14, 37:13-15, 116:2-11.

66.    Defendant Woodson did not personally review Sturgeon department policy on shooting

animals. Ex. 2, 116:22-117:3.

67. Defendant Woodson was never shown the Sturgeon policy on shooting animals. Ex. 2, 25:8-14.

68. Defendant Woodson knew that shooting an animal was the "last option," even though it was not written in the department policies. Ex. 2, 14:14-20.

69. Sergeant Crawford did not train Defendant Woodson how to use his city-issued catch pole. Ex. 2, 98:19-99:3, 115:21-23, 117:4:12; Ex. 3, Nos. 4-5; Ex. 5, #24

70. Defendant Woodson never asked for additional training regarding his animal control duties or use of the catch pole. Ex. 2, 129:9-12.

71. Defendant Woodson did not learn how to operate a catch pole until June 4, 2025 when he was taught by Plaintiff's counsel at his deposition. Ex. 2, 101:14-20, 107:15-108:23.

### *Defendant Sturgeon Did Not Supervise or Discipline Defendant Woodson*

72. Defendant Woodson was an "at-will employee" and could be terminated for any reason. Ex. 4, 19:15-20:1; Personnel Policy, attached as Ex. 11.

73. Defendant Woodson was a probationary employee for his first year of employment with Sturgeon. Ex. 5, #19; Ex. 7, 76:8-15; 7/067

74. Sergeant Crawford was responsible for coaching Defendant Woodson and correcting his deficiencies. Ex. 11.

75. Defendant Sturgeon had a progressive discipline policy consisting of a verbal warning, a written warning, suspension, and dismissal. Ex. 11

76. Defendant Sturgeon's personnel policy provides grounds for disciplinary action including: "deliberate incompetence," "acts of insubordination," "intentional failure or refusal to carry out instructions," "acts of misconduct while on duty," "falsification of

any information required by the City," and "causing or contributing to a hostile work environment." Ex. 11.

77. Defendant Woodson had immediate and ongoing issues and deficiencies with his report writing. Ex. 7, 50:13-15, 53:3-13.

78. Defendant Woodson received only verbal coaching, with no written documentation, regarding his report writing while employed by Sturgeon. Ex. 7, 60:5-14

79. Defendant Sturgeon began receiving complaints about Defendant Woodson nearly immediately after his hiring. Ex. 7, 21:10-16.

80. Complaints about Defendant Woodson were kept separately from his regular employee file. Ex. 7, 22:2-7.

81. Sergeant Crawford substantiated two of these early complaints against Defendant Woodson. Ex. 7, 22:8-16.

82. Defendant Sturgeon received two citizen complaints about Defendant Woodson in October 2023. October Complaints, attached as Exhibit 12; Ex. 7, 90:13-15.

83. On October 10, 2023, a citizen filed a complaint (the "Baker" complaint) alleging that, two weeks prior, Defendant Woodson harassed her seventeen-year-old son and his friend. Baker Complaint, attached as Ex. 13.

84. The Baker complaint alleged Defendant Woodson pulled the teens over, behaved aggressively, used profanity, and ordered the teens out of the car before searching it. Ex. 13.

85. The Baker complaint further alleged Defendant Woodson was "bragging to everyone inside Casey's [General Store]" about the way he treated the teens. Ex. 13.

86. The Baker complaint further alleged Defendant Woodson, on October 9, harassed her son again while he was at the park with the same friend. Ex. 13.

87. The Baker complaint alleged on October 9, Defendant Woodson assaulted her son's friend by reaching into the vehicle and yanking his phone out of his hands. Ex. 13.

88. The other teen's parents also complained (the "Roark" complaint) about Defendant Woodson reaching into the vehicle and forcibly removing the teen's phone from his hand. May 28 Meeting Minutes, attached here as Exhibit 14; Ex. 7, 81:25-82:13.

89. Defendant Sturgeon's Mayor and Board of Aldermen were contemporaneously aware of these complaints. Ex. 12.

90. Mayor Abrahamson told Sergeant Crawford to deal with the complaints. Ex. 12.

91. Mayor Abrahamson told Alderwoman Dorrie Crawford the board did not need to get involved in the complaints and that Sergeant Crawford was handling it. Ex. 12.

92. Sergeant Crawford determined Defendant Woodson's taking of the phone was "a clear violation." Ex. 7, 82:2-10

93. Defendant Woodson received only verbal coaching for seizing the phone and searching the teens, with no written notes, documentation, or discipline recorded in his file. Ex. 7, 81:25-82:13.

94. Defendant Sturgeon received another written citizen complaint about Defendant Woodson in December 2023 (the "Richards" complaint). Richards Complaint attached here as Exhibit 15.

95. The Richards complaint alleged Defendant Woodson came to the door of a citizen's home, made her move a vehicle, then pulled her over and falsely accused her of driving with a suspended license. Ex. 15.

96. The Richards complaint against Defendant Woodson included an offer for her to discuss other negative interactions with Woodson that were not the subject of her complaint. Ex. 15.

97. In response to the Richards complaint, Sergeant Thomas Crawford emailed and asked, "What would you like me to do?" Ex. 14.

98. Despite also reaching out to the mayor, the Richards complainant did not get a response. Ex. 14.

99. Defendant Woodson received only verbal coaching, with no written notes, documentation, or formal discipline for any complaints about him. Ex. 7, 91:6-13.

100. Defendant Woodson received only verbal coaching, with no written documentation, for the way he often spoke to and treated citizens. Ex. 7, 28:7-29:2.

## *May 19, 2024*

101. The afternoon of May 19, 2024, Mr. Hunter put Teddy and his other dog, Gizmo, in an outdoor kennel enclosure and went to Columbia, Missouri for dinner. Ex. 1, 15:14-25; 17:9-13.

102. Unbeknownst to Mr. Hunter, Teddy escaped the kennel while he was away. Ex. 17:9-15.

103. Tiffany Ware, a resident at North Fairgrounds Road, found Teddy on her property and observed he may be blind because he was bumping into things. Declaration of Tiffany Ware, attached here as Exhibit 16, ¶ 3.

104. Ms. Ware provided Teddy water and sat with him. Ex. 16, ¶ 3.

105. Ms. Ware thought did not observe any active bleeding, obvious wounds, or difficulty moving. Ex. 16, ¶ 3;

106. Ms. Ware did not observe Teddy making any sounds to indicate he was in any pain, discomfort, or suffering. Ex. 16, ¶ 3.

107. Ms. Ware set about trying to find his owner by taking pictures and posting them on Facebook, which were re-shared by the City of Sturgeon on its Facebook page. Ex. 16, ¶ 4

108. When she was unable to locate Teddy's owner, Ms. Ware contacted the Boone County Joint Communications non-emergency line to request an officer to come get him. Ex. 16, ¶ 5.

109. Ms. Ware repeatedly informed the dispatcher that Teddy appeared blind and was in no way dangerous or aggressive. Ex. 16, ¶ 5.

110. Ms. Ware never told the dispatcher she could not be contacted by the responding officer. Ex. 16, ¶ 5.

111. Joint Communications dispatched Defendant Myron Woodson, then employed by and on duty for Defendant City of Sturgeon, to respond to Ms. Ware's address. Ex. 2, 9:9-19.

112. The call involving Teddy was Defendant Woodson's second animal call of the day, and fourth of that week. Dispatch Logs, attached here as Exhibit 17.

113. The dispatch report Woodson received indicated Teddy's behavior was "NON-DANGEROUS," that he was "very small," and that he "looks blind in one eye, running into trees and walking sideways." Woodson 55:15-24; Woodson 56:17-57:11.

114. Defendant Woodson's response to Ms. Ware's call and his interaction with Teddy were captured by his body camera. Body Camera Video, attached here as Exhibit 18.

115. Defendant Woodson arrived and parked at Ms. Ware's home at 5:38 p.m. Ex. 18, 0:20.

116. Defendant Woodson removed his phone from a holder on the dashboard and exited his vehicle. Ex. 18, 0:26

117. Defendant Woodson approached the back of his police cruiser, donned black nitrile gloves, and retrieved his city-issued catch pole. Ex. 18, 0:54.

118. Defendant Woodson carried his catch pole west across Ms. Ware's property toward a field and spotted Teddy seconds before 5:40 p.m. Ex. 18, 1:57.

119. Defendant Woodson whistled and made noises as he approached Teddy to get his attention, but Teddy did not respond. Ex. 18, 2:28

120. Teddy was trotting around in the field without difficulty, without making any sounds, and with no obvious signs of injury or distress. Ex. 18, 2:21; Ex. 10, 20:16-21:15.

121. Despite no obvious injuries, Defendant Woodson wondered out loud to himself, "What the fuck happened to you?" Ex. 18, 2:25

122. Defendant Woodson followed Teddy for a few more seconds, observed him trotting away from him, then remarked, "Neck's broken?" Ex. 18, 2:34

123. Defendant Woodson was a medic in the military but does not have veterinary training. Ex. 2, 11:4-11.

124. Defendant Woodson does not know how a person or animal with a neck injury behaves. Ex. 2, 104:22 – 105:3.

125. Defendant Woodson knows neck injuries require head support and immobilization. Ex. 2, 105:4-9.

126. Despite having just mentioned a possible broken neck, Woodson pursued Teddy and began attempting to use the catch pole by placing the loop around his neck. Ex. 18, 2:47

127. For approximately two minutes, Defendant Woodson repeatedly tried to get the loop of the catch pole around Teddy's neck or body. Ex. 18, 2:47 – 4:54.

128. When Woodson succeeded at getting the loop over Teddy he failed to close the loop - resulting in Teddy repeatedly escaping. Ex. 18, 2:47 – 4:54.

129. Woodson could not close the loop because he thought the device worked by extending and collapsing the pole to open and close the loop. Ex. 18,2:47 – 4:54; Woodson 103:2-8, 104:3-5.

130. Defendant Woodson failed to properly close the loop and safely capture Teddy because he was "unaware" of how to do so and "did not know how to use the equipment." Ex. 2, 117:4-12, 127:2-13.

131. While attempting to secure Teddy, Woodson told Teddy, "Just get in there. Come on, baby, something's fucked you up, I'm gonna take you to get help." Ex. 18, 3:03

132. Defendant Woodson then followed Teddy, got the loop over his head, and again failed to close the loop, allowing Teddy's escape. Ex. 18, 3:21

133. During one attempt at incorrectly using the pole, Woodson accidentally pulled the pole apart, requiring him to reassemble it. Ex. 18, 3:35; Ex. 2, 103:24-104:7.

134. Woodson then began repeatedly attempting to use the pole one-handed, no longer trying to close the loop. Ex. 18, 3:44; Ex. 2, 104:8-15, 105:18-23.

135. After more failed attempts at capturing Teddy, Defendant Woodson remarked, "Maybe get a blanket, just wrap you up." Ex. 18, 4:40.

136. Defendant Woodson then got the loop over Teddy's neck and again reached down to collapse the pole – which failed to close the loop. Ex. 18, 4:46. Ex. 2, 106:14-21.

137. After failing, Woodson remarked, "Ah, you're smooth as hell," transferred the catch pole to his left hand (facing the loop away), and began following Teddy as he walked away from Woodson. Ex. 18, 4:48; Ex. 2, 106:22-25.

138. Defendant Woodson followed Teddy around the field for approximately forty more seconds before standing over him and unholstering his service weapon. Ex. 18, 5:27.

139. Defendant Woodson's first shot did not instantaneously kill Teddy, so he fired a second shot. Ex. 18, 5:31; Ex. 2, 64:23-65:5; Original incident report, attached here as Exhibit 19.

140. The entire interaction from the time Woodson spotted Teddy to the time he fired his first shot was approximately three minutes and thirty seconds. Ex. 18, 1:57-5:27

141. Defendant Woodson then returned to his vehicle, placed his catch pole in the back seat, contacted dispatch, and retrieved a black plastic tote from the back. Ex. 18, 6:14

142. Defendant Woodson returned to the field with the tote, placed Teddy's corpse inside it, and returned to his vehicle, placing the open tote with Teddy's body in the back. Ex. 18, 7:40, Woodson 65:14-17, Ex. 16, ¶ 6.

143. Defendant Woodson previously denied disposing of Teddy's body in an outdoor area. Woodson Admissions #17.

144. Officer Woodson told Sergeant Crawford he took Teddy's body outside of city limits and "tossed him into the woods," but did not want to tell him exactly where so Crawford would not know. Crawford 108:16-109:24.

145. Comments by users on the City's Facebook page also alleged Woodson disposed of Teddy in a ditch; those comments and the posts they were made on have been deleted by Defendant City of Sturgeon. Ex. 16, ¶ 14.

146. Defendant Woodson claims he drove outside city limits and placed the open tote with Teddy's body outside of an abandoned building before returning to the Sturgeon police department to call Sergeant Crawford. Woodson 65:18-67:10, 68:13-16.

147. Defendant Woodson claims he was going to retrieve Teddy's body after he discussed next steps with Sergeant Crawford, but cannot explain why he did not just take the body to Sturgeon PD. Ex. 2, 69:17-70:5, 71:6-18.

148. While Plaintiff was in Columbia, he was contacted by a friend who saw the Facebook post by Ms. Ware regarding Teddy, prompting Plaintiff to immediately leave to return home. Hunter Depo. 21:7-20, 22:3-12.

149. While en route, Plaintiff received a second phone call from his friend, who saw on Facebook that Teddy had been shot and killed. Hunter Depo. 22:19-23:8.

150. Plaintiff then called the Sturgeon Police Department and spoke to Defendant Woodson, who told Plaintiff if he wanted to talk about the incident, they could meet at the police station and Woodson would issue him a citation. Woodson hung up on Plaintiff. Hunter Depo. 23:18-24:8.

151. Plaintiff went to the police station and recorded his interaction with Defendant Woodson. Hunter Depo. 24:9-22.

152. Plaintiff asked Defendant Woodson for information about the incident, specifically why he used lethal force. Hunter Depo. 24:23-25:5.

153. During the interaction, Woodson admitted Teddy had not shown any aggression, that Woodson was not in fear, and stated, "we don't have freaking animal control."

154. Defendant Woodson then drove to where he left Teddy's body, retrieved it, drove back to the station, and returned it to Mr. Hunter. Ex. 2, 69:7-13.

155.    Defendant Woodson completed his incident report for the shooting on the evening of May

19 and sent it to Sergeant Crawford. Ex. 2, 55:4-11, 72:10-20.

156.    Defendant Woodson's incident report includes the dispatch information that Teddy

appeared blind because he was running into trees and walking sideways, behaved non-

dangerously, and was very small. Ex. 19,.

157.    The incident report references an unknown white male who flagged down Defendant

Woodson and told him, "the dog looks injured, and I can't bring myself to… it," implying

putting Teddy down. Ex. 19,; Ex. 2, 57:15-24.

158.    Defendant Woodson says the statement from the unknown male was a direct quote.

57:18-20.

159.    Defendant Woodson insists he had the conversation with the white male across the street

from Ms. Ware's residence immediately after turning his police cruiser around. Woodson

57:25-58:25, 59:11-60:13, 94:22-95:9

160.    Defendant Woodson's body-worn camera captures Woodson turning his police cruiser

around, and he does not speak to anyone while approaching Ms. Ware's house. Ex. 18,

0:00 – 0:20; Woodson 93:6-18.

161.    Defendant Woodson's body camera captured the street and homes across from Ms.

Ware's property and revealed there was nobody – including the unknown white male –

outside. Ex. 18, 0:30; Woodson 95:18-96:6.

162.    Defendant Woodson's only observations of Teddy's physical condition in the incident

report were that Teddy's tongue was hanging out, he appeared disoriented and was

walking into things, and he had mud and blood "throughout" his fur. Ex. 19,.

163. Defendant Woodson's report says he did not use his hands to pick up Teddy because he did not know if Teddy would bite him. Ex. 19,.

164. Defendant Woodson's report says he shot Teddy because he did not know Teddy's medical situation or who his owner was. Ex. 19,.

165. Defendant Woodson's report does not mention rabies or illness. Ex. 19,; Ex. 2, 76:18-20.

166. Defendant Woodson's report does not mention what he did with or where he took Teddy's body. Ex. 19,; Ex. 2, 77:23-78:2.

167. Defendant Woodson sent his report to Sergeant Crawford, who did not approve the report and told him to "elaborate more." Ex. 2, 72:18-25.

168. Sergeant Crawford provided Woodson's un-edited report to the Mayor and City Attorneys on May 23 at 2:06 p.m. in response to an open records request. Emails attached here as Exhibit 20.

169. Defendant Woodson sent an updated report to Sergeant Crawford at 2:54 p.m. on May 23, which Crawford then forwarded to the Mayor and City Attorneys, calling it "an updated report, cleaned up a little bit." Ex. 20.

170. Defendant Woodson initially testified he wrote the updated report himself, and that Sergeant Crawford edited and approved it. Ex. 2, 73:10-24.

171. The updated report was not rewritten solely by Defendant Woodson, but by Chief Bryan Schultz (Hallsville PD) and Chief Jeff Voss (Ashland PD), who were not in the Sturgeon chain of command. Ex. 2, 87:5-88:14.

172. The updated report maintained the story about the unknown white male. Ex. 21, ; Ex. 2, 74:5-8.

173. The updated report added that Teddy "appeared to be suffering from possible injuries in [his] neck and facial area," which was not in the prior report. Updated incident report, attached here as Ex. 21; Ex. 2, 74:17-21.

174. The updated report added that Defendant Woodson suspected Teddy was infected with rabies and abandoned by his owner because of his "strange behavior" and "overall unkept appearance," which was not in the prior report. Ex. 21; Ex. 2, 74:22-75:6.

175. Regarding why Defendant Woodson did not attempt to pick Teddy up, the updated report changed "Not knowing if the dog would bite me" to "Due to my suspicions" regarding rabies. Ex. 21, ; Ex. 2, 74:13-16, 74:22-75:2.

176. The updated report changed Woodson's reason for shooting Teddy from "not knowing the medical situation of the animal and not knowing who the owner of the dog was" to "Fearing that the dog would possibly bite a citizen and having no other recourse at hand." Ex. 21, ; Ex. 2, 75:11-14.

177. The updated report added that Defendant Woodson put Teddy in a plastic tote and "transported it to an area away from a residential or occupied area, where I disposed of it." Ex. 21, .

178. The updated report added that Defendant Woodson thought Teddy had been thrown from a moving vehicle. Ex. 21, ; Ex. 2, 75:7-10.

179. The City Attorney expressed concern to the Mayor and Sergeant Crawford about defending the statement that Teddy had been thrown from a car and did not want competing versions of the incident report. Additional emails attached here as Exhibit 22.

180. Mayor Abrahamson replied to the City Attorney that he was also confused, as it was the first time he heard the allegation Teddy was thrown from a vehicle. Ex. 22.

181.    The City Attorney told Mayor Abrahamson "It seems convenient to include that in his report now" and suggested they follow up with Crawford to explain himself. Ex. 22.

182.    Sergeant Crawford told the City Attorney they could use whichever version of the report sounded better. Ex. 22.

183.    The City Attorney told Sergeant Crawford to use the revised one if it was true, but use the original if the language about Teddy being thrown from a vehicle was "included to cover ourselves." Ex. 22.

184.    The City Attorney told Sergeant Crawford "the revised one seems suspicious and will invite criticism." Ex. 22.

185.    Sergeant Crawford agreed with the City Attorney's assessment that the updated report was suspicious and would invite criticism. Ex. 7, 47:23-58:17.

186.    Sergeant Crawford never followed up regarding the unknown white male witness referenced in Defendant Woodson's reports. Ex. 7, 61:14-62:1.

187.    Sergeant Crawford never followed up about the allegation in the second report about Teddy being thrown from a vehicle.

*Defendant Woodson's Bases for Killing Teddy*

188.    Defendant Woodson did not resort to lethal force because Teddy behaved aggressively. Ex. 2, 62:10-13, 64:11-13, 76:3-5, 119:8-120:15

189.    Defendant Woodson did not resort to lethal force because he believed Teddy posed an imminent threat to him. Ex. 2, 22:23-23:11.

190.    Defendant Woodson did not resort to lethal force because he believed Teddy posed an imminent threat to other animals, as there were none present. Ex. 2, 23:12-14.

191. Defendant Woodson did not resort to lethal force because he believed Teddy posed an imminent danger to other people, as there were none present. Ex. 2, 15:15-17, 120:16-22; Ex. 3, #13

192. Defendant Woodson once physically picked up a German shepherd dog that was struck by a car and bleeding in a ditch to transport it to a veterinarian for euthanasia. Ex. 2, 41:20-42:13, 61:23-62:2

193. Despite showing no signs of aggression, Defendant Woodson never attempted to touch or pick up Teddy. Ex. 2, 61:16-62:20, 121:16-18.

194. Defendant Woodson could not articulate why he picked up the German shepherd but shot Teddy. Ex. 2, 62:3-63:1, 121:7-15.

195. Defendant Woodson believes his reason for deciding to shoot Teddy is that he was "injured or sick." Ex. 2, 9:23-10:5, 18:2-8.

196. Defendant Woodson initially refused to "zero in on either" injury or sickness as his reason for shooting Teddy. Ex. 2, 19:14-24.

197. Nothing at the time of the incident led Defendant Woodson to believe Teddy was sick. Ex. 2, 18:9-19:17.

198. Defendant Woodson did not observe Teddy foaming at the mouth. Ex. 2, 22:1-12.

199. Defendant Woodson did not believe Teddy was sick, only that "it is a possibility" he was sick. Ex. 2, 18:15-19:2.

200. Defendant Woodson did not remark about Teddy being sick in his official incident report. Ex. 19,

201. Defendant Woodson ultimately admitted he killed Teddy solely because he believed he "could have been injured." Ex. 2, 64:7-10, 112:1-5.

202.  Defendant Woodson killed Teddy because Teddy "could simply have been suffering." Ex. 2, 20:16-21, 106:1-3.

203.  Defendant Woodson did not observe any obvious wounds, active bleeding, or compound fractures on Teddy. Woodson 13:8-17, 100:11-18.

204.  Defendant Woodson says he observed what "could be" mud or dried blood on Teddy's fur. Ex. 2, 10:12-19, 57:4-7

205.  Defendant Woodson cannot recall where on Teddy's body the mud or blood was. Ex. 2, 10:20-23.

206.  The extent of Defendant Woodson's reasons to believe that Teddy was suffering was "the way he was holding his head, [and] the way he was responding to the whole situation." Ex. 2, 110:19-111:6.

207.  Defendant Woodson thought Teddy walking with his head tilted and tongue out were signs of serious injury. Ex. 2, 100:6-10, 103:19-23.

208.  Defendant Woodson thought it unusual for a dog's tongue to hang out of its mouth. Ex. 2, Ex. 2, 60:14-61:4.

209.  Defendant Woodson knew there were numerous possible reasons for Teddy's visible condition. Ex. 2, 10:12-19.

210.  Defendant Woodson was aware dogs could be deaf or blind. Ex. 2, 55:25-56:2.

211.  Defendant Woodson did not think Teddy had a broken neck. Ex. 2, 11:12-19.

212.  Defendant Woodson thought it was "possible" that Teddy had a neck injury despite shaking his head and pulling free from the catch pole loop. Ex. 2, 104:15-21.

213.  Defendant Woodson believed Teddy silently pulling away from the catch pole was also a sign of injury. Ex. 2, 19:6-13.

214. During Defendant Woodson's attempts to secure Teddy, Teddy barely acknowledged Woodson. Ex. 2, 107:3-7; Ex. 18, 2:47 – 4:54

215. Defendant Woodson did not observe Teddy making any sounds to indicate he was in any pain, discomfort, or suffering. Ex. 2, 12:7-17, 19:6-13, 103:9-13, 106:4-10.

216. During Defendant Woodson's attempts, Teddy made no sounds when touched by or snared in the catch pole. Ex. 2 12:7-9; Ex. 18, 2:47 – 4:54

217. Defendant Woodson did not observe Teddy making any sounds at all. Ex. 2, 64:21-22; 106:4-10; Ex. 18, 2:47 – 4:54

218. Defendant Woodson believed Teddy's lack of noise is because "he could have been mute." Ex. 2, 106:8-10.

219. Defendant Woodson admits the lack of collar and tags did not affect his decision.

*Aftermath & Defendant Sturgeon's Response and "Investigation"*

220. Ms. Ware contacted Mayor Abrahamson about the shooting and spoke with him on the phone the morning of May 20. Ex. 16, ¶ 9

221. Mayor Abrahamson was unhappy that Ms. Ware was posting on Facebook and making public complaints about the shooting of Teddy. Ex. 16, ¶ 9

222. Ms. Ware then completed a citizen complaint on the City's official complaint form and submitted it to the city. Ex. 16, ¶ 10

223. Mr. Hunter also submitted a written complaint to Defendant Sturgeon.

224. On May 20, Sergeant Crawford prepared and circulated a draft statement for the City of Sturgeon to post to Facebook, which was edited by the City Attorneys. Ex. 7, 38:15-39:21.

225.  Sergeant Crawford had not yet obtained the body camera from the incident, and thus the public statement was based only off what Defendant Woodson told Sergeant Crawford. Ex. 7, 41:1-18.

226.  The post was an attempt to get ahead of any media coverage or bad publicity. Ex. 7, 41:13-24.

227.  The mayor approved the post and it was published on Facebook on May 20, 2024. Ex. 7, 41:13-18.

228.  The statement says Teddy was "displaying signs of possible injuries and/or what the officer perceived to be rabid behavior." Facebook Posts, attached as Exhibit 23.

229.  The statement says Teddy was believed to be either "severely injured or infected with rabies." Ex. 23.

230.  The statement says Defendant Woodson felt his only option was to put down Teddy because he "feared being bitten and infected with rabies." Ex. 23.

231.  Sergeant Crawford does not recall Woodson mentioning rabies to him or remember how the language about rabies or rabid behavior got into the statement. Ex. 7, 40:2-20, 43:5-13.

232.  The May 20 statement also mentions, for the first time, that Woodson believed Teddy was abandoned. Ex. 23.

233.  The May 20 statement also indicates Teddy did not have a collar or tags, which influenced Woodson's decision to shoot. Ex. 23.

234.  Sergeant Crawford believes the language about Woodson being influenced by the lack of collar or tags was inserted by the City Attorney. Ex. 7, 43:14-44:3.

235. Defendant Sturgeon subsequently obtained and reviewed the body camera footage before issuing another public Facebook statement on May 23. Ex. 23.

236. The May 23 statement indicates Defendant Sturgeon found that Defendant Woodson acted "within his authority based on information available to him at the time." Ex. 23.

237. The May 23 statement recites the information in the dispatch report as support for Defendant Woodson's decision. Ex 23.

238. The May 23 statement does not mention rabies. Ex. 23.

239. The May 23 statement does not mention Woodson shooting Teddy because he was afraid of being bitten. Ex. 23.

240. For the first time, the May 23 statement says Woodson shot Teddy "to protect against possible injury to citizens." Ex. 23.

241. Mayor Abrahamson repeatedly told Sergeant Crawford and Defendant Woodson that he supported them fully and would back them publicly. Ex. 7, 55:7-20; Ex. 2, 89:24-90:6.

242. Following the public release of the body camera footage and ensuing public outcry, Mayor Abrahamson resigned his position on Friday, May 24.

243. Alderman Seth Truesdell assumed the position of mayor pro temp and issued a Facebook post on behalf of the City on May 25. Ex 23.

244. The May 25 post says Truesdell and the board of aldermen did not agree with the former mayor's statements and were not given notice before they were released. Ex. 23.

245. The May 25 post says the first time Truesdell or the aldermen saw the body camera footage was on the news. Ex. 23.

246. The May 25 post says Truesdell and the board were "appalled by what [they] saw." Ex. 23.

247. The May 25 post says Truesdell contacted the Boone County Sheriff to discuss an investigation. Ex. 23.

248. On May 28, 2024, Defendant City of Sturgeon held its monthly board meeting and allowed citizen comment on the incident and Defendant Woodson. Ex. 14.

249. More than twenty people spoke at the meeting, many recounting their experiences with Defendant Woodson. Ex. 14.

250. One resident (the "Embree" Complaint) recounted Defendant Woodson being outside his house at night and, when confronted by the citizen, telling him to "lease [sic] his dogs or they will disappear." Ex. 14.

251. The original Roark complainants recounted the story of Defendant Woodson reaching into their son's vehicle to seize his phone. Ex. 14.

252. The Roark complainants also told the board how Defendant Woodson had approached their dog, which was tethered and secure in their yard, with a catch pole. Ex. 14.

253. When the Roarks' teenage daughter intervened in Defendant Woodson's approach toward their secured dog, Woodson cursed at her. Ex. 14.

254. Defendant Woodson then, according to Mrs. Roark, called DFS on the family, resulting in a home visit to inspect for unlivable conditions that yielded nothing. Ex. 14.

255. After the DFS visit, Mrs. Roark alleges Defendant Woodson told her she was not in control, cursed at her, and refused to leave her property. Ex. 14.

256. Sergeant Crawford observed Defendant Woodson's behavior with the Roarks and did nothing. Ex. 14

257. The original Richards complainant also appeared and recounted her experience with Defendant Woodson and the lack of response by Defendant Sturgeon. Ex. 14.

258. On or about May 29, 2024, Defendant Woodson was informed he was being investigated for mistreatment and unprofessional conduct pursuant to Missouri statute § 590.502. Ex. 2, 124:9-125:12

259. Defendant City of Sturgeon's aldermen and mayor put together a list of issues to investigate and included several of the complaints about Woodson received during the May 28 meeting. Ex. 24.

260. That scope of investigation did not include Defendant Woodson shooting Teddy. Ex. 7, 93:20-94:15; Ex. 24.

261. That scope of investigation did not include the prior written complaints about Defendant Woodson from October and December 2023. Ex. 24.

262. Defendant Sturgeon asked a single law firm to conduct an outside investigation, which was declined. Ex. 24.

263. Defendant Sturgeon never conducted the investigation they publicly stated they would do. Ex. 24.

264. Defendant Sturgeon never investigated Defendant Woodson's actions from May 19. Ex. 24.

265. While Defendant Woodson was on administrative leave, he was publicly prohibited from being on city property. Ex. 25

266. Defendant Woodson still showed up at city hall, demanding his paycheck early and being disrespectful to city employees. Ex. 24.

267. While awaiting Sturgeon's investigation, Defendant Woodson engaged counsel and negotiated a resignation agreement with Defendant Sturgeon. Ex. 2, 126:2-11

268. Defendant Woodson's agreement with Defendant Sturgeon resulted in Sturgeon paying $16,000 to Woodson and his counsel. Ex. 2, 126:15-18.

269. Defendant Woodson's agreement with Defendant Sturgeon provided the language Sturgeon was to use in a public statement clearing Woodson of misconduct. Ex. 2, 126:19-23; Ex. 26 ¶ 4.

270. Defendant City of Sturgeon's Mayor and Board of Aldermen voted in favor of the agreement with Woodson and executed it October 7, 2024. Ex. 27.

271. At the October 7 board meeting, Mayor Truesdell read the agreed-upon statement into the minutes, stating: "Upon completion and review of the administrative investigation into Mr. Woodson's on duty actions on May 19, 2024, and on the City Attorney's advice and recommendation, the City of Sturgeon concluded that Mr. Woodson did not commit any misconduct." Ex. 27.

272. Defendant Woodson executed the agreement on October 8, 2024, with a retroactive resignation date of October 1, 2024. Ex. 27.

*Life After Sturgeon*

273. Defendant Woodson continued working for Hallsville Police following the incident. Ex. 2, 36:19-22; Ex. 7,

274. Thomas Crawford left Sturgeon and became the Sergeant at Hallsville, again supervising Defendant Woodson. Ex. 7, 9:17-10:1.

275. Defendant Woodson was disciplined by the Chief of Police at Hallsville for his report writing, because his reports "constantly needed correction in regards to inaccurate or missing information." Ex. 7, 11:2-24.

276. Defendant Woodson was further disciplined by Hallsville PD for another incident and received a two-day unpaid suspension. Ex. 2, 47:1-25

277. Defendant Woodson testified he was suspended for allegations he violated a citizen's rights. Ex. 2, 47:1-25

278. Sergeant Crawford testified Woodson's suspension was for an unauthorized ride-along. Ex. 7, 11:25-12:10.

279. Hallsville City Counsel scheduled some form of legal or disciplinary action against Defendant Woodson for June 9, 2025. Ex. 7, 12:11-13:10.

280. Defendant Woodson resigned from Hallsville PD on June 3, 2025 – the day before his deposition in this matter. Ex. 2, 36:19-22.

## Argument

Plaintiff Nicholas Hunter's beloved dog, Teddy, a deaf and blind shih-tzu, was shot and killed on May 19, 2024 by Defendant Sturgeon's police officer, Defendant Myron Woodson. Defendant Sturgeon has, by ordinance, placed animal control duties within the purview of the police and obligated them to impound stray animals. To facilitate their performance of animal control duties, Sturgeon provided its officers with a tool to secure animals (catch pole) and executed a contract with Boone County to provide limited animal control functions including shelter, assistance to officers, and emergency response for injured animals. However, Defendant Sturgeon never trained Defendant Woodson about his obligations under the law, nor how to use the city-provided catch pole, nor did they even tell Woodson that the agreement with Boone County existed. Moreover, the City utterly failed to supervise and discipline Defendant Woodson

despite repeated and severe misconduct. To add insult to injury, Defendant Sturgeon publicly said they would conduct a formal investigation under Missouri law – which they never did – and then ratified their officer's actions and paid him a settlement of $16,000. This was not simply a tragic event, it was an egregious violation of Plaintiff's rights as the natural consequence of Defendant Sturgeon's repeated failures to train, supervise, and discipline its officer.

## I.     Standard for Summary Judgment

A party is entitled to summary judgment by showing "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one which would affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A material fact is only genuinely in dispute if a reasonable jury could find for either party based on the record evidence. *Littrell v. City of Kansas City, Mo.*, 459 F.3d 918, 921 (8th Cir. 2006) (citing *Anderson*, 477 U.S. at 252). If the movant shows there is no such dispute, the non-moving party must "meet proof with proof" to avoid summary judgment. *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909 (8th Cir. 2010). However, the existence of some factual dispute does not justify denying summary judgment when the opposing party's version of the facts is blatantly contradicted by the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In the context of cases brought under 42 U.S.C. § 1983, like this one, there is an added wrinkle: qualified immunity, which Defendant Woodson has asserted. "Whether summary judgment on the grounds of qualified immunity is appropriate from a particular set of facts is a question of law." *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000) (quoting *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999)). To avail himself of qualified immunity, Defendant Woodson must establish the relevant predicate facts showing he is entitled

to the defense. *Id*. Those predicate facts are only the relevant acts and circumstances and, if they are not in dispute, resolve the question of whether Defendant Woodson's conduct was reasonable under settled law. *Id*.

## II.     Plaintiff is Entitled to Judgment Against Defendant Woodson

Qualified immunity's expansive protection for officer conduct has been described as "providing ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (U.S. 1986). More precisely, an officer is immune from suit for his actions unless "(1) the officer violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotations omitted). Were "plainly incompetent" an actual legal standard, Defendant Woodson's conduct would clear the bar. Here, his actions violated Plaintiff's very clearly established constitutional rights without any justification.

### A.     Defendant Woodson Violated Plaintiff's Constitutional Rights

The Fourth Amendment to the Constitution protects Plaintiff and his property (effects) against unreasonable seizures. *See* U.S. Const., amend. IV. Seizures of personal property without a warrant are considered *per se* unreasonable absent a recognized exception. *U.S. v. Place*, 462 U.S. 696, 701 (1983). Property is considered "seized" under the Fourth Amendment when a person's possessory interests in that property are meaningfully interfered with. *Hansen v. Black*, 872 F.3d 554, 558 (8th Cir. 2017). Importantly, privately-owned dogs are considered "effects" in the Eighth Circuit and numerous others. *Id*.

When the seizure is warrantless, the analysis focuses not just on the seizure itself, but on the method of the seizure. The Court must balance Plaintiff's Fourth Amendment rights against

the government's interests in the seizure to determine whether the use of force was reasonable. *Id*. This includes weighing the nature and quality of the intrusion in evaluating the reasonableness. *Andrews v. City of West Branch, Iowa*, 454 F.3d 914, 918 (8th Cir. 2006). Whether a warrantless seizure is constitutionally "reasonable" is evaluated from the perspective of a reasonable officer, without regard to the officer's subjective intent. *Id*.

Defendant Woodson's shooting of Teddy was an unreasonable seizure that violated Mr. Hunter's rights. Teddy was Mr. Hunter's property, protected from unreasonable seizure by the Constitution. While Defendant Woodson's objective may have been to fulfill the government's legitimate interest by securing a loose dog, the nature and quality of the intrusion – killing Teddy – far exceeds that interest, particularly when less intrusive means were provided to him and were readily available. Moreover, it was Woodson's job and legally-designated duty to safely secure Teddy and take him for impoundment until Mr. Hunter could retrieve him.

Teddy was in an empty field away from the road. Defendant Woodson admits that Teddy did not behave aggressively to anyone, including him. He admits Teddy did not pose an imminent threat to any other person or animal, because there were none nearby. He admits he did not believe Teddy was sick or rabid. Instead, Defendant Woodson asserts that he was doing the "humane" thing by executing a deaf and blind dog, because he "could have been suffering." No evidence in the record supports such a claim, and Woodson has only been able to explain his acts with ephemeral language: Teddy was sick <u>or</u> injured, Teddy could have been sick, Teddy could have been suffering. Woodson admits that Teddy exhibited no visible or audible behaviors that would lead a reasonable officer to believe Teddy was suffering, and nothing in the record would lead a reasonable officer to believe that euthanasia was necessary or reasonable under the circumstances. Regardless of Woodson's subjective intent or "reasonable beliefs" regarding

Teddy, the circumstances and evidence are clear: this was a permanent, unreasonable seizure in violation of Mr. Hunter's constitutional rights.

### B. The Rights Were Clearly Established at the Time of the Violation

A right is "clearly established" if a reasonable officer would understand that his actions violated that right. *Andrews*, 454 F.3d 914, 919. At the time of the shooting, the Eighth Circuit had already established that pets are effects and that officers must act reasonably when seizing them. *LeMay v. Mays*, 18 F.4th 283, 287 (8th Cir. 2021) (internal citations omitted). The touchstone in determining whether an officer's shooting and seizure of a dog is reasonable is whether the animal posed an imminent danger. *Id*.

In *Lemay*, the Court denied qualified immunity to an officer who climbed a privacy fence while responding to a security alarm and shot two dogs he encountered on the property. The Court did so because the dogs behaved in a friendly and non-threatening manner, making force unnecessary. *Id* at 286. Similarly, in *Andrews*, the Court denied qualified immunity to an officer who mistakenly shot a dog in an enclosed back yard thinking it was a different dog. *Andrews*, 454 F.3d at 916-918. The *Andrews* court denied immunity because the dog was behind a fence, was not growling or acting fiercely, was not harassing anyone, and did not pose an imminent threat to the officer. *Id* at 918-19. Moreover, the *Andrews* court noted the officer did not engage in other means of attempting to capture the dog short of firing his weapon. *Id*.

By comparison, the Eighth Circuit has granted qualified immunity to officers in other dog shooting cases, particularly when the officer is confronted with a split-second decision or has exhausted non-lethal options and still cannot contain a dog that is a danger to the public. The Court has granted immunity to officers confronted with a dog barking and running at them during a domestic violence call. *See Buschmann v. Kansas City Bd. Of Police Commiss.*, 76 F.4th

1081 (8th Cir. 2023). The Court has also granted immunity to an officer for shooting and killing a large dog that was running on a busy highway after he shut down the highway to attempt to catch the dog or scare it away from the road. *See Hansen v. Black*, 872 F.3d 554 (8th Cir. 2017).

Defendant Woodson's actions fall much further on the side of the *Andrews* and *LeMay* cases than the *Hansen* and *Buschmann* cases. Nobody has alleged that Teddy posed an imminent danger, nor that Teddy posed a generalized danger by walking in a field, nor has Defendant Woodson produced any credible evidence of such. The record evidence makes clear that Defendant Woodson's failure to capture Teddy with the catch pole was due to his own incompetence and lack of training. Woodson knew that using deadly force on a dog was the last option, yet despite pursuing Teddy for less than four minutes, Woodson undertook no other means of securing Teddy, such as picking him up, wrapping him in a blanket (which Woodson remarked about as he pursued Teddy), calling his superior officer or mayor, or calling Boone County Animal Control. There was no tense situation that required a split-second decision on Woodson's part. Teddy was a lost dog trotting around an empty field that needed help getting home. It was clearly established at the time of the shooting that Defendant Woodson could not use lethal force on a dog that did not pose any danger, risk, or threat.

## C.     Defendant Woodson's Actions Were Objectively Unreasonable

As discussed above, the reasonableness of an officer's actions is a question of law determined by the predicate facts and drawing inferences in favor of the non-movant to the extent supportable by the record. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Pace*, 201 F.3d 1050, 1056 (8th Cir. 2000). The reasonableness determination has nothing to do with Woodson's subjective beliefs as to the reasonableness of his acts, only whether he "acted reasonably under settled law in the circumstances." *Pace*, 201 F.3d at 1056. The sum of the predicate facts in this

matter makes clear that Defendant Woodson's actions were not reasonable under settled law in the circumstances. *Pace*, 201 F.3d 1050, 1056 (8th Cir. 2000). Defendant Woodson's belief that he was humanely euthanizing an injured dog is irrelevant, it was not a permissible exercise of his authority in the circumstances. Therefore, Plaintiff is entitled to summary judgment against Defendant Woodson on his defense of qualified immunity and judgment in his favor on his § 1983 claim.

### III. Plaintiff is Entitled to Summary Judgment Against Defendant Sturgeon

A municipality is not responsible for the actions of its subordinates under a *respondeat superior* theory of liability in a claim under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dept. of Soc. Svcs.*, 436 U.S. 658 (1978)). However, when the municipality itself causes the constitutional violation, it can be held liable. *Id*. This can occur in the context of inadequate training for police officers when the failure amounts to a deliberate indifference to the rights of people who will interact with those police. *Id*. It can also occur when a city has knowledge of prior misconduct and fails to take remedial actions to prevent future misconduct. *Andrews v. Fowler*, 98 F.3d 1069, 1075. Finally, it can occur when a city's authorized policymakers approve ("ratify") a subordinate's unconstitutional act and the basis for it. *Gustilo v. Hennepin Healthcare System, Inc.*, 122 F.4th 1012, 1018 (8th Cir. 2024). Plaintiff is entitled to summary judgment against Defendant Sturgeon for its failure to train Defendant Woodson, its failure to supervise and discipline him, and for its ratification of his unconstitutional seizure of Teddy.

### A. Defendant Sturgeon Failed to Train Defendant Woodson

As explained by the *Canton* Court, the initial questions here are "whether such training is adequate and, if not . . . whether such inadequate training can justifiably be said to represent 'city policy.'" *Canton*, 489 U.S. at 390. Specifically, the Court noted that assigning duties to specific officers may require additional or different training. *Id*. The Court noted that if the need for training is so obvious, and the lack of training is likely to cause a violation, then the policymakers for that city have been deliberately indifferent. *Id*. In order to actually be liable for the harm, however, the municipality's deficiency must be closely related to the injury. *Id* at 391. In other words, "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id*.

The Court further articulated an "obvious need" paradigm under which a municipality could be held liable for its failures to train based *on a single-incident alone*, explaining:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be *"so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights*.

*Id* at fn.10 (internal citation omitted and cleaned up)(emphasis added).

Thus, as explained by the Court, a municipality can be found deliberately indifferent and thus liable for a "failure to train" based on a single-incident when it: (1) knows with "moral certainty" that its officers will be required to perform certain duties or confront certain situations in the performance of their duties; (2) provides the its officers with equipment or tools to perform that task; and (3) fails to properly train its officers both on the use of the equipment and tools provided and constitutional limitations and requirements in completing their assigned duties and tasks. And, in this present matter, Plaintiff Hunter can meet his burden with respect to his failure

to train claim against Defendant Sturgeon is entitled to judgment in his favor under the *Canton* "obvious need" analysis.

Defendant Sturgeon, by ordinance, gave responsibility for animal control duties to its police officers and required them to collect animals at large and bring them to Boone County Animal Control. The City was the only entity capable of obligating its police in such a way and deliberately chose to do so. Its policymakers knew, with absolute "moral certainty," that its officers would regularly encounter animals and be responsible for dealing with them in conformity with the law. In fact, the Sturgeon police regularly received calls each week to handle animal issues, and in the week leading up to the shooting, Defendant Woodson handled three other animal calls besides Teddy's.

The City provided its officers, including Woodson, with the tools to perform their animal control responsibilities, namely a catch pole and an agreement with Boone County that provided impoundment services, an animal control response when requested by Sturgeon PD, and emergency response services to deal with injured animals.

Where Defendant Sturgeon failed, however, was in training Defendant Woodson what his animal control responsibilities were and, most importantly, how to utilize the tools he was given. There was not a deficient training program in this situation; there was no training. It is undisputed by all parties that Defendant Sturgeon never told Defendant Woodson what his animal control duties were, never trained him on his obligations, never trained him on using force against animals, and never even told him about the agreement with Boone County. It is similarly undisputed by all parties that Defendant Woodson did not know how to use the catch pole he was given, and that the City of Sturgeon failed to ensure he knew how to use it. Finally, it is also undisputed that the failure to train him how to use the catch pole was the cause of the

constitutional violation. Not only did Plaintiff's expert conclude as such, Defendant Woodson admitted that the incident likely would have turned out differently if he knew how the pole worked. Defendant Sturgeon's need to train Defendant Woodson was obvious from the facts and circumstances, the failure to train him was a deliberate choice, and the failure to do so resulted in the violation of Plaintiff's rights, entitling him to judgment.

### B. Defendant Sturgeon Failed to Discipline and Supervise Defendant Woodson

A municipality may also be liable under *Monell* when there is evidence of prior complaints sufficient to show the municipality ignored misconduct or fails to investigate or punish misconduct. *Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999) (internal citations omitted). When that evidence shows that misconduct is continuing or persistent, it may support a finding that a municipal custom permitting misconduct exists. *Id*.

Defendant Woodson began as a Sturgeon officer on September 11, 2023 and, by the new year, had received three written citizen complaints (and an unknown number of informal complaints). One of those complaints involved Defendant Woodson reaching into a vehicle and snatching a cell phone out of the hand of a teenager – a violation of the Fourth Amendment that Sergeant Crawford substantiated. The Mayor of Sturgeon was aware of the complaint, as was the Board of Aldermen. Woodson was not disciplined, and received only a verbal warning. Another complaint involved Woodson harassing the same teenagers and forcing them to exit their vehicle so he could search it. Woodson was not disciplined. In fact, despite repeated issues with citizens, Woodson received nothing more than verbal warnings, with nothing whatsoever entered into his file. Despite Woodson's serious deficiencies in report writing, he was never disciplined.

Eight months into his tenure when Defendant Woodson shot Teddy, the Mayor, the City Attorneys, and Sergeant Crawford came to his aid. Sergeant Crawford wrote, and the City

Attorney edited, the May 20th Facebook post claiming Teddy may have been rabid and clearing Defendant Woodson of wrongdoing, despite not viewing the body camera. On May 23, the City again posted defending Woodson, this time claiming he protected the public. When Woodson updated his police report with dubious claims about the incident, the City Attorney, Mayor, and Sergeant Crawford all expressed concerns but did nothing. When Defendant Woodson showed up on city property during his suspension despite being told to stay away, he suffered no repercussions. As the final act in the City's ongoing failure to discipline Woodson, they publicly claimed they would be investigating him for shooting Teddy pursuant to Missouri statute, quietly did nothing, and then paid him $16,000 and read a statement clearing him of any wrongdoing.

In less than a year of employment, Defendant Woodson received numerous complaints about his interactions with citizens, at least two complaints alleging Fourth Amendment violations (one of which was substantiated by Sergeant Crawford), and repeatedly wrote deficient reports. Despite the City's progressive discipline policy and the fact Woodson was a probationary employee, the City took no action. The City's failure to supervise and discipline Woodson is akin to a municipal custom that permitted Woodson to violate rights without fear of punishment, ultimately leading to his flagrant violation of Plaintiff's Fourth Amendment rights.

### C. Defendant Sturgeon Ratified Defendant Woodson's Bad Conduct

Finally, *Monell* liability may also attach where a municipality's final policymakers have ratified the actions of a subordinate. *Stolesz v. Rushmore Plaza Civic Center*, 847 F.3d 941, 946 (8th Cir. 2017). Ratification occurs when a final policymaker takes an affirmative act to (1) approve of the subordinate's decision, and (2) approve of the basis for the decision. *Id* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Accordingly, ratification requires both knowledge of the alleged constitutional violation, and proof that the policymaker

specifically approved of the subordinate's act." *Id* (quoting *Lytle v. Carl,* 382 F.3d 978, 988 n.2 (9th Cir. 2004).

Here, Defendant Sturgeon has identified its final policymakers as the Mayor and the Board of Aldermen. As discussed above, the City has ratified his behavior since immediately after the shooting, including by using the City's official Facebook page to justify Woodson's actions and bases for those acts. On May 20, before the body cam was even available, the City posted that Teddy appeared to be displaying rabid behavior, that Woodson was afraid of being bitten and infected with rabies, and that the lack of collar played a role in Woodson's decision. None of that is supported by the evidence. On May 23, the City again posted, this time stating that Woodson acted within his authority to protect citizens from a potentially sick, injured, abandoned dog. That is also not supported by the evidence. In other words, the city approved not only of Woodson's actions (shooting Teddy), but also the basis for doing so (protecting the public), and were willing to engage in misinformation to cover for him.

Then, on October 7, 2024, under leadership of a new mayor, the City of Sturgeon again ratified Woodson's actions. At a regular board meeting, Mayor Truesdell made a public statement on behalf of the City: they had completed the investigation into Woodson's May 19th actions and found he committed no misconduct. At the time the City made its final announcement, it was aware of Plaintiff's claims that Woodson violated his Constitutional rights, and was even more aware that it had not actually investigated Woodson's May 19th acts. In other words, at every step, the City protected Woodson. The final policymakers were aware that Woodson violated Plaintiff's rights, approved of Woodson's behavior as "protecting the public," and publicly exonerated him after conducting a non-existent investigation. Defendant Sturgeon ratified Defendant Woodson's acts and are therefore liable to Plaintiff under *Monell*.

## IV.    Conclusion

For the foregoing reasons, Plaintiff Nicholas Hunter respectfully prays this Court grant his motion for summary judgment, in whole or in part, on Defendant Woodson's defense of qualified immunity, on Plaintiff's claim against Defendant Woodson under 42 U.S.C. § 1983, and on Plaintiff's claim for *Monell* liability against Defendant Sturgeon.

Respectfully submitted,

*/s/ Eric C. Crinnian*
Eric C. Crinnian, MO 66536
The Crinnian Law Firm, LLC
9212 N. Garfield Ave.,
Kansas City, MO 64155
Tel: (816) 459-0649
eric@crinnian.law
**COUNSEL FOR PLAINTIFF**
**NICHOLAS HUNTER**