

# NAEGELI
## DEPOSITION & TRIAL

**(800) 528 - 3335**

**NAEGELIUSA.COM**

*Nationwide*

**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**REMOTE DEPOSITIONS**

**TRIAL PRESENTATION**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**

*Powerful*
LITIGATION SUPPORT

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION


NICHOLAS HUNTER

     Plaintiff,

vs.

                  Case No.  2:24-CV-04081-WJE

MYRON WOODSON, and CITY OF STURGEON, MISSOURI

     Defendants.

_____


REMOTE STREAMING DEPOSITION OF


MYRON WOODSON


TAKEN ON

WEDNESDAY, JUNE 4, 2025

8:40 A.M.


VESSEL BRIDGES MURPHY LAW OFFICES

3901 SOUTH PROVIDENCE ROAD, SUITE D

COLUMBIA, MISSOURI 65203





# NAEGELI
## DEPOSITION & TRIAL | (800) 528-3335
NAEGELIUSA.COM

REMOTE APPEARANCES

Appearing on behalf of the Plaintiff:

ERIC C. CRINNIAN, ESQUIRE

Crinnian Law Offices

9212 North Garfield Avenue

Kansas City, Missouri 64155

(816) 459-0649

eric@crinnian.law

DANIEL J. KOLDE, ESQUIRE

Kolde Law Offices

9506 Olive Boulevard, Suite 418

Olivette, Missouri 63132

(636) 675-5383

daniel.kolde.law@gmail.com

REMOTE APPEARANCES (CONTINUED)

Appearing on behalf of Defendant Myron Woodson:

JACK FLEMMING, ESQUIRE

Vessel Bridges Murphy Law Offices

3901 South Providence Road, Suite D

Columbia, Missouri 65203

(573) 777-4488

jack.flemming@vbmlaw.com

Appearing on behalf of Defendant City of Sturgeon,

Missouri:

WAYNE MICHAEL JORDAN, ESQUIRE

Newman Comley and Ruth

601 Monroe Street, Suite 301

Jefferson City, Missouri 65101

(573) 634-2266

laura@ncrec.com

Also Present:

Jess Bryan, Naegeli Technician

EXAMINATION INDEX

PAGE

EXAMINATION BY MR. CRINNIAN                              7

EXAMINATION BY MR. JORDAN                              128

EXHIBIT INDEX

EXHIBIT                                          PAGE


1    INCIDENT REPORT                        54

2    EMPLOYMENT APPLICATION                 48

3    INCIDENT REPORT                        72

4    GOOGLE DRIVE TEAM DOCUMENT             80

5    GOOGLE DRIVE TEAM DOCUMENT             84

6    BODY CAM VIDEO                         92

     (REQUESTED NOT RECEIVED)

7    RESPONSES                             114

8    NOTICE OF INVESTIGATION               124

REMOTE STREAMING DEPOSITION OF

MYRON WOODSON

TAKEN ON

WEDNESDAY, JUNE 4, 2025

8:40 A.M.

THE REPORTER:  We are on the record at 8:40 a.m.

Mr. Woodson, please raise your right hand. Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  Yes, I do.

THE REPORTER:  Thank you.

Will each attorney please state their name and whom they represent.

MR. CRINNIAN:  Yes.  My name is Eric Crinnian.  I represent the plaintiff, Nicholas Hunter.

MR. FLEMMING:  Jack Flemming.  I represent Defendant Myron Woodson.

THE REPORTER:  Thank you.

Counsel, you may proceed.

MR. CRINNIAN:  Oh, actually, sorry --

MR. JORDAN:  We -- we have a few more.

MR. CRINNIAN:  Sorry, Jennifer.  We actually have a couple more.

MR. JORDAN:  Dan, do you want to go?

THE REPORTER:  Oh.

MR. KOLDE:  Daniel Kolde, spelled K-o-l, D as in David, E as in Edward.  Co-counsel for plaintiff.

THE REPORTER:  Okay.

MR. JORDAN:  And -- and then Wayne Jordan on behalf of the City of Sturgeon.

THE REPORTER:  Thank you.

Thank you, Counsel.  You may proceed.

MR. CRINNIAN:  Thank you.

MYRON WOODSON, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. CRINNIAN:

Q.  Good morning, Officer Woodson.  Have you ever been deposed before?

A.  Yes.

Q.  Okay.  So you understand this is under oath?

A.  Yes.

Q.  You agree that you'll let me ask my

questions before you answer, especially since we are doing this remotely?

A.   I understand.  Yes.

Q.   Okay.  If you don't understand a question, will you please ask me to rephrase it?

A.   Yes.

Q.   Okay.  If you answer a question, I'm just going to assume that you understand the question.

A.   Okay.

Q.   If you need a break at any point, feel free to ask for one.  Just make sure that it's not when I already have a question pending.  Just wait until we're done answering the question.

A.   I understand.

Q.   Okay.  Prior to today's deposition, did you review any documents or recording in preparation?

A.   Yes.

Q.   Okay.  What documents and recordings did you review?

A.   The report.

Q.   Your incident report?

A.   Yes.

Q.   Okay.  Did you review any other documents?

A.   No.

Q.    Did you review any video?

A.    Yes.

Q.    Which video did you review?

A.    My body cam video.

Q.    Did you just review the body cam video from the incident, or also afterwards with Mr. Hunter?

A.    Both.

Q.    Okay.  The afternoon of May 19th, 2024, you were serving as a police officer for the Sturgeon Police Department, correct?

A.    That's correct.

Q.    Okay.  And you were employed by them since approximately September of 2023?

A.    I believe so, yes.

Q.    Okay.  The afternoon of May 19th, were you dispatched as a Sturgeon police officer to respond to a call for a potentially injured dog?

A.    Yes.

Q.    Okay.  You shot and killed that dog, correct?

A.    I dispatched the animal, yes.

Q.    Okay.  And in that moment, what was your exact reason for shooting the dog?

A.    What was my exact reason?

Q.   Yes.

A.   I believe it was that the animal was injured or sick.

Q.   Injured or sick or injured and sick?

A.   I mean, either/or.

Q.   "Either/or."  Okay.

Let's start with the injuries.  What observations did you make about the dog whose name is Teddy -- so if I say Teddy, that's what I'm saying.

A.   I understand.

Q.   What observations did you make about Teddy's physical condition that led you to believe he was injured?

A.   He was covered in material.  It could have been mud and blood.  I know his head was cocked to the side -- to the right -- and his tongue was hanging out.  It could have been a slew of reasons of why he was in that condition.

Q.   Okay.  Now, you said that he had material on him, potentially mud and blood.  Where did you identify that material on Teddy's body?

A.   I don't recall exactly where.

Q.   But you -- you believe that there was mud and blood on his body when you encountered --

A.   Yes.

Q.   Okay.  Do you have any medical training?

A.   Yes.

Q.   Okay.  What kind of medical training do you have?

A.   Army.  I was a medic in the military.

Q.   You were a medic in the military?

A.   Yes.

Q.   Okay.  Do you have any veterinary training?

A.   No.

Q.   Okay.  With regard to the observations that you made about Teddy's potential injuries, what -- what serious injuries did you believe that he had?

A.   I believe he had a neck injury.

Q.   You thought that he had a broken neck?

A.   A neck injury.

Q.   Just a neck injury.

Okay.  When you observed Teddy, you were with him for several minutes between the time that you first encountered him and before you finally dispatched him, correct?

A.   That's correct.

Q.   Okay.  During that time that you

encountered him, what did you observe Teddy doing?

A. He was walking around as if he was complacent.

Q. Okay. Did you try to catch him with a catchpole?

A. Yes.

Q. Okay. Did he shriek or yelp when you touched him with the catchpole?

A. Not that I recall.

Q. Okay. Did you ever notice Teddy bump into anything while you were observing him?

A. He was walking into the tree.

Q. Okay. Did he act like he was injured, say -- say, yelping when he bumped into a tree?

A. Did he -- did he yelp?

Q. Yes.

A. I don't recall him yelping.

Q. Okay. When he was walking around, did you see him moving his head back and forth?

A. I saw him swaying his body, his head going back and forth in a sense.

Q. Okay. Why would you use a catchpole on something that you believe had a broken neck?

A. I used the tools I had available.

Q. Okay. The purpose of the catchpole loop

is to go around the animal's neck, correct?

A.   That's correct.  Or around the hip, whatever you can do to contain that animal.

Q.   When you tried to catch him, did you try to catch him around the hips or did you try to catch him around the neck?

A.   I tried to get the catchpole on him.

Q.   Okay.  When you believed that you were dealing with an injured animal -- strike that.  Let me step back.  Did you notice any open and obvious wounds on Teddy?

A.   At the time, no.

Q.   Okay.  Did you notice any bleeding?

A.   Not at the time, no.

Q.   Okay.  You didn't notice any bones sticking out of his body?

A.   Not at the time.

Q.   Okay.  Why would you not call for guidance from Sergeant Crawford if you were having difficulty apprehending the animal?

A.   I just didn't -- didn't call for guidance. I followed the policy.

Q.   Which policy?

A.   The Sturgeon policy.

Q.   The Sturgeon policy on shooting animals?

A.    The Sturgeon policy is not shooting animals -- it's not called shooting animals.

Q.    I understand that.  You're talking about specifically the section of the policy handbook that talks about when it's justified to shoot an animal?

A.    Meaning dispatching -- the humane --

Q.    Sure.  Let's call it humane dispatch. You're talking about that provision in the -- the handbook?

A.    No, I'm talking about the whole policy.

Q.    Do you know approximately how many pages the Sturgeon Police Department manual is?

A.    I never counted it.

Q.    Okay.  What can you tell me about what the manual says about when it's okay to humanely dispatch an animal?

A.    It's the last option.

Q.    That's what the policy handbook says?

A.    It's not what it says; I know it has to be the last option.

Q.    Okay.  You just said you were going based off of the policy, but you say that's not what the policy says.  What does the policy --

A.    No, that is not what the policy said. What I said that's not what it is.  The policy falls

in the category of all these efforts lead up to it. I attempted to catch it, didn't work. I had no other alternative.

Q. Okay. And just to be clear, you're saying this is in the Sturgeon Police Department handbook, correct?

A. It is policies. I was never handed the handbook.

Q. Okay. Then what policies were you given?

A. Well, I was given access to own computer. I don't know their exact numbers.

Q. I'm a bit confused. When you say you were given access, but you weren't given the handbook, what do you mean?

A. They're in the network on their computers.

Q. So you could look up the individual policies?

A. Individual policies. Yes.

Q. Okay. Okay. So you believe that you followed Sturgeon's policies to a T?

A. Mm-hmm.

Q. And your understanding of the Sturgeon policy is that you start slow and escalate from there. Is that fair?

A. There was no escalation.

Q.   Okay.  A few moments ago -- correct me if I'm wrong -- you said that you started by trying to catch him and then you advanced to humanely dispatching.

A.   Yes.

Q.   Is that correct?  Is that an escalation?

A.   It'd depend on your definition of escalation.

Q.   Okay.  So you believe that you followed the policy, which is why you didn't call Sergeant Crawford, correct?

A.   That's right.

Q.   Okay.  You believed you were following policy, so you didn't bother calling the mayor at the time, Kevin Abrahamson, correct?

A.   That's right.

Q.   Okay.  You didn't bother calling back joint communications at Boone County, correct?

A.   I didn't see the purpose of that.

Q.   Okay.  Why not contact the complainant and ask if she had something that could help you lure Teddy, or put a blanket over Teddy, for example?

MR. FLEMMING:  I'll object to the form.  Calls for speculation.

You can answer -- answer.

THE DEPONENT: Okay. She said she didn't want no contact.

BY MR. CRINNIAN:

Q. Okay. Does no contact mean that you're not allowed to contact them, or does it mean that they don't need to be contacted after the --

A. It mean they don't want to be contacted, but they could be contacted if it was -- the situation deemed necessary.

Q. Okay. So you could have contacted her if you felt it necessary to ask for assistance or information?

A. If I felt the need; if there was more detail needed.

Q. Okay. And the details needed, you had the dispatch report, correct?

A. That's correct.

Q. And the dispatch report is where you say that you were told not to contact her, correct?

A. That's correct.

Q. Was there anything else in the dispatch report that you relied on in this interaction with Teddy?

A. I don't remember verbatim, but it was an injured animal. I got there and semi-matched to

what I was observing.

Q. Okay. The alternative that you proposed is that if Teddy wasn't injured, that he was seriously sick or ill, correct?

A. Yes.

Q. Okay. And you don't know if it was one or the other or both?

A. That's correct.

Q. Okay. So let's go ahead and start with your observations about Teddy's behavior again. What observations led you to believe that Teddy was sick?

A. Nothing ever led me to believe he was sick at the time.

Q. Okay. Then why do you assert that you believed that he was sick and used that as a justification to shoot him?

A. I didn't use it as justification. It is a possibility.

Q. I'm not asking for possibilities, Officer Woodson. I'm asking you, in the moment, when you decided to unholster your firearm and shoot the dog, I asked you earlier why did you decide to do that, and you said he was injured and/or he was ill. Are you saying that he wasn't ill and that didn't inform

your decision?

A.    I didn't know if he was ill or not.

Q.    So you acted on incomplete information?

A.    I acted on the information I had at hand and what I observed to dispatch an animal.

Q.    Okay.  What did you observe?

A.    I observed an injured animal that appeared to have an injured neck and be complacent.

Q.    What -- what do you mean by "complacent"?

A.    He was swaying.  He wasn't in -- when I tried to get him with the catchpole, he was pulling away from it.  He wasn't yelping.  So what am I to believe?

Q.    All right.  So you have no observations that you saw yourself that leads you to believe that Teddy was sick?

A.    No.

Q.    "No."  So the only option then is that he was injured, is that correct?

A.    I won't say the only option.

Q.    Why did you shoot him?  Was it because he was sick or because he was injured?

A.    I'm not going to zero in on either one because I don't know.

Q.    You don't know why you shot this --

A.   I know why I shot the dog.

Q.   Okay.  Why'd you shoot the dog?

A.   The dog appeared injured and it could have been sick.  If I would've let the dog roam about and it got injured or hit by someone else, that could have been a bad situation.  If the dog was sick and it bit someone, that could have been a bad situation.

Q.   Okay.  So the dog could have been sick, you're not saying he was?

A.   I can't confirm or deny that he was or wasn't.

Q.   So you're essentially saying that you shot him just in case he was sick.  Is that correct?

A.   No.

Q.   Did you shoot him because you believed he was injured and it was the humane thing to do?

A.   I believed it to be the humane thing to do.

Q.   Okay.

A.   The dog could simply have been suffering.

Q.   Did he cry or make any noises that led you to believe he was suffering?

A.   Not all injured animals or persons cry.

Q.   You said he had no problems walking around

the field, correct?

A.   He was stumbling around the field.  He --

Q.   **He had no problems getting loose from the catchpole, correct?**

A.   So do meth heads when they get shot.

Q.   **Okay.  All right.  What do you know about rabies?**

A.   It's a disease.  I don't know much other than that.

Q.   **Okay.  So you don't know anything -- you have no formal training on rabies then?**

A.   I've been given some play-by-play of what rabies is.  I have no formal training.

Q.   **Okay.  What play-by-play have you been given?**

A.   I was in animal rescue in my early 20s with Columbia Second Chance.  And in the military, you go through a little bit of rabies training, but it's not a in-depth training.

Q.   **Doesn't teach you how to spot rabies in dogs?**

A.   No.

Q.   **Okay.  You don't know what the various stages of rabies are?**

A.   It gives you cues; that's all.

Q. Okay. What kind of cues are you looking for?

A. It was just the dog's behavior, could possibly be upset, foaming from the mouth. That's about it.

Q. Okay. So your -- your familiarity with the symptoms of rabies are temperament and foaming at the mouth?

A. Pretty much stuff you got on the cartoon.

Q. Okay. Did you see Teddy foaming in the mouth?

A. Couldn't tell.

Q. Okay.

A. The way he was moving about, his white fur, can't tell the difference of foam or not.

Q. Okay. If you were unsure about whether this dog was sick or injured, why would you not call for guidance?

A. I didn't feel the need for guidance.

Q. You felt completely empowered to act under your own volition without any supervision?

A. Yes.

Q. Okay. Do you believe that Teddy posed an imminent danger to you when you had your encounter with him?

MR. FLEMMING: I'll object to the form. Vague.

You can answer.

THE DEPONENT: To answer?

I believe he -- I was fearful -- can you say it again?

BY MR. CRINNIAN:

Q. Do you believe that he posed an imminent threat to you?

A. An imminent threat? Not an imminent threat, no.

Q. Okay. Do you believe that he posed an imminent threat to another animal?

A. There was no other animals there, so no.

Q. Okay. Do you believe that he posed an imminent threat to another person?

A. At that time, no.

Q. Okay. To your recollection, did the dispatch report indicate that Teddy was behaving aggressively?

A. I don't recall that.

Q. So you said that you felt that you were empowered to make this decision on your own, correct?

A. Yes.

Q.    Okay.  Why did you feel empowered to do so?

A.    I didn't feel empowered.  I feel like I was doing my duty.

Q.    You felt it was your duty to shoot a Shih Tzu?

A.    My duty is to follow my categories -- my -- my tasks or my job.

Q.    Okay.  Did you receive any training at any point in your career as a police officer, specifically, on when it's acceptable to use force on animals?

A.    No.

Q.    "No."

Did you receive any training, presumably not at the Department of Corrections, about using force on animals, right?

A.    No.

Q.    Okay.  And I'm presuming in the military you didn't either?

A.    No.

Q.    Okay.  You began working for Sturgeon in September of 2023, and this happened in May of 2024, so you hadn't even been an officer for Sturgeon for a full year, is that correct?

A.    That's correct.

Q.    Okay.  Your direct supervisor was Sergeant Crawford?

A.    That's right.

Q.    And Sergeant Crawford never trained you on interactions with animals?

A.    No.

Q.    Sergeant Crawford never opened the policy manual and pointed out the sections in there prior to this incident --

A.    No.

Q.    -- about when it was justified to use force on an animal?

A.    No.

Q.    Have you ever been trained in the protections of constitutional rights and what your limits are as an officer?

A.    Yes.

Q.    Okay.  Let's talk specifically about the Fourth Amendment --

A.    Okay.

Q.    -- generally search and seizure.

A.    Okay.

Q.    That's what I want to talk about.  Have you ever been trained on the appropriate use of

force in seizing a person?

A. Mm-hmm.

Q. Okay. And you received training on that at the academy, I presume?

A. Yes.

Q. And you received it in the jobs that you've had since?

A. Yes.

Q. Okay. When you are using force on a person, generally speaking, what level of force is acceptable to use?

A. The least amount of force necessary.

Q. Okay. So the -- the least amount of force necessary in order to subdue the subject or stop the threat, correct?

A. That's correct.

Q. Okay. And that's that escalation that we talked about?

A. Escalating, deescalating, yes.

Q. Okay. Let's talk about some of your training background. So we already touched on this briefly. I want to go all the way back to the beginning. You know, you said that you were in the Army, right? And you were a medic in the Army?

A. Yes.

Q. Okay. And how many years were you in the Army?

A. I did less than three.

Q. Less than three?

A. Yeah.

Q. Okay. And did you go in trained specifically to be a medic or is that something that you --

A. Medical justice. I was in training to be a medic.

Q. So you were training to be a medic? Okay.

A. Yes. Medical justice was the material.

Q. Got you. Okay.

When you were in the Army, I presume that you went through basic training, firearms training, things like that?

A. Yes.

Q. Okay. Did they ever touch on rules of engagement with you?

A. Yes.

Q. Okay. What are "rules of engagement"?

A. I don't recall in depth now. It's been a while.

Q. That's fair. That's fair. Let me rephrase that. Generally speaking, what -- what are

rules of engagement for?

A. To summarize, because I don't -- I don't want to phrase it because I -- it's been a while since I read any of those. It was just don't respond to a threat if it's not a threat to you.

Q. Okay. And essentially it's there to prevent force from being used unnecessarily. Is that fair?

A. That's correct.

Q. And making sure everybody understands when it's appropriate, when it's not, correct?

A. That's correct.

Q. In your experience, in the time that you've been out of the military, do civilian police forces have rules of engagement?

A. Yes.

Q. They do? Okay. And -- and would that be, for example, the provision in the policy handbook about when it's acceptable to use force on an animal?

A. Yes.

Q. So you consider that a rule of engagement?

A. Yeah, of course.

Q. Now, you said you did just under three years with the Army, and I was looking at your DD-

214, and I noticed that you -- when you left, you left as a Private First, E1. Is that correct?

A. Mm-hmm.

Q. Okay. That's what you typically go into the military as, right?

A. It is.

Q. Okay. Did you advance beyond that E1 level?

A. Yeah, I did.

Q. Okay. And then you -- when you were discharged, you dropped back down to the E1 level?

A. Yeah, I dropped down before then, but yeah.

Q. Okay. You were stationed in Korea, correct?

A. That's right.

Q. Okay. Now, when you were separated from the military, it was not at the completion of your normal contract term, correct?

A. That's correct.

Q. Okay. You were separated from the military, is that correct?

A. Yeah.

Q. Okay. You were not dishonorably discharged, but you were not honorably discharged

either, were you?

A.    Mm-hmm.  It was honorable conditions, yes.

Q.    Under honorable conditions.  You were discharged under 14-12c of the Army regulations, correct?

A.    That right.

Q.    And that's a -- I apologize, I don't remember exactly how they call it -- but it's -- it's a significant offense usually that causes that, correct?  Or a pattern of offenses?

A.    Yeah.

Q.    Okay.  What did you get in trouble at the military for?

A.    I had trouble for drinking.

Q.    For drinking?

A.    Yeah.

Q.    Okay.  And they separated you, did you come right back to the United States right from Korea?

A.    Yeah, I finished at Scott Air Force Base in Illinois.

Q.    Okay.  And then you came to Missouri?

A.    Yes, I lived in University City at the time.

Q.    Okay.  That's St. Louis?

A.   Yes.

Q.   Okay.  After that, you went to the Missouri Department of Correction?

A.   Yes.

Q.   Correct?  And while you were at the DOC, were you -- were you trained on uses of force?

A.   Yes.

Q.   And you were trained on when it's acceptable or not acceptable?

A.   That's right.

Q.   Okay.  Now, while you were at the Department of Corrections, you were named as a defendant in a civil rights lawsuit for excessive force, weren't you?

A.   That's right.

Q.   Okay.  And do you remember what year that was?

A.   I don't recall the year.

Q.   Okay.  Do you remember what year the incident would've been?

A.   (Nods head.)

Q.   Okay.  But you separated from the Department of Corrections at some point and then went to become a police officer, correct?

A.   I separated to become a police officer,

yes.

Q. All right. That's the reason you left the Department of Corrections?

A. That's right.

Q. Okay. And -- just a moment here -- I just want to make sure I'm getting your work experience right here. January of 2020, you become a public safety officer for the Mexico Public Safety Department. Does that sound right?

A. Yes. I was in the -- the fire station for the first year. Yes.

Q. Okay. What is a -- is a public safety officer a police officer?

A. It's the same thing; we also did firefighting.

Q. Okay. So you did kind of a dual --

A. They put it together, yes.

Q. Okay. And you were there for a little over two years, correct? Almost three years?

A. That's right.

Q. Why did you leave Mexico Public Safety?

A. I was weary of being a firefighter and police officer. The requirements that they asked of you just couldn't add up to me.

Q. Okay. When you were with the Mexico

Public Safety Department, did you undergo any kind of training with regard to use of force?

A. Yes.

Q. Okay. Did they have policies on use of force against animals?

A. Yeah, I believe so.

Q. Okay. So you -- you had been trained by them at -- at least as far as their jurisdiction goes?

A. That's right.

Q. Okay. And then in February of 2022, you became a reserve sheriff's deputy for Randolph County, is that correct?

A. I was actually a deputy. That's -- probably was a rough draft but --

Q. Oh, okay. Okay. So you were -- you were a deputy then?

A. I was a deputy. I reserved after I left there.

Q. I apologize. That -- that's my misunderstanding.

When you were a deputy, did you go through training on use of force?

A. Yes.

Q. Did you go through training on use of

force against animals?

A.    What's that?

Q.    Use of force against animals?

A.    Yes.

Q.    Okay.  And then in November of 2022, you became a police officer at Hallsville, correct?

A.    That's right.

Q.    Okay.  Now we're going to talk quite a bit about Hallsville and your connections there, but do they have a policy on animal, you know, use of force against animals?

A.    Who?

Q.    Hallsville.

A.    Yes.

Q.    Okay.  Were you trained --

A.    Yes.

Q.    -- on using force at Hallsville?

All right.  Now, you began at Sturgeon -- like we talked about earlier -- around September of 2023, approximately September 11th?

A.    Yes.

Q.    Okay.  How did you get onto the Sturgeon Police Department?  Did you know somebody there and you put in your application?

A.    Sergeant Crawford.

Q.   You -- so you already knew Sergeant Crawford?

A.   Yes.

Q.   Okay.  And if I recall correctly, you were originally brought on as a reserve officer for Hallsville at the same meeting that Bryan Schultz from Hallsville was too, correct?

A.   I was brought on as a reserve officer in Sturgeon?

Q.   I'm sorry, in Sturgeon.  Yes.

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   And that same day, the Board of Aldermen hired you to be a full-time officer as well, correct?

A.   I believe so, yeah.

Q.   Okay.  Any idea why they brought you on as a reserve and then hired you immediately?

A.   It was something that they wanted to do.

Q.   Okay.

A.   Their intention was to have Hallsville assist there too.

Q.   Okay.  And Sergeant Crawford was the person who essentially brought you in to Sturgeon.

How did you know him before?

A.   I didn't.

Q.   Oh, I thought you said that you knew Sergeant Crawford before?

A.   From Hallsville.  Hallsville and Sturgeon worked together.

Q.   Right.

A.   A few things, trainings and whatnots.  Two small departments trying to make things happen together.

Q.   Okay.  So you knew him because you were at Hallsville and he was at Sturgeon and you crossed paths?

A.   That's right.

Q.   Okay.  Presumably, that's how you also knew Chief Bryan Schultz, because obviously you worked at Hallsville under him?

A.   That's right.

Q.   And you still work at Hallsville, correct?

A.   No.

Q.   Oh, you don't?

A.   No, I resigned yesterday.

Q.   Okay.  When you went to Sturgeon, Sergeant Crawford was your only supervisor, correct?

A.   That's correct.

Q.    There was no chief of police?

A.    That's right.

Q.    Did you believe that Sergeant Crawford was responsible for training you?

A.    Yes.

Q.    Okay.  And he was responsible for supervising you?

A.    That's right.

Q.    Okay.  Did you receive any explicit training on use of force by Sturgeon?

A.    No.

Q.    "No."

Did you receive any specific training on use of force against animals by Sturgeon?

A.    No.

Q.    Okay.  Were you ever told by Sturgeon, whether when you were hired or after, that the police department served as animal control?

A.    Yes, I was aware of that.

Q.    Okay.  Do you know when you would've become aware of that?

A.    The Sturgeon policies would affect the Hallsville's policies.

Q.    So Hallsville also has a policy that the police serve as animal control?

A.    Yeah.

Q.    Okay.  Now, Sturgeon -- strike that.  Were you aware as to whether Sturgeon had an agreement with Boone County to provide animal control services?

A.    They did not.

Q.    So it's your belief that Boone County did not provide any animal control services?

A.    Oh, it wasn't a belief; it was well known that animal control didn't respond to Sturgeon.

Q.    Let me clarify.  Boone County never -- they didn't respond to Sturgeon because that's not what the contract was for, correct?

A.    Right.

Q.    Okay.  But Boone County Animal Control did have a contract with Sturgeon that allowed you to take stray animals to Boone County Animal Control.  Were you aware of that?

A.    Did they have that contract?  That -- it was unknown to me.

Q.    Okay.  So you were aware that you were animal control, but Sturgeon never told you where you were supposed to take these stray animals?

A.    I -- we were told -- in the same way it happened in Hallsville -- we go down the street from

the animal control place, and we meet them at Casey's. I was never told to take them directly there. I was always under the impression that animal control didn't work with Sturgeon. They didn't have a contract with Sturgeon.

That was my understanding. And we would drive it to them and they would meet us somewhere, but not on their property. So I was led to believe that they were just doing us a courtesy. I'm -- I was unaware of any contracts.

Q. Okay. During your time as a Sturgeon officer, how many animal calls do you think that you ended up on?

A. I recall -- I can't even count. It wasn't a lot, but it was so spaced out, and I know there was many.

Q. Okay. Do you believe that you were called out to other animal calls probably the same week as the Teddy incident?

A. No.

Q. You don't think you were?

A. I don't believe so.

Q. Okay. When you would go out on an animal call, let's say it was for a stray animal, what would you do with that animal?

A.    Fortunately, I don't think I ever had a stray call up there.  Most of them had an owner that could be identified, or was nearby, or the animal ran to their house.

Q.    Okay.  So you've never -- you never had to catch an animal prior to Teddy?

A.    Yes.  In Hallsville I did, not in Sturgeon.

Q.    Okay.  So --

A.    That I remember.  I really don't.  There was so many animal calls.

Q.    Okay.  At Hallsville, did they provide you with a catchpole?

A.    They did.

Q.    Okay.  And is it the same type of catchpole that you were given at Sturgeon?

A.    Yes.

Q.    Okay.  And is that how you secured animals when you would go out on a call for Hallsville?

A.    No.

Q.    How would you secure them?

A.    Most of the time the animal just listened. I would bait them with a treat, or they were injured, and we have to dispatch it, or would take it to the -- the Humane Society where they would

dispatch it.

Q. Okay. How many -- how many animals have you dispatched while acting as a police officer between all of your jobs across all the police departments?

A. Six.

Q. "Six." And that's in five years of being a police officer, is that correct?

A. Yes.

Q. How many animals do you believe that you've dispatched at Hallsville?

A. In Hallsville? Three.

Q. And you believe only one at Sturgeon?

A. No, one of those was -- that's the one I took to the vet to be dispatched. I didn't physically dispatch it, I transported it to the emergency room, and they dispatched it.

Q. From Hallsville?

A. Yes. Under my orders, yes.

Q. Okay. Okay. What -- what kind of dog was that? Do you remember?

A. I don't remember. It was like a Shepherd of some sorts.

Q. So it was an even bigger dog?

A. It was a bigger dog.

Q.   Okay.  And it was serious -- you said it was injured?

A.   He got hit by a car and was laying in a ditch bleeding.

Q.   Okay.  How did you get the dog into your car to take it to the vet?

A.   I lifted it.

Q.   So you -- you picked up a -- an injured German Shepherd or large -- a similar --

A.   A larger dog.  Yes.

Q.   You picked up an injured larger dog and put it into your patrol car?

A.   Yes.

Q.   Okay.  Were all the animals that you dispatched dogs?

A.   No.

Q.   What other animals have you dispatched?

A.   Racoons and deers.

Q.   Okay.  So wild animals.  So the only domestic animals were dogs?

A.   Yeah.

Q.   Okay.  Did you ever have any complaints against you, whether formal or informal, in any of the other situations where you dispatched a dog?

A.   No.

Q.   "No."  Now, going back to your training, I'm assuming that you probably didn't do a lot of report writing in the Army, correct?

A.   That's right.

Q.   Okay.  But Department of Corrections you probably did?

A.   Not really.

Q.   Oh, okay.  How about as a police officer, though?

A.   Yes.

Q.   Okay.  Did you receive any specialized training on how to write a report?

A.   In the academy, and just throughout -- throughout law enforcement.

Q.   Just working with other officers?

A.   Working with other officers, the videos, through the academy.  Yeah.

Q.   Okay.  Did Sturgeon give you any specific training on how to write a report?

A.   No.

Q.   Okay.  If you had to summarize what it is that makes a good police report or an incident report, what types of things would you say make a good incident report?

MR. FLEMMING:  I'll object to the form.

Vague.

You can answer.

THE DEPONENT:  The purpose of being there, observation, the decision.  And if you -- we do have a -- a finish such as "arrest" or "dispatch." That'd be the last conclusion.

BY MR. CRINNIAN:

Q.   Do you believe it's important to be as factually accurate as possible in your -- your report writing?

A.   I believe so, yes.

Q.   Do you believe it's important to be truthful in your report writing?

A.   That's correct.

Q.   Okay.  When you write your reports, do you write and edit them yourself or do you have other people help you edit them?

A.   I wouldn't say help.  I -- I write it, pass up the chain for approval, and then they send it back down to me.

Q.   Okay.  Is that what you did with the report in the Teddy shooting?

A.   Yes.

Q.   Okay.  So you wrote the report, passed it up to Crawford?

A.    Mm-hmm.

Q.    Okay.  Do you recall if he passed it back down to you to make any revisions?

A.    He did.

MR. CRINNIAN:  "He did."  Okay.

Right.  Officer Woodson, I'm going to hand you what I'm marking as plaintiff's Exhibit 1.

THE REPORTER:  And I apologize for the interruption.  Did you say Exhibit 1?

MR. CRINNIAN:  Yes, ma'am.

THE REPORTER:  Okay.  Great.  Thank you.

(Pause in the proceedings.)

MR. CRINNIAN:  Hey, Jennifer, we are going to have to temporarily postpone.  We apparently have a gas leak in the building next door.

THE REPORTER:  Oh, let's go off the record.

MR. CRINNIAN:  Yeah.  Let's go off the record.

THE REPORTER:  Thank you.  The time is 9:13.  We are off the record.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 9:42.  We are on the record.

BY MR. CRINNIAN:

Q.    Okay.  Officer Woodson, we're back on the record.  Do you understand you're still under oath?

A.    Yes.

Q.    Correct?  Okay.  We'll try to pick up where we left off here.  One thing I do want to go back and I -- I do want to ask a couple of questions real quick.  You had mentioned that you resigned from Hallsville yesterday, correct?

A.    That's correct.

Q.    And you are no longer working for a police department as of right now?

A.    That's correct.

Q.    Are you presently seeking employment as a police officer?

A.    No.

Q.    Okay.  Why did you leave Hallsville?

A.    I started picking up another job.

Q.    Okay.  What other job?

A.    Of process serving.

Q.    Oh, okay.  So you're process serving here in the area then?

A.    That's right.

Q.    Okay.  Were you subject to any discipline or anything at Hallsville?

A.    For me leaving?

Q. No. No. For -- for anything in general. I mean, did you -- were you ever disciplined or anything while you were at Hallsville?

A. Yes.

Q. Okay. For what?

A. Oh. Allegations of a male made a comment that I violated his rights.

Q. Okay. And who initiated the discipline? Would that have been Chief Schultz?

A. That was Chief Schultz, yes.

Q. Okay. And when was that?

A. I believe last month sometime. I don't recall.

Q. Oh, so this is recent?

A. Back in February. Back in February. Yes.

Q. "Back in February." Okay.

Were you under an investigation at Hallsville?

A. No.

Q. "No." So they -- did they give you an informal counseling?

A. It was two days unpaid. It was a --

Q. Okay. Two-day -- two-day unpaid suspension and --

A. That's right.

MR. CRINNIAN: Okay. All right. Let's go back to your hiring at Sturgeon. I'm going to hand you what I've marked as plaintiff's Exhibit 2.

(WHEREUPON, Exhibit 2 was marked for identification.)

BY MR. CRINNIAN:

Q. And we're just going to spend a moment with this. Do you recognize this Officer Woodson?

A. I believe it's part of the application for the Sturgeon Police Department.

Q. Okay. Do you -- does that look like your handwriting?

A. Yes.

Q. Okay. I'll represent to you that this was provided to us by the City of Sturgeon in discovery as part of your employee file. So I'm assuming that this is yours, but that's why I want to verify that you believe that it is. Can you please read what you wrote under your occupational and career goals.

A. Do I have to read out loud?

Q. Yes, please.

A. All right. My goals are to better myself while providing a safe community while bettering myself. I will -- I don't even know what those letters are -- myself on the path to run for

sheriff's office.

Q.   Okay.   Are you planning on getting back into law enforcement?

A.   I don't -- I don't have a plan.  I don't know.

Q.   Okay.   So, tentatively, your plan for running for sheriff is off the table?

A.   I -- I'm just staying home with my children and processing right now.

Q.   Okay.   Can you please read the next section under "Why do you feel that being a police officer is important work?"

A.   "Safeguard freedom, preserve life and property while protecting constitutional rights of the citizen -- of citizens."

Q.   Okay.   When you say "safeguarding freedom," what kind of things do you mean that you do as a cop that safeguards freedom?

A.   Just everyone feel comfortable within themselves, their property.

Q.   Okay.   You had a number of citizen complaints about you, didn't you, while you worked at Sturgeon?

A.   Yeah.

Q.   Okay.   Do you believe that you -- that you

made those citizens feel like you were safeguarding their freedoms?

MR. FLEMMING: I'll object to form. Calls for speculation.

THE DEPONENT: Okay.

MR. FLEMMING: You can answer.

THE DEPONENT: Well, say it again, please.

BY MR. CRINNIAN:

Q. Do you believe that the citizens of Sturgeon felt that you were protecting their freedoms considering how many complaints they had about you?

MR. FLEMMING: Same objection.

THE DEPONENT: They had complaints because they -- they -- they felt some type of way. I believe I -- well, elaborate on do I believe it, I knew I was doing the job and they just had some -- an issue with it.

BY MR. CRINNIAN:

Q. Sturgeon's a fairly small town, right? About 900 people?

A. It is.

Q. Okay. You continue there and you say, "Protecting the constitutional rights of citizens," correct?

A.    That's right.

Q.    Okay.  Now, we talked earlier about the Fourth Amendment right to be free from unreasonable searches and seizures, correct?

A.    Yes.

Q.    You understand you've been sued here for an unreasonable seizure by killing my client's dog, right?

A.    I understand that's the basis of the lawsuit.

Q.    That's -- that's the basis of it. Correct.

You understand that the basis of our lawsuit is that Mr. Hunter has a constitutional right to be free from having an agent of the government seize his property.  Do you understand?

A.    I understand that, yes.

Q.    Okay.  Do you think in this situation you protected Mr. Hunter's constitutional rights?

MR. FLEMMING:  I'll object to the form. Calls for speculation and legal conclusion.

You can answer.

THE DEPONENT:  Do I believe I protected his constitutional rights?

MR. CRINNIAN:  Yes.

THE DEPONENT: I would say I unknowingly -- if there was a violation that was violated, but I did not intentionally violate his rights.

BY MR. CRINNIAN:

Q. Okay. Okay. That's all we need on that one then. We can set that aside. And what I'm going to do is I'm just going to keep all of these documents together here since we have to maintain them.

A. I understand.

Q. If we have to go back to multiple here, we can get them.

All right. So where we left off, we were talking about police reports. Do you recall that?

A. Yes.

Q. Okay. And we talked about the importance of being truthful in police reports.

A. That's correct.

Q. And we talked about the importance of being accurate and precise in everything you say, correct?

A. Mm-hmm.

MR. CRINNIAN: Okay. I'm going to hand you what I've marked as plaintiff's Exhibit 3. I apologize, there's two pages to that.

MR. KOLDE:  Hey, guys, did we look at Exhibit 1 yet?

MR. CRINNIAN:  Yeah.  Exhibit 1 was the incident --

THE DEPONENT:  Right.  You skipped past that.  We got distracted.

MR. KOLDE:  You did mark this one.

MR. CRINNIAN:  Oh, I marked his here.

MR. KOLDE:  So you marked his as?

MR. CRINNIAN:  Exhibit 2.

MR. KOLDE:  Exhibit 2.  Okay.

MR. CRINNIAN:  Yeah.

THE REPORTER:  And I just apologize, who -- who's speaking in the background?

MR. CRINNIAN:  I apologize.  That was Mr. Kolde and Mr. Jordan.

THE REPORTER:  Okay.

MR. CRINNIAN:  We -- we're just trying to figure out our exhibits here real quick.

THE REPORTER:  I understand.

MR. CRINNIAN:  Okay.  Actually, never mind, we already -- I'll take Exhibit 3 back.  I apologize.  We actually already introduced that.

THE REPORTER:  And -- and just for the record, Mr. Crinnian, I didn't get the description

on Exhibit 1.

MR. CRINNIAN: Exhibit 1 was the incident report.

THE REPORTER: Thank you.

MR. CRINNIAN: And we're actually going to have two incident reports, so just a heads up.

THE REPORTER: Okay.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MR. CRINNIAN:

**Q. So I don't know why I printed off two copies of the initial incident report.**

**So let's start with Exhibit -- what was originally Exhibit 1. Do you recognize that document?**

A. Yes.

**Q. Okay. And is that the incident report that you wrote?**

A. That's right.

MR. KOLDE: Sorry, Eric, just to clarify, is this Exhibit 1 then?

MR. CRINNIAN: Yes. Yes.

MR. FLEMMING: What's the Bates stamp on the bottom?

MR. CRINNIAN: 1434 and 35.

MR. FLEMMING:  Okay.

THE DEPONENT:  Yes.

BY MR. CRINNIAN:

Q.    Okay.  And do you recall when you wrote this incident report?

A.    This was the first draft.  I believe I wrote that the same evening of that incident.

Q.    Okay.  So, after the incident, you handled everything, finished the report, and then clocked out for the day.  Does that sound right?

A.    Yes.

Q.    Okay.  In this report you identify that the caller is Tiffany Ware, correct?

A.    Yes.

Q.    And the caller identified that she found a dog, there is something wrong, looks blind in one eye, running into trees and walking sideways.  Is that correct?

A.    That's right.

Q.    Okay.  Does that information accurately reflect what you observed when you arrived?

A.    I wouldn't say "looks blind."  I'm not sure what looks blind looks like.  Running to trees, yes.  Walking sideways, yes.

Q.    Okay.  Just so I'm clear, you are aware

that dogs can be blind and deaf, right?

A.   I'm aware.

Q.   Okay.  It says, "Unknown if animal type is dangerous," correct?

A.   Yeah, it says that.

Q.   What -- in these types of calls, when something is a type of animal that's dangerous, is that usually a dog or is that usually -- sounds like a raccoon or some wild animal?

A.   That is a -- that's the dispatch notes.

Q.   I -- I understand.

A.   Okay.  Okay.

Q.   I understand that.

You relied on these dispatch notes when you were responding?

A.   That's right.

Q.   Okay.  "Animal behavior NON-DANGEROUS." Do you see that?

A.   I see that.

Q.   Okay.  And that is information that the dispatcher would've collected direct from the complainant and put into this report?

A.   Yeah.

Q.   Okay.

A.   We hope so.

Q. Okay. "White dog with mud and dried blood." Do you see that?

A. I see that.

Q. Okay. And it's your testimony that you observed mud and blood on Teddy when you arrived, is that correct?

A. Yeah. Substantive belief that it could be those two items.

Q. Okay. And very small dog. And you'd agree that Teddy --

A. Is a small dog.

Q. Okay. And it says "no contact," and we talked about that earlier, correct?

A. That's right.

Q. Okay. Now, the next paragraph you say, "When you arrived in the area, an unknown white male flagged me down and stated, 'The dog looks injured, I can't bring myself to...it.'" Is that quote an exact quote or is that a summary of what he said?

A. Exact quote.

Q. That's an exact quote. So he trailed off after "I can't bring myself to..."?

A. He did like a (unreportable sound), like imply.

Q. Okay. Do you have any idea who this white

male was?

A.   I don't know his name.  I never met the individual.  He -- I was turned around in the street looking for the dog, and he flagged me down.

Q.   When you were turning around in the street?

A.   When I was turning around in the driveway, I backed up and turned back around and came back onto the street.

Q.   Okay.  So when you -- when you approach the house and you have to make the turn-around, at what point does this individual flag you down and say, "The dog's over there; I can't do it myself"?

A.   I was driving north and I turned around, came back south on Fairgrounds, and that's when he flagged me down.  And he was directly across the street from her, on kitty-corner to her house.

Q.   Okay.

A.   And he's on opposite side of the road.

Q.   Okay.  So he would've been on the east side of the road pointing to the west?

A.   I believe so, yes.

Q.   Okay.

A.   And his front of the house had a view of everything going on across the street.  Yes.

Q.   Okay.  And the reason I ask that is because the next sentence of that paragraph says, "The male pointed east across the roadway to a tree line behind 511 North Fairgrounds."  So I just want to make sure that we have all of our directions, because I -- I believe now you're recounting this correctly that you were driving north and you turned around, and that Teddy was on the west side of Fairgrounds?

A.   Yes.  Yes.

Q.   Okay.  Okay.  So I just want to make sure I'm real clear.  You're driving north.  Do you see the individual -- talk to the individual first before turning around?  Or do you turn around and that's when he talks to you while you're turning around?

A.   No, I turned around; I came back down.  He flagged me down.  I didn't see him going that way first.  I knew where I was going to be looking, which is the west side; he's on east side.

Q.   Okay.

A.   I'm driving north; I turned around, and on my way back down, I saw him.

Q.   Okay.

A.   And he flag me down.

Q.   How's -- approximately how long after your interaction with this person did you turn on your body camera?

A.   I believe I turned my body camera on as I pulled in the driveway.  Really don't recall.

Q.   Okay.  You said you watched the video in preparation for today's deposition, though, right?

A.   Yeah, that's right.

Q.   And you don't recall seeing you talking to any unknown male on video?

A.   Well, I was driving the car, he flagged me down.  And there was window down, immediately started talking.

Q.   Okay.  You then say you observed the dog's tongue hanging out, right, in the report?

A.   That's right.

Q.   And is that an unusual thing for a dog?

A.   From my experience, yes.

Q.   Seeing a dog's tongue hanging out of his mouth is unusual?

A.   In that -- in that situation, yes.

Q.   Okay.

A.   A dog panting heavily, breathing, yes, a dog tongue hangs out.  But in that position with the tongue hanging out, just hanging out, I've never

seen it.

Q. Okay. This -- this is May, though, right? This is summer -- start of summer?

A. No.

Q. "No." Okay. All right. "The dog's fur had mud and blood throughout it," is what your statement of this incident report says. That confirms what you've testified to today and what --

A. It is.

Q. -- was in the report true to you from dispatch, correct?

A. That's right.

Q. Okay. "I attempted to gather the dog with a catchpole."

A. That's right.

Q. Correct. "Not knowing if the dog would bite me, I did not attempt to use my hands to grab the dog."

A. That's correct.

Q. Okay. You were concerned about being bitten by Teddy, right?

A. Yes.

Q. Okay. Earlier you testified that you picked up a large dog similar to a German Shepherd that had been hit by a car, and brought it to a

veterinary hospital to be euthanized.

A. Yes.

Q. Why did you feel comfortable picking up a severely injured large dog, but you were afraid to pick up an 11-pound Shih Tzu?

A. Because of the response of the animals. Not all animals are the same sizes -- not all animals' aggression are the same just because of their size.

Q. Okay. Did Teddy exhibit any signs of aggression towards you?

A. Did he exhibit any signs of aggression? No.

Q. Okay. I'm assuming that the German Shepherd didn't either?

A. No, the German Shepherd was a sweetheart.

Q. Okay. What was Teddy?

A. Teddy was an injured animal.

Q. So was the German Shepherd.

A. Yup.

Q. So you -- you picked to shoot Teddy, but you picked to pick up a German Shepherd, right?

A. No, I picked a response to the situation at hand. The German Shepherd responded well. I was able to get the German Shepherd in the custody into

the car.

Q. Okay. You say, "Not knowing the medical situation of the animal" -- can you elaborate on that? What -- what were you unsure about the medical situation of the animal?

A. I never had any contact with the dog prior to that day. I was unaware if the dog was blind. I was unaware of the dog being deaf. So his responses were just simple responses to me, not, "Oh, this is because of this, this is because of that."

Q. In your other encounters with animals, since you have had to do animal control responsibilities for both Sturgeon and Hallsville, do you ever know the medical situation of the dogs that you're encountering?

A. We never know.

Q. Okay. But in this situation, you made it a point of pointing out you didn't know what his medical situation was?

A. That was the situation that I report about.

Q. "Not knowing who the owner of the dog was at the time of the call, I drew my service weapon and discharged one round at the dog." Is that correct?

A.    No.  I wouldn't -- I wouldn't say "not knowing the owner," but it was in the report, yes.

Q.    Okay.  Did the fact that you didn't know who the owner was play a role in your decision to dispatch Teddy?

A.    No.

Q.    Okay.  So your testimony is that you dispatched Teddy solely because you believed that he was injured?

A.    That's right.

Q.    Okay.  And, again, to be clear, Teddy didn't show any aggression to you?

A.    No.

Q.    He didn't charge you?

A.    I can't confirm if it or deny it was a charge or not.

Q.    But he was --

A.    He ran toward me, I was able to maneuver away from him, yes.

Q.    But he wasn't growling and barking and snarling?

A.    He wasn't making any noise.

Q.    Okay.  You drew your service weapon, discharged one round.  After observing the dog was not at rest, you discharged a second round, is that

correct?

A.   That's correct.

Q.   Okay.  And so after the first shot, Teddy was not dead?

A.   I believe, yes.

Q.   Okay.  So you just made sure he was?

A.   What was what?

Q.   Was -- was deceased.

A.   I made sure he wasn't suffering.

Q.   Right.  And then you, again, report, "I observed no tags nor collar around his neck."  Is that correct?

A.   That's correct.

Q.   Okay.  And we'll go through the video.  I know that you go back to your vehicle, you grab a container, you put Teddy in the container.

A.   That's right.

Q.   You take Teddy from 511 North Fairgrounds. Where did you take Teddy after that?

A.   I took Teddy down to the tire shop and set him outside of my cruiser, inside the container.

Q.   Okay.  So you -- I -- I just want to be clear I'm -- make sure -- make sure I'm understanding this.  You drove your cruiser to the tire shop?

A.    Mm-hmm.

Q.    And then you took the entire container out of your vehicle, correct?

A.    That's right.

Q.    And where did you put that container?

A.    I set it next to the building, away from wildlife or any other -- anyone could have tampered with it.

Q.    Okay.  Is this tire shop like an open, functional business?

A.    No.

Q.    So it is an -- and I -- I apologize, I'm not from Sturgeon, so --

A.    It -- it's an abandoned building near the railroad tracks, away from residential homes, away from any wildlife, away from the wood line where a creature could come out.

Q.    Okay.  So you just kept him in a tote so he wouldn't -- nothing would bother him --

A.    Exactly.

Q.    -- and he was away from people?

A.    Sturgeon doesn't have a good cell signal, and I was ending up not having good cell signal, so I staged him somewhere so I can get a good cell range.

Q.    Okay.

A.    I was running back to the office to call Sergeant Crawford.

Q.    Okay.  Now, when the incident was first over and you got back in your car, did you make a phone call at that point?

A.    I don't recall.

Q.    Okay.  But you do recall calling Sergeant Crawford after you dropped Teddy off the tire shop?

A.    That's right.

Q.    Okay.  Now, you've said that you do or you did animal control for Hallsville and also for Sturgeon.  At any point, have you been trained as far as what the protocol is for dealing with an animal that may potentially be rabid?

A.    Normally, a protocol if someone gets bitten and for them to get tested and for the animal to get tested.

Q.    Okay.  Now, you were at some point concerned, apparently, that Teddy might have rabies.  Is that correct?

A.    It's possible, yeah.

Q.    Well, I --

A.    Oh, if I'm concerned?

Q.    Yes.

A.    Yeah, that's -- it's just one of the phrases used in the policy.

Q.    Okay.  So you were concerned that he may have had rabies, and so you put him in a container and put him outside of the building, correct?

A.    Yes.

Q.    Okay.  Are you aware as to what the laws and regulations are in Missouri with regard to if you have an animal that you suspect may be rabid what you're required to do with it?

A.    I wouldn't say I'm a expert on anything of the sorts.  Have I read them?  Yes, I read them.

Q.    Okay.  So you left Teddy in this container, went back to the station and called Sergeant Crawford?

A.    That's right.

Q.    Okay.  What did you tell Sergeant Crawford?

A.    I just -- just repeated the incident, what took place while I was out there, and -- and that's it.  It happened.

Q.    Okay.  What did Sergeant Crawford tell you?

A.    He said, "Okay.  Write it up."

Q.    Okay.  And is that what you -- you didn't

immediately do that because you got a phone call from Mr. Hunter, right?

A. That's right, yeah.

Q. Okay. And you went and met Mr. Hunter at the police station or City hall?

A. That's right.

Q. Okay. And you and he had a -- had some words, and then you went and picked Teddy's body back up, correct?

A. Yes.

Q. Okay. Was Teddy still in the container at the tire shop?

A. Yes.

Q. Okay. Crawford didn't tell you to move his body somewhere else?

A. No.

Q. Okay. Were you going to just leave Teddy in the tote outside of the tire shop --

A. No.

Q. -- indefinitely?

A. I knew there was next -- there's more steps to the process. You can't just leave animals laying like that.

Q. Okay. So what steps in the process were you expecting?

A.   From the past is someone will pick it up and dispose of it.  But, I mean, that's normally wildlife.  I've never had to deal with a dispatched animal in Sturgeon, and so I had to be sure on how they handled it.

Q.   Okay.  How would you deal with dispatched animals at Hallsville?

A.   In Hallsville?

Q.   Mm-hmm.

A.   We had a deer guy -- we had a wildlife guy that would come and get it, and he would dispose of that wildlife.

Q.   Okay.  What if it was a dog?

A.   Take it down to the -- to probably most likely the vet, the clinic, where you take them to get dispatched that way, and then they just dispose of them through their medical facility.

Q.   Is the vet clinic a private vet clinic or is it part of the -- is it Boone County's vet clinic?

A.   I honestly don't know.

Q.   Is it in Sturgeon?

A.   What's that?

Q.   Is it in Sturgeon?

A.   No, it's in Columbia.

Q.   "It's in Columbia."  So no matter what, you would've had to bring a dog to Columbia to have it disposed of?

A.   Yes, I think it's ME-related.  I'm not sure.

Q.   Right.  Okay.  Okay.  I think that finishes up Exhibit 3 or, I'm sorry, Exhibit 1.  Now let me just ask you this:  Why would you not take Teddy's body just to the station if you were going to have to take him somewhere else anyway?

A.   Why didn't I just take him to the station?

Q.   Yeah.  If you had to call Crawford anyway, and you were going to have to put him in the car and take him to Columbia, why take him to the tire shop?

A.   I really didn't think much into it.

Q.   Okay.

A.   I just left him in the open area where I knew he wouldn't get tampered with.

MR. CRINNIAN:  Okay.  Okay.  So I'm handing you what has been marked as Exhibit 3 now.

MR. JORDAN:  Eric, you have this one as Exhibit 3.

MR. CRINNIAN:  We're getting rid of that one.  That was a duplicate.

MR. JORDAN:  Okay.

MR. CRINNIAN:  So this will be the new Exhibit 3.

MR. JORDAN:  And you want to also just identify by the Bates number?

MR. CRINNIAN:  Yeah, that's probably a good idea, yeah.

(WHEREUPON, Exhibit 3 was marked for identification.)

BY MR. CRINNIAN:

Q.  All right.  Now, when we were talking about the first incident report Bates numbered 1434, you said this was your draft, correct?

A.  That's right.

Q.  Okay.  When you say it was your draft, what do you mean?

A.  It was the -- we can -- just a draft.  You type it all out.

Q.  And this is what you sent to Sergeant Crawford?

A.  That's right.

Q.  What did Sergeant Crawford say in response to this draft?

A.  He didn't approve it and wanted me to elaborate more.  That -- that's when the second draft came up.

Q.   Okay.  Did Sergeant Crawford tell you via email that he wanted you to make changes?

A.   I don't recall --

Q.   You don't recall?

A.   -- if it was a phone call.  I -- I don't recall.

Q.   Okay.  But Sergeant Crawford instructed you to use this -- I mean, or to fill out --

A.   Yes.

Q.   Okay.  And is it your testimony that you wrote this new incident report yourself?

A.   Yes.

Q.   Okay.  Did anybody help you with this incident report?

A.   There's -- there's help along the way. The supervisor approve and disapprove reports.

Q.   Okay.  So did Sergeant Crawford help you write this new one?

A.   He didn't help me write it, but yes.

Q.   Okay.  Did he edit it for you?

A.   Yeah.

Q.   Okay.  And what editing did he do?

A.   I don't recall what editing.  It's all my words. I'm like, okay.  Yeah.

Q.   Okay.  So let's go ahead and look at this

incident report.  This is document 1429 that we are calling Exhibit 3.  The beginning is verbatim the same as the other one, correct?

A.  That's right.

Q.  Okay.  You kept the part about "When I arrived in the area, the unknown white male" -- correct?

A.  That's right.

Q.  Okay.  And then in the third paragraph, the language begins to change, correct?  Language has been rewritten?

A.  Yes.

Q.  Okay.  In the version in Exhibit 3, you did not say that you were afraid that the dog would bite you, did you?

A.  I did not.

Q.  Okay.  In the updated version, you said, "The dog also appeared to be suffering from possible injuries in its neck and facial area."  That was not in the original report either, was it?

A.  It was not.

Q.  Okay.  The original version did not include the language that says, "Based on the strange behavior that it was exhibiting in the overall unkempt appearance of the dog, I suspected

that it was infected with rabies," did it?

A. Did not.

Q. The original version said nothing about suspecting the dog had been abandoned by its owner, did it?

A. Did not.

Q. The original report did not include the language that says that you believed that the dog had been thrown from a moving vehicle, did it?

A. Did not.

Q. The original language did not say anything about fearing that the dog would possibly bite a citizen, did it?

A. Did not.

Q. Now, earlier today, you testified there was nobody else around, right?

A. That's right.

Q. There were no other dogs around?

A. That's right.

Q. You testified you didn't really have a particular concern of any imminent danger to anybody else around Teddy, correct?

A. No, that's right.

Q. Then why do you say in your amended police report that you were afraid that he would possibly

bite a citizen and that you had no other recourse?

A.   If I was to let him be and roam around.

Q.   He exhibited absolutely no behaviors indicative of aggression, did he?

A.   Toward me, from what I could see, no.

Q.   And the dispatch report said that he was not behaving aggressively, correct?

A.   That's right.

Q.   Okay.  And yet you still felt that you had no other recourse?

A.   No other recourse to relieve his suffering?

Q.   To shoot him.

A.   To relieve suffering, yes.

Q.   You can call it relieve suffering if you want to.  That's part of the dispute here, Officer Woodson.

Your original report didn't say a single word about rabies, did it?

A.   It did not.

Q.   Didn't say anything about the dog being abandoned?

A.   No.

Q.   Didn't say anything about the dog being thrown from the vehicle?

A.    No.

Q.    Who added that language?

A.    I did.

Q.    No, you didn't.

A.    Yes, I did.

Q.    Okay.  Officer Crawford on May 20th posted a Facebook post for the City.  Are you aware of that?

A.    Officer Crawford posted that?

Q.    Well, let's -- let's say the mayor posted it.  Whoever posted it, had they read your police report by the time they posted that?

A.    I don't know.

Q.    You don't know.  But you know you didn't put anything about rabies in your police report?

A.    The original.

Q.    The original police report.  So any mention of rabies by the City or on Facebook did not come from you until you came out with this amended report, right?

A.    What they posted or read prior to their post is -- I can't say.

Q.    Okay.  The original report also doesn't say anything about you placing him in a plastic tote and transporting him away from a residential or

occupied area. Did it?

A. Did not.

Q. If you turn to the second page of this new report, you elaborate on your interaction with Mr. Hunter and you say that he was visibly upset, which I think is probably true, correct?

A. That's right.

Q. You attempted to explain to him what had transpired, but he didn't appear to accept your explanation. You drove back, retrieved it, and brought it back to SPD where you gave it back into Hunter's custody. None of that language is in the first report, is it?

A. It was not.

Q. Let's look at the specific language in these two reports, Officer Woodson. On the first report, you call your weapon a "services weapon," correct?

A. I did, yeah.

Q. In the updated report, it's a "service weapon," isn't it?

A. Mm-hmm.

Q. It's not services? In your original report, you said that you attempted to use the catchpole to gather the dog. In the new version,

you say that you attempted to capture the dog.

A.   Okay.

Q.   Why did you change your language from "gather" to "capture"?

A.   Rough draft, final.

THE REPORTER:  And I apologize, gentlemen, I believe I may be losing you.

(Pause in the proceedings.)

THE REPORTER:  Can we go off the record?

MR. CRINNIAN:  Yeah, that's fine.

THE REPORTER:  Okay.  Thank you.  The time is 10:11.  We're off the record.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 10:12.  We are on the record.

BY MR. CRINNIAN:

Q.   Okay.  Officer Woodson, do you know what metadata is?

A.   No.

Q.   Okay.  "Metadata" is data about a file that is stored in the file, tells some things like who created a file, when it was created, things like that.

A.   Okay.

MR. CRINNIAN:  Okay?  Now, I've already

spoken with opposing counsel on this. I don't know if -- are you guys going to have any objection to me showing him metadata if it's not Bates tagged?

MR. JORDAN: If you just put an exhibit sticker on it, then I don't care.

MR. CRINNIAN: Okay. All right. Sounds good.

MR. JORDAN: Sorry, that was Mr. Jordan.

MR. CRINNIAN: Oh, sorry. Yeah, that was Mr. Jordan.

THE REPORTER: Thank you.

MR. CRINNIAN: This will be number?

MR. JORDAN: Exhibit 4.

(WHEREUPON, Exhibit 4 was marked for identification.)

MR. FLEMMING: And I'm fine with that. I'll just object that this wasn't produced in discovery.

MR. CRINNIAN: Yeah, we can -- yeah, we can do whatever we need to with that.

All right. And this, I do not actually have enough copies for everybody, but this is the metadata that you guys --

MR. JORDAN: Well, I'm almost sad.

MR. CRINNIAN: All right. If you'll take

-- if you guys will take a look at that real quick and then we'll ask him about it.  And if you guys want to, if you'd rather, I can hook the screen up and show him metadata from the file -- the file live if you don't want a printed version.

MR. JORDAN:  We want to make sure we know which document this one came from, so as long as you --

MR. CRINNIAN:  Yeah.  And --

MR. JORDAN:  -- identify that.

MR. CRINNIAN:  -- what I did, if you look at the top --

THE REPORTER:  And I'm sorry, who was that?

MR. JORDAN:  Mr. Jordan.  Sorry.  I'll start saying Jordan before I start talking.  Is that okay?

THE REPORTER:  Thank you very much.

MR. JORDAN:  Okay.

MR. CRINNIAN:  The top of the files have the file number 24-0048.  I numbered them with the times that they were sent or received.  So that one is 2:08; the other one that I've got is 2:54.  Again, we can pull the files up and look at the metadata live if you guys want to.  This is why we

--

MR. JORDAN:  I do want to make sure --
it's just for the -- just for the record purposes --

MR. CRINNIAN:  No, I understand.

MR. JORDAN:  -- and this one says 2:06 at
the top.

MR. CRINNIAN:  Oh, 2:06, not 2:08.  Yeah.

MR. JORDAN:  Okay.

BY MR. CRINNIAN:

Q.  All right.  Officer Woodson, I'd like for
you to look at that file or that document that I
just placed in front of you.  On the right-hand side
of that file, do you see where it says "Properties"?

A.  Yes.

Q.  And it tells you the size, the number of
pages, the number of words, right?

A.  Yes.

Q.  It also tells you related dates.  It says
that this document was created May 19th, 2024 at
8:26 p.m.  Do you see that?

A.  Yes.

Q.  Okay.  And that appears to match up with
what we've talked about, about how after you
finished with the call, you went back, you finished
the report, and then you clocked out at the end of

the night, correct?

A.   Yup.

Q.   Okay.  And then it says that it was last modified at 8:55 p.m. that same day.  So you worked on this file for approximately 30 minutes.  Do you see that?

A.   Yes.

Q.   Does that sound about how long it took you to complete this draft?

A.   No.

Q.   But seems like it -- it is probably reasonable it took you about that long?

A.   Took far as the -- the first draft?

Q.   Yes.

A.   Oh yes.

Q.   Okay.  And then if you go down below that, you see where it says "Related People"?

A.   No.

Q.   On the right-hand side.

A.   Oh, right-hand?  Yes.

Q.   There -- there's a small header that says "Related People."  Do you see where it says, "Last modified by Myron Woodson"?

A.   Yeah.

Q.   Okay.  Now, did you use a Sturgeon

computer at the police department or city hall to type your draft of the incident report?

A.    Yeah.

Q.    Okay.  You didn't -- you didn't do this from home?

A.    No, I didn't work from home, no.

Q.    Okay.  So you -- you did this, presumably, from the Sturgeon Police Department?

A.    Yeah.

MR. CRINNIAN:  Okay.  All right.  Now I'm going to hand you what has been marked as Exhibit 5.  Actually, I'm going to hand it to them and let them look at it first.

(WHEREUPON, Exhibit 5 was marked for identification.)

BY MR. CRINNIAN:

Q.    All right.  Officer Woodson, now that you have that document in front of you, if you look over on the right-hand side, you'll see the same thing that we just talked about:  "Properties," "Related Dates," and "Related People."  You see that?

A.    I see it.

Q.    Okay.  And if you look down on "Related Dates," you'll see that this document was created May 19th, 2024, at 8:26 p.m.  Do you see that?

A.   Yup.

Q.   That matches up with the time on the other document, correct --

A.   Yes, sir.

Q.   -- 8:26 p.m.?  But this document shows that it was last modified May 23rd at 2:31 p.m.  Do you see that?

A.   I see that.

Q.   Okay.  And in "Related People" --

A.   Okay.

Q.   -- do you see where it says, "Last modified by Bryan Schultz"?

A.   I see it.

Q.   Okay.  How did Bryan Schultz end up with your incident report?

A.   I worked on it at Hallsville as well.

Q.   Okay.  So you as a Sturgeon police officer were working with the police chief from another town who you also worked for --

A.   Yes.

Q.   -- to draft your revised report for Sturgeon.  Is that correct?

A.   Yeah.

Q.   Okay.  Earlier you told me you sent the first draft to Crawford.  Crawford gave it back to

you and said there needs to be some changes, right?

A.   Yes.

Q.   Okay.  You don't recall what changes he told you to make?

A.   I don't recall.

Q.   Okay.  Do you recall where you made those changes?

A.   Well, I could have been in Hallsville; I could've been in Sturgeon.

Q.   Okay.  When you are at Hallsville, do you use Chief Schultz's computer to draft incident reports for other municipalities?

A.   If I need to -- if I need his computer. We trade off computers all the time.

Q.   So you don't have a sign -- there's no sign-ins or anything?

A.   We have assigned -- sign-ins.  We have assigned computers, but a computer being it's job, I can have his computer for any number of reasons.

Q.   But when you go to use that computer, do you have to sign into it with a unique passcode or username?

A.   Yes.

Q.   Right.  So --

A.   Also me using his NetMotions could have

timestamped to -- I'm just saying numerous ways it could have been timestamped that way. I'm not saying Chief Schultz didn't help me. I'm not saying he wasn't involved. I didn't say that.

Q. I asked you earlier who helped you and you said nobody. You said, "I wrote this all by myself and I had some help from Crawford revising it."

A. Yeah.

Q. Did -- did Chief Schultz help you or not?

A. Did Chief Schultz help me?

Q. Yes.

A. Yes, he did.

Q. Okay.

A. So did Jeff Voss out at Ashland.

Q. And Jeff Voss is also not a Sturgeon officer?

A. Yes. That's correct.

Q. Okay. He wasn't your leadership, was he?

A. He is a leadership.

Q. Not your leadership at Sturgeon.

A. Meaning direct chain of command?

Q. Yes.

A. No, he is not.

Q. Okay. Schultz was not your leadership at Sturgeon either, was he? He was your leadership at

Hallsville but not Sturgeon?

A. Yes, he is.

Q. Okay. Why are you relying on outside police departments and police officers to rewrite your reports for you?

A. They're not rewriting, they helped me write report I wrote before. If I rewrite it -- I wrote the reports.

Q. You're really telling me that the language between both of these versions, including the stuff that wasn't included and the changes to your own idiosyncrasies in writing, are not Bryan Schultz's?

A. I'm telling you that this is a draft and then that's the final draft.

Q. Okay. You submitted this final version of this report --

A. Yes.

Q. -- back to Sergeant Crawford, correct?

A. That's right.

Q. Okay. Did Sergeant Crawford ever come back to you again about the new report?

A. Did he come and just coach me through or say, "Hey, we need some modifiers"?

Q. Did he say anything about -- did he give you any feedback about the second report that you

wrote?

A.   I don't recall.

Q.   You don't recall.

Did he ever talk to you specifically about the lines in the report about the dog being thrown from a vehicle?

A.   Did he ask me to elaborate on my thoughts more?  Yes.

Q.   Okay.  How specifically did he ask you?

A.   I don't recall.

Q.   Okay.  What did you elaborate?

A.   I added to the final draft of the report.

Q.   No, I'm talking about the final draft of the report.  You submitted this report?

A.   Yes.

Q.   And after that, did Sergeant Crawford ever contact you and ask you about the allegations that the dog had been thrown from a vehicle?

A.   Oh no.  I was immediately on admin leave after that.

Q.   So he never followed up with you about that?

A.   No, we never spoke since.

Q.   Okay.  I -- I presume Mayor Abrahamson never did either?

A.   Kevin?  After he was outside the chain of command, he talked to me just his support.

Q.   Okay.  So what did you and Kevin talk about?

A.   Just his support of how he believed in us and how he was stepping down for his own beliefs.

Q.   Okay.

A.   And it had nothing to do with the police department.

Q.   But when you -- you say he had nothing to do with the police department or?

A.   No, his stepping down had nothing to do with the police department.

Q.   Okay.  So he was just stepping down for the good of the City, for himself --

A.   Well, it would've -- would've sounded like to me it was because the Board requested him to, and he stepped down for that.  And he just let us know it had nothing to do with us.  It was his choice, the Board's choice.

Q.   Okay.  So --

MR. JORDAN:  Your camera --

MR. CRINNIAN:  Ah.  Why is it doing this?

THE REPORTER:  And is that Mr. Jordan?

MR. CRINNIAN:  That was Mr. Jordan.  He

was letting me know that my camera was off.  We've got it back on now.

THE REPORTER:  I appreciate you, Mr. Jordan.  Thank you.

MR. CRINNIAN:  I apologize.  I do not know why this is doing that.  It was working fine the first half.  I'm going to blame it on the gas.

MR. JORDAN:  Fair.

BY MR. CRINNIAN:

Q.  So, based on your conversations with Kevin Abrahamson after this incident, is it your belief that he supported you?

A.  Yes.

Q.  Okay.  You believe that he felt you did not do anything wrong?

A.  I believe that he understood the situation at hand.  I believe he was aware of the policy.  And I -- I can't say what he believed or that he supported -- he shared his support.

Q.  Now, when you said "the policy," you mean the police department policy we talked about earlier?

A.  Yes.

(Pause in the proceedings.)

MR. CRINNIAN:  Hey, Jennifer, I think we

may need to go off the record real quick.  We're going to have to change --

THE REPORTER:  Okay.  Sure.  Thank you.  The time is 10:24.  We are off the record.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 10:34.  We are on the record.

BY MR. CRINNIAN:

Q.   Okay.  Officer Woodson, we're back on the record.  Do you understand --

A.   Yes.

Q.   -- under oath?

We've talked about the incident reports in pretty extensive detail.  Is it your testimony that the second incident report that you submitted is accurate and true?

A.   Yes.

MR. CRINNIAN:  Okay.  All right.  We're going to go ahead and look at -- this will be -- what is this?  Exhibit 5?

MR. KOLDE:  Exhibit 6.

MR. CRINNIAN:  Or Exhibit 6, the video.

Okay.  Exhibit 6 will be the video from the body cam.  It is 24-0048.

(WHEREUPON, Exhibit 6 was marked for

identification.)

BY MR. CRINNIAN:

Q.   Officer Woodson, I'm going to -- let me know if you can see that okay.

A.   I can see.

Q.   Okay.  So we're going to start here from the very beginning of the video, and I want you to pay attention to the driving because I think this matches up what you were talking about earlier about having to back up to go back south, okay?

A.   (Nods head.)

Q.   And this is you backing up, correct?

A.   That's right.

(WHEREUPON, a recording was played.)

BY MR. CRINNIAN:

Q.   And that's you turning back south, correct?

A.   Yes.

Q.   Okay.  Now, the unknown white male, was your encounter with him immediately before you turned on the body cam?

A.   I think I was going north.  I don't really recall what I had -- I know I had an encounter with him.

THE REPORTER:  I -- I apologize.  I -- I -

- I didn't get that.  Could you repeat what you just said?

MR. CRINNIAN:  The question or the answer?

THE REPORTER:  The -- the answer.  And we'll need to go off the record after he repeats, just to fix the audio.

MR. CRINNIAN:  Okay.  Yeah, if you can go ahead and repeat your answer.

THE DEPONENT:  I said I could have been going north when I had contact with the white male. I don't recall when the contact happened, going south or north.

THE REPORTER:  You don't recall when the contact happened what?

MR. CRINNIAN:  Going south or north.

THE REPORTER:  Okay.  Thank you.  The time is 10:36.  We're off the record.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 10:41.  We are on the record.

BY MR. CRINNIAN:

**Q.   Okay.  So, Officer Woodson, we left off we were talking about you approached the -- the property from the south to the north and then you had to turn around and go back south, but you were**

unsure of where you made contact with that unknown white male, correct?

A. Oh, the approach? Yes. I know where I made contact with him. On which direction I was traveling, I'm unsure of.

Q. Okay. But you said he was the house directly across from the complainant's house, Ms. Ware?

A. That's correct.

MR. CRINNIAN: Okay. So let's go ahead and -- is it up on the --

MR. KOLDE: No, it's not. There you go.

BY MR. CRINNIAN:

Q. All right. So you put the vehicle in park. Presumably, you are at Ms. Ware's driveway at this point, correct?

A. Yes.

Q. Okay. Now, as you get out of the vehicle, do you see the unknown white male on your body cam video here?

A. I don't see no male, no.

Q. Okay. Which house would he have been at?

A. I believe it's the white truck in the bottom left corner.

Q. The white truck?

A.   Yes, I believe that to be the house.

Q.   **All right.**

A.   With the open garage there.

Q.   **"With the open garage"?  Okay.**

**Do you see him standing outside out there?**

A.   No.

Q.   **That's the driveway you turned around in, though, isn't it?**

A.   I don't think I turned around that driveway.  I think I was farther down.

Q.   **Okay.  Let's go ahead and rewind this back here to the beginning.**

**Now, this video begins with you backing up in reverse, correct?**

A.   That's me inside her driveway adjusting my cruiser.

Q.   **Now you put it in drive and turn left, correct?**

A.   Let's see.

Q.   **Okay.  Let's look at the stick shift or the shifter up on the column.**

A.   I understand that.

Q.   **It -- it's up high, right?  So it's either probably in park or reverse?**

A.   Yeah.

Q.    Okay.  You're turning your wheel to the right as you're backing up, correct?

A.    Mm-hmm.

Q.    Okay.  Now you're turning your wheel left, and you shift down into drive and keep turning left.  Do you see that?

A.    I see that.

Q.    Okay.  So you turned around in the driveway directly across the street from Ms. Ware's house, correct?

A.    That's possible.

Q.    And you believe that is the house where the unknown white male lived?

A.    It could be.

Q.    Okay.  All right.  So let's go ahead and watch as you get out of the car here.  Put the vehicle in park.

A.    Yeah, that could be.

Q.    So that -- but you don't see the man there.  Did you watch him go back in the garage?  Did you watch him walk down the street?

A.    I watched where I was moving my cruiser to.

Q.    Were you on Fairgrounds Road when you had this interaction with this person?

A.   Yes.

Q.   Okay.  You were on the road.  Did you roll down your driver's side or your passenger window?

A.   I don't recall.

Q.   Okay.  All right.  So you go to the back of the vehicle, and you get your gloves out of the back here.  And there's a catchpole sitting in the back of your car there, right?

A.   That's right.

Q.   And is that similar to the catchpole that's over here?

A.   Yes.

Q.   Does it appear be?  Okay.  I'll -- I'll represent, the catchpole that's over here was brought by counsel for Sturgeon because we requested it in discovery.  So it's one of the Sturgeon poles.  We don't know if it's yours or not.

A.   I understand.

Q.   Now, had you ever used a catchpole prior to this?

A.   No.

Q.   "No."

And, again, Sturgeon never trained you how to use the catchpole?

A.   They did not.

Q.   Has Hallsville ever trained you how to use a catchpole?

A.   No.

Q.   And that tub in the back of the vehicle, that's the -- the tub that you put Teddy in to transport him, correct?

A.   That's correct.

Q.   And so you grabbed the catchpole, it's about 5:39, and you began walking towards the field where you found Teddy, correct?

A.   Yup.

Q.   Okay.  And I'm just going to skip ahead a little here to where you actually get to your encounter with -- with him, if that's all right.

A.   Sounds good.

Q.   Okay.  So here you come up to a tree line, correct?

A.   That's right.

Q.   And there you begin to see Teddy?

A.   Mm-hmm.

Q.   And he seems to be kind of trotting around, right?

A.   That's right.

Q.   Okay.  Now I don't have the audio up because of the microphone, but at this point you're

whistling and calling to him, correct?

A.   That's right.

Q.   Okay.   You're trying to get his attention?

A.   Trying to get his attention making little pet noises.

Q.   Okay.   Now, what about the way that he's walking makes you think that that dog has any kind of serious physical injury?

A.   Because he has head tilting; he has his tongue hanging out of his mouth.

Q.   But you don't see blood all over him, do you?   You don't see a -- a big gaping wound?

A.   No, I don't see -- it's not like a large quantity.   No.

Q.   Okay.   You don't see anything sticking out of his body that shouldn't be sticking out of his body?

A.   No, I don't.

Q.   Now here he walks kind of right past you, right?   Doesn't even seem to really know that you're there?

A.   That's right.

Q.   Now here you're trying to lasso him with the catchpole, correct?

A.   Mm-hmm.

Q.    Okay.  Now here you moved the hand -- the pole from one hand to both hands?

A.    Yeah.

Q.    Several times, right?

A.    I did.

Q.    So at some point you're trying to catch him with just the one hand on the pole --

A.    That's right.

Q.    -- the other time you're trying to get him with both.  Okay.

Now here you start getting the loop around Teddy's neck, correct?

A.    Mm-hmm.

Q.    I'm going to pause it right there for a moment.  Now, since this has happened, have you learned how to use a catchpole?

A.    Nope.

Q.    Okay.  So nobody else -- Hallsville didn't train you after all this happened either?

A.    No.

Q.    Okay.  Would you mind grabbing that catchpole for me?  Actually, let me grab it for you.  And I may need you to stand up just so you can demonstrate this.

A.    Yeah.

Q.   I'm going to ask you to show me how it is that you're trying to --

A.   Right there in that video?

Q.   -- bring the loop down, because --

A.   Okay.

Q.   -- the loop's supposed to collapse, right?

A.   Mm-hmm.  I was holding right here.

Q.   Okay.

A.   And it's supposed to collapse right here.

THE REPORTER:  And I apologize, I can't hear our witness.

THE DEPONENT:  I'm sorry.

MR. CRINNIAN:  Yeah, sorry about that.

THE DEPONENT:  I was grabbing it like this, and it collapsed down from the red and extended down, which closed up the loop around the neck of the animal.

MR. CRINNIAN:  Okay.  All right.

THE DEPONENT:  Put it back over here?

MR. CRINNIAN:  Yeah, that's fine.

THE REPORTER:  Was that Mr. Jordan?

MR. CRINNIAN:  No.  That -- that was the witness, and then I -- I responded back to the witness.  I apologize.

THE REPORTER:  Thank you.

BY MR. CRINNIAN:

Q.   All right.  So exactly what you just described is what we start seeing here as you try to collapse the loop around Teddy's neck, right?

A.   Yes.

Q.   You're reaching down, you're grabbing by the red part of the handle?

A.   That's right.

Q.   Okay.  And now you testified earlier that you don't remember hearing Teddy yelp, or whine, or anything when you touched him with the pole or anything, correct?

A.   That's right.

Q.   Okay.  If -- if you have any reason to believe that he did, we can listen to it with audio, but I'm just, again, keeping the audio off for the time being.

A.   You're fine.

Q.   Did he engage in any other behaviors that led you to believe that he was injured as you were trying to catch him?

A.   Just the way he was holding his head and just responding to everything.

Q.   Okay.  And so here, again, you get it over his head, and you go to pull the loop or pull the

pole, the pole comes apart there, doesn't it?

A.    It did.

Q.    So you extended that pole too far and it separated --

A.    I believe so, yes.

Q.    -- put it back together?

A.    I believe that to be the issue.

Q.    And here it looks like you are not even trying to grab the bottom part of the rod anymore.

A.    Using one hand.  Yeah.

Q.    You're using it one-handed.  Okay.

Now here you've got it around Teddy's front side of his body, around his neck and his head and his front legs, correct?

A.    That's correct.

Q.    And he's tossing around like he doesn't want to be caught in this thing, right?  With how much he's moving, do you really think that he had a neck injury?

A.    With how much he's moving, do I think he had a neck injury?  Still possible.

Q.    So "possible" is what we're going with, not -- not -- not you reasonably believe that he was acting like he had a neck injury, just that you think it's possible that he had a neck --

A.   I'm not sure what someone with a neck injury acts like or an animal with a neck injury acts like.

Q.   You have medical training.  What are you supposed to do with somebody that you think has a neck or back injury?

A.   Support their head.

Q.   You're not supposed to move them, are you?

A.   You're not supposed to.

Q.   Okay.  And so if you think that you have an animal with a neck injury, why are you trying to put a loop around his neck and pull him around?

A.   I wasn't trying to pull him around.  I'm trying to contain him.

Q.   Okay.

A.   And also I've seen people running around with neck injuries.

Q.   Okay.  So here you're one-handing it again, right?

A.   Yup.

Q.   Now, at this point, you've been attempting to catch Teddy for a -- a couple of minutes now.

A.   Yeah.

Q.   Are you getting frustrated by this point?

A.   No.

Q. What's going through your head at this point?

A. This dog could be suffering.

Q. He didn't make any noises that led you to believe he was in pain, did he?

A. Noises isn't the only sign that lead to suffering.

Q. So you believe that he was just suffering in silence?

A. He could have been mute.

Q. Okay. So now Teddy's over here by this car. You're still trying to catch him, correct?

A. That's right.

Q. And you get him looped again --

A. I did.

Q. -- and then you go to reach down for the red handle and it doesn't tighten, correct?

A. That's correct.

Q. And then Teddy starts to trot away from you.

A. Mm-hmm.

Q. Now, at this point, you have the catchpole turned around, so the loop is not facing Teddy anymore, is that right?

A. That's right.

Q.    So you've given up on using the catchpole?

A.    No, I do not.

Q.    Teddy doesn't seem to be particularly aware of you, does he?  He doesn't seem to care that you're following him around.  He's not even acknowledging you, is he?

A.    He is not.

Q.    You haven't tried to catch him again with the catchpole since I pointed that out, have you?  And you just shot him.

A.    I dispatched him, yes.

Q.    Okay.  Officer Crawford, I'd like you to stand up again and grab that catchpole.

A.    Crawford's not here.

Q.    Or, I'm sorry, Woodson.  My apologies.

Officer Woodson, please grab the catchpole again.  If you will pull on that cord on the back of it and pay attention to the loop, what does the loop do?

A.    It closes.

Q.    Now if you pull on that knurled handle, pull it straight backwards, what does the loop do?

A.    Oh, that's awesome.

Q.    If you twist that knurled rod or that knurled handle to the clockwise and tighten -- I'm

sorry -- towards you.

A. Just keep twisting it?

Q. Yeah, I think it can delay in twisting sometimes. Oh, actually, I think the thing -- oh, never mind. I was telling you to tighten it the wrong way. Counter-thread it.

THE REPORTER: I cannot hear you. If you could just repeat yourself.

MR. CRINNIAN: Sure.

BY MR. CRINNIAN:

Q. Yeah. If you turn the knob that direction and counter-threaded it, tightened up?

A. It's tightened up.

Q. Okay. Now if you try pulling on that red portion, it still moves. If you tightened -- it doesn't tighten anymore?

A. It locked.

Q. Okay. Now, as you're moving that extended handle, that's not changing the loop, is it?

A. No, it's not.

Q. What changes the loop is what's on the back, correct?

A. Yeah, I guess so.

Q. Okay. All right. Thank you. You can put that there. So you dispatched Teddy and you again -

- as we've already talked about -- fire a second round just to make sure that he was no longer suffering. And you begin to walk back to your vehicle, presumably, to get the tote to put Teddy in, correct?

A. Yes.

Q. Okay. And Ms. Ware is out on her back porch there. Do you see that?

A. I see her.

Q. And she was yelling at you about the fact that you shot the dog?

A. Yes.

Q. Okay. And you told her, "I had to dispatch it," correct?

A. Yes.

Q. Okay. Now, as she's yelling and you're walking, I want you to pay attention to your shadow. And I want you to pay attention to the gesture that you made while Ms. Ware is talking to you. Do you see that gesture that you made with your hand?

A. I raised my hand to her and put it down?

Q. Yeah. Were you waving her off?

A. No, I just -- I put my hand down.

Q. You had to switch which hand the catchpole was in in order to wave her off.

A.   That was the side she was on.

Q.   Why were you waving at her if she was yelling at you?

A.   Just like, "Whatever.  Okay."

Q.   Okay.  So it wasn't you being disrespectful and saying, "Ah, I don't care what you're saying"?

A.   No.

Q.   Okay.  All right.  So then you go and you get the container out of the back of your vehicle; you dump your drink -- the -- the water and your drink out of it; you put Teddy in it, and then you take him to the tire shop like we talked about, right?

A.   Mm-hmm.

Q.   Okay.  So when we're talking about how you felt like Teddy was suffering --

A.   Yeah.

Q.   -- I need to know exactly what it is, what things that you observed about Teddy that lead you to believe that he was suffering.  Because I -- I still -- I don't know, other than you saying he may have been suffering, right?  I -- I don't know what you saw that led you to do that.  And that's what I'm trying to figure out.

A.    I understand.  His behavior could have been just an injured dog.  His -- his neck could have been injured.  The way he was holding his head, the way he was responding to the whole situation.  I really don't know how much more or the depth you need than that.

**Q.    Essentially, the problem I'm having, Officer Woodson, is everything that you have -- have explained so far has been, "It could have been this, or he may have done this, or it may have been this," but I want to know what you observed that leads you, as somebody of -- with some medical experience, and as a police officer, and as a Department of Corrections officer, and as a member of the military, what specific things was Teddy doing that made you think that he was seriously injured?**

MR. FLEMMING:  I'll object to the form.  Asked and answered.

You can go ahead.

THE DEPONENT:  You want me to continue -- repeat that stuff?

MR. CRINNIAN:  Yeah, please, if -- if you've got anything else to add.

THE DEPONENT:  I have nothing else to add.

BY MR. CRINNIAN:

Q.    Okay.  So it's your entire basis for shooting Teddy was just that you thought he may be injured or that he may be dangerous?

A.    Yes, he appeared to be suffering.  He appeared to be an injured animal.

Q.    All right.  Now when Mr. Hunter came and met you at the police station after all this, I understand it was a tense situation, and he was obviously upset, correct?

A.    He was upset, yes.

Q.    Okay.  When you were with Mr. Hunter, you told him that you didn't -- you weren't afraid of Teddy, obviously, right?

A.    I believe so.

Q.    You admitted that to him.  You also told Mr. Hunter that Sturgeon didn't have animal control, correct?

A.    They don't have animal control.

Q.    You were the animal control officer, weren't you?

A.    I'm a police officer.  We do animal control task -- animal control.

Q.    Earlier when we asked about that and we talked about this, I asked you, I said, "Were you aware that you were, for all intents and purposes,

animal control for the City?"  And you said, "Yeah, I knew that I was."

A.   Animal control duties.

Q.   Okay.  So animal control duties, the City of Sturgeon, right -- you seem to be maybe partially aware -- had an agreement with Boone County where you could drop the dogs off with them, right?

A.   Is it true?  Well, is it true?

Q.   Well, you said --

THE REPORTER:  I'm sorry, I couldn't hear your answer.

THE DEPONENT:  I don't know that to be true.

THE REPORTER:  Thank you.

BY MR. CRINNIAN:

Q.   Earlier you said that you would meet Boone County Animal Control and give them a dog.

A.   Yes.  As can a citizen do it as well.

Q.   Okay.  So you still maintain that the City of Sturgeon had no animal control?

A.   I still maintain I'm unaware of it.

Q.   Okay.  But you do agree that you were responsible for animal control duties?

A.   Yes.

MR. CRINNIAN:  What exhibit are we on?

MR. KOLDE:  On Exhibit 7.

MR. CRINNIAN:  Okay.

THE REPORTER:  I'm sorry, I didn't get that or who said it.

MR. CRINNIAN:  I -- I apologize.  That was Crinnian and Kolde.  We were just discussing which exhibit we were on.

THE REPORTER:  And -- and that was who?

MR. CRINNIAN:  That was Eric Crinnian and Daniel Kolde.

MR. KOLDE:  Just coordinating exhibits.

MR. CRINNIAN:  Yeah, we're just coordinating exhibits.

THE REPORTER:  And who's speaking right now?

MR. CRINNIAN:  Eric Crinnian.

THE REPORTER:  Oh, okay.  Perfect.  Just making sure.  All right.  Thank you.

(WHEREUPON, Exhibit 7 was marked for identification.)

BY MR. CRINNIAN:

Q.  Okay.  Officer Woodson, I'm handing you what is marked as Exhibit 7.  Do you recognize these questions and responses that we sent to you for you to answer?

A.    Yes.

Q.    Okay.  And you went through and answered these "admit" or "deny" in response to our questions, correct?

A.    That's correct.

Q.    On request number one, we said, "Admit nobody from the City of Sturgeon informed you that you were responsible for performing animal control duties."  You said, "Deny," correct?

A.    That's right.

Q.    You -- you were aware --

A.    Yes.

Q.    -- that you were responsible for animal control duties.  Do you remember who told you that you were responsible for them?

A.    Sergeant Crawford.

Q.    "Sergeant Crawford."  Okay.  So Sergeant Crawford knew that the department was responsible for the animal control duties too?

A.    That's right.

Q.    But he did not train you on the catchpole, correct?

A.    That's correct.

Q.    He did not give you any specific training on how to deal with animal encounters, correct?

A.   That's correct.

Q.   Okay.  Did he ever tell you before the shooting about the department policy with regard to shooting animals?

A.   No.

Q.   Okay.  Did he tell you after?

A.   Did he tell me after?

Q.   Did -- did he tell you after the shooting about the City's policy with regard to shooting animals?

A.   I don't believe so.  I don't recall.

Q.   Okay.  But at the time that you shot Teddy, you were not aware of that policy that you're talking about, is that correct?

A.   The policy that I was aware of was the one that was modified from Hallsville to Sturgeon.  And I was aware of that policy.  And that's policy that I was -- I was acting under.

Q.   You were aware of the Hallsville policy then, right?

A.   That's correct.

Q.   But you hadn't specifically read and been trained on the Sturgeon policy, correct?

A.   The -- what I was informed of was all the Hallsville policies were the Sturgeon policies, just

stamped for Sturgeon.

Q. So they -- you -- you --

A. It's what I'm saying. Yes. Okay.

Q. -- used the same ones. Okay. Request number five, we asked you to admit that at the time you attempted to catch Teddy with a catchpole, you did not know how to properly and safely utilize it. The response was that you admit that you could not properly and safely utilize the catchpole provided to you. Why could you not properly and safely utilize it?

A. I was unaware how to use the pole.

Q. Okay. Request number nine, "Admit you have no formal or professional training in identifying possible rabies in canines." You said, "Deny." Earlier today, when we talked about this, you said that you have no specialized training, just kind of the cartoon knowledge of what things rabies does. Can you reconcile that for me, please?

A. No, I said with -- with Columbia Second Chance I did have some training, so I did have some formal training, but I haven't had any updated new training, no.

Q. Okay. How long ago was it that you were at the animal rescue?

A.    20 years ago.

Q.    Okay.  Rabies hasn't really changed in 20 years, I don't think.

A.    I agree.

Q.    The things that we talked about earlier, are those the only things that you can recall about identifying rabies?

A.    Yes.

Q.    Okay.  Request 11, "Admit you have no formal or professional training nor specialized knowledge or expertise in animal abuse or cruelty investigations."  You said, "Deny."

A.    Yes.

Q.    What training do you have in animal abuse or cruelty investigations?

A.    The -- our training through the academy. Just looking at dog situations and overall.

Q.    So did the academy actually have a -- like a -- a program or a course on animal investigations, animal cruelty?

A.    Yeah.

Q.    Okay.  And so do you know how many classes you would've taken?

A.    I have no idea.

Q.    Okay.  It probably wouldn't have been very

many, though?

A.    I don't -- I think it was actually fit into another investigations, like human investigations.  It's probably one category in there.

Q.    So like a chapter is --

A.    Exactly.

Q.    Okay.  Request 12, "Admit Teddy did not show any aggression towards you or any other person in your presence."  You said, "Deny."  Earlier -- earlier we talked about this.  You said Teddy did not show you any aggression, correct?

A.    Yes.  I admit that I felt Teddy showed no aggression.

Q.    Okay.  And that you said there was nobody else around for him to show aggression to besides you, right?

A.    When I was there, yeah.

Q.    Okay.  Can you tell me why you denied request 12 then?

A.    Hard to define what "aggression" is.

Q.    Well, we've talked about how you have some level of training when it comes to animals.  You worked in animal rescue; you've been doing animal control duties.  Do you think that you have a pretty

good idea of what basic signs of aggression might look like in a -- in a dog?

A.    I understand what you're saying.

Q.    Okay.  Things like growling?

A.    If he made sounds, yes.

Q.    Okay.  Snapping his teeth?

A.    If he can close his mouth.  He did not.

Q.    Charging at you?

A.    I can't tell if he was charging at me or not.

Q.    Okay.

A.    He seemed very disoriented.

Q.    Disorientation is not the same as aggression, is it?

A.    I never said it was.

Q.    Okay.  Request 13, "Admit Teddy did not pose an imminent danger to you or others in the immediate area."  You denied that.  Earlier I asked you about this, and you said that Teddy did not pose an imminent threat to you.  Is that correct?

A.    It appears he did not.  I denied it still, because it is unknown.

Q.    Okay.  "Admit you did not feel threatened by Teddy."  You denied that.  Why did you feel threatened by Teddy?

A.   If he had a disease, I was afraid of catching that.

Q.   So, again, we're having the same issue where it's a lot of "ifs" and "maybes" and "could bes."

A.   I understand what you're saying.

Q.   "If he had rabies, if he had an injury." Did you ask yourself those questions about the German Shepherd that you picked up?  What if it attacked you?  What if it had rabies?

A.   Oh, I ask the questions all the time, and I put gloves on every time.  If I would've had to wrestle a German Shepherd, I would not have picked it up.  Teddy wasn't responding as if I went to pick him up like he wasn't going to snap at me.

Q.   Did you even try to touch Teddy with your hand?

A.   No.

Q.   "No."  Okay.

Request 15, "Admit your first shot did not instantaneously kill Teddy."  You say, "Deny."

A.   Correct.

Q.   We talked about this earlier.  In your police report -- both versions of your police report -- you indicate that you fired a second shot because

he was not deceased yet, correct?

A.   I believe to be, yes.

Q.   Okay.  And when we talked about this, you said you fired another shot to make sure that he was truly no longer suffering, correct?

A.   That's correct.

Q.   But in the request for admission, you deny that the first shot didn't kill him?

A.   Yeah, I did.

Q.   Okay.  Request 17, "Admit you disposed of Teddy's body in an outdoor area before retrieving and returning him to plaintiff."  You denied that, correct?

A.   To which one?

Q.   Request 17.

A.   No.  The way I read that is if it was like he was tossed somewhere.

Q.   You left him outside in a tote, though, right?

A.   That's correct.

Q.   Okay.  So he didn't go inside of a building?

A.   He didn't go inside of a building, but I made sure he wasn't just thrown into the bushes.

MR. CRINNIAN:  Okay.  Wouldn't you guys

want to take about -- we're actually going to wrap up earlier than I thought.  You want to take like 10 real quick?

MR. KOLDE:  That's fine.

MR. CRINNIAN:  Let me just make sure -- we're -- we'll go ahead and go off the record.

THE REPORTER:  Thank you.  The time is 11:08.  We're off the record.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 11:21.  We are on the record.

BY MR. CRINNIAN:

Q.  All right.  Officer Woodson, we're almost wrapped up.  So with regard to what happened after the shooting, when were you notified that you were going to be placed on some form of suspension?

A.  I don't recall exactly when.  I know Sergeant Crawford did it by phone.

Q.  Did you --

A.  I think it was maybe the same -- same evening, I believe so.

Q.  Okay.  So you didn't go back to work for Sturgeon after the shooting, essentially, correct?

A.  That's correct.

Q.  Okay.  You finished the report, but you

didn't actually go back and --

A.    Right.

Q.    You resumed or you continued working at Hallsville, though, correct?

A.    That's correct.

Q.    This incident did not affect your employment at Hallsville?

A.    That's right.

Q.    Now, do you recall being given a written notice of an investigation pursuant to Missouri law?

A.    That's right.

MR. CRINNIAN:  Okay.  What exhibit are we on?  Is this Exhibit 7 or 8?

MR. KOLDE:  You're on Exhibit 8.

MR. CRINNIAN:  Exhibit 8.  That's what I thought.  Okay.

(WHEREUPON, Exhibit 8 was marked for identification.)

BY MR. CRINNIAN:

Q.    All right.  I'm handing you what has been marked as Exhibit 8.  And, Mr. Woodson, if you can let me know if you recognize that.

MR. JORDAN:  This is Jordan.  For the record, we're looking at Sturgeon document 56.

THE DEPONENT:  Yes, I was given this.

BY MR. CRINNIAN:

Q.    Okay.   And this was dated July -- sorry -- May 29th, 2024, correct?

A.    Yes.

Q.    And this is notifying you that the City is investigating you for mistreatment and unprofessional conduct, correct?

A.    That's right.

Q.    And if you notice, they are doing that pursuant to Section 590.502 of the Revised Statutes in Missouri.  Do you see that?

A.    Yes.

Q.    Okay.   Did anybody at the City of Sturgeon ever explain to you what this investigation would entail?

A.    No.

Q.    Did anybody from Sturgeon ever contact you to investigate?

A.    No.

Q.    Did anybody from the Missouri Department of Public Safety or the Peace Officer Standards and Training department ever contact you?

A.    No.

Q.    Okay.   You never talked to a Jeffrey Collins from POST?

A.   No.

Q.   Okay.  Now, when you were notified of this on May 29th, you shortly got an attorney not too terribly long after that, correct?

A.   That's right.

Q.   Okay.  And that attorney negotiated with the City to essentially a severance agreement, is that correct?  The separation agreement?

A.   Yeah.  Yeah.

Q.   Okay.

A.   Resignation.  Yes.

Q.   Okay.  So, to your knowledge, the City never completed the investigation into you?

A.   Yes.

Q.   Okay.  Okay.  The City did pay you and your attorney a total of $16,000 for your settlement of and severance from employment, correct?

A.   That's correct.

Q.   Okay.  Now, as part of that, you and your attorney negotiated for the City to include language that would be publicly read that says you committed no misconduct, correct?

A.   That's correct.

Q.   And you maintain today that you committed no misconduct, correct?

A.    That's correct.

Q.    I think the last question that I have for you is, if you would've known how to work that catchpole when you had your encounter with Teddy, do you think that encounter could have gone differently?

MR. FLEMMING:  Object to the form.  Calls for speculation.

MR. JORDAN:  I'll join to the objection.

You can answer.

THE DEPONENT:  I believe that if I did know how to use that equipment, and it operated quickly, it could have been a different outcome.

MR. CRINNIAN:  Okay.  That's all I've got.

MR. KOLDE:  One more.

MR. CRINNIAN:  Oh.

MR. KOLDE:  Do that real quick.

THE REPORTER:  I'm sorry, I can't hear whoever is talking.

MR. CRINNIAN:  I -- I apologize.  That was Dan and Eric talking.

BY MR. CRINNIAN:

Q.    Okay.  Last question then.  Did you search through your devices to get any text messages, emails, anything related to this case for responding

to our discovery requests?

A. I searched through them. I knew they weren't there because I didn't communicate that way. Once I was told there's an investigation, I knew better than to communicate that way.

Q. Okay. Now, for communications between -- that we requested between like, for example, you and Sergeant Crawford --

A. Yes.

Q. -- things like that, would -- would there be text messages or emails between you and Sergeant Crawford about this case?

A. Through the Sturgeon email, which I don't have access to anymore.

MR. CRINNIAN: Okay. Okay. That's all I've got.

EXAMINATION

BY MR. JORDAN:

Q. This is Attorney Jordan, on behalf of the City.

Good morning, Officer Crawford -- I mean, Officer Woodson -- I had just a few questions for you. Is that okay?

A. Mm-hmm.

Q. When talking about the policies that you

were trained on for Hallsville and Sturgeon, is it your understanding that those were the same policies?

A.   That's what was shared with me.

Q.   When you were trained at Hallsville, were you specifically trained on their policies by any of the commanding officers over there?

A.   No.

Q.   And as far as Sturgeon is concerned, did you request any additional training on the policies while you were employed there?

A.   No.

Q.   On a day-to-day, did you feel that you had the adequate knowledge or training to do your job?

A.   Yes.

MR. JORDAN:  No further questions.

MR. CRINNIAN:  Anything else?

MR. FLEMMING:  Nope.

Okay.  Myron, you can read and sign a copy of the transcript.  If you misspoke or said a name or a date or a time wrong, you could change that on an errata sheet, which can be provided to you, or you could just trust that the court reporter got it all down and waive signature.  It's your decision.

THE DEPONENT:  I trust Jennifer.

MR. FLEMMING:  All right.  We'll waive signature.

THE REPORTER:  Thank you.

Mr. Crinnian, would you like the original?

MR. CRINNIAN:  Yes, please.

THE REPORTER:  All right.  Mr. Flemming, a copy?

MR. FLEMMING:  Yes.  Just a E-Tran, please.

THE REPORTER:  Sure.  Mr. Kolde, copy?

MR. KOLDE:  No.  No.  Thank you.

THE REPORTER:  Okay.  Mr. Jordan, a copy?

MR. JORDAN:  Yes.  PDF.

Eric, are you going to scan the exhibits?

MR. CRINNIAN:  I will, yeah.

MR. JORDAN:  Okay.  And then if we can get our exhibits attached, please.

MR. CRINNIAN:  Absolutely.  As soon as I find a place to scan them tonight, I'll scan and send them over to you, unless -- you guys probably have a scanner here, right?

THE REPORTER:  All right.  Thank you.  The time is 11:29, and we are off the record.

(WHEREUPON, the deposition of MYRON WOODSON was concluded at 11:29 a.m.)

CERTIFICATE

I, Jennifer Cotton, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 7th day of July, 2025.

Jennifer Cotton, #4280

CORRECTION SHEET

Deposition of: Myron Woodson Ofc   Date: 6/4/25

Regarding: Hunter vs. Woodson et al.

Reporter: Cotton/Adoyo

_____

Please make all corrections, changes or

clarifications to your testimony on this sheet,

showing page and line number.  If there are no

changes, write "none" across the page.  Sign this

sheet and the line provided.

Page  Line  Reason for Change

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

        Signature: _____

                    Myron Woodson Ofc

DECLARATION

Deposition of: Myron Woodson Ofc     Date: 06/04/2025

Regarding: NICHOLAS HUNTER vs MYRON WOODSON ET AL.

Reporter:  Jennifer Cotton

_____


I declare under penalty of perjury the following to be

true:


I have read my deposition and the same is true and

accurate save and except for any corrections as made

by me on the Correction Sheet herein.


Signed at _____, _____

on the _____ day of _____, 20____.


                    Signature: _____

                              Myron Woodson Ofc

## Exhibits

**EX001 INCIDENT REPORT** 45:7,9 53:2,3 54:1,2,8, 14,21 71:7

**EX002 EMPLOYMENT APPLICATION** 48:3,4 53:10,11

**EX003 INCIDENT REPORT** 52:24 53:22 71:7,20,22 72:2,7 74:2,13

**EX004 GOOGLE DRIVE TEAM DOCUMENT** 80:13, 14

**EX005 GOOGLE DRIVE TEAM DOCUMENT** 84:11, 14 92:20

**EX007 RESPONSES** 114:1,19,23 124:13

**EX008 NOTICE OF INVESTIGATION** 124:14,15,17,21

## $

**$16,000** 126:16

## 1

**1** 45:7,9 53:2,3 54:1,2,8,14,21 71:7

**10** 123:2

**10:11** 79:12

**10:12** 79:14

**10:24** 92:4

**10:34** 92:6

**10:36** 94:17

**10:41** 94:19

**11** 118:9

**11-pound** 62:5

**11:08** 123:8

**11:21** 123:10

**11:29** 130:23

**11th** 34:20

**12** 119:8,20

**13** 120:16

**14-12c** 30:4

**1429** 74:1

**1434** 54:25 72:11

**15** 121:20

**17** 122:10,15

**19th** 9:9,16 82:19 84:25

## 2

**2** 48:3,4 53:10,11

**20** 118:1,2

**2020** 32:7

**2022** 33:11 34:5

**2023** 9:14 24:23 34:20

**2024** 9:9 24:23 82:19 84:25 125:3

**20s** 21:16

**20th** 77:6

**214** 29:1

**23rd** 85:6

**24-0048** 81:21 92:24

**29th** 125:3 126:3

**2:06** 82:5,7

**2:08** 81:23 82:7

**2:31** 85:6

**2:54** 81:23

## 3

**3** 52:24 53:22 71:7,20,22 72:2,7 74:2,13

**30** 83:5

**35** 54:25

## 4

**4** 80:13,14

## 5

**5** 84:11,14 92:20

**511** 59:4 65:18

**56** 124:24

**590.502** 125:10

**5:39** 99:9

## 6

**6** 92:21,22,23,25

## 7

**7** 114:1,19,23 124:13

## 8

**8** 124:13,14,15, 17,21

**8:26** 82:20 84:25 85:5

**8:40** 6:8

**8:55** 83:4

## 9

**900** 50:21

**9:13** 45:21

**9:42** 45:23

## A

**a.m.** 6:8

**abandoned** 66:14 75:4 76:22

**Abrahamson** 16:15 89:24 91:11

**absolutely** 76:3 130:18

**abuse** 118:11,14

**academy** 26:4 43:13,17 118:16, 18

**accept** 78:9

**acceptable** 24:11 26:11 28:19 31:9

access 15:10,13
128:14

accurate 44:9
52:20 92:16

accurately 55:20

acknowledging
107:6

act 12:13 22:20

acted 19:3,4

acting 41:3
104:24 116:18

acts 105:2,3

add 32:24 111:23,
24

added 77:2 89:12

additional 129:10

adequate 129:14

adjusting 96:15

admin 89:19

admission 122:7

admit 115:3,6
117:5,8,13 118:9
119:8,13 120:16,
23 121:20 122:10

admitted 112:15

advance 29:7

advanced 16:3

affect 37:22 124:6

affirm 6:10

affirmed 7:14

afraid 62:4 74:14
75:25 112:12
121:1

afternoon 9:9,16

agent 51:15

aggression 62:8,
11,12 64:12 76:4
119:9,12,14,16,
21 120:1,14

aggressively
23:20 76:7

agree 7:25 57:10
113:22 118:4

agreement 38:3
113:6 126:7,8

ahead 18:9 73:25
92:19 94:8 95:10
96:11 97:15
99:12 111:19
123:6

Air 30:20

Aldermen 35:14

allegations 47:6
89:17

allowed 17:5
38:16

alternative 15:3
18:2

amended 75:24
77:19

Amendment
25:20 51:3

amount 26:12,13

and/or 18:24

animal 9:22 10:2
13:3,9,20 14:5,16
17:25 19:5,7
21:16 23:13
25:13 28:20
34:10 37:18,25
38:4,8,10,15,17,
22 39:1,4,12,18,

23,24,25 40:3,6,
11,22 56:3,7,9,17
62:18 63:3,5,12
67:12,15,17 68:9
70:4 102:17
105:2,11 112:5,
16,18,19,21,22
113:1,3,4,17,20,
23 115:8,13,19,
25 117:25
118:11,14,19,20
119:24

animal's 13:1

animals 13:25
14:2 20:24 23:14
24:12,17 25:6
33:5 34:1,3,11
37:14 38:17,23
40:18 41:2,10
42:14,17,19,20
62:6,7 63:11
69:22 70:7 116:4,
10 119:23

animals' 62:8

answering 8:13

anymore 104:9
106:24 108:16
128:14

apologies 107:15

apologize 30:7
33:20 45:8 52:25
53:13,15,23
66:12 79:6 91:5
93:25 102:10,24
114:5 127:20

apparently 45:14
67:20

appearance
74:25

appeared 19:7
20:3 74:18 112:4,
5

appears 82:22
120:21

application 34:24
48:9

apprehending
13:20

approach 58:10
95:3

approached
94:23

approval 44:19

approve 72:23
73:16

approximately
9:14 14:11 34:20
60:1 83:5

area 46:21 57:16
71:17 74:6,19
78:1 120:18
122:11

Army 11:6 26:24
27:2,14 28:25
30:4 43:3

arrest 44:5

arrived 55:21
57:5,16 74:6

Ashland 87:14

assert 18:15

assigned 86:17,
18

assist 35:23

assistance 17:11

assume 8:8

**assuming** 43:2 48:16 62:14

**attached** 130:17

**attacked** 121:10

**attempt** 61:17

**attempted** 15:2 61:13 78:8,24 79:1 117:6

**attempting** 105:21

**attention** 93:8 100:3,4 107:18 109:17,18

**attorney** 6:15 126:3,6,16,20 128:19

**audio** 94:6 99:24 103:15,16

**aware** 37:19,21 38:3,18,21 55:25 56:2 68:7 77:7 91:17 107:4 112:25 113:6 115:11 116:13, 15,17,19

**awesome** 107:23

**B**

**back** 12:19,21 13:10 16:17 26:22 29:11 30:18 43:1 44:20 45:2 46:1,6 47:15,16 48:2 49:2 52:11 53:22 58:8,15 59:17,23 65:15 67:2,5 68:14 69:9 78:10,

11 82:24 85:25 88:18,21 91:2 92:9 93:10,16 94:25 96:11 97:20 98:5,7,8 99:4 102:19,23 104:6 105:6 107:17 108:22 109:3,7 110:10 123:22 124:1

**backed** 58:8

**background** 26:21 53:14

**backing** 93:12 96:13 97:2

**backwards** 107:22

**bad** 20:6,7

**bait** 40:23

**barking** 64:20

**Base** 30:20

**based** 14:21 74:23 91:10

**basic** 27:15 120:1

**basis** 51:9,11,13 112:1

**Bates** 54:23 72:4, 11 80:3

**began** 24:22 34:18 99:9

**begin** 99:19 109:3

**beginning** 26:23 74:2 93:7 96:12

**begins** 74:10 96:13

**behalf** 7:10 128:19

**behaving** 23:19 76:7

**behavior** 18:10 22:3 56:17 74:24 111:1

**behaviors** 76:3 103:19

**belief** 38:7,9 57:7 91:11

**beliefs** 90:6

**believed** 13:8 16:13 18:16 20:16,18 64:8 75:8 90:5 91:18

**bes** 121:5

**bettering** 48:23

**big** 100:12

**bigger** 41:24,25

**bit** 15:12 20:7 21:18 34:8

**bite** 61:17 74:15 75:12 76:1

**bitten** 61:21 67:17

**blame** 91:7

**blanket** 16:22

**bleeding** 13:13 42:4

**blind** 55:16,22,23 56:1 63:7

**blood** 10:16,21, 25 57:2,5 61:6 100:11

**Board** 35:14 90:17

**Board's** 90:20

**body** 9:4,5 10:22, 25 12:20 13:16 60:3,4 69:8,15 71:9 92:24 93:21 95:19 100:16,17 104:13 122:11

**bones** 13:15

**Boone** 16:18 38:4,7,11,15,17 70:19 113:6,16

**bother** 16:14,17 66:19

**bottom** 54:24 95:24 104:9

**break** 8:10

**breathing** 60:23

**briefly** 26:22

**bring** 57:18,22 71:2 102:4

**broken** 11:17 12:23

**brought** 35:5,8, 18,25 61:25 78:11 98:15

**Bryan** 35:6 36:16 85:12,14 88:12

**building** 45:15 66:6,14 68:5 122:22,23

**bump** 12:10

**bumped** 12:14

**bushes** 122:24

**business** 66:10

**C**

**call** 9:18 13:18,21

14:7 16:10 22:17 30:8 39:24 40:2, 19 63:23 67:2,6 69:1 71:12 73:5 76:15 78:17 82:24

**called** 14:2 39:17 68:14

**caller** 55:13,15

**calling** 16:14,17 67:8 74:2 100:1

**calls** 16:24 39:12, 18 40:11 50:3 51:21 56:6 127:7

**cam** 9:4,5 92:24 93:21 95:19

**camera** 60:3,4 90:22 91:1

**canines** 117:15

**capture** 79:1,4

**car** 42:3,6,12 60:11 61:25 63:1 67:5 71:13 97:16 98:8 106:12

**care** 80:5 107:4 110:6

**career** 24:10 48:19

**cartoon** 22:9 117:18

**case** 20:14 127:25 128:12

**Casey's** 39:2

**catch** 12:4 13:4,5 15:2 16:3 40:6 101:6 103:21 105:22 106:12 107:8 117:6

**catching** 121:2

**catchpole** 12:5,8, 22,25 13:7 19:11 21:4 40:13,16 61:14 78:25 98:7, 10,14,19,24 99:2, 8 100:24 101:16, 22 106:22 107:1, 9,13,16 109:24 115:21 117:6,9 127:4

**categories** 24:7

**category** 15:1 119:4

**caught** 104:17

**cell** 66:22,23,24

**chain** 44:19 87:21 90:1

**Chance** 21:17 117:21

**change** 74:10 79:3 92:2 129:21

**changed** 118:2

**changing** 108:19

**chapter** 119:6

**charge** 64:14,16

**charging** 120:8,9

**chief** 36:16 37:1 47:9,10 85:18 86:11 87:3,9,10

**children** 49:9

**choice** 90:19,20

**citizen** 49:15,21 75:13 76:1 113:18

**citizens** 49:15

50:1,9,24

**city** 7:10 30:23 48:15 69:5 77:7, 18 84:1 90:15 113:1,4,19 115:7 125:5,13 126:7, 12,15,20 128:20

**City's** 116:9

**civil** 31:13

**civilian** 28:14

**clarify** 38:11 54:20

**classes** 118:22

**clear** 15:4 55:25 59:12 64:11 65:23

**client's** 51:7

**clinic** 70:15,18,20

**clocked** 55:9 82:25

**clockwise** 107:25

**close** 120:7

**closed** 102:16

**closes** 107:20

**Co-counsel** 7:6

**coach** 88:22

**cocked** 10:16

**collapse** 102:6,9 103:4

**collapsed** 102:15

**collar** 65:11

**collected** 56:21

**Collins** 125:25

**Columbia** 21:17

70:25 71:1,2,14 117:20

**column** 96:21

**comfortable** 49:19 62:3

**command** 87:21 90:2

**commanding** 129:7

**comment** 47:6

**committed** 126:21,24

**communicate** 128:3,5

**communications** 16:18 128:6

**community** 48:23

**complacent** 12:3 19:8,9

**complainant** 16:20 56:22

**complainant's** 95:7

**complaints** 42:22 49:22 50:11,14

**complete** 83:9

**completed** 126:13

**completely** 22:20

**completion** 29:18

**computer** 15:10 84:1 86:11,13,18, 19,20

**computers** 15:15 86:14,18

concern 75:21

concerned 61:20
67:20,24 68:3
129:9

conclusion 44:6
51:21

condition 10:13,
19

conditions 30:2,3

conduct 125:7

confirm 20:11
64:15

confirms 61:8

confused 15:12

connections 34:9

constitutional
25:16 49:14
50:24 51:14,19,
24

contact 16:20
17:2,4,5,19 57:12
63:6 89:17 94:10,
11,14 95:1,4
125:17,22

contacted 17:6,7,
8,10

container 65:16,
21 66:2,5 68:4,14
69:11 110:10

continue 50:23
111:20

continued 124:3

contract 29:19
38:13,16,19 39:5

contracts 39:10

control 37:18,25

38:4,8,10,15,17,
22 39:1,4 63:12
67:12 112:16,18,
19,22 113:1,3,4,
17,20,23 115:8,
14,19 119:25

conversations
91:10

coordinating
114:11,13

cop 49:18

copies 54:12
80:22

copy 129:19
130:7,10,12

cord 107:17

corner 95:24

correct 9:11,12,
21 11:23,24 13:1,
2 15:6 16:1,6,11,
15,18 17:16,17,
19,20 18:4,8
19:19 20:14 21:1,
4 23:24 24:25
25:1 26:15,16
28:9,11,12 29:2,
15,19,20,22 30:5,
10 31:5,24 32:19
33:13 34:6 35:7,
16 36:19,24,25
38:13 41:8 43:3
44:14 46:4,8,9,12
50:25 51:4,12
52:18,21 55:13,
18 56:4 57:6,13
61:11,16,19
63:25 65:1,2,12,
13 66:3 67:21
68:5 69:9 72:12
74:3,7,10 75:22
76:7 78:6,18 83:1

85:3,22 87:17
88:18 93:12,17
95:2,9,16 96:14,
18 97:2,10 99:6,
7,10,17 100:1,24
101:12 103:12
104:14,15
106:12,17,18
108:22 109:5,14
112:9,17 115:4,5,
9,22,23,25 116:1,
14,21,23 119:12
120:20 121:22
122:1,5,6,13,20
123:23,24 124:4,
5 125:3,7 126:4,
8,17,18,22,23,25
127:1

Correction 31:3

Corrections
24:16 31:12,23
32:3 43:5 111:14

correctly 35:4
59:7

could've 86:9

counsel 6:23 7:12
80:1 98:15

counseling 47:21

count 39:14

counted 14:13

Counter-thread
108:6

counter-threaded
108:12

County 16:18
33:13 38:4,7,11,
15,17 113:6,17

County's 70:19

couple 7:2 46:6
105:22

court 129:23

courtesy 39:9

covered 10:15

Crawford 13:19
16:11 25:3,5,8
34:25 35:2,24
36:4,24 37:3
44:25 67:3,9
68:15,18,22
69:14 71:12
72:19,21 73:1,7,
17 77:6,9 85:25
87:7 88:18,20
89:16 107:12
115:16,17,18
123:18 128:8,12,
21

Crawford's
107:14

created 79:22
82:19 84:24

creature 66:17

Crinnian 6:17,18,
24 7:1,13,18 17:3
23:7 44:7 45:5,
10,13,18,25 48:1,
6 50:8,19 51:25
52:4,23 53:3,8,
10,12,15,18,21,
25 54:2,5,10,22,
25 55:3 71:19,23
72:1,5,9 79:10,
16,25 80:6,9,12,
19,25 81:9,11,20
82:4,7,9 84:10,16
90:23,25 91:5,9,
25 92:8,18,22
93:2,15 94:3,7,
15,21 95:10,13

102:13,18,20,22
103:1 108:9,10
111:22,25
113:15,25 114:2,
5,6,9,12,16,21
122:25 123:5,12
124:12,15,19
125:1 127:14,16,
20,22 128:15
129:17 130:4,5,
15,18

**crossed** 36:12

**cruelty** 118:11,
15,20

**cruiser** 65:21,24
96:16 97:22

**cry** 20:22,24

**cues** 21:25 22:1

**custody** 62:25
78:12

---

**D**

**Dan** 7:3 127:21

**danger** 22:24
75:21 120:17

**dangerous** 56:4,7
112:3

**Daniel** 7:5 114:10

**data** 79:20

**date** 129:21

**dated** 125:2

**dates** 82:18
84:21,24

**David** 7:6

**day** 35:14 55:10
63:7 83:4

**day-to-day**
129:13

**days** 47:22

**DD-** 28:25

**dead** 65:4

**deaf** 56:1 63:8

**deal** 70:3,6
115:25

**dealing** 13:9
67:14

**deceased** 65:8
122:1

**decide** 18:23

**decided** 18:22

**decision** 19:1
23:23 44:4 64:4
129:24

**deemed** 17:9

**deer** 70:10

**deers** 42:18

**deescalating**
26:19

**defendant** 6:21
31:13

**define** 119:21

**definition** 16:7

**delay** 108:3

**demonstrate**
101:24

**denied** 119:19
120:18,21,24
122:12

**deny** 20:11 64:15
115:3,9 117:16
118:12 119:10

121:21 122:7

**department** 9:11
14:12 15:5 24:16
31:3,12,23 32:3,9
33:1 34:23 37:18
43:5 46:11 48:10
84:1,8 90:9,11,13
91:21 111:13
115:18 116:3
125:20,22

**departments** 36:9
41:5 88:4

**depend** 16:7

**DEPONENT** 6:13
17:1 23:4 44:3
50:5,7,14 51:23
52:1 53:5 55:2
94:9 102:12,14,
19 111:20,24
113:12 124:25
127:11 129:25

**deposed** 7:20

**deposition** 8:15
60:7

**depth** 27:22
111:5

**deputy** 33:12,14,
17,18,22

**description** 53:25

**detail** 17:14 92:14

**details** 17:15

**devices** 127:24

**difference** 22:15

**differently** 127:6

**difficulty** 13:19

**direct** 25:2 56:21
87:21

**direction** 95:4
108:11

**directions** 59:5

**directly** 39:2
58:16 95:7 97:9

**disapprove** 73:16

**discharged**
29:11,25 30:4
63:24 64:24,25

**discipline** 46:23
47:8

**disciplined** 47:2

**discovery** 48:15
80:18 98:16
128:1

**discussing** 114:6

**disease** 21:8
121:1

**dishonorably**
29:24

**Disorientation**
120:13

**disoriented**
120:12

**dispatch** 14:7,16
17:16,18,21 19:5
23:19 40:24 41:1,
16 44:5 56:10,14
61:11 64:5 76:6
109:14

**dispatched** 9:17,
22 11:23 41:3,11,
15,17 42:15,17,
24 64:8 70:3,6,16
107:11 108:25

**dispatcher** 56:21

**dispatching** 14:6

16:4

**dispose** 70:2,11, 16

**disposed** 71:3 122:10

**dispute** 76:16

**disrespectful** 110:6

**distracted** 53:6

**ditch** 42:4

**DOC** 31:5

**document** 54:15 74:1 81:7 82:11, 19 84:18,24 85:3, 5 124:24

**documents** 8:16, 19,24 52:8

**dog** 9:18,20,24 10:8 18:22 20:1, 2,3,4,6,9,21 22:17 41:20,24, 25 42:5,10,11,24 51:7 55:16 56:8 57:1,9,11,17 58:4 60:17,23,24 61:13,16,18,24 62:4 63:6,7,8,22, 24 64:24 70:13 71:2 74:14,18,25 75:4,8,12 76:21, 24 78:25 79:1 89:5,18 100:7 106:3 109:11 111:2 113:17 118:17 120:2

**dog's** 22:3 58:13 60:14,19 61:5

**dogs** 21:21 42:15, 20 56:1 63:14

75:18 113:7

**domestic** 42:20

**door** 45:15

**draft** 33:15 55:6 72:12,14,16,22, 25 79:5 83:9,13 84:2 85:21,25 86:11 88:13,14 89:12,13

**drew** 63:23 64:23

**dried** 57:1

**drink** 110:11,12

**drinking** 30:14,15

**drive** 39:7 96:17 97:5

**driver's** 98:3

**driveway** 58:7 60:5 95:15 96:7, 10,15 97:9

**driving** 58:14 59:7,12,22 60:11 93:8

**drop** 113:7

**dropped** 29:11,12 67:9

**drove** 65:24 78:10

**dual** 32:16

**duly** 7:14

**dump** 110:11

**duplicate** 71:24

**duties** 113:3,4,23 115:9,14,19 119:25

**duty** 24:4,5,7

---

**E**

---

**E-TRAN** 130:8

**E1** 29:2,7,11

**earlier** 18:23 34:19 51:2 57:13 61:23 75:15 85:24 87:5 91:22 93:9 103:9 112:23 113:16 117:16 118:5 119:10,11 120:18 121:23 123:2

**early** 21:16

**east** 58:20 59:3, 20

**edit** 44:16,17 73:20

**editing** 73:22,23

**Edward** 7:6

**efforts** 15:1

**either/or** 10:5,6

**elaborate** 50:16 63:3 72:24 78:4 89:7,11

**email** 73:2 128:13

**emails** 127:25 128:11

**emergency** 41:17

**employed** 9:13 129:11

**employee** 48:16

**employment** 46:13 124:7 126:17

**empowered** 22:20 23:23 24:1, 3

**encounter** 22:24 93:20,23 99:14 127:4,5

**encountered** 10:25 11:22 12:1

**encountering** 63:15

**encounters** 63:11 115:25

**end** 82:25 85:14

**ended** 39:13

**ending** 66:23

**enforcement** 43:14 49:3

**engage** 103:19

**engagement** 27:19,21 28:1,15, 22

**entail** 125:15

**entire** 66:2 112:1

**equipment** 127:12

**Eric** 6:17 54:20 71:21 114:9,16 127:21 130:14

**errata** 129:22

**escalate** 15:23

**Escalating** 26:19

**escalation** 15:25 16:6,8 26:17

**essentially** 20:13 28:6 35:25 111:7 123:23 126:7

**euthanized** 62:1

**evening** 55:7
123:21

**exact** 9:24,25
15:11 57:19,20,
21

**EXAMINATION**
7:17 128:17

**examined** 7:15

**excessive** 31:13

**exhibit** 45:7,9
48:3,4 52:24
53:2,3,10,11,22
54:1,2,8,13,14,21
62:10,12 71:7,20,
22 72:2,7 74:2,13
80:4,13,14 84:11,
14 92:20,21,22,
23,25 113:25
114:1,7,19,23
124:12,13,14,15,
17,21

**exhibited** 76:3

**exhibiting** 74:24

**exhibits** 53:19
114:11,13
130:14,17

**expecting** 69:25

**experience** 28:13
32:6 60:18
111:12

**expert** 68:11

**expertise** 118:11

**explain** 78:8
125:14

**explained** 111:9

**explanation**

78:10

**explicit** 37:9

**extended** 102:16
104:3 108:18

**extensive** 92:14

**eye** 55:17

---

**F**

**Facebook** 77:7,
18

**facial** 74:19

**facility** 70:17

**facing** 106:23

**fact** 64:3 109:10

**factually** 44:9

**fair** 15:24 27:24
28:8 91:8

**Fairgrounds**
58:15 59:4,9
65:18 97:24

**fairly** 50:20

**falls** 14:25

**familiarity** 22:6

**farther** 96:10

**fearful** 23:5

**fearing** 75:12

**February** 33:11
47:15,16

**feedback** 88:25

**feel** 8:10 22:19
24:1,3 49:11,19
50:1 62:3 120:23,
24 129:13

**felt** 17:11,13
22:20 23:22 24:5
50:10,15 76:9
91:14 110:17
119:13

**field** 21:1,2 99:9

**figure** 53:19
110:25

**file** 48:16 79:20,
21,22 81:4,21
82:11,13 83:5

**files** 81:20,24

**fill** 73:8

**final** 79:5 88:14,
15 89:12,13

**finally** 11:22

**find** 130:19

**fine** 79:10 80:16
91:6 102:20
103:18 123:4

**finish** 44:5

**finished** 30:20
55:9 82:24
123:25

**finishes** 71:7

**fire** 32:10 109:1

**firearm** 18:22

**firearms** 27:15

**fired** 121:25
122:4

**firefighter** 32:22

**firefighting** 32:15

**fit** 119:2

**fix** 94:6

**flag** 58:12 59:25

**flagged** 57:17
58:4,16 59:18
60:11

**Flemming** 6:20
16:23 23:1 43:25
50:3,6,13 51:20
54:23 55:1 80:16
111:17 127:7
129:18 130:1,6,8

**foam** 22:15

**foaming** 22:4,7,
10

**follow** 24:7

**force** 24:11,17
25:13 26:1,9,10,
12,13 28:7,19
30:20 31:6,14
33:2,5,23 34:1,3,
10,17 37:10,14

**forces** 28:15

**form** 16:23 23:1
43:25 50:3 51:20
111:17 123:16
127:7

**formal** 21:11,13
42:23 117:14,22
118:10

**Fortunately** 40:1

**found** 55:15
99:10

**Fourth** 25:20 51:3

**free** 8:11 51:3,15

**freedom** 49:13,
17,18

**freedoms** 50:2,11

**front** 58:24 82:12
84:18 104:13,14

**frustrated** 105:24

**full** 24:25

**full-time** 35:15

**functional** 66:10

**fur** 22:15 61:5

**G**

**gaping** 100:12

**garage** 96:3,4 97:20

**gas** 45:15 91:7

**gather** 61:13 78:25 79:4

**gave** 78:11 85:25

**general** 47:1

**generally** 25:22 26:10 27:25

**gentlemen** 79:6

**German** 42:9 61:24 62:14,16, 19,22,24,25 121:9,13

**gesture** 109:18, 20

**give** 6:11 43:18 47:20 88:24 113:17 115:24

**gloves** 98:6 121:12

**goals** 48:19,22

**good** 7:19 43:22, 24 66:22,23,24 72:6 80:7 90:15 99:15 120:1 128:21

**government** 51:16

**grab** 61:17 65:15 101:22 104:9 107:13,16

**grabbed** 99:8

**grabbing** 101:21 102:14 103:6

**Great** 45:11

**growling** 64:20 120:4

**guess** 108:23

**guidance** 13:18, 21 22:18,19

**guy** 70:10

**guys** 53:1 80:2,23 81:1,2,25 122:25 130:20

**H**

**half** 91:7

**hall** 69:5 84:1

**Hallsville** 34:6,9, 13,17 35:6,7,22 36:5,12,17,19 37:24 38:25 40:7, 12,19 41:11,12, 18 46:8,16,24 47:3,18 63:13 67:12 70:7,8 85:16 86:8,10 88:1 99:1 101:18 116:16,19,25 124:4,7 129:1,5

**Hallsville's** 37:23

**hand** 6:9 19:4 45:6 48:2 52:23

62:24 84:11,12 91:17 101:1,2,7 104:10 109:20, 21,23,24 121:17

**handbook** 14:4,9, 18 15:5,8,13 28:18

**handed** 15:7

**handing** 71:20 114:22 124:20

**handle** 103:7 106:17 107:21,25 108:19

**handled** 55:8 70:5

**hands** 61:17 101:2

**handwriting** 48:12

**hanging** 10:18 60:15,19,25 100:10

**hangs** 60:24

**happen** 36:9

**happened** 24:23 38:25 68:21 94:11,14 101:15, 19 123:14

**Hard** 119:21

**head** 10:16 12:19, 20 31:21 93:11 100:9 103:22,25 104:13 105:7 106:1 111:3

**header** 83:21

**heads** 21:5 54:6

**hear** 102:11 108:7

113:10 127:18

**hearing** 103:10

**heavily** 60:23

**helped** 87:5 88:6

**Hey** 45:13 53:1 88:23 91:25

**high** 96:23

**hip** 13:2

**hips** 13:5

**hired** 35:15,19 37:17

**hiring** 48:2

**hit** 20:5 42:3 61:25

**holding** 102:7 103:22 111:3

**home** 49:8 84:5,6

**homes** 66:15

**honestly** 70:21

**honorable** 30:2,3

**honorably** 29:25

**hook** 81:3

**hope** 56:25

**hospital** 62:1

**house** 40:4 58:11, 17,24 95:6,7,22 96:1 97:10,12

**How's** 60:1

**human** 119:3

**humane** 14:6,7 20:17,18 40:25

**humanely** 14:15 16:3

**Hunter** 6:19 9:7 51:14 69:2,4 78:5 112:6,11,16

**Hunter's** 51:19 78:12

**I**

**idea** 35:18 57:25 72:6 118:24 120:1

**identification** 48:5 54:9 72:8 80:15 84:15 93:1 114:20 124:18

**identified** 40:3 55:15

**identify** 10:22 55:12 72:4 81:10

**identifying** 117:15 118:7

**idiosyncrasies** 88:12

**ifs** 121:4

**ill** 18:4,24,25 19:2

**Illinois** 30:21

**immediately** 35:19 60:12 69:1 89:19 93:20

**imminent** 22:24 23:8,10,13,16 75:21 120:17,20

**imply** 57:24

**importance** 52:16,19

**important** 44:8,12 49:12

**impression** 39:3

**in-depth** 21:19

**incident** 8:22 9:6 25:10 31:20 39:19 43:22,24 53:4 54:2,6,12,17 55:5,7,8 61:7 67:4 68:19 72:11 73:11,14 74:1 84:2 85:15 86:11 91:11 92:13,15 124:6

**include** 74:23 75:7 126:20

**included** 88:11

**including** 88:10

**incomplete** 19:3

**indefinitely** 69:20

**indicative** 76:4

**individual** 15:16, 18 58:3,12 59:13

**infected** 75:1

**inform** 18:25

**informal** 42:23 47:21

**information** 17:12 19:3,4 55:20 56:20

**informed** 115:7 116:24

**initial** 54:12

**initiated** 47:8

**injured** 9:18 10:3, 4,14 12:13 13:9 17:25 18:3,24 19:7,8,19,22 20:3,5,17,24

22:17 40:24 42:2, 8,11 57:17 62:4, 18 64:9 103:20 111:2,3,16 112:3, 5

**injuries** 10:7 11:13,14 74:19 105:17

**injury** 11:16,18, 19 100:8 104:19, 21,24 105:2,6,11 121:7

**inside** 65:21 96:15 122:21,23

**instantaneously** 121:21

**instructed** 73:7

**intention** 35:22

**intentionally** 52:3

**intents** 112:25

**interaction** 17:22 60:2 78:4 97:25

**interactions** 25:6

**interruption** 45:9

**introduced** 53:23

**investigate** 125:18

**investigating** 125:6

**investigation** 47:17 124:10 125:14 126:13 128:4

**investigations** 118:12,15,19 119:3,4

**involved** 87:4

**issue** 50:18 104:7 121:3

**items** 57:8

**it's** 86:18

**I'm** 73:24

**J**

**Jack** 6:20

**January** 32:7

**Jeff** 87:14,15

**Jeffrey** 125:24

**Jennifer** 7:1 45:13 91:25 129:25

**job** 24:8 46:17,18 50:17 86:18 129:14

**jobs** 26:6 41:4

**join** 127:9

**joint** 16:18

**Jordan** 6:25 7:3,9 53:16 71:21,25 72:3 80:4,8,10, 13,24 81:6,10,15, 16,19 82:2,5,8 90:22,24,25 91:4, 8 102:21 124:23 127:9 128:18,19 129:16 130:12, 13,16

**July** 125:2

**jurisdiction** 33:8

**justice** 27:9,12

**justification** 18:17,18

**justified** 14:5
25:12

**K**

**K-O-L** 7:5

**keeping** 103:16

**Kevin** 16:15 90:1,
3 91:10

**kill** 121:21 122:8

**killed** 9:20

**killing** 51:7

**kind** 11:4 22:1
32:16 33:1 41:20
49:17 99:21
100:7,19 117:18

**kitty-corner**
58:17

**knew** 35:1 36:3,
11,16 50:17
59:19 69:21
71:18 113:2
115:18 128:2,4

**knob** 108:11

**knowing** 61:16
63:2,22 64:2

**knowledge**
117:18 118:11
126:12 129:14

**knurled** 107:21,
24,25

**Kolde** 7:5 53:1,7,
9,11,16 54:20
92:21 95:12
114:1,6,10,11
123:4 124:14
127:15,17
130:10,11

**Korea** 29:14
30:19

**L**

**language** 74:10,
23 75:8,11 77:2
78:12,15 79:3
88:9 126:20

**large** 42:9 61:24
62:4 100:13

**larger** 42:10,11

**lasso** 100:23

**law** 43:14 49:3
124:10

**laws** 68:7

**lawsuit** 31:13
51:10,14

**laying** 42:3 69:23

**lead** 15:1 106:6
110:20

**leadership** 87:18,
19,20,24,25

**leads** 19:15
111:11

**leak** 45:15

**learned** 101:16

**leave** 32:21 46:16
69:17,22 89:19

**leaving** 46:25

**led** 10:13 18:11,
13 20:22 39:8
103:20 106:4
110:24

**left** 29:1,2 32:2
33:18 46:5 52:13
68:13 71:17

94:22 95:24
96:17 97:4,5
122:18

**legal** 51:21

**legs** 104:14

**letters** 48:25

**letting** 91:1

**level** 26:10 29:8,
11 119:23

**life** 49:13

**lifted** 42:7

**limits** 25:17

**lines** 89:5

**listen** 103:15

**listened** 40:22

**live** 81:4,25

**lived** 30:23 97:13

**locked** 108:17

**long** 60:1 81:7
83:8,12 117:24
126:4

**longer** 46:10
109:2 122:5

**loop** 12:25 101:11
102:4,16 103:4,
25 105:12 106:23
107:18,22
108:19,21

**loop's** 102:6

**looped** 106:14

**loose** 21:3

**losing** 79:7

**lot** 39:15 43:2
121:4

**loud** 48:20

**Louis** 30:25

**lure** 16:21

**M**

**made** 11:13 47:6
50:1 63:17 65:6,9
86:6 95:1,4
109:19,20 111:16
120:5 122:24

**maintain** 52:8
113:19,21 126:24

**make** 8:11 10:8,
12 20:22 23:23
32:6 36:9 43:23
45:3 58:11 59:5,
11 65:23 67:5
73:2 81:6 82:2
86:4 106:4 109:2
122:4 123:5

**makes** 43:22
100:7

**making** 28:10
64:22 100:4
114:18

**male** 47:6 57:16
58:1 59:3 60:10
74:6 93:19 94:10
95:2,19,21 97:13

**man** 97:19

**maneuver** 64:18

**manual** 14:12,15
25:9

**mark** 53:7

**marked** 48:3,4
52:24 53:8,9 54:8
71:20 72:7 80:14
84:11,14 92:25

114:19,23
124:17,21

**marking** 45:7

**match** 82:22

**matches** 85:2
93:9

**material** 10:15,
20,22 27:12

**matter** 71:1

**maybes** 121:4

**mayor** 16:14
77:10 89:24

**ME-RELATED**
71:4

**Meaning** 14:6
87:21

**medic** 11:6,7
26:24 27:7,10,11

**medical** 11:2,4
27:9,12 63:2,5,
14,19 70:17
105:4 111:12

**meet** 39:1,7
113:16

**meeting** 35:6

**member** 111:14

**mention** 77:18

**mentioned** 46:7

**messages** 127:24
128:11

**met** 58:2 69:4
112:7

**metadata** 79:18,
20 80:3,23 81:4,
25

**meth** 21:5

**Mexico** 32:8,21,
25

**microphone**
99:25

**military** 11:6,7
21:17 24:19
28:14 29:5,18,22
30:13 111:15

**mind** 53:22
101:21 108:5

**minutes** 11:21
83:5 105:22

**misconduct**
126:22,25

**Missouri** 30:22
31:3 68:8 124:10
125:11,20

**misspoke** 129:20

**mistreatment**
125:6

**misunderstandin
g** 33:21

**Mm-hmm** 15:21
26:2 29:3 30:2
45:1 52:22 66:1
70:9 78:22 97:3
99:20 100:25
101:13 102:7
106:21 110:15
128:24

**modified** 83:4,23
85:6,12 116:16

**modifiers** 88:23

**moment** 9:23
18:21 32:5 48:7
101:15

**moments** 16:1

**month** 47:12

**morning** 7:19
128:21

**mouth** 22:4,8,11
60:20 100:10
120:7

**move** 69:14 105:8

**moved** 101:1

**moves** 108:15

**moving** 12:19
22:14 75:9 97:22
104:18,20 108:18

**mud** 10:16,21,24
57:1,5 61:6

**multiple** 52:11

**municipalities**
86:12

**mute** 106:10

**Myron** 6:21 7:14
83:23 129:19

_____

**N**

_____

**named** 31:12

**nearby** 40:3

**neck** 11:16,17,18,
19 12:23 13:1,6
19:8 65:11 74:19
101:12 102:17
103:4 104:13,19,
21,24,25 105:1,2,
6,11,12,17 111:2

**needed** 17:14,15

**negotiated** 126:6,
20

**Netmotions**
86:25

**network** 15:15

**Nicholas** 6:18

**night** 83:1

**nods** 31:21 93:11

**noise** 64:22

**noises** 20:22
100:5 106:4,6

**NON-
DANGEROUS**
56:17

**normal** 29:19

**north** 58:14 59:4,
7,12,22 65:18
93:22 94:10,12,
15,24

**notes** 56:10,14

**notice** 12:10
13:10,13,15
124:10 125:9

**noticed** 29:1

**notified** 123:15
126:2

**notifying** 125:5

**November** 34:5

**number** 49:21
72:4 80:12 81:21
82:15,16 86:19
115:6 117:5,13

**numbered** 72:11
81:21

**numbers** 15:11

**numerous** 87:1

## O

**oath** 7:23 46:2 92:12

**object** 16:23 23:1 43:25 50:3 51:20 80:17 111:17 127:7

**objection** 50:13 80:2 127:9

**observation** 44:4

**observations** 10:8,12 11:12 18:10,11 19:14

**observe** 12:1 19:6

**observed** 11:20 19:5,7 55:21 57:5 60:14 65:11 110:20 111:11

**observing** 12:11 18:1 64:24

**obvious** 13:10

**occupational** 48:19

**occupied** 78:1

**offense** 30:9

**offenses** 30:10

**office** 49:1 67:2

**officer** 7:19 9:10, 17 18:20 24:10, 24 25:17 31:24, 25 32:8,13,23 34:6 35:5,8,15 39:12 41:3,8 43:8 45:6 46:1,14 48:8 49:12 76:16 77:6,

**9** 78:16 79:17 82:10 84:17 85:17 87:16 92:9 93:3 94:22 107:12,16 111:8, 13,14 112:19,21 114:22 123:13 125:21 128:21,22

**officers** 43:15,16 88:4 129:7

**one-handed** 104:11

**one-handing** 105:18

**open** 13:10 66:9 71:17 96:3,4

**opened** 25:8

**operated** 127:12

**opposing** 80:1

**opposite** 58:19

**option** 14:17,20 19:18,20

**order** 26:14 109:25

**orders** 41:19

**original** 74:20,22 75:3,7,11 76:18 77:16,17,23 78:23 130:4

**originally** 35:5 54:14

**outcome** 127:13

**outdoor** 122:11

**owner** 40:2 63:22 64:2,4 75:4

## P

**p.m.** 82:20 83:4 84:25 85:5,6

**pages** 14:11 52:25 82:16

**pain** 106:5

**panting** 60:23

**paragraph** 57:15 59:2 74:9

**park** 95:15 96:24 97:17

**part** 48:9,16 70:19 74:5 76:16 103:7 104:9 126:19

**partially** 113:5

**pass** 44:19

**passcode** 86:21

**passed** 44:24 45:2

**passenger** 98:3

**past** 53:5 70:1 100:19

**path** 48:25

**paths** 36:13

**patrol** 42:12

**pattern** 30:10

**pause** 45:12 79:8 91:24 101:14

**pay** 93:8 107:18 109:17,18 126:15

**PDF** 130:13

**Peace** 125:21

**penalty** 6:10

**pending** 8:12

**people** 44:17 50:21 66:21 83:17,22 84:21 85:9 105:16

**Perfect** 114:17

**performing** 115:8

**perjury** 6:10

**person** 23:16 26:1,10 35:25 60:2 97:25 119:9

**persons** 20:24

**pet** 100:5

**phone** 67:6 69:1 73:5 123:18

**phrase** 28:3

**phrases** 68:2

**physical** 10:13 100:8

**physically** 41:16

**pick** 46:4 62:5,22 70:1 121:14

**picked** 42:8,11 61:24 62:21,22, 23 69:8 121:9,13

**picking** 46:17 62:3

**place** 39:1 68:20 130:19

**placing** 77:24

**plaintiff** 6:18 7:7 122:12

**plaintiff's** 45:7 48:3 52:24

**plan** 49:4,6

**planning** 49:2

**plastic** 77:24

**play** 64:4

**play-by-play** 21:12,14

**played** 93:14

**point** 8:10 24:10 31:23 58:12 63:18 67:6,13,19 95:16 99:25 101:6 105:21,24 106:2,22

**pointed** 25:9 59:3 107:9

**pointing** 58:21 63:18

**pole** 101:2,7 103:11 104:1,3 117:12

**poles** 98:16

**police** 9:10,11,17 14:12 15:5 24:10 28:14 31:24,25 32:13,23 34:6,23 37:1,18,25 41:3, 4,8 43:8,22 46:10,14 48:10 49:11 52:14,17 69:5 75:24 77:11, 15,17 84:1,8 85:17,18 88:4 90:8,11,13 91:21 111:13 112:7,21 121:24

**policies** 15:7,9, 17,18,20 33:4 37:22,23 116:25 128:25 129:3,6,

10

**policy** 13:22,23, 24,25 14:1,4,10, 18,22,23,24,25 15:23 16:10,14 25:8 28:18 34:10 37:24 68:2 91:17, 20,21 116:3,9,13, 15,17,19,23

**porch** 109:8

**portion** 108:15

**pose** 120:17,19

**posed** 22:23 23:8, 12,15

**position** 60:24

**possibilities** 18:20

**possibility** 18:19

**possibly** 22:4 75:12,25

**post** 77:7,22 125:25

**posted** 77:6,9,10, 11,12,21

**postpone** 45:14

**potential** 11:13

**potentially** 9:18 10:21 67:15

**precise** 52:20

**preparation** 8:17 60:7

**presence** 119:10

**presently** 46:13

**preserve** 49:13

**presume** 26:4 27:14 89:24

**presuming** 24:19

**pretty** 22:9 92:14 119:25

**prevent** 28:7

**printed** 54:11 81:5

**prior** 8:15 25:9 40:6 63:6 77:21 98:19

**private** 29:2 70:18

**problem** 111:7

**problems** 20:25 21:3

**proceed** 6:23 7:12

**proceedings** 45:12 79:8 91:24

**process** 46:19,20 69:22,24

**processing** 49:9

**produced** 80:17

**professional** 117:14 118:10

**program** 118:19

**properly** 117:7,9, 10

**Properties** 82:13 84:20

**property** 39:8 49:14,20 51:16 94:24

**proposed** 18:2

**protected** 51:19, 23

**protecting** 49:14 50:10,24

**protections** 25:16

**protocol** 67:14,16

**provide** 38:4,8 40:12

**provided** 48:15 117:9 129:22

**providing** 48:23

**provision** 14:8 28:18

**public** 32:7,8,12, 21 33:1 125:21

**publicly** 126:21

**pull** 81:24 103:25 105:12,13 107:17,21,22

**pulled** 60:5

**pulling** 19:11 108:14

**purpose** 12:25 16:19 44:3

**purposes** 82:3 112:25

**pursuant** 124:10 125:10

**put** 16:22 32:17 34:24 42:12 56:22 65:16 66:5 68:4,5 71:13 77:15 80:4 95:14 96:17 97:16 99:5 102:19 104:6 105:12 108:24 109:4,21,23 110:12 121:12

**Q**

**quantity** 100:14

**question** 8:4,7,8,
12,13 94:3 127:2,
23

**questions** 8:1
46:6 114:24
115:4 121:8,11
128:22 129:16

**quick** 46:7 53:19
81:1 92:1 123:3
127:17

**quickly** 127:13

**quote** 57:18,19,
20,21

**R**

**rabid** 67:15 68:9

**rabies** 21:7,11,13,
18,20,24 22:7
67:20 68:4 75:1
76:19 77:15,18
117:15,18 118:2,
7 121:7,10

**raccoon** 56:9

**Racoons** 42:18

**railroad** 66:15

**raise** 6:9

**raised** 109:21

**ran** 40:4 64:18

**Randolph** 33:12

**range** 66:25

**reach** 106:16

**reaching** 103:6

**read** 28:4 48:18,
20 49:10 68:12
77:11,21 116:22
122:16 126:21
129:19

**real** 46:7 53:19
59:12 81:1 92:1
123:3 127:17

**reason** 9:24,25
32:2 59:1 103:14

**reasonable** 83:12

**reasons** 10:18
86:19

**recall** 10:23 12:9,
17 23:21 27:22
31:18 35:4 39:14
45:2 47:13 52:14
55:4 60:5,9 67:7,
8 73:3,4,6,23
86:3,5,6 89:2,3,
10 93:23 94:11,
13 98:4 116:11
118:6 123:17
124:9

**receive** 24:9,15
37:9,13 43:11

**received** 26:3,6
81:22

**recent** 47:14

**recess** 45:22
79:13 92:5 94:18
123:9

**recognize** 48:8
54:14 114:23
124:22

**recollection**
23:18

**reconcile** 117:19

**record** 6:7 45:17,
19,21,24 46:2
53:25 79:9,12,15
82:3 92:1,4,7,10
94:5,17,20 123:6,
8,11 124:24
130:23

**recording** 8:16
93:14

**recordings** 8:19

**recounting** 59:6

**recourse** 76:1,10,
11

**red** 102:15 103:7
106:17 108:14

**reflect** 55:21

**regard** 11:12 33:2
68:8 116:3,9
123:14

**regulations** 30:4
68:8

**related** 82:18
83:17,22 84:20,
21,23 85:9
127:25

**relied** 17:22 56:14

**relieve** 76:11,14,
15

**relying** 88:3

**remember** 17:24
30:8 31:16,19
40:10 41:21,22
103:10 115:14

**remotely** 8:2

**repeat** 94:1,8
108:8 111:21

**repeated** 68:19

**repeats** 94:5

**rephrase** 8:5
27:25

**report** 8:21,22
17:16,18,22
23:19 43:3,12,19,
22,23,24 44:10,
13,22,24 54:3,12,
17 55:5,9,12
56:22 60:15 61:7,
10 63:20 64:2
65:10 72:11
73:11,14 74:1,20
75:7,25 76:6,18
77:12,15,17,20,
23 78:4,13,17,20,
24 82:25 84:2
85:15,21 88:7,16,
21,25 89:5,12,14
92:15 121:24
123:25

**reporter** 6:7,14,
22 7:4,8,11 45:8,
11,16,20,23
53:13,17,20,24
54:4,7 79:6,9,11,
14 80:11 81:13,
18 90:24 91:3
92:3,6 93:25
94:4,13,16,19
102:10,21,25
108:7 113:10,14
114:3,8,14,17
123:7,10 127:18
129:23 130:3,6,
10,12,22

**reports** 44:15
52:14,17 54:6
73:16 78:16
86:12 88:5,8
92:13

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**represent** 6:16, 18,20 48:14 98:14

**request** 115:6 117:4,13 118:9 119:8,20 120:16 121:20 122:7,10, 15 129:10

**requested** 90:17 98:15 128:7

**requests** 128:1

**required** 68:10

**requirements** 32:23

**rescue** 21:16 117:25 119:24

**reserve** 33:12 35:5,8,19

**reserved** 33:18

**residential** 66:15 77:25

**Resignation** 126:11

**resigned** 36:22 46:7

**respond** 9:17 28:5 38:10,12

**responded** 62:24 102:23

**responding** 56:15 103:23 111:4 121:14 127:25

**response** 62:6,23 72:21 115:3 117:8

**responses** 63:8,9 114:24

**responsibilities** 63:13

**responsible** 37:4, 6 113:23 115:8, 13,15,18

**rest** 64:25

**resumed** 124:3

**retrieved** 78:10

**retrieving** 122:11

**returning** 122:12

**reverse** 96:14,24

**review** 8:16,20,24 9:1,3,5

**revised** 85:21 125:10

**revising** 87:7

**revisions** 45:3

**rewind** 96:11

**rewrite** 88:4,7

**rewriting** 88:6

**rewritten** 74:11

**rid** 71:23

**right-hand** 82:12 83:19,20 84:19

**rights** 25:16 31:13 47:7 49:14 50:24 51:19,24 52:3

**road** 58:19,21 97:24 98:2

**roadway** 59:3

**roam** 20:4 76:2

**rod** 104:9 107:24

**role** 64:4

**roll** 98:2

**room** 41:17

**rough** 33:15 79:5

**round** 63:24 64:24,25 109:2

**rule** 28:22

**rules** 27:18,21 28:1,15

**run** 48:25

**running** 49:7 55:17,23 67:2 105:16

**S**

**sad** 80:24

**safe** 48:23

**Safeguard** 49:13

**safeguarding** 49:16 50:1

**safeguards** 49:18

**safely** 117:7,9,10

**safety** 32:8,12,21 33:1 125:21

**scan** 130:14,19

**scanner** 130:21

**Schultz** 35:6 36:16 47:9,10 85:12,14 87:3,9, 10,24

**Schultz's** 86:11 88:12

**Scott** 30:20

**screen** 81:3

**search** 25:22

127:23

**searched** 128:2

**searches** 51:4

**section** 14:4 49:11 125:10

**sections** 25:9

**secure** 40:21

**secured** 40:18

**seeking** 46:13

**seize** 51:16

**seizing** 26:1

**seizure** 25:22 51:7

**seizures** 51:4

**semi-matched** 17:25

**send** 44:19 130:20

**sense** 12:21

**sentence** 59:2

**separated** 29:17, 21 30:17 31:22, 25 104:4

**separation** 126:8

**September** 9:14 24:23 34:19,20

**Sergeant** 13:19 16:10 25:2,5,8 34:25 35:1,24 36:4,23 37:3 67:3,8 68:15,17, 22 72:18,21 73:1, 7,17 88:18,20 89:16 115:16,17 123:18 128:8,11

**serve** 37:25

**served** 37:18

**service** 63:23
64:23 78:20

**services** 38:5,8
78:17,23

**serving** 9:10
46:19,20

**set** 52:6 65:20
66:6

**settlement**
126:16

**severance** 126:7,
17

**severely** 62:4

**shadow** 109:17

**shared** 91:19
129:4

**sheet** 129:22

**Shepherd** 41:22
42:9 61:24 62:15,
16,19,22,24,25
121:9,13

**sheriff** 49:7

**sheriff's** 33:12
49:1

**shift** 96:20 97:5

**shifter** 96:21

**Shih** 24:5 62:5

**shoot** 14:5 18:17,
22 19:21 20:2,16
24:5 62:21 76:13

**shooting** 9:24
13:25 14:1,2
44:22 112:2
116:3,4,8,9

123:15,23

**shop** 65:20,25
66:9 67:9 69:12,
18 71:14 110:13

**shortly** 126:3

**shot** 9:20 19:25
20:1,13 21:5 65:3
107:10 109:11
116:12 121:20,25
122:4,8

**show** 64:12 81:4
102:1 119:9,12,
16

**showed** 119:13

**showing** 80:3

**shows** 85:5

**shriek** 12:7

**sick** 10:3,4 18:4,
12,13,16 19:16,
22 20:4,6,9,14
22:17

**side** 10:17 58:19,
21 59:8,20 82:12
83:19 84:19 98:3
104:13 110:1

**sideways** 55:17,
24

**sign** 86:15,21
106:6 129:19

**sign-ins** 86:16,17

**signal** 66:22,23

**signature** 129:24
130:2

**significant** 30:9

**signs** 62:10,12
120:1

**silence** 106:9

**similar** 42:9 61:24
98:10

**simple** 63:9

**simply** 20:21

**single** 76:18

**sir** 85:4

**sitting** 98:7

**situation** 17:9
20:6,8 51:18
60:21 62:23 63:3,
5,14,17,19,20
91:16 111:4
112:8

**situations** 42:24
118:17

**size** 62:9 82:15

**sizes** 62:7

**skip** 99:12

**skipped** 53:5

**slew** 10:18

**slow** 15:23

**small** 36:9 50:20
57:9,11 83:21

**snap** 121:15

**Snapping** 120:6

**snarling** 64:21

**Society** 40:25

**solely** 64:8

**sorts** 41:23 68:12

**sound** 32:9 55:10
57:23 83:8

**sounded** 90:16

**sounds** 56:8 80:6

99:15 120:5

**south** 58:15
93:10,16 94:12,
15,24,25

**spaced** 39:15

**SPD** 78:11

**speaking** 26:10
27:25 53:14
114:14

**specialized** 43:11
117:17 118:10

**specific** 37:13
43:18 78:15
111:15 115:24

**specifically** 14:4
24:11 25:19 27:7
89:4,9 116:22
129:6

**speculation**
16:24 50:4 51:21
127:8

**spelled** 7:5

**spend** 48:7

**spoke** 89:23

**spoken** 80:1

**spot** 21:20

**St** 30:25

**staged** 66:24

**stages** 21:24

**stamp** 54:23

**stamped** 117:1

**stand** 101:23
107:13

**Standards** 125:21

**standing** 96:5

**start** 10:7 15:23 18:9 54:13 61:3 81:16 93:6 101:11 103:3

**started** 16:2 46:17 60:13

**starts** 106:19

**state** 6:15

**stated** 57:17

**statement** 61:7

**States** 30:18

**station** 32:10 68:14 69:5 71:9, 11 112:7

**stationed** 29:14

**Statutes** 125:10

**staying** 49:8

**step** 13:10

**stepped** 90:18

**stepping** 90:6,12, 14

**steps** 69:22,24

**stick** 96:20

**sticker** 80:5

**sticking** 13:16 100:15,16

**stop** 26:14

**stored** 79:21

**straight** 107:22

**strange** 74:24

**stray** 38:17,23 39:24 40:2

**street** 38:25 58:3, 6,9,17,25 97:9,21

**strike** 13:9 38:2

**stuff** 22:9 88:10 111:21

**stumbling** 21:2

**Sturgeon** 7:10 9:11,17 13:24,25 14:1,12 15:5,22 24:22,24 34:18, 22 35:9,10,25 36:5,12,23 37:10, 14,16,22 38:2,3, 10,12,16,22 39:4, 5,11 40:8,16 41:13 43:18 48:2, 10,15 49:23 50:10 63:13 66:13,22 67:13 70:4,22,24 83:25 84:8 85:17,22 86:9 87:15,20,25 88:1 98:15,16,23 112:16 113:5,20 115:7 116:16,23, 25 117:1 123:23 124:24 125:13,17 128:13 129:1,9

**Sturgeon's** 15:20 50:20

**subdue** 26:14

**subject** 26:14 46:23

**submitted** 88:15 89:14 92:15

**Substantive** 57:7

**sued** 51:6

**suffering** 20:21, 23 65:9 74:18 76:12,14,15 106:3,7,8 109:3 110:17,21,23

112:4 122:5

**summarize** 28:2 43:21

**summary** 57:19

**summer** 61:3

**supervising** 37:7

**supervision** 22:21

**supervisor** 25:2 36:24 73:16

**support** 90:2,5 91:19 105:7

**supported** 91:12, 19

**supposed** 38:23 102:6,9 105:5,8,9

**suspect** 68:9

**suspected** 74:25

**suspecting** 75:4

**suspension** 47:24 123:16

**swaying** 12:20 19:10

**sweetheart** 62:16

**switch** 109:24

**symptoms** 22:7

**T**

**table** 49:7

**tagged** 80:3

**tags** 65:11

**talk** 25:19,24 26:20 34:8 59:13 89:4 90:3

**talked** 26:18 34:19 51:2 52:16, 19 57:13 82:23 84:20 90:2 91:21 92:13 109:1 110:13 112:24 117:16 118:5 119:11,22 121:23 122:3 125:24

**talking** 14:3,8,10 52:14 60:9,13 72:10 81:16 89:13 93:9 94:23 109:19 110:16 116:14 127:19,21 128:25

**talks** 14:5 59:15

**tampered** 66:7 71:18

**task** 112:22

**tasks** 24:8

**teach** 21:20

**Teddy** 10:9 11:20 12:1,10 13:11 16:22 17:23 18:3, 11 19:16 22:10, 23 23:19 39:19 40:6 44:22 57:5, 10 59:8 61:21 62:10,17,18,21 64:5,8,11 65:3, 16,18,19,20 67:9, 20 68:13 69:11, 17 75:22 99:5,10, 19 103:10 105:22 106:19,23 107:3 108:25 109:4 110:12,17,20 111:15 112:2,13 116:13 117:6 119:8,11,13

120:16,19,24,25 121:14,16,21 127:4

**Teddy's** 10:13,22 11:13 18:10 69:8 71:9 101:12 103:4 104:12 106:11 122:11

**teeth** 120:6

**telling** 88:9,13 108:5

**tells** 79:21 82:15, 18

**temperament** 22:7

**temporarily** 45:14

**tense** 112:8

**tentatively** 49:6

**term** 29:19

**terribly** 126:4

**tested** 67:17,18

**testified** 7:15 61:8,23 75:15,20 103:9

**testimony** 6:11 57:4 64:7 73:10 92:14

**text** 127:24 128:11

**That'd** 44:6

**thing** 20:17,18 32:14 46:5 60:17 84:19 104:17 108:4

**things** 27:16 36:8,9 43:23 49:17 79:21,22

110:20 111:15 117:18 118:5,6 120:4 128:10

**thought** 11:17 36:3 112:2 123:2 124:16

**thoughts** 89:7

**threat** 23:9,10,11, 13,16 26:15 28:5 120:20

**threatened** 120:23,25

**thrown** 75:9 76:25 89:5,18 122:24

**Tiffany** 55:13

**tighten** 106:17 107:25 108:5,16

**tightened** 108:12, 13,15

**tilting** 100:9

**time** 11:21,25 13:12,14,17 16:15 18:14 23:17 28:13 30:24 39:11 40:22 45:20,23 63:23 77:12 79:11,14 85:2 86:14 92:4,6 94:16,19 101:9 103:17 116:12 117:5 121:11,12 123:7,10 129:21 130:23

**times** 81:22 101:4

**timestamped** 87:1,2

**tire** 65:20,25 66:9 67:9 69:12,18 71:14 110:13

**to...it.'** 57:18

**today** 61:8 75:15 117:16 126:24

**today's** 8:15 60:7

**told** 17:19 37:16 38:22,24 39:2 85:24 86:4 109:13 112:12,15 115:14 128:4

**tongue** 10:17 60:15,19,24,25 100:10

**tonight** 130:19

**tools** 12:24

**top** 81:12,20 82:6

**tossed** 122:17

**tossing** 104:16

**total** 126:16

**tote** 66:18 69:18 77:24 109:4 122:18

**touch** 27:18 121:16

**touched** 12:8 26:21 103:11

**town** 50:20 85:18

**tracks** 66:15

**trade** 86:14

**trailed** 57:21

**train** 101:19 115:21

**trained** 25:5,15, 25 27:6 31:6,8

33:7 34:15 67:13 98:23 99:1 116:23 129:1,5,6

**training** 11:2,4,10 21:11,13,18,19 24:9,15 26:3,21 27:9,11,15 33:2, 23,25 37:4,10,13 43:1,12,19 105:4 115:24 117:14, 17,21,22,23 118:10,14,16 119:23 125:22 129:10,14

**trainings** 36:8

**transcript** 129:20

**transpired** 78:9

**transport** 99:6

**transported** 41:16

**transporting** 77:25

**traveling** 95:5

**treat** 40:23

**tree** 12:12,14 59:3 99:16

**trees** 55:17,23

**trot** 106:19

**trotting** 99:21

**trouble** 30:12,14

**truck** 95:23,25

**true** 61:10 78:6 92:16 113:8,13

**trust** 129:23,25

**truth** 6:11,12 7:15

**truthful** 44:13

52:17

**tub** 99:4,5

**turn** 59:14 60:2 78:3 94:25 96:17 108:11

**turn-around** 58:11

**turned** 58:3,8,14 59:7,17,22 60:4 93:21 96:7,9 97:8 106:23

**turning** 58:5,7 59:14,15 93:16 97:1,4,5

**twist** 107:24

**twisting** 108:2,3

**two-day** 47:23

**type** 40:15 50:15 56:3,7 72:17 84:2

**types** 43:23 56:6

**typically** 29:4

**Tzu** 24:6 62:5

## U

**unaware** 39:10 63:7,8 113:21 117:12

**undergo** 33:1

**understand** 7:22 8:3,4,8,14 10:11 14:3 46:2 51:6,9, 13,16,17 52:10 53:20 56:11,13 82:4 92:10 96:22 98:18 111:1 112:8 120:3 121:6

**understanding** 15:22 39:6 65:24 129:2

**understands** 28:10

**understood** 91:16

**unholster** 18:22

**unique** 86:21

**United** 30:18

**University** 30:23

**unkempt** 74:25

**unknowingly** 52:1

**unknown** 38:20 56:3 57:16 60:10 74:6 93:19 95:1, 19 97:13 120:22

**unnecessarily** 28:7

**unpaid** 47:22,23

**unprofessional** 125:7

**unreasonable** 51:3,7

**unreportable** 57:23

**unsure** 22:16 63:4 95:1,5

**unusual** 60:17,20

**updated** 74:17 78:20 117:22

**upset** 22:4 78:5 112:9,10

**username** 86:22

**utilize** 117:7,9,11

## V

**Vague** 23:2 44:1

**vehicle** 65:15 66:3 75:9 76:25 89:6,18 95:14,18 97:17 98:6 99:4 109:4 110:10

**verbatim** 17:24 74:2

**verify** 48:17

**version** 74:13,17, 22 75:3 78:25 81:5 88:15

**versions** 88:10 121:24

**vet** 41:15 42:6 70:15,18,19

**veterinary** 11:9 62:1

**video** 9:1,3,4,5 60:6,10 65:14 92:22,23 93:7 95:20 96:13 102:3

**videos** 43:16

**view** 58:24

**violate** 52:3

**violated** 47:7 52:2

**violation** 52:2

**visibly** 78:5

**volition** 22:21

**Voss** 87:14,15

## W

**wait** 8:12

**waive** 129:24 130:1

**walk** 97:21 109:3

**walking** 12:2,12, 18 20:25 55:17, 24 99:9 100:7 109:17

**walks** 100:19

**wanted** 35:20 72:23 73:2

**Ware** 55:13 95:8 109:7,19

**Ware's** 95:15 97:9

**watch** 97:16,20, 21

**watched** 60:6 97:22

**water** 110:11

**wave** 109:25

**waving** 109:22 110:2

**Wayne** 7:9

**ways** 87:1

**weapon** 63:23 64:23 78:17,21

**weary** 32:22

**week** 39:18

**west** 58:21 59:8, 20

**whatnots** 36:8

wheel 97:1,4

whine 103:10

whistling 100:1

white 22:14 57:1, 16,25 74:6 93:19 94:10 95:2,19,23, 25 97:13

Why'd 20:2

wild 42:19 56:9

wildlife 66:7,16 70:3,10,12

window 60:12 98:3

wood 66:16

Woodson 6:9,21 7:14,19 18:21 45:6 46:1 48:8 76:17 78:16 79:17 82:10 83:23 84:17 92:9 93:3 94:22 107:15,16 111:8 114:22 123:13 124:21 128:22

word 76:19

words 69:8 73:24 82:16

work 15:2 32:6 36:19 39:4 49:12 84:6 123:22 127:3

worked 36:6,17 49:22 83:4 85:16, 19 119:24

working 24:22 43:15,16 46:10 85:18 91:6 124:3

would've 20:4 31:20 37:20 56:21 58:20 71:2 90:16 118:23 121:12 127:3

wound 100:12

wounds 13:11

wrap 123:1

wrapped 123:14

wrestle 121:13

write 43:12,19 44:15,16,18 68:24 73:18,19 88:7

writing 43:3 44:10,13 88:12

written 124:9

wrong 16:2 55:16 91:15 108:6 129:21

wrote 44:24 48:19 54:18 55:4,7 73:11 87:6 88:7,8 89:1

**Y**

year 24:25 31:16, 18,19 32:11

years 27:1 28:25 32:19 41:7 118:1, 3

yelling 109:10,16 110:3

yelp 12:7,15 103:10

yelping 12:14,17 19:12

yesterday 36:22 46:8

Yup 62:20 83:2 85:1 99:11 105:20