

NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

Nationwide

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

Powerful
LITIGATION SUPPORT

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION


NICHOLAS HUNTER,

      Plaintiff,

vs.               CASE NO. 2:24-CV-04081-WJE

MYRON WOODSON, and

CITY OF STURGEON, MISSOURI,

      Defendants.

_____


REMOTE STREAMING DEPOSITION OF


KEVIN K. ABRAHAMSON


TAKEN ON

FRIDAY, JUNE 6, 2025

9:14 A.M.


VESSELL BRIDGES MURPHY

3901 SOUTH PROVIDENCE ROAD, SUITE D

COLUMBIA, MISSOURI 65203


NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

REMOTE APPEARANCES

Appearing on behalf of the Plaintiff:

ERIC C. CRINNIAN, ESQUIRE

Crinnian Law Offices

9212 North Garfield Avenue

Kansas City, Missouri 64155

(816) 459-0649

eric@crinnian.law


DANIEL J. KOLDE, ESQUIRE

Kolde Law Offices

P.O. Box 440344

Saint Louis, Missouri 63144

(636) 675-5383

Daniel.Kolde.Law@gmail.com

REMOTE APPEARANCES (CONTINUED)


Appearing on behalf of the Defendant, Myron Woodson:

JACK FLEMING, ESQUIRE

Vessell Bridges Murphy Law

3901 South Providence Road, Suite D

Columbia, Missouri 65203

(573) 777-4488

Jack.Fleming@VBMLaw.com


Appearing on behalf of Defendant, City of Sturgeon:

WAYNE M. JORDAN, III, ESQUIRE

Newman, Comley and Ruth, PC

601 Monroe Street, Suite 301

Jefferson City, Missouri 65101

(573) 634-2266

jordanW@ncrpc.com

laura@ncrpc.com


Also present:

Vincent Guerrera, NDT Technician

EXAMINATION INDEX

                                                          PAGE


EXAMINATION BY MR. CRINNIAN                                  7

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

EXHIBIT INDEX

EXHIBIT                                              PAGE

 1    INCIDENT REPORT                                 25

 3    INCIDENT REPORT                                 30

 9    EMAIL OCT 25 2023                               14

10    EMAIL APR 11 2024                               18

11    EMAIL MAY 20 2024                               26

12    STATEMENT                                       26

21    BAKER COMPLAINT                                 39

22    COMPLAINT FORM                                  41

23    ORDINANCE                                       42

24    ANIMAL REGULATIONS                              49

25    COMPLAINT                                       50

26    TEXTS                                           51

27    STATEMENTS                                      60

28    RESPONSE                                        64

29    EMAILS                                          70

REMOTE STREAMING DEPOSITION OF

KEVIN K. ABRAHAMSON

TAKEN ON

FRIDAY, JUNE 6, 2025

9:14 A.M.

THE REPORTER:  We're on the record, 9:14 a.m.

Mr. Abrahamson, will you please raise your right hand.  Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  Yes.

THE REPORTER:  Thank you.

Will each attorney please state their name and whom they represent.

MR. CRINNIAN:  Eric Crinnian, on behalf of Plaintiff Nicholas Hunter.

MR. KOLDE:  Daniel Kolde, for Plaintiff Nicholas Hunter.

MR. FLEMING:  Jack Fleming, on behalf of Defendant Myron Woodson.

MR. JORDAN:  Wayne Jordan, on behalf of Defendant City of Sturgeon, Missouri.

THE REPORTER:  Thank you.

Counsel, please proceed.

MR. CRINNIAN:  Thank you.

KEVIN K. ABRAHAMSON, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. CRINNIAN:

Q.  Good morning, Mr. Abrahamson.

A.  Morning.

Q.  Have you ever been deposed before?

A.  I don't recall.  I mean, I -- I don't.  If I was, it was a long, long, long, long, long time ago, but --

Q.  That's fair.  Do -- have you ever testified under oath, to your recollection, aside from --

A.  No.

Q.  -- maybe a deposition?

A.  No.

Q.  You understand that today the testimony you're going to give is under oath --

A.  Yes.

Q.  -- and if you have any -- if you're unsure about a question that I ask, please ask me to clarify, okay?

A.   Okay.

Q.   And the reason why is if you answer without asking for clarification, I'm going to assume you understood the question, and I want to make sure we get everything as factually accurate as possible, okay?

A.   All right.

Q.   If you don't understand a question, please ask me to clarify.  If you want to take a break at any point, you're welcome to do so.  The only thing that we ask is just that you wait until you have answered any pending questions, and then --

A.   Okay.

Q.   -- we'll gladly take a break.  Now, Mr. Abrahamson, you are the former Mayor of the City of Sturgeon, Missouri?

A.   Yes.

Q.   And when did -- do you recall when you became mayor?

A.   It would have been -- that would have been a year and a half ago or -- or whatever.

Q.   Prior to the incident?

A.   Yeah, prior -- prior to the incident, I was already mayor --

Q.   Okay.

A.   -- at that point.

Q.   So 2023-ish?

A.   Yes.

Q.   Okay.

A.   Somewhere in there.

Q.   And did you -- did Sturgeon have a police force when you became the mayor?

A.   I -- I -- we had an officer, and it was prior to me.  I think it was Thomas who was in on that time.

Q.   So Sergeant Crawford was already -- had already been in --

A.   He was --

Q.   -- position when you --

A.   He was in the position as a police officer. Yeah.

Q.   And --

THE REPORTER:  A reminder to speak one at a time.

THE DEPONENT:  Sorry.

MR. CRINNIAN:  That's what I was just getting ready to say, too.

BY MR. CRINNIAN:

Q.   So Sergeant Crawford was already there when you took the mayor position.  Had -- did you

know Thomas Crawford before you took the mayor position?

A. No.

Q. How long had you lived -- or have you lived in Sturgeon?

A. Oh my goodness, since the 90s.

Q. So a long time, then?

A. Yes.

Q. So were you aware of the prior lawsuit with the City of Sturgeon and the former police chief then?

A. I was aware of it, yes.

Q. Okay. And then there was a break between that police chief and then when Thomas Crawford was put into position; is that correct?

A. Yes.

Q. In late 2023, in the fall sometime, do you recall hiring Myron Woodson as a full-time police officer?

A. Yes.

Q. And you had reached out to Officer Woodson after he had been instated as a reserve officer and asked him if he'd like to join the force as a full-time officer; is that correct?

A. We did an interview process.

Q.   Okay.  And you called him and you offered him a job?

A.   Yes.  We -- we, as the counsel.

Q.   Okay.  When you did that interview process, was it just you, or do you remember who else participated?

A.   It was all the counsel.

Q.   Was there anybody else present besides you and the counsel?

A.   I think Thomas was sitting -- sitting just in the background.

Q.   Did you know Myron Woodson prior to hiring him as a Sturgeon police officer?

A.   No, I did not.

Q.   Do you know how he came to apply to the Sturgeon Police Department?

A.   We had an opening.

Q.   Do you know -- do you know if he knew anybody at Sturgeon at that time?

A.   That I don't know.

Q.   Now, Myron Woodson became a police officer approximately around September 11th, I think.  Does that sound right?

A.   Somewhere right in there, yeah.  Yes.

Q.   And by the time that this incident

happened, he had been an officer for less than a year at that point with Sturgeon?

A.   Yes.

Q.   From the time that Myron Woodson was hired, do you recall there being any issues with him shortly after his hiring?

A.   Well, I recall both of our police officers had complaints, but also police officers get complaints.

Q.   Sure.  Do you recall --

UNIDENTIFIED FEMALE SPEAKER 1:  Head east toward Outer Road.

MR. KOLDE:  Sorry.

MR. CRINNIAN:  Okay.

BY MR. CRINNIAN:

Q.   Do you recall any specific instances or recollections of complaints about Myron Woodson?

A.   The only one that really comes to my mind, and like I said, it was towards both, is one guy just felt that they drove tactically past his house.

Q.   Would that be Zach Dailey?

A.   I think that's who it is.

Q.   And had there been other complaints, besides Zach Dailey's?

A.   Like I said, you know, police officers get

complaints, if they pull them over and they just ask them questions, you know.  I -- I don't recall any specific ones, except for Zach's and, you know, I think there was one when he pulled somebody over.

Q.   Okay.  I'm going to hand you what has previously been marked as Plaintiff's Exhibit 9.

MR. CRINNIAN:  And opposing counsel, I apologize.  I don't have copies of these, but if you want to take a look at that.  That's what's missing in your stuff right now.  I apologize.  But that was from Wednesday's -- or, yeah, Wednesday's depositions.

MR. KOLDE:  Are we planning to use a lot, like, a decent amount of the depo exhibits from Wednesday?

MR. CRINNIAN:  I will be, only because that's what I got right now, but there's not a lot of them.

MR. JORDAN:  I need one for --

THE REPORTER:  Who just asked a question?

MR. CRINNIAN:  I'm sorry?

THE REPORTER:  Who just asked a question in the background?

MR. CRINNIAN:  I apologize.  That was Mr. Jordan.

Can we go off the record for just a moment, please.

THE REPORTER:  Please stand by.  We're off the record, 9:21 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  We're back on the record, 9:22 a.m.

Would you like Exhibit 9 attached to the transcript?

MR. CRINNIAN:  Yes, please.

THE REPORTER:  Exhibit 9.

(WHEREUPON, Exhibit 9 was marked for identification.)

BY MR. CRINNIAN:

Q.    Exhibit 9, also for identification, is Sturgeon Doc 1202.  I'm going to hand that to you, if you could look that over for me and tell me if you may recognize that.

A.    Okay.

Q.    Do you recognize that document?

A.    Yeah, it's mine.

Q.    And it appears to be an e-mail from you to Dorrie Crawford, correct?  At the top.

A.    Yes.

Q.    And at the bottom, it's an e-mail from

Dorrie Crawford to you on October 25th of 2023; is that correct?

A.    Yes.

Q.    And on October 25th, Dorrie Crawford e-mailed June and said, "Sergeant Crawford said there were two complaints on the new officer.  I understand they are not in writing at this time.  Is there something the counsel needs to address?" Do you see that?

A.    Yes.

Q.    And your response is that, "There has been two complaints, which I talked with Thomas about.  As in the counsel addressing anything, I don't feel we need to as of now.  Thomas is working with Myron, and I will be discussing everything with Thomas." Do you see that?

A.    Yes.

Q.    Okay.  So we know that at that point on October 25th, there are at least already two complaints against Myron Woodson; is that correct?

A.    Yes.

Q.    Now, you had talked about officers get complaints, they pull people over and things like that. Do you recall any of the specifics of the complaints about Myron Woodson that were received

shortly after his starting?

A.   No, I'm sorry, I don't.

Q.   Do you recall a complaint about Myron Woodson reaching into a car and taking a cell phone out of a teenager's hand?

A.   Yeah.  I do recall that being said, yes.

Q.   And you -- do you recall talking to Sergeant Crawford about dealing with that issue?

A.   Yes, I did.

Q.   Do you believe that Sergeant Crawford dealt with that issue?

A.   Yes, I do.

Q.   Did you ever follow up with Sergeant Crawford to see what he did in response to that?

A.   I can't recall the time frame of that, but I -- I -- we were on a constant -- pretty much an every day talk, just asking hey, what's going on, you know, things like that so --

Q.   Did you ever instruct Sergeant Crawford to document his conversations with Myron Woodson about these issues?

A.   I don't recall doing that.  No.

Q.   Now, in October of 2023, you were the Mayor of the Board of Alderman at that point?

A.   Yes.

Q.   Do you recall a bill that came before the Board of Alderman related to an animal control contract with Boone County?

A.   I -- I remember a little bit of it, yes.

Q.   Do -- I -- I judge you won't recall all the specifics, but can you summarize what you believe that agreement was.

A.   We were -- we were trying to get an agreement for them to do all our dog or whatever, you know --

Q.   The animal --

A.   Animal control, yeah.

Q.   And to your knowledge, did you reach an agreement with Boone County?

A.   No, we did not, as far back as I remember.

THE REPORTER:  Last sentence?

THE DEPONENT:  Not -- not that I remember, that we got a -- that we got a contract.

BY MR. CRINNIAN:

Q.   Are you aware of any City of Sturgeon ordinances that place animal control responsibilities in the hands of police officers?

A.   I -- I don't recall that anywhere that I know of.

Q.   Let's go ahead and jump to what's

previously been marked as Plaintiff's Exhibit 10. This is --

THE REPORTER:  Exhibit 10.

(WHEREUPON, Exhibit 10 was marked for identification.)

BY MR. CRINNIAN:

Q.    Exhibit 10, this is Sturgeon Document 1234.

Mayor Abrahamson, I'm going to hand that to you.  You'll take a look at that, and let me know if you recognize that.

A.    I mean, I wrote it.

Q.    Okay.  So you recognize it?

THE REPORTER:  What was the last part?

THE DEPONENT:  I wrote it.

BY MR. CRINNIAN:

Q.    So you do recognize that document?

A.    Yes.

Q.    And this document, you say you want to thank each of you as you have all stepped up and made things happen.  Do you see that?

A.    Yes.

Q.    And this e-mail was sent to, among other people, Thomas Crawford and Myron, correct?

A.    Yes.

Q.   Do you recall what it was you were talking about them stepping up and making things happen in April of 2024?

A.   It was just a matter of making sure that we kept the chain of command in -- in the order that it was.  If there was something going on, let me know, then we can all work together to fix it.

Q.   And that's what you say in the second paragraph, that, "I just want to reiterate that if any of you have anything that needs to be dealt with, decided, or discussed by the whole council, the first person you call is the mayor." Do you --

A.   Yes.

Q.   -- see that?  And that was your understanding of the reporting structure of the --

A.   Yes.  Yes.

Q.   You were responsible for the police department above Sergeant Crawford?

A.   Yes.

Q.   The third paragraph, you say, "Once you give me all the information, I need to be the person contacting the counsel" right?

A.   Yeah.

Q.   "The reason for this is I need to be able to get this information to others in the best way to

keep reactions and responses guided to good and not gut reaction." That's why?

A.   Uh-huh.

Q.   Now, why were you --

THE REPORTER:  Is that a yes?

THE DEPONENT:  Yes.  Sorry.

MR. JORDAN:  And this is Attorney Jordan. Mayor -- or former Mayor Abrahamson, just a reminder, we will just need verbal responses.

THE DEPONENT:  Okay.

MR. JORDAN:  Uh-huhs, huh-uhs don't come through clearly on the transcript --

THE DEPONENT:  I apologize.

MR. JORDAN:  -- and so Eric and I don't want to fight about it later.  So we're not trying to be mean.  It happens in a lot of depositions.

THE DEPONENT:  I will -- I will do my best.

MR. JORDAN:  If we were to remind you, don't take offense to it.

THE DEPONENT:  I -- I won't.

BY MR. CRINNIAN:

Q.   Now, in that e-mail, you say that you want to avoid gut reactions in the city, correct?

A.   Yes.

Q.   What types of gut reactions are you trying to avoid?

A.   Just, in my opinion, what it was was just -- just making sure that we all are on the same page, not one person or this person or me or whoever, that we are as -- as one.  We are the counsel.  We do this together.  We -- we, you know, if we go down, we go down on the ship together, you know.  It's -- it's a matter of us being a team together.

Q.   And you wanted to make sure that you were the liaison between the police department and the board?

A.   Yes.  Since I was officially the person over the police department or whatever you want to call it.

Q.   Right.  That makes sense.  Now, let's talk about the incident on May 19th, the shooting.

A.   Okay.

Q.   First of all, when was the first time that you heard from anybody that Officer Woodson had shot his dog?

A.   Well, it -- it would have been the same day. I -- I can't remember if that's when I was down in Jeff City, when I got the call, or if I was still

in Sturgeon.  I'm not for sure on that.

Q.   That's okay.  And let me clarify.  I'm -- I'm not going to hold you to specific dates and times on things that are just in your memory, so don't feel like this is a got-you.  I just want to know if -- if you talked to somebody or not.  Do you recall who it was that called you about the shooting?

A.   Thomas.

Q.   Thomas Crawford called you?

A.   Yes.

Q.   Do you recall what time -- not the specific time, but what part of the day that would have been?

A.   Afternoon.

Q.   Was it the same day as the shooting, to your recollection?

A.   That I can't remember.  I'm -- I'm not sure on that.

Q.   But you --

A.   I think it was, but I'm not sure.

Q.   So if the shooting occurred at 5 something in the afternoon, it probably would have been after that?

A.   Yes.

Q.   Okay.  And do you recall what Sergeant Crawford told you about the shooting?

A.   He told -- he told me -- he basically gave me a rundown of what happened, and I said okay, well, get everything down on paper.  If -- if you do, I mean, I don't know whether you, you know, you'll get -- get it -- get everything how you're supposed to do, whatever you're supposed to do as a police chief. You -- you put the stuff together, and we'll go from there.

Q.   Had Sergeant Crawford informed you that he had watched the body camera video yet?

A.   I don't recall that.

Q.   Did you ask him about the body camera video?

A.   No, I did not.

Q.   The following day, May 20th, is when things kind of start to slide a little bit into kind of chaos, right?  Do you remember getting a complaint from the person who called Dispatch about the dog?

A.   I don't recall talking to them after -- I don't recall talking to the person.

Q.   Well, let me step back.  My question is: Do you remember the city receiving a complaint from

her, a written complaint?

A.   I -- I remember -- yes, I do.  Yes.

Q.   And do you recall, generally, the content of that complaint about the incident?

A.   Vaguely.

Q.   Okay.  What do you recall?

A.   That -- that -- basically sort of what Thomas told me what happened.  It was basically, you know, the officer couldn't catch it with the catchpole or -- or whatever it was, and then he shot the dog.

Q.   Did you ask Sergeant Crawford any questions about why Myron felt he needed to shoot the dog?

A.   Well, I mean, I -- I don't -- I don't remember what I talked to Thomas about on that.  I'm sorry.

Q.   That's fine.  I -- I don't want you to guess. I want you to only tell me what you remember. And if we have documents to help your memory along, we'll -- we'll use them.  So let's go ahead and actually talk about the police report that Officer Woodson put together for you.  This is Plaintiff's Exhibit 1.  This is Sturgeon Document 1434.  I'll hand that to you.

THE REPORTER:  Exhibit 1.

(WHEREUPON, Exhibit 1 was marked for identification.)

THE DEPONENT:  Okay.

BY MR. CRINNIAN:

Q.    You -- you recognize that document as the police report that Myron --

A.    Yes.

Q.    -- Woodson put together?

A.    Yes.

Q.    And you see on there it mentions a Ms. Ware or Ms. Ware, the complainant?

A.    Yes.

Q.    And to your recollection, is that the name of the person who filed the complaint on May 20th?

A.    I -- I believe so.  Yes.

Q.    So -- pardon me.  And you said you don't recall speaking to her; is that correct?

A.    Yes.

Q.    Okay.  Do you recall speaking to anybody on the morning of May 20th about this incident?

A.    I -- I can't recall who I spoke to on -- on May 20th.  I just don't.

Q.    Do you recall anybody telling you that they were a -- formerly in law enforcement or

associated with law enforcement, and that they didn't think that this was right?

A.   I remember a conversation, but I don't remember who it was.

Q.   That's understandable.

I'm now going to hand you what have been marked as Plaintiff's Exhibits 11 and 12.

THE REPORTER:  Exhibits 11 and 12.

(WHEREUPON, Exhibit 11, Exhibit 12 were marked for identification.)

BY MR. CRINNIAN:

Q.   And these are Documents number Sturgeon 1600 and 1601.  So just take a look at both of those for me, please.

Do you recall seeing this e-mail before?

A.   Yes.

Q.   Okay.  And this is an e-mail from Jackie Rodgers, the city attorney?

A.   Yes.

Q.   You are included in the recipients, mayorsturgeonmo.org?

A.   Yes.

Q.   And this is Jackie Rodgers, the city attorney, responding to Sergeant Crawford, saying, "Attached, please find my revisions to your Facebook

post.  Please feel free to call if you have any questions.  I think it should also suffice as a response to Ms. Ware." Do you see that?

A.   Yes.

Q.   Now, the May 20th Facebook post, which is what's Exhibit 12 there, you did not write that post; is that correct?

A.   No.  Jackie did.

Q.   Well --

A.   Oh, wait, No, wait.  This -- this one right here?

Q.   Correct.  This is the actual --

A.   Okay.  Okay.

Q.   -- post itself.  This is the e-mail that the post was attached to.

A.   I -- I didn't write that.  No.

Q.   It appears from the e-mail that Thomas Crawford wrote that; is that correct?

A.   I think -- yeah, I believe so.

Q.   And that Jackie Rodgers proofread it and --

A.   Yes.

Q.   -- edited it?  Did you give Thomas Crawford permission to come up with the Facebook post?

A.   Yes, I did.

Q.   And you gave the city IT person permission to post it?

A.   Yes.

Q.   Now, let's go ahead and look specifically at Document 12 there, or Exhibit 12.

A.   Okay.

Q.   That's the actual statement itself.  And it says that, "The Sturgeon Police Department received a call for an injured animal at large, an officer arrived and located the animal, noticed the dog was behaving strangely and displaying signs of possible injuries and/or what the officer perceived to be rabid behavior." Do you see that?

A.   Uh-huh.

THE REPORTER:  Is that a yes?

THE DEPONENT:  Yes.  I'm sorry.

BY MR. CRINNIAN:

Q.   Now, if you look back at the initial report that Myron Woodson filed, that's Exhibit 1 right there in front of you, will you please review that and see if anywhere he mentions rabies.

A.   No, he did not.

Q.   Now, if you go back to the Facebook statement. You see that it mentioned rabies a number

of times, correct?

A.   Yes.

Q.   And the very last sentence,
"Unfortunately, the animal's lack of a collar or
tags influenced the SPD officer's decision to put
the animal down due to his belief that the animal
was injured, sick, and abandoned." Do you see that?

A.   Yes.

Q.   And you testified you did not write this,
which means you did not put the language about
rabies into that statement, correct?

A.   No, I did not.

Q.   But you still permitted it to be posted on
behalf of the city and you as the mayor, correct?

A.   Yes.

Q.   Did you do any investigation to determine
whether Sergeant Crawford's statement for Facebook
was factually accurate with what Myron Woodson's
incident report said?

A.   No, I didn't.

Q.   You also, then, presumably had nothing to
do with the language about the lack of a collar or
tags influencing his actions?

A.   No, I didn't.

Q.   Now, do you recall, following the shooting

and the Facebook posts, beginning -- the city

beginning to receive open records requests for

materials related to this incident?

A.   Yes.

Q.   People requested the body cam, correct?

A.   I don't recall.

Q.   Presumably, the body cam ended up on the

Internet and the news, so presumably somebody

requested it?

A.   Must have.  Yes.

Q.   And the incident reports, do you recall if

anybody requested the incident reports?

A.   That I don't remember.  I'm sorry.

Q.   No.  You're fine.

I am going to hand you what has been

previously marked as Plaintiff's Exhibit 3.  This is

Sturgeon Document 1429.

THE REPORTER:  Exhibit 3.

(WHEREUPON, Exhibit 3 was marked for

identification.)

BY MR. CRINNIAN:

Q.   You can look that over and tell me if you

remember that document, please.

A.   Yeah.  It's the same one I just read over

here.

Q.   Okay.  Well, let's go ahead and put those two exhibits side by side then and go --

A.   Okay.

Q.   -- through them.  Now, if you notice in the third paragraph, I apologize, the fourth paragraph, it says, "I made multiple attempts to capture the dog with a catchpole." Do you see that?

A.   Yes.

Q.   Okay.  Please read through that paragraph and tell me if the word rabies is in that paragraph.

A.   You want it read out?  Do you want me to read it out loud or --

Q.   You can just read it to --

A.   Okay.

Q.   -- yourself.

A.   Yes.  It's in there.

Q.   And that was not in the original police report, correct?

A.   (No audible response.)

Q.   The paragraph continued.

THE REPORTER:  What was the answer?

THE DEPONENT:  No, it was not.

BY MR. CRINNIAN:

Q.   The paragraph also says that he believed the dog had been abandoned by its owner and may have

been thrown from a moving vehicle.  Do you see that?

A.   Yes, I do see that.

Q.   And was that in the original report?

A.   No, it was not.

Q.   He continues to say, "Due to my suspicions, I did not attempt to grab the dog with my hands.  Fearing that the dog would possibly bite a citizen and having no other recourse at hand, I drew my service weapon and discharged one round into the dog." Do you see that?

A.   Yes.

Q.   Was the remark about the dog possibly biting a citizen in the original report?

A.   No, it was not.

Q.   At the bottom of that page, it says, "I placed the animal in a plastic tote and transported it to an area away from a residential or occupied area, where I disposed of it." Do you see that?

A.   Yes.

Q.   Was that in the original report?

A.   No, it was not.

Q.   I'm going to hand you what has been previously marked as Plaintiff's Exhibit 14.  This is Sturgeon Document 1171.

THE REPORTER:  Exhibit 14.

BY MR. CRINNIAN:

Q.   And if you'll please look at that e-mail and tell me if you recognize that, please.

A.   I -- I wrote this.  Yes.

Q.   Which -- you wrote the part in the middle of the document?

A.   Yes.

Q.   Okay.  Let's go ahead and start down at the bottom.

A.   Okay.

Q.   And I'll represent to you that that last report that I just handed you is the document that was attached to the e-mail that we're going over right now.

A.   Okay.

Q.   At the bottom of this document, 1171, there's a section from Jose Caldera, who's one of the attorneys for the city; is that correct?

A.   He was the one that was -- Jackie was gone, and he was the one that was helping us through that time frame --

Q.   That's right.

A.   -- while Jackie was gone.

Q.   That's right.  So Mr. Caldera e-mails and says, "Thanks for sending this over.  Are we ready

NAEGELI  (800) 528-3335
DEPOSITION & TRIAL  NAEGELIUSA.COM

to defend this statement: I also suspected, based on its appearance, that the dog had been thrown from a moving vehicle." Do you see that?

A.   Yes.

Q.   And he says, "If so, this would be the open record we should provide to the requester, not the previous one we reviewed.  We should not have competing versions out there." Do you see that?

A.   Yes.

Q.   Okay.  And then you respond.  And can you please read your response.

A.   Is that the one up top?

Q.   Yes, it's up top.

A.   Okay.

Q.   So it's reverse order.

A.   Okay.  Do you want me to read that?

Q.   Yes.  Read it --

A.   Okay.

Q.   -- out loud.

A.   "Hey, Jose.  I'm confused about the comment about the dog thrown from a car.  It had never been brought up, that I remember.  Just asking."

Q.   And Mr. Caldera responds to you and says, "It seems convenient to include that in his report

now, so I will let Sergeant Crawford explain himself to you. We should definitely follow up with him on that, though." Do you see that at the top?

A.   Yes.

Q.   Okay.  Do you believe that this was -- strike that.

Did you ever speak to Sergeant Crawford about the inconsistencies in these two reports?

A.   I know -- I know we talked about it, but I don't know exactly -- I can't remember exactly what we did.

Q.   So when you say you, "Talked about it" do you recall if you went to Sergeant Crawford and said hey, we need to talk about Myron's report?

A.   I asked him to go over the reports again.

Q.   Do you recall asking him specifically about the dog being thrown from a car part?

A.   I asked him to go over the reports again and just double check because there was two different things.

Q.   Do you know if Sergeant Crawford did that?

A.   I -- I don't know.

Q.   You never followed up with Sergeant Crawford to find out if he dealt with Officer Woodson about this?

A. No. I -- I did not.

Q. Now, earlier, you talked about the chain of command and how you were ultimately responsible for the police department --

A. Yes.

Q. -- correct? Make sure I can get my question out before you answer, please.

A. Okay. I'm sorry.

Q. Can you -- can you restate your answer?

A. Yes.

Q. It was your responsibility to ensure that Sergeant Crawford was running that police department properly, correct?

A. Yes.

Q. It was your responsibility to ensure that Sergeant Crawford was training his subordinates; is that correct?

A. Yes.

Q. Did you ever follow up with Sergeant Crawford about Myron Woodson's training at all?

A. I'm going to say yes, I did because I did keep up with Sergeant Crawford, so we would have a good police department.

Q. But you don't have any specific recollections of anything that you and Sergeant

Crawford spoke of?

A.   No, sir.

Q.   When is the last time that you recall speaking to Sergeant Crawford?

A.   I have no idea.

Q.   Do you think you've spoken to him this year?

A.   I think we did in passing.  I'm not -- I don't -- I don't really remember because I haven't seen him that much so --

Q.   Do you and he have each other's phone numbers and text each other?

A.   We have each other's phone numbers.  I mean, we've texted before.  Yeah.

Q.   Have you and he talked since he resigned from the Sturgeon Police Department; do you recall?

A.   I think I've asked him how his -- how his new job was going.

Q.   And his new -- his new job was as a sergeant in Hallsville, correct?

A.   Yes.

Q.   And --

A.   I -- I think.  I don't -- I'm not sure exactly what his place is.

Q.   Do you know if Myron Woodson was also

working as a Hallsville Police Department officer?

A.    I think he is.

Q.    Would you be surprised to find out that Officer Woodson testified that on Tuesday he resigned his job from the Hallsville Police Department?

A.    Yeah.  I didn't know he did it.

Q.    So you haven't spoken to Officer Woodson?

A.    No.

Q.    Okay.  Do you recall when the last time you may have spoken to him was?

A.    I have -- I have no idea on that.

Q.    Do you have his phone number?

A.    I think it's still in my phone.

Q.    That's fair.  I have a lot of phone numbers in my phone I don't talk to, either.

MR. CRINNIAN:  Okay.  Let's go ahead and take just a quick break, if that's all right.  We're going to get our stuff finished up and wrap this up.  So let's go ahead and go off the record, please.

THE REPORTER:  We'll go off the record, 9:52 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  We're back on the record, 10:05 a.m.

BY MR. CRINNIAN:

Q.    Mayor Abrahamson -- or Mr. Abrahamson, we are back on the record.  You're still under oath, okay?  I want to go back and talk about a few things we talked about earlier that we didn't have the documents for. So I'm going to hand you what I am marking as Plaintiff's Exhibit 21.  This is Sturgeon Document 1290 and 1291.

Can you please look at that document and let me know if you recognize that.

THE REPORTER:  Was that Exhibit 21?  I apologize.

MR. CRINNIAN:  Yes.  It was Exhibit 21.

THE REPORTER:  22?

MR. CRINNIAN:  21.

THE REPORTER:  21.  Okay.  Thank you.

Exhibit 21.

(WHEREUPON, Exhibit 21 was marked for identification.)

BY MR. CRINNIAN:

Q.    Do you recognize that document?

A.    Yes.

Q.    Okay.  And we're going to start at the bottom of it.  That is an e-mail from someone named Raechel Baker on October 10th, 2023; is that

correct?

A.   Yes.

Q.   And she's complaining about Officer Woodson's interaction with her son in a vehicle, correct?

A.   Yes.

Q.   And is this the incident, to the best of your knowledge, where Officer Woodson reached in and grabbed the phone from the teenager's hand?

A.   Hold on.  I got to find that part in here.

Q.   Sure.

A.   If I'm reading right over it, I don't see it.

Q.   Look on the second page.

A.   The second page?

Q.   Yes.

A.   Okay.  Okay.  Yes, I see that.

Q.   Okay.  And this complaint was sent to you originally on October 10th, 2023?

A.   Yes.

Q.   And you forwarded it to Thomas Crawford, at the top, on October 16th, 2023?

A.   Yes.

Q.   And that was roughly one month after Myron Woodson started at Sturgeon, correct?

A.   I would -- I would assume that.  I don't know the exact date.

Q.   Sure.  Yeah.  It may not be the exact date --

A.   Yeah.

Q.   -- but he started in early to mid-September, correct?

A.   Somewhere right in there, yes.

Q.   I'm going to now hand you what has been marked as Plaintiff's Exhibit 22, which are Document numbers 1585 and 1586.

THE REPORTER:  Exhibit 22.

(WHEREUPON, Exhibit 22 was marked for identification.)

BY MR. CRINNIAN:

Q.   You can take a look at that and tell me if you recognize that, please.

MR. KOLDE:  (Audio disruption.)

THE REPORTER:  What was said, please?

MR. CRINNIAN:  Nothing.  Please disregard. That was co-counsel.

BY MR. CRINNIAN:

Q.   Do you recognize that complaint?

A.   Yes.

Q.   Okay.  And that complaint was submitted by

Katie Richards on December 4th, 2023?

A.   Yes.

Q.   And Ms. Richards is complaining about Officer Woodson making her move a car that he said was illegally blocking and pulling her over for a suspended license; is that correct?

A.   That's what I read.  Yes.

Q.   And she said she did not have a suspended license, and he pulled her over for no reason?

A.   That is what she says.  Yes.

Q.   Do you recall if you ever followed up with Thomas Crawford about this?

A.   I do not recall on that one.

Q.   Okay.  I'm now going to hand you what I am marking as Plaintiff's Exhibit 23.  This begins as Sturgeon Document number 1513.  If you'll please take a look at that for me.

THE REPORTER:  Exhibit 23.

(WHEREUPON, Exhibit 23 was marked for identification.)

BY MR. CRINNIAN:

Q.   Did you have a chance to review that document now?

A.   Basically, yes.

Q.   Do you recognize those -- that pack of

documents?

A.   Yes, I do.

Q.   The very first page of that document is an ordinance approving an agreement by and between the City of Sturgeon and County of Boone, State of Missouri, correct?

A.   Yes.

Q.   And that's Ordinance number 960?

A.   Yes.

Q.   That ordinance arranges an agreement with Boone County Animal Control to provide some animal control service to the City of Sturgeon; is that correct?

A.   Yes.

Q.   Earlier, I had asked you about this and you said that you didn't believe that you -- that the city had reached an agreement with Boone County. Do you still believe that that statement is accurate?

A.   No, it is not.

Q.   On the second page of that document, it's Sturgeon number 1514 at the bottom.  Do you see 1514? Oh, it's the second page of --

A.   Oh.

Q.   -- that one.

A.    This one?

Q.    Oh, no, you switched.

A.    Oh, sorry.

Q.    The second page.  There it is.  Is that your signature on that?

A.    Yes, it is.

Q.    And that is you signing your name to the ordinance that was --

A.    Yes.

THE REPORTER:  What was the end of the question, please?

THE DEPONENT:  Yes, it is.

BY MR. CRINNIAN:

Q.    If you move on to the next page at the top, you'll see it says, "Copy 10/24/23."

A.    Yes.

Q.    And this is the Animal Control Limited Services Cooperation -- Cooperative Agreement, correct?

A.    Yes.

Q.    And this is the details of the agreement between the City of Sturgeon and Boone County, correct?

A.    Yes.

Q.    In the middle of the page, do you see

where it says, "Whereas the city has enacted its own animal control ordinances enforced by the Sturgeon Police Department"?

A.   Okay.  Is that -- is that the first one, the whereas right there, or is it down?

Q.   It's down towards the middle of the page.

A.   Okay.  So whereas enacted -- okay.

Q.   And do you see where it says that the city enacted its own animal control ordinances, enforced by the police department?

A.   Yes, but I also see that below that it says that some assistance might be needed by the department.

Q.   Yes, that -- that's correct, and that was actually going to be my next question.

A.   Okay.

Q.   So I want to make sure I'm framing this correctly.  The city had an ordinance that made the police officers responsible for animal control duties, correct?

A.   Correct.

Q.   And this agreement says that you want Boone County's help with doing -- performing the animal control duties, correct?

A.   If -- yes.

Q.   If you go to the following page, at the top it says, "City agreements." Do you see that?

A.   Yes.

Q.   And it says, "The city, by and through its police department, will administer its own animal control codes through responding to calls for service, the issuance of citations, investigation of cruelty cases, et cetera." Do you see that?

A.   Yes.

Q.   Subsection B sets forth the amount that the City of Sturgeon would pay?

A.   Yes.

Q.   Subsection C, "City, by and through its police department, will administer its own animal control codes through the" that's duplicative, so just disregard that.  The -- go ahead and turn to the following page, and there should be some signatures.

A.   Yes.

Q.   Is your signature on the top of that page?

A.   Yes, it is.

Q.   So you signed the contract with Boone County Animal Control on behalf of the city, correct?

A.   Yes.

Q.    Finally, turn to the last page of that. It should say Exhibit A at the top.  Do you see that?

A.    Yes.

Q.    This document is the Animal Control Limited Service Cooperative Agreement Anticipated Level of Services, and this sets forth when animal control officers from Boone County would be available.  Do you see that?

A.    Yes.

Q.    And the third paragraph it says, "Service expectations.  County will respond to animal control service requests from Sturgeon Police Department only." Do you see that?

A.    What are you --

Q.    The big --

A.    -- looking at?

Q.    The big paragraph.

A.    Yes.  I got that.

Q.    And you see where it says that, "County will respond to calls from the police department"?

A.    Yes.

Q.    And it will not respond to calls directly from the citizens?

A.    Yes.

Q.   County Animal Control will meet Sturgeon PD officers at a mutually agreed-upon location?

A.   Yes.

Q.   To receive and accept any dog that Sturgeon PD has impounded?

A.   Yes.

Q.   And at the bottom of that -- or the last paragraph of that page, it says, "Emergency response." Do you see that?

A.   Yes.

Q.   "When possible, and upon request from Sturgeon PD, County will assist Sturgeon PD with emergencies such as dog bites, vicious dogs, large animals in roadways threatening public safety, injured animals and wildlife inside living spaces as quickly as resources allow." Do you see that?

A.   Yes.

Q.   Is it your understanding, based on the language of that, that Boone County was available in certain circumstances to respond to calls for injured animals?

A.   Yes, in certain circumstances.

Q.   I'm going to hand you what I have marked as Plaintiff's Exhibit 24.  This is Sturgeon Document 1512.  Can you please review that and tell

me if you recognize that.

THE REPORTER:  Exhibit 24.

(WHEREUPON, Exhibit 24 was marked for identification.)

MR. JORDAN:  This is Attorney Jordan.  And just to clarify, the second part of Exhibit 23, after those first two pages, the document numbers were 1498 through 1501.  It's just not sequential at the beginning of Exhibit 23 so I just wanted to --

MR. CRINNIAN:  Got you.

MR. JORDAN:  -- try to keep those in order so --

MR. CRINNIAN:  Would you like to break that exhibit out or just --

MR. JORDAN:  Oh, no. It's fine --

MR. CRINNIAN:  Okay.

MR. JORDAN:  -- to keep it just as is.  I just wanted to make sure that we have the document numbers. So to clarify Exhibit 23 begins with 1513 through 1514, and then continues with 1498 through 1501.  And it's all fine.  This will be Exhibit 23.

THE REPORTER:  What was the last part of your sentence?

MR. JORDAN:  And it's all fine.  This will be considered Exhibit 23.

BY MR. CRINNIAN:

Q.   Mr. Abrahamson, I am handing you what I'm marking as Plaintiff's Exhibit 25.  Will you please look at that and tell me if you recognize that.

THE REPORTER:  Exhibit 25.

(WHEREUPON, Exhibit 25 was marked for identification.)

MR. JORDAN:  This is Attorney Jordan.  Just to clarify, Exhibit 25 is marked as Documents NH77 through 79.

THE REPORTER:  What was the last two words?

MR. JORDAN:  Through 79.

BY MR. CRINNIAN:

Q.   Did you have a chance to review that document?

A.   Yes.

Q.   Do you recognize it?

A.   Yeah.  I -- I remember reading it, yes.

Q.   And what is -- strike that.

This document is the complaint from Tiffany Ware, correct?

A.   Yes.

Q.   And she's the person who called joint dispatch about Teddy being -- wandering in her yard?

A.   I believe it was a dog wandering in her yard.

Q.   My apologies.  The dog's name was Teddy. So if I refer to him as Teddy, please understand I'm talking about the dog.  And you see that Ms. Ware was expressing that Officer Woodson's actions did not conform with her belief about what the situation was; is that correct?

A.   Correct.

Q.   Now, you said earlier you don't recall speaking with Ms. Ware specifically, right?

A.   I -- I don't remember speaking with her explicitly.  No.

Q.   Now, this complaint was filed on May 20th, 2024.  Do you see that?

A.   Yes.

Q.   I'm going to hand you what I am marking as Exhibit 26.

THE REPORTER:  Exhibit 26.

(WHEREUPON, Exhibit 26 was marked for identification.)

BY MR. CRINNIAN:

Q.   And these -- pardon me.  This is Sturgeon Document 979 through 982.  I'm going to hand that to you, if you'll please take a look at that.  Let me

know if you recognize that.

A.   Yeah.  I remember it.  Yeah.

Q.   And you recognize these as text messages that you were involved in?

A.   Yes.

Q.   Now, on the left-hand side of this page, in the lighter-colored box, the first message at the top of this page says, "I talked to the lady that was there." Is that a text message from you?

A.   That is a text message from me.

Q.   Do you recall who you were sending this text message to?

A.   I believe it was Seth.

Q.   Seth Truesdell?

A.   Yes.

Q.   Okay.  Now, let's talk about that first message.  You say, "I talked to the lady that was there, and she has contacted the sheriff because she used to work for him." Do you recall that?

A.   Oh, it's right there.  Yes.

Q.   Okay.  So let -- let me -- let me ask this. Does this text message reflect contemporaneously what you thought and knew at the time?

A.   Yes.

Q.   Okay.  You continue to say, "I think he might have overstepped.  She said that dog wasn't rabid. They were helping the dog." Is that a correct reflection of what's contained in that text message?

A.   Well, that's exactly what's contained in the text message right here.

Q.   And this text message was sent May 20th at 8:59 in the morning; is that correct?

A.   Yes.

Q.   Now, if the shooting occurred on the evening of the 19th and you sent this text message at just before 9 a.m. on May 20th, does it stand to reason that you would have spoken with Ms. Ware either the evening of the 19th or the morning of the 20th?

A.   I -- I would -- I would say so.  Yes.

Q.   And this was posted -- or I -- I apologize. This message was sent prior to Sergeant Crawford posting the first Facebook post on May 20th; is that correct?

A.   That I don't -- I don't remember when I posted it.  I'm sorry.

Q.   No, that's fair.  That's -- totally understand.

A.   Or when he posted that.  I apologize.

Q.   Now, why do you think that you said that I think he may have overstepped?

A.   It's just what I was thinking at that time.

Q.   And you had not seen the body camera footage at this point, had you?

A.   No.

Q.   When you say, "Overstepped" what do you mean?

A.   That -- that he could have taken it too far.

Q.   Okay.

A.   I mean, I --

Q.   And --

A.   I guess that's the way I would -- I would have been thinking.

Q.   And you said, "She said that dog was not rabid" correct?

A.   Well, she said that dog was not rabid.

Q.   Right.

A.   Yes.

Q.   And you continued, "They were helping the dog."

A.   Yes.

Q.   And then a little further down, later that

same day, 5:17 p.m., you say, "People are being so hateful and nasty.  I didn't take this office to be treated like this.  I really am at a loss of words. I support Myron 100 percent." Do you see that?

A.   Yes.

Q.   Do you believe that you sent a text message saying, "People are being so hateful and nasty" because they had seen the Facebook post?

A.   I -- I guess.  I'm -- I'm not sure.  I don't know what they were thinking.

Q.   Okay.  Let's talk about the second text message in -- in that chain there, "I support Myron 100 percent." Why did you say that?

A.   Because everything wasn't totally figured out, so I have to support my police officers until things are worked --

Q.   So --

A.   -- through.

Q.   -- by this point, you haven't seen the body cam, correct?

A.   Correct.

Q.   You had not read his initial police report, correct?

A.   Correct.

Q.   You stated, "I think he might have

overstepped" that morning, correct?

A.    Yes.

Q.    And they were helping the dog that morning, correct?

A.    Well, she said they were helping the dog.

Q.    And that's what you communicated to --

A.    Yeah.

Q.    -- Seth Truesdell, correct?

A.    I -- yeah, I guess.  I -- yeah.

Q.    So you just said that you have to support your officer 100 percent until you have all the evidence, but you already had doubts about Officer Woodson's actions, didn't you?

A.    I guess you can deduct that from that.

Q.    Is there an alternative explanation that I should be considering?

A.    I -- bottom line, I supported my police officers.  Was there things that were done wrong? I'm sure there was.  But yes, he -- I -- I felt that he might have overstepped.  That's all I said.  So --

Q.    As you sit here today, do you think that Officer Woodson overstepped?

A.    Yes.

Q.    When did you come to the conclusion that

you -- that you believe Officer Woodson did in fact overstep?

A.   I don't know.

Q.   Was it after you saw the body camera footage?

A.   Yes.  It would have been after that.

Q.   Do you remember what day you resigned?

A.   Somewhere in here, I know that.

Q.   If you look at the back page of that exhibit, it'll tell you.  It looks like it would have been May 24th.  Does that sound right?

A.   I -- I think that's about where it was at, the 24th.

Q.   And you were upset because, obviously, you -- you caught a lot of flack for this situation, right?

A.   My family was threatened in this situation.

Q.   I understand that, and I -- I understand --

A.   Sorry.

Q.   No, you're fine.  Do you need to take a quick -- a quick little break?

A.   No.

Q.   Okay.  If you want to, that's not a

problem. I -- I understand that you were the subject of a lot of harassment and targeting -- targeting after this. I've read a lot of the messages, and I'm -- I'm sorry you went through that, because I don't think that's an appropriate way to handle anything. But you were obviously very, very upset about the way that you were being treated in this situation, right?

A. Yes.

Q. Did you understand why your citizens were so upset about this?

A. Most of it wasn't from our citizens.

Q. Okay. Why did you say that?

A. Because it came from England, it came from everywhere. It did not just come from Sturgeon, so it -- I was getting it from everywhere.

Q. Do you think maybe that's an indication as to how outrageous this is to a lot of people?

MR. FLEMING: I'll object to the form.

MR. JORDAN: Object to form.

THE REPORTER: Who objected, please?

MR. FLEMING: Jack Fleming.

MR. JORDAN: Wayne Jordan. I'll join the objection.

You can answer the question.

THE DEPONENT:  What was the question again? I'm sorry.

BY MR. CRINNIAN:

Q.  **Do you think the fact that you were getting messages from all over the world is a reflection of how outrageous Officer Woodson's conduct was, subject to the same objection?**

MR. JORDAN:  And I have to say the same objection.  Attorney Jordan.

MR. FLEMING:  Jack Fleming.  I join the objection.

THE DEPONENT:  Now, what was the question again?

MR. KOLDE:  Why don't we just stipulate to the objection in advance, how's that?  We're good with that.

THE DEPONENT:  I'm sorry.

BY MR. CRINNIAN:

Q.  **You're -- you're fine.  I get it.  Is it possible that the messages and things that you were receiving from all over the world was a reflection on how outrageous Officer Woodson's conduct was?**

A.  Yes, you could deduct that from the response.

Q.  **And as you sit here today, you think**

Woodson overstepped, right?

A.   I -- I do.

Q.   Were you outraged when you saw the body camera footage?

A.   No.  It gave me a better, clear view of what -- what happened.  I wouldn't say I was outraged.

Q.   Did you -- after watching the body camera footage, did you change your position on the incident?

A.   Could it have been handled different, is that what you're asking?

Q.   I'm not asking whether it could have been handled differently.  Whether your mind changed about supporting Myron 100 percent at that time?

A.   Probably some.

Q.   I'm going to hand you what is being marked as Plaintiff's Exhibit 27.  This is Sturgeon Document 1724.  Please look over that and tell me if you recognize it.

THE REPORTER:  Exhibit 27.

(WHEREUPON, Exhibit 27 was marked for identification.)

BY MR. CRINNIAN:

Q.   Do you recognize those documents?

A.    Yes.

Q.    The bottom paragraph here says, "May 20th, 2024," and that -- is that the content of Officer -- or Sergeant Crawford's Facebook --

A.    Yes.

Q.    -- post?  Was that a yes?

A.    Yes.

Q.    And the paragraph above that is May 23rd, 2024, correct?

A.    Yes.

Q.    So that was three days after Officer Sergeant Crawford made his Facebook post, right?

A.    Yes.

Q.    And that was three days after you sent your text message saying, "I support Myron 100 percent" correct?

A.    Yes.

Q.    The May 23rd post says, "Update: The city has reviewed the dispatch report and body camera footage regarding the recent dog-at-large incident. The city believes the officer acted within his authority based on the information available to him at the time to protect against possible injury to citizens from what appeared to be an injured, sick, and abandoned dog." Do you see that?

A.    Yes.

Q.    The rest of the post continues to justify Officer Woodson's behavior; would you agree?

A.    Yes.

Q.    Did you write this post?

A.    I believe it was written for me by my -- by the city attorneys.

Q.    Did you review it before it was posted on Facebook?

A.    Yes.

Q.    Okay.  So is it fair to say that you agreed with the content of that post?

A.    Yes.

Q.    So even though by this point you had spoken with Ms. Ware, even though now you don't quite remember it, but you apparently spoke with Ms. Ware, and you had indicated that Woodson may have overstepped, you still agreed with this language, correct?

A.    Yes.

Q.    Why?

A.    Because that's what my attorney told me to do. But we -- we talked through everything, and that's what we went with.

Q.    Now, the city attorneys -- when I say,

"City attorneys" I mean Jackie Rodgers, but also Jose Caldera who --

A.   Uh-huh.

Q.   -- filled in for her.  So you understand that?

A.   Yes.

Q.   The city attorneys were actually responsible for crafting virtually all of the responses for the situation, weren't --

A.   Yes.

Q.   -- they?  That was the response to Mr. Hunter's complaint?

A.   That I -- I don't -- I don't know.

Q.   Do you recall if the city sent an official response to Ms. Ware's complaint?

A.   I don't recall.  I'm sorry about that.

Q.   It's fine.  Do you recall if the city sent a response to my client, Mr. Hunter's complaint?

A.   I don't recall that either.

Q.   Do you recall if the city attorney drafted your responses to the media inquiries about this situation?

A.   The -- the city attorneys did all the drafting of everything that was posted.

Q.   Okay.  So virtually none of it was drafted

by you, just overseen by you?  And you --

A.    Yes.

Q.    -- you approved it?

I'm handing you what is being marked as Plaintiff's Exhibit 28.  That is Sturgeon Document numbers 1396 through 1397 and NH1 and NH2.

THE REPORTER:  Exhibit 28.

(WHEREUPON, Exhibit 28 was marked for identification.)

BY MR. CRINNIAN:

Q.    Look through that document and tell me if you recognize it, please.

Do you recognize the document?

A.    Yes.

Q.    Okay.  Is this document the drafting and the final response of the response to Mr. Hunter's complaint?

A.    Yes.

Q.    And this was written by Jackie Rodgers and Jose Caldera, correct?

A.    Yes.

Q.    And the first two pages reflect the e-mail exchange in which you were copied on their discussions of the draft?

A.    Yes.

Q.   And the third and fourth pages, which are NH1 and NH2, these are copies of the actual document that Mr. Hunter received?

A.   Yes.

Q.   Do you recall having that document drafted and sent on your behalf?

A.   I -- I do now, yes.

Q.   Now, the response essentially restates what was contained in the two Facebook posts, correct?

A.   What was that?

Q.   The response that was drafted effectively mirrors what was in the Facebook --

A.   Yes.

Q.   -- post, correct?

A.   Yes.

Q.   If you turn to the second page of this, the very top of the page, small paragraph.  "Also, we would like you to know that Boone County Animal Control will not respond to incidents in Sturgeon, Missouri, leaving it to the city's police officers, whose primary function and training does not involve animal control, to deal with the issue." Do you see that?

A.   Yes.

Q.    Based on the documents that we reviewed today, that's an incorrect statement, isn't it?

A.    Well, if I remember correctly, we, as the city, did sign on Boone County Animal Control, but there was also times where they were not available.

Q.    And I understand that.  That's -- that's not --

A.    So --

Q.    -- what I'm asking.  What I'm asking is: Sturgeon, Missouri Police are responsible for performing animal control duties, correct?

A.    Yes.

Q.    There was a contract that you signed in place with Boone County for them to take stray and injured lost animals, correct?

A.    Yes, but it was also if it was available -- if they were available to come up.  I mean, that -- that's always how it is.

Q.    Well, if we --

A.    So --

Q.    If we need to go back and look at the agreement --

A.    Maybe --

Q.    -- we can.  We talked about this a little earlier.

A.   Okay.

Q.   Wait.  Let me -- let me talk, please, and not talk over you.  The agreement we talked about earlier said that the Sturgeon police officers would go meet Boone County somewhere in Columbia and bring the dogs to them, correct?

A.   Yes.

Q.   And it also said that in the event of emergency circumstances, like injured animals, if Boone County is available to come out, they would --

A.   Yes.

Q.   -- correct?  So Sturgeon did have provisions to cover animal control duties and responsibilities, correct?

A.   If available, yes.

Q.   Okay.  So that sentence also says, "Whose primary function and training does not involve animal control." Is it your understanding that the Sturgeon police officers were not trained to perform animal control responsibilities?

A.   Not as sufficiently as they should have been.

Q.   Do you know what training for animal control responsibilities they did undergo?

A.   That I don't recall.

Q.   Would you be surprised if I told you that during Sergeant Crawford's testimony, he indicated that he had not been trained on how to perform those duties, including using the catchpole?

A.   Okay.

Q.   Does that surprise you?

A.   Yeah.

Q.   It does?

A.   Yeah.

Q.   Do you believe that you provided or somebody provided training to Sergeant Crawford on how to use the catchpoles?

A.   I probably am just assuming that.

Q.   The next paragraph down, it starts talking about the information that Officer Woodson was working with, that the dog may be muddy with dried blood, that something seemed wrong with it, that it could be blind in one eye, and that it was running into trees and walking sideways.  Do you see that?

A.   Yes.

Q.   Did that reflect what you saw on the body cam footage?

A.   I -- I believe there was some -- some not -- not looking right, but I don't know how much the extent.

Q.   Okay.  But when you watched the body cam footage, did you notice anything obviously and profoundly wrong with the dog?

A.   I -- I wouldn't say I did.

Q.   Okay.  And then at the very end of that second big paragraph there.  It says, "During Officer Woodson's attempt to capture your dog, it appeared as if Teddy attempted to bite the catchpole." Do you see that?

A.   Yes.

Q.   Do you recall seeing Teddy try to bite the catchpole?

A.   I -- I don't recall that.  No.

Q.   You didn't write this sentence, though --

A.   No.

Q.   -- correct?

A.   No.

Q.   Taking all of this information in its totality and in the interest of protecting the public against possible injury from what appeared to be an injured, sick, and abandoned dog, Officer Woodson made a tough decision.  Do you see that?

A.   Yes.

Q.   I'm handing you what has been -- being marked as Plaintiff's Exhibit 29.  This is Sturgeon

Document 1247 and Sturgeon Doc 004.  There's also a -- I guess I don't really know how to describe it, a zoomed-in version of this document, and you'll see why.  So Page 2 --

THE REPORTER:  Exhibit 29.

(WHEREUPON, Exhibit 29 was marked for identification.)

BY MR. CRINNIAN:

Q.    Page 2, I have a zoomed-in version of that top copy, so take a look at that for me.

MR. CRINNIAN:  I'll represent that the second page is zoomed-in and cropped of the first page.  And I'll give you guys a chance to look at it, if you have an issue with it.

MR. JORDAN:  I'll stipulate to that.

MR. CRINNIAN:  Okay.

MR. JORDAN:  Sorry.  Attorney Jordan.

BY MR. CRINNIAN:

Q.    Have you had a chance to review that?

A.    Yes.

Q.    Okay.  So on the second page of the zoomed-in version, am I correct, and this is hard to read, but it appears that this was sent May 23rd, 2024, at 1:50 p.m. Does that appear correct?  We may have to have your Counsel --

MR. JORDAN:  Yes.

BY MR. CRINNIAN:

Q.    -- look at it to confirm.

A.    Okay.  There it is.

MR. JORDAN:  I'll confirm that for you.

BY MR. CRINNIAN:

Q.    And this is an e-mail from Jose Caldera to you --

A.    Yes.

Q.    -- correct?  Okay.  This is the city attorneys drafting the response to Tiffany Ware, the complainant in the first case, correct?

A.    Yes.

Q.    Go ahead and turn to the third page, which reflects the response that she was sent on May 23rd. And you say, "In response to the above subject line complaint, please see the city's responses posted May 20th and May 23rd, which responses are enclosed herewith." Do you see that?

A.    Yes.

Q.    And when we look at those two Facebook posts earlier that had the two posts on the same page --

A.    Yes.

Q.    -- you remember those?

A.   Yes.

Q.   Okay.  "Additionally, enclosed herewith, please find a screenshot of the dispatch report. Please note this report has all the information that Officer Woodson had to inform him of the nature of the call out, and it is based upon this information available to him at the time that the city reviews Officer Woodson's actions." Do you see that?

A.   Yes.

Q.   Okay.  You did not write that?

A.   No.

Q.   You approved it?

A.   Yes.

Q.   Second paragraph, same thing explaining why Officer Woodson did not contact her even after he had shot the dog?

A.   Yes.

Q.   And the third paragraph, it's explained that he attempted for several minutes to capture him, but was trying to protect, again, the public against possible injury from what appeared to be an injured, sick, and abandoned dog, correct?

A.   Yes.

Q.   That's the same language that was in the response of Mr. Hunter; is that correct?

A.    Yes.

Q.    The last thing I want to do -- I apologize, I don't remember which document number it is because I don't have it in front of me, but it was a text message chain between you and Seth Truesdell.

Can you grab that for me, please.

A.    That was in this one?

Q.    Yes.  I believe so.  It's the one that began with, "I talked to a lady."

MR. JORDAN:  Exhibit 26.

MR. CRINNIAN:  26?

THE DEPONENT:  Yep.

THE REPORTER:  Who said Exhibit 26?

MR. CRINNIAN:  Yes.

BY MR. CRINNIAN:

Q.    Let's go to the third page of this.

A.    Okay.

Q.    Actually, let's go to the fourth.  And again, this is where -- we talked about this earlier.  This is right around the timing that you were resigning, right?

A.    Yes.

Q.    Okay.  Obviously, we talked about the fact that you were upset by the way that you were treated

by everybody involved in the situation.  Down at the bottom, though, you say, "Just a reminder that it was our attorney and his attorneys in his firm who said Myron didn't do anything wrong." Do you see that?

A.   Yes.

Q.   You, as the mayor, and the Board of Alderman are responsible for appointing or hiring the city attorney, correct?

A.   Yes.

Q.   And the city pays these attorneys to provide legal services to the city?

A.   Yes.

Q.   But the city has the ultimate say on what they're going to do, correct?

A.   Yes.

Q.   And the city has the final say on what they're going to say about an issue, correct?

A.   Yes.

Q.   Now, when you say, "It was our attorney and his attorneys in his firm who said Myron didn't do anything wrong" is that because they did the initial investigation review of this?

A.   They did.  I was there, too.

Q.   Were you there when they reviewed the body

camera footage for the first time?

A.   Yes.

Q.   So you were sitting with Jackie or Jose?

A.   Yeah.  It -- Jackie wasn't there.  It was only Jose at that time.

Q.   Was there anybody else from the city there?

A.   Not that I remember.

Q.   So Mr. Truesdell was not there?

A.   No.

Q.   Dorrie Crawford was not there?

A.   No.

Q.   Traci Cranmer-Palliser was not there?

A.   No.

Q.   And I'm trying to remember who the other Alder person was.  Was it David Day?

A.   David Day.  Yeah.

Q.   And David Day was not there?

A.   No.

Q.   Okay.  Was Sergeant Crawford there?

A.   No, he wasn't.

Q.   So it was just you and Jose, one of the city attorneys?

A.   Yes.

Q.   Okay.  When you watched that video

together, do you recall Jose saying anything to you about the video?

A.   No, I don't.  I'm sorry.

Q.   No, it's fine.  Did he provide any type of analysis to you about the legal implications?

A.   I don't recall everything that he said on that.

Q.   Do you recall in general whether you had a conversation, you know, did you look at him and say, oh, God, we're screwed or we have to protect Myron? Do you recall anything about that conversation?

A.   I think I asked the question what do we need to do.  I mean, where do we go from here.

Q.   Okay.  And what -- do you recall what their response was?

A.   No, I don't.

Q.   His response?

A.   I'm sorry.

Q.   You could have disregarded the city attorney's evaluation of this, saying that Myron didn't do anything wrong, right?

A.   I guess I could have.  Yes.

Q.   Ultimately, at the end of the day --

A.   Yeah.

Q.   -- you were the mayor, right?

A.   Yes.

Q.   You were responsible for the police department, right?

A.   Yes.

Q.   You were responsible for Sergeant Crawford, right?

A.   Yes.

Q.   And therefore, ultimately responsible for Myron Woodson, right?

A.   Yes.

Q.   Why did you not show the other Aldermembers the video at the same time that you and Jose watched it?

A.   I don't know.  We were -- we were just trying to get things going.

Q.   Do you remember where you watched the video?

A.   I believe it was at their -- their offices is what I remember.

Q.   Did you give the Aldermembers a heads-up that you were going to the office to watch the video?

A.   I -- I can't recall who I called, or if I called anybody.

Q.   If the city attorney would not have told

you that Myron did nothing wrong, do you think you would have come to a different conclusion after looking at all the evidence?

MR. JORDAN:  I'll have to object.  Form.  Calls for the witness to guess or speculate.

If you have an answer, you can give it.

THE DEPONENT:  I -- I don't have an answer for that.

BY MR. CRINNIAN:

Q.    At the beginning of all of this, in the -- the very first text message that we reviewed, you said, "I support Myron 100 percent" right?

A.    Yes.

Q.    And that was on May 20th, 2024, right?

A.    Yes.

Q.    On May 24th, 2024, you blame the attorneys for saying that Myron didn't do anything wrong, right?

A.    Well, I wasn't blaming the attorneys.  I -- I was just stating that this is what the attorneys came back with, stating this.  So I mean, I didn't mean to have it come across that way.  I -- I don't -- I don't know.

Q.    No, that's fine.  And that's why I asked the question.  I don't --

A.   Yeah.

Q.   -- want to put words in your mouth, and I don't want to assume an intent that you didn't have, okay?

MR. CRINNIAN:  Yeah.  Let's go ahead and go off the record for just a very quick break.

THE REPORTER:  We'll go off the record, 10:53 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  We're back on the record, 11:01 a.m.

MR. CRINNIAN:  Thank you.

BY MR. CRINNIAN:

Q.   Okay.  Mr. Abrahamson, we're just about done, just a couple more questions.  First of all, are there any other text messages, e-mails, or phone calls that you are aware of in this time frame regarding this issue that we didn't go over today?

A.   Not that I know of.

Q.   You don't -- you don't recall having any communications with Sergeant Crawford, aside from the ones we've talked about today?

A.   Not -- not after that point.  I mean, there was a little bit going on when I was still in as the mayor, but once I left as mayor, I didn't

have any contact, as in dealing with this.

Q.    Okay.  On approximately May 22nd, would that be about the time that you think you would have gone to the city attorney's office to watch the body cam footage?

A.    Yeah, because when I talked to Jackie, it would have been the 22nd.  No, because at that point I was still down in class, and so I didn't get right to the -- looking at the -- I was at a class in Jeff City.  And if you look at -- I was texting Seth and I said, you know, he said that he talked to Jackie.  He said that he was reviewing the camera.  What did you find out?  I said I don't know because -- I said do you want to call him because I'm in class.  I was taking a class at that point.

Q.    Okay.  So if we look down a little further, May 23rd, on that same document, it says, "Did you get ahold of Brad Foster" and you say, "Not yet.  I was at Jackie's."  Do you see that?

A.    Yes, I do.

Q.    Okay.  When you say you were at Jackie's, you're talking about the attorney?

A.    Yes.

Q.    Okay.  Is that likely when you saw the body camera footage?

A.    Yes.

Q.    Okay.  Now, Seth Truesdell never sent you a follow-up text about your visit with Jackie to see the body camera footage, did he?

A.    It's not here.

Q.    Do you recall talking to Mr. Truesdell about what was on that body camera footage shortly after you viewed it?

A.    I don't know whether we did talk or not, because there was a point there where I just said I'm done.

Q.    And --

A.    The stress was -- was too much.

Q.    And so that's when you turned in your resignation and sent them the -- the contract that was already signed that needed to be --

A.    Yes.

Q.    -- taken care of?  Did you see the city's subsequent Facebook posts after your resignation?

A.    I -- I didn't go looking.

Q.    Did anyone --

A.    I was trying to protect my family at that point.

Q.    I understand.  Were you -- did you ever read, at any point, the Facebook posts that Mayor

Pro-Tem Truesdell posted, saying that they had not seen the body camera footage and did not agree with your initial assessment?

A.    Yes.  I do remember that.

Q.    Do you remember about when you would have seen that?

A.    I have no idea.

Q.    Do -- do you think it was within a couple of months of them posting it, or has it been more recent since the lawsuit has been undergone?

A.    I -- I can't even answer that question because I have no idea when -- when it was that I -- I seen that.

Q.    Okay.  Did the -- the Board of Alderman pressure you to step down?

A.    No.

Q.    Nobody asked you to step down?

A.    No.

Q.    Did you have any conversations privately with any of the Aldermen about stepping down before you actually did?

A.    Well, I mean, you see the conversations between me and Seth.

Q.    But there was nobody else that you talked to about --

A.    No.

Q.    -- this?

A.    No.  When -- when -- I mean, bottom line, when the threats started coming towards my family, that's when it was enough.

Q.    Last question.  Were you upset when you read the city's posts that disagreed with you and said that they didn't authorize that post?

A.    No.

Q.    Why not?

A.    Why get upset?  I mean, that's their -- at that point, that's their decision.

Q.    You don't --

A.    So --

Q.    You didn't feel like that was them throwing you under the bus?

A.    No.  I've been under a bus before.

MR. CRINNIAN:  Fair -- fair enough.  No further questions.

MR. FLEMING:  I don't -- I don't have any questions.

MR. JORDAN:  I have no questions.  So, Mr. Abrahamson --

THE REPORTER:  Did you say no -- no further questions?

MR. JORDAN:  Jack Fleming said no questions, and Wayne Jordan said no questions.

THE REPORTER:  Thank you.

Mr. Crinnian, would you like to order the original?

MR. JORDAN:  Before we do that, should I give him the instruction on signature?

MR. CRINNIAN:  Yeah.

We're going to have him give an instruction on signature first.

THE REPORTER:  Sure.

MR. JORDAN:  So, Mr. Abrahamson, you have the opportunity to go back and review the transcript that our court reporter took down to look for inaccuracies and spellings, things like that, and fill out what's called an errata sheet that you would have to sign off and send back, or you have the option of doing what's called waiving signature, which just means that the court reporter -- you're going to trust the court reporter took things down accurately today.  Most people waive, but the option is yours.

THE DEPONENT:  I am waiving.  I trust you.

THE REPORTER:  Okay.

Mr. Crinnian, would you like to order the

original?

          MR. CRINNIAN:  Yes, please.

          THE REPORTER:  Thank you.

          Mr. Kolde, would you like to order a copy?

          MR. KOLDE:  No, thank you.

          THE REPORTER:  Mr. Fleming, would you like
to order a copy?

          MR. FLEMING:  Yes, an eTran copy, please.

          THE REPORTER:  Thank you.

          Mr. Jordan, would you like to order a
copy?

          MR. JORDAN:  Yes, please, with the
exhibits attached.

          THE REPORTER:  Thank you.

          We're going off the record, 11:08 a.m.

          (WHEREUPON, the deposition of KEVIN K.
ABRAHAMSON was concluded at 11:08 a.m.)

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

CERTIFICATE

I, Brittany Douglas, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 10th day of July, 2025.

Brittany Douglas, #4235

CORRECTION SHEET

Deposition of: Kevin Abrahamson     Date: 6/6/25

Regarding: Hunter vs. Woodson et al.

Reporter: Douglas/Seaman

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet and the line provided.

Page   Line   Reason for Change

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

       Signature: _____

                        Kevin Abrahamson

NAEGELI (800) 528-3335
DEPOSITION & TRIAL  NAEGELIUSA.COM

DECLARATION

Deposition of: Kevin Abrahamson     Date: 06/06/2025

Regarding: NICHOLAS HUNTER vs MYRON WOODSON ET AL.

Reporter:  Brittany Douglas

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____

on the _____ day of _____, 20_____.

Signature: _____

Kevin Abrahamson

## Exhibits

**EX001 INCIDENT REPORT**  24:24 25:1,2 28:20

**EX003 INCIDENT REPORT**  30:16, 18,19

**EX009 EMAIL OCT 25 2023**  13:6 14:8,11,12,15

**EX010 EMAIL APR 11 2024**  18:1,3, 4,7

**EX011 EMAIL MAY 20 2024**  26:9

**EX012 STATEMENT**  26:9 27:6 28:6

**EX021 BAKER COMPLAINT**  39:7, 11,13,17,18

**EX022 COMPLAINT FORM**  41:10, 12,13

**EX023 ORDINANCE**  42:15,18,19 49:6,9,19,21,25

**EX024 ANIMAL REGULATIONS**  48:24 49:2,3

**EX025 COMPLAINT**  50:3,5,6,9

**EX026 TEXTS**  51:18,19,20 73:11,14

**EX027 STATEMENTS**  60:18,21,22

**EX028 RESPONSE**  64:5,7,8

**EX029 EMAILS**  69:25 70:5,6

---

**0**

**004**  70:1

---

**1**

**1**  12:11 24:24 25:1,2 28:20

**10**  18:1,3,4,7

**10/24/23**  44:15

**100**  55:4,13 56:11 60:15 61:15 78:12

**10:05**  38:25

**10:53**  79:8

**10th**  39:25 40:19

**11**  26:7,8,9

**1171**  32:24 33:16

**11:01**  79:11

**11:08**  85:15

**11th**  11:22

**12**  26:7,8,9 27:6 28:6

**1202**  14:16

**1234**  18:8

**1247**  70:1

**1290**  39:8

**1291**  39:8

**1396**  64:6

**1397**  64:6

**14**  32:23,25

**1429**  30:17

**1434**  24:24

**1498**  49:8,20

**1501**  49:8,21

**1512**  48:25

**1513**  42:16 49:19

**1514**  43:22,23 49:20

**1585**  41:11

**1586**  41:11

**1600**  26:13

**1601**  26:13

**16th**  40:22

**1724**  60:19

**19th**  21:18 53:11, 14

**1:50**  70:24

---

**2**

**2**  70:4,9

**2023**  10:17 15:1 16:23 39:25 40:19,22 42:1

**2023-ish**  9:2

**2024**  19:3 51:15 61:3,9 70:24 78:14,16

**20th**  23:17 25:15, 21,23 27:5 51:14 53:7,12,15,20 61:2 71:18 78:14

**21**  39:7,11,13,15, 16,17,18

**22**  39:14 41:10, 12,13

**22nd**  80:2,7

**23**  42:15,18,19 49:6,9,19,21,25

**23rd**  61:8,18 70:23 71:15,18 80:17

**24**  48:24 49:2,3

**24th**  57:11,13 78:16

**25**  50:3,5,6,9

**25th**  15:1,4,19

**26**  51:18,19,20 73:11,12,14

**27**  60:18,21,22

**28**  64:5,7,8

**29**  69:25 70:5,6

---

**3**

**3**  30:16,18,19

---

**4**

**4th**  42:1

---

**5**

**5**  22:22

**5:17**  55:1

---

**7**

**79**  50:10,13

## 8

**8:59** 53:8

## 9

**9** 13:6 14:8,11,12, 15 53:12

**90s** 10:6

**960** 43:8

**979** 51:24

**982** 51:24

**9:14** 6:7

**9:21** 14:4

**9:22** 14:7

**9:52** 38:22

## A

**a.m.** 6:8 14:4,7 38:22,25 53:12 79:8,11 85:15

**abandoned** 29:7 31:25 61:25 69:21 72:22

**Abrahamson** 6:9 7:3,8 8:15 18:9 20:8 39:2 50:2 79:14 83:23 84:12

**accept** 48:4

**accurate** 8:5 29:18 43:19

**accurately** 84:21

**acted** 61:21

**actions** 29:23

51:6 56:13 72:8

**actual** 27:12 28:8 65:2

**Additionally** 72:2

**address** 15:8

**addressing** 15:13

**administer** 46:5, 14

**advance** 59:15

**affirm** 6:10

**affirmed** 7:3

**afternoon** 22:15, 23

**agree** 62:3 82:2

**agreed** 62:12,18

**agreed-upon** 48:2

**agreement** 17:7, 9,14 43:4,10,17 44:18,21 45:22 47:6 66:22 67:3

**agreements** 46:2

**ahead** 17:25 24:21 28:5 31:1 33:8 38:17,20 46:16 71:14 79:5

**ahold** 80:18

**Alder** 75:16

**Alderman** 16:24 17:2 74:8 82:14

**Aldermembers** 77:12,20

**Aldermen** 82:20

**alternative** 56:15

**amount** 13:14 46:10

**analysis** 76:5

**and/or** 28:13

**animal** 17:2,11, 12,21 28:10,11 29:6 32:16 43:11 44:17 45:2,9,19, 24 46:5,14,24 47:5,7,12 48:1 65:19,23 66:4,11 67:13,18,20,23

**animal's** 29:4

**animals** 48:14,15, 21 66:15 67:9

**Anticipated** 47:6

**apologies** 51:3

**apologize** 13:8, 10,24 20:13 31:5 39:12 53:18,25 73:3

**apparently** 62:16

**appearance** 34:2

**appeared** 61:24 69:8,20 72:21

**appears** 14:22 27:17 70:23

**apply** 11:15

**appointing** 74:8

**approved** 64:3 72:12

**approving** 43:4

**approximately** 11:22 80:2

**April** 19:3

**area** 32:17,18

**arranges** 43:10

**arrived** 28:11

**assessment** 82:3

**assist** 48:12

**assistance** 45:12

**assume** 8:4 41:1 79:3

**assuming** 68:13

**attached** 14:8 26:25 27:15 33:13 85:13

**attempt** 32:6 69:7

**attempted** 69:8 72:19

**attempts** 31:6

**attorney** 6:15 20:7 26:18,24 49:5 50:8 59:9 62:22 63:20 70:17 74:3,9,20 77:25 80:22

**attorney's** 76:20 80:4

**attorneys** 33:18 62:7,25 63:1,7,23 71:11 74:3,11,21 75:23 78:16,19, 21

**audible** 31:19

**audio** 41:18

**authority** 61:22

**authorize** 83:8

**avoid** 20:24 21:2

**aware** 10:9,12 17:20 79:17

## B

**back** 14:6 17:15 23:24 28:19,24 38:24 39:3,4 57:9 66:21 78:21 79:10 84:13,17

**background** 11:11 13:23

**Baker** 39:25

**based** 34:1 48:18 61:22 66:1 72:6

**basically** 23:3 24:7,8 42:24

**began** 73:10

**beginning** 30:1,2 49:9 78:10

**begins** 42:15 49:19

**behalf** 6:17,21,23 29:14 46:24 65:6

**behaving** 28:12

**behavior** 28:14 62:3

**belief** 29:6 51:7

**believed** 31:24

**believes** 61:21

**big** 47:16,18 69:6

**bill** 17:1

**bit** 17:4 23:18 79:24

**bite** 32:7 69:8,11

**bites** 48:13

**biting** 32:13

**blame** 78:16

**blaming** 78:19

**blind** 68:18

**blocking** 42:5

**blood** 68:17

**board** 16:24 17:2 21:13 74:7 82:14

**body** 23:12,14 30:5,7 54:5 55:20 57:4 60:3,8 61:19 68:21 69:1 74:25 80:4,25 81:4,7 82:2

**Boone** 17:3,14 43:5,11,17 44:22 45:23 46:22 47:8 48:19 65:19 66:4, 14 67:5,10

**bottom** 14:25 32:15 33:9,16 39:24 43:22 48:7 56:17 61:2 74:2 83:3

**box** 52:7

**Brad** 80:18

**break** 8:9,14 10:13 38:18 49:13 57:23 79:6

**bring** 67:5

**brought** 34:22

**bus** 83:16,17

## C

**Caldera** 33:17,24 34:24 63:2 64:20 71:7

**call** 19:12 21:16, 25 27:1 28:10 72:6 80:14

**called** 11:1 22:7, 10 23:20 50:24 77:23,24 84:16, 18

**calls** 46:6 47:21, 23 48:20 78:5 79:17

**cam** 30:5,7 55:20 68:22 69:1 80:5

**camera** 23:12,14 54:5 57:4 60:4,8 61:19 75:1 80:12, 25 81:4,7 82:2

**capture** 31:7 69:7 72:19

**car** 16:4 34:21 35:17 42:4

**care** 81:18

**case** 71:12

**cases** 46:8

**catch** 24:9

**catchpole** 24:10 31:7 68:4 69:9,12

**catchpoles** 68:12

**caught** 57:15

**cell** 16:4

**cetera** 46:8

**chain** 19:5 36:2 55:12 73:5

**chance** 42:22 50:15 70:13,19

**change** 60:9

**changed** 60:14

**chaos** 23:19

**check** 35:19

**chief** 10:11,14 23:9

**circumstances** 48:20,22 67:9

**citations** 46:7

**citizen** 32:8,13

**citizens** 47:24 58:10,12 61:24

**city** 6:24 8:15 10:10 17:20 20:24 21:25 23:25 26:18,23 28:2 29:14 30:1 33:18 43:5,12,17 44:22 45:1,8,18 46:2,4,11,13,24 61:18,21 62:7,25 63:1,7,14,17,20, 23 66:4 71:10 72:7 74:9,11,12, 14,17 75:6,23 76:19 77:25 80:4, 10

**city's** 65:21 71:17 81:18 83:7

**clarification** 8:3

**clarify** 7:25 8:9 22:2 49:6,19 50:9

**class** 80:8,9,14, 15

**clear** 60:5

**client** 63:18

**co-counsel** 41:21

**codes** 46:6,15

**collar** 29:4,22

**Columbia** 67:5

**command** 19:5 36:3

**comment** 34:21

**communicated** 56:6

**communications** 79:21

**competing** 34:8

**complainant** 25:12 71:12

**complaining** 40:3 42:3

**complaint** 16:3 23:20,25 24:1,4 25:15 40:18 41:23,25 50:21 51:14 63:12,15, 18 64:17 71:17

**complaints** 12:8, 9,17,23 13:1 15:6,12,20,23,25

**conclusion** 56:25 78:2

**conduct** 59:7,22

**confirm** 71:3,5

**conform** 51:7

**confused** 34:20

**considered** 49:25

**constant** 16:16

**contact** 72:15 80:1

**contacted** 52:18

**contacting** 19:22

**contained** 53:4,5 65:9

**contemporaneou sly** 52:23

**content** 24:3 61:3 62:12

**continue** 53:1

**continued** 31:20 54:22

**continues** 32:5 49:20 62:2

**contract** 17:3,18 46:22 66:13 81:15

**control** 17:2,12, 21 43:11,12 44:17 45:2,9,19, 24 46:6,15,24 47:5,8,12 48:1 65:20,23 66:4,11 67:13,18,20,24

**convenient** 34:25

**conversation** 26:3 76:9,11

**conversations** 16:20 82:19,22

**Cooperation** 44:18

**Cooperative** 44:18 47:6

**copied** 64:23

**copies** 13:8 65:2

**copy** 44:15 70:10 85:4,7,8,11

**correct** 10:15,24 14:23 15:2,20 18:24 20:24 25:18 27:7,12,18 29:1,11,14 30:5 31:18 33:18 36:6,

13,17 37:20 40:1, 5,25 41:7 42:6 43:6,13 44:19,23 45:14,20,21,24 46:24 50:22 51:8, 9 53:3,8,20 54:18 55:20,21,23,24 56:1,4,8 61:9,16 62:19 64:20 65:10,15 66:11, 15 67:6,12,14 69:16 70:22,24 71:10,12 72:22, 25 74:9,15,18

**correctly** 45:18 66:3

**council** 19:11

**counsel** 7:1 11:3, 7,9 13:7 15:8,13 19:22 21:7 70:25

**County** 17:3,14 43:5,11,17 44:22 46:23 47:8,12,20 48:1,12,19 65:19 66:4,14 67:5,10

**County's** 45:23

**couple** 79:15 82:8

**court** 84:14,19,20

**cover** 67:13

**crafting** 63:8

**Cranmer-palliser** 75:13

**Crawford** 9:11,24 10:1,14 14:23 15:1,4,5 16:8,10, 14,19 18:24 19:18 22:10 23:2, 11 24:12 26:24 27:18,24 35:1,7,

13,21,24 36:12, 16,20,22 37:1,4 40:21 42:12 53:19 61:12 68:11 75:11,20 77:6 79:21

**Crawford's** 29:17 61:4 68:2

**Crinnian** 6:17 7:2, 7 9:21,23 12:14, 15 13:7,16,21,24 14:10,14 17:19 18:6,16 20:22 25:5 26:11 28:18 30:21 31:23 33:1 38:17 39:1,13,15, 20 41:15,20,22 42:21 44:13 49:10,13,16 50:1, 14 51:22 59:3,18 60:24 64:10 70:8, 11,16,18 71:2,6 73:12,15,16 78:9 79:5,12,13 83:18 84:4,8,25 85:2

**cropped** 70:12

**cruelty** 46:8

**D**

**Dailey** 12:21

**Dailey's** 12:24

**Daniel** 6:19

**date** 41:2,3

**dates** 22:3

**David** 75:16,17, 18

**day** 16:17 21:24 22:13,16 23:17

55:1 57:7 75:16, 17,18 76:23

**days** 61:11,14

**deal** 65:23

**dealing** 16:8 80:1

**dealt** 16:11 19:10 35:24

**December** 42:1

**decent** 13:14

**decided** 19:11

**decision** 29:5 69:22 83:12

**deduct** 56:14 59:23

**defend** 34:1

**Defendant** 6:22, 24

**department** 11:16 19:18 21:12,15 28:9 36:4,12,23 37:16 38:1,6 45:3,10,13 46:5, 14 47:13,21 77:3

**depo** 13:14

**DEPONENT** 6:13 9:20 17:17 18:15 20:6,10,13,17,21 25:4 28:17 31:22 44:12 59:1,12,17 73:13 78:7 84:23

**deposed** 7:10

**deposition** 7:18

**depositions** 13:12 20:16

**describe** 70:2

**details** 44:21

**determine** 29:16

**differently** 60:14

**directly** 47:23

**disagreed** 83:7

**discharged** 32:9

**discussed** 19:11

**discussing** 15:15

**discussions** 64:24

**dispatch** 23:20 50:25 61:19 72:3

**displaying** 28:12

**disposed** 32:18

**disregard** 41:20 46:16

**disregarded** 76:19

**disruption** 41:18

**Doc** 14:16 70:1

**document** 14:20 16:20 18:7,17,19 24:24 25:6 28:6 30:17,23 32:24 33:6,12,16 39:8, 9,21 41:10 42:16, 23 43:3,21 47:5 48:25 49:7,18 50:16,21 51:24 60:19 64:5,11,13, 15 65:2,5 70:1,3 73:3 80:17

**documents** 24:20 26:12 39:6 43:1 50:9 60:25 66:1

**dog** 17:9 21:22 23:21 24:11,14 28:12 31:7,25

32:6,7,10,12 34:2,21 35:17 48:4,13 51:1,5 53:2,3 54:17,19, 23 56:3,5 61:25 68:16 69:3,7,21 72:16,22

**dog's** 51:3

**dog-at-large** 61:20

**dogs** 48:13 67:6

**Dorrie** 14:23 15:1, 4 75:11

**double** 35:19

**doubts** 56:12

**draft** 64:24

**drafted** 63:20,25 65:5,12

**drafting** 63:24 64:15 71:11

**drew** 32:9

**dried** 68:16

**drove** 12:20

**due** 29:6 32:5

**duly** 7:3

**duplicative** 46:15

**duties** 45:20,24 66:11 67:13 68:4

**E**

**e-** 15:4

**e-mail** 14:22,25 18:23 20:23 26:15,17 27:14, 17 33:2,13 39:24 64:22 71:7

**e-mails** 33:24 79:16

**earlier** 36:2 39:5 43:15 51:10 66:25 67:4 71:22 73:21

**early** 41:6

**east** 12:11

**edited** 27:23

**effectively** 65:12

**emergencies** 48:13

**emergency** 48:8 67:9

**enacted** 45:1,7,9

**enclosed** 71:18 72:2

**end** 44:10 69:5 76:23

**ended** 30:7

**enforced** 45:2,9

**enforcement** 25:25 26:1

**England** 58:14

**ensure** 36:11,15

**Eric** 6:17 20:14

**errata** 84:16

**essentially** 65:8

**etran** 85:8

**evaluation** 76:20

**evening** 53:11,14

**event** 67:8

**evidence** 56:12 78:3

exact 41:2,3

**EXAMINATION** 7:6

examined 7:4

exchange 64:23

exhibit 13:6 14:8, 11,12,15 18:1,3, 4,7 24:24 25:1,2 26:9 27:6 28:6,20 30:16,18,19 32:23,25 39:7,11, 13,17,18 41:10, 12,13 42:15,18, 19 47:2 48:24 49:2,3,6,9,14,19, 21,25 50:3,5,6,9 51:18,19,20 57:10 60:18,21, 22 64:5,7,8 69:25 70:5,6 73:11,14

exhibits 13:14 26:7,8 31:2 85:13

expectations 47:12

explain 35:1

explained 72:18

explaining 72:14

explanation 56:15

explicitly 51:13

expressing 51:6

extent 68:25

eye 68:18

**F**

Facebook 26:25 27:5,24 28:24

29:17 30:1 53:19 55:8 61:4,12 62:9 65:9,13 71:21 81:19,25

fact 57:1 59:4 73:24

factually 8:5 29:18

fair 7:14 38:15 53:23 62:11 83:18

fall 10:17

family 57:17 81:22 83:4

Fearing 32:7

feel 15:13 22:5 27:1 83:15

felt 12:20 24:13 56:19

**FEMALE** 12:11

fight 20:15

figured 55:14

filed 25:15 28:20 51:14

fill 84:16

filled 63:4

final 64:16 74:17

Finally 47:1

find 26:25 35:24 38:3 40:10 72:3 80:13

fine 24:18 30:14 49:15,21,24 57:22 59:19 63:17 76:4 78:24

finished 38:19

firm 74:3,21

fix 19:7

flack 57:15

Fleming 6:21 58:19,22 59:10 83:20 84:1 85:6,8

follow 16:13 35:2 36:19

follow-up 81:3

footage 54:6 57:5 60:4,9 61:20 68:22 69:2 75:1 80:5,25 81:4,7 82:2

force 9:7 10:23

form 58:19,20 78:4

forwarded 40:21

Foster 80:18

fourth 31:5 65:1 73:19

frame 16:15 33:21 79:17

framing 45:17

free 27:1

front 28:21 73:4

full- 10:23

full-time 10:18

function 65:22 67:17

**G**

gave 23:3 28:2 60:5

general 76:8

generally 24:3

give 6:11 7:21 19:21 27:23 70:13 77:20 78:6 84:7,9

gladly 8:14

God 76:10

good 7:8 20:1 36:23 59:15

goodness 10:6

got-you 22:5

grab 32:6 73:7

grabbed 40:9

guess 24:19 54:15 55:9 56:9, 14 70:2 76:22 78:5

guided 20:1

gut 20:2,24 21:1

guy 12:19

guys 70:13

**H**

half 8:21

Hallsville 37:20 38:1,5

hand 6:10 13:5 14:16 16:5 18:9 24:25 26:6 30:15 32:8,22 39:6 40:9 41:9 42:14 48:23 51:17,24 60:17

handed 33:12

handing 50:2

64:4 69:24

**handle** 58:5

**handled** 60:11,14

**hands** 17:22 32:7

**happen** 18:21 19:2

**happened** 12:1 23:4 24:8 60:6

**harassment** 58:2

**hard** 70:22

**hateful** 55:2,7

**Head** 12:11

**heads-up** 77:20

**heard** 21:21

**helping** 33:20 53:3 54:22 56:3,5

**herewith** 71:19 72:2

**hey** 16:17 34:20 35:14

**hired** 12:5

**hiring** 10:18 11:12 12:6 74:8

**hold** 22:3 40:10

**house** 12:20

**how's** 59:15

**huh-uhs** 20:11

**Hunter** 6:18,20 65:3 72:25

**Hunter's** 63:12,18 64:16

---

**I**

**idea** 37:5 38:12 82:7,12

**identification** 14:13,15 18:5 25:3 26:10 30:20 39:19 41:14 42:20 49:4 50:7 51:21 60:23 64:9 70:7

**illegally** 42:5

**implications** 76:5

**impounded** 48:5

**inaccuracies** 84:15

**incident** 8:22,23 11:25 21:18 24:4 25:21 29:19 30:3, 11,12 40:7 60:10 61:20

**incidents** 65:20

**include** 34:25

**included** 26:20

**including** 68:4

**inconsistencies** 35:8

**incorrect** 66:2

**indication** 58:17

**influenced** 29:5

**influencing** 29:23

**inform** 72:5

**information** 19:21,25 61:22 68:15 69:18 72:4, 6

---

**informed** 23:11

**initial** 28:19 55:22 74:23 82:3

**injured** 28:10 29:7 48:15,21 61:24 66:15 67:9 69:21 72:22

**injuries** 28:13

**injury** 61:23 69:20 72:21

**inquiries** 63:21

**inside** 48:15

**instances** 12:16

**instated** 10:22

**instruct** 16:19

**instruction** 84:7, 10

**intent** 79:3

**interaction** 40:4

**interest** 69:19

**Internet** 30:8

**interview** 10:25 11:4

**investigation** 29:16 46:7 74:23

**involve** 65:22 67:17

**involved** 52:4 74:1

**issuance** 46:7

**issue** 16:8,11 65:23 70:14 74:18 79:18

**issues** 12:5 16:21

---

**J**

**Jack** 6:21 58:22 59:10 84:1

**Jackie** 26:17,23 27:8,20 33:19,23 63:1 64:19 75:3,4 80:6,11 81:3

**Jackie's** 80:19,21

**Jeff** 21:25 80:9

**job** 11:2 37:18,19 38:5

**join** 10:23 58:23 59:10

**joint** 50:24

**Jordan** 6:23 13:19,25 20:7,11, 14,19 49:5,11,15, 17,24 50:8,13 58:20,23 59:8,9 70:15,17 71:1,5 73:11 78:4 83:22 84:1,2,6,12 85:10,12

**Jose** 33:17 34:20 63:2 64:20 71:7 75:3,5,22 76:1 77:13

**judge** 17:5

**jump** 17:25

**June** 15:5

**justify** 62:2

---

**K**

**Katie** 42:1

**KEVIN** 7:3

kind 23:18

knew 11:18 52:23

knowledge 17:13 40:8

Kolde 6:19 12:13 13:13 41:18 59:14 85:4,5

## L

lack 29:4,22

lady 52:8,17 73:10

language 29:10, 22 48:19 62:18 72:24

large 28:10 48:13

late 10:17

law 25:25 26:1

lawsuit 10:9 82:10

leaving 65:21

left 79:25

left-hand 52:6

legal 74:12 76:5

Level 47:7

liaison 21:12

license 42:6,9

lighter-colored 52:7

Limited 44:17 47:6

lived 10:4,5

living 48:15

located 28:11

location 48:2

long 7:12 10:4,7

loss 55:3

lost 66:15

lot 13:13,17 20:16 38:15 57:15 58:2, 3,18

loud 31:12 34:19

## M

made 18:21 31:6 45:18 61:12 69:22

mailed 15:5

make 8:5 21:11 36:6 45:17 49:18

makes 21:17

making 19:2,4 21:4 42:4

marked 13:6 14:12 18:1,4 25:2 26:7,10 30:16,19 32:23 39:18 41:10,13 42:19 48:23 49:3 50:6,9 51:20 60:17,22 64:4,8 69:25 70:6

marking 39:7 42:15 50:3 51:17

materials 30:3

matter 19:4 21:9

mayor 8:15,19,24 9:7,25 10:1 16:24 18:9 19:12 20:8 29:14 39:2 74:7

76:25 79:25 81:25

mayorsturgeonmo.org 26:21

means 29:10 84:19

media 63:21

meet 48:1 67:5

memory 22:4 24:20

mentioned 28:25

mentions 25:11 28:22

message 52:7,9, 10,12,17,22 53:4, 6,7,11,18 55:7,12 61:15 73:5 78:11

messages 52:3 58:3 59:5,20 79:16

mid- 41:6

middle 33:5 44:25 45:6

mind 12:18 60:14

mine 14:21

minutes 72:19

mirrors 65:13

missing 13:9

Missouri 6:24 8:16 43:6 65:21 66:10

moment 14:2

month 40:24

months 82:9

morning 7:8,9

25:21 53:8,14 56:1,4

mouth 79:2

move 42:4 44:14

moving 32:1 34:3

muddy 68:16

multiple 31:6

mutually 48:2

Myron 6:22 10:18 11:12,21 12:4,17 15:14,20,25 16:3, 20 18:24 24:13 25:7 28:20 29:18 36:20 37:25 40:24 55:4,12 60:15 61:15 74:4, 21 76:10,20 77:9 78:1,12,17

Myron's 35:14

## N

named 39:24

nasty 55:2,8

nature 72:5

needed 24:13 45:12 81:16

news 30:8

NH1 64:6 65:2

NH2 64:6 65:2

NH77 50:10

Nicholas 6:18,20

note 72:4

notice 31:4 69:2

noticed 28:11

**number** 26:12 28:25 38:13 42:16 43:8,22 73:3

**numbers** 37:12, 13 38:16 41:11 49:7,19 64:6

## O

**oath** 7:15,21 39:3

**object** 58:19,20 78:4

**objected** 58:21

**objection** 58:24 59:7,9,11,15

**occupied** 32:17

**occurred** 22:22 53:10

**October** 15:1,4, 19 16:23 39:25 40:19,22

**offense** 20:20

**offered** 11:1

**office** 55:2 77:21 80:4

**officer** 9:8,16 10:19,21,22,24 11:13,21 12:1 15:6 21:21 24:9, 22 28:11,13 35:24 38:1,4,8 40:3,8 42:4 51:6 56:11,12,23 57:1 59:6,22 61:3,11, 21 62:3 68:15 69:7,21 72:5,8,15

**officer's** 29:5

**officers** 12:7,8,25 15:22 17:22 45:19 47:8 48:2 55:15 56:18 65:21 67:4,19

**offices** 77:18

**official** 63:14

**officially** 21:14

**open** 30:2 34:6

**opening** 11:17

**opinion** 21:3

**opportunity** 84:13

**opposing** 13:7

**option** 84:18,21

**order** 19:5 34:15 49:11 84:4,25 85:4,7,10

**ordinance** 43:4,8, 10 44:8 45:18

**ordinances** 17:21 45:2,9

**original** 31:17 32:3,13,20 84:5 85:1

**originally** 40:19

**other's** 37:11,13

**Outer** 12:12

**outraged** 60:3,7

**outrageous** 58:18 59:6,22

**overseen** 64:1

**overstep** 57:2

**overstepped** 53:2 54:2,8 56:1,20,23

60:1 62:18

**owner** 31:25

## P

**p.m.** 55:1 70:24

**pack** 42:25

**pages** 49:7 64:22 65:1

**paper** 23:5

**paragraph** 19:9, 20 31:5,6,9,10, 20,24 47:11,18 48:8 61:2,8 65:18 68:14 69:6 72:14, 18

**pardon** 25:17 51:23

**part** 18:14 22:13 33:5 35:17 40:10 49:6,22

**participated** 11:6

**passing** 37:8

**past** 12:20

**pay** 46:11

**pays** 74:11

**PD** 48:2,5,12

**penalty** 6:10

**pending** 8:12

**people** 15:23 18:24 30:5 55:1,7 58:18 84:21

**perceived** 28:13

**percent** 55:4,13 56:11 60:15 61:16 78:12

**perform** 67:19 68:3

**performing** 45:23 66:11

**perjury** 6:10

**permission** 27:24 28:2

**permitted** 29:13

**person** 19:12,21 21:5,14 23:20,23 25:15 28:2 50:24 75:16

**phone** 16:4 37:11,13 38:13, 14,15,16 40:9 79:16

**place** 17:21 37:24 66:14

**Plaintiff** 6:18,19

**Plaintiff's** 13:6 18:1 24:23 26:7 30:16 32:23 39:7 41:10 42:15 48:24 50:3 60:18 64:5 69:25

**planning** 13:13

**plastic** 32:16

**point** 8:10 9:1 12:2 15:18 16:24 54:6 55:19 62:14 79:23 80:7,15 81:10,23,25 83:12

**police** 9:6,15 10:10,14,18 11:13,16,21 12:7, 8,25 17:22 19:17 21:12,15 23:9

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

24:22 25:7 28:9 31:17 36:4,12,23 37:16 38:1,5 45:3,10,19 46:5, 14 47:13,21 55:15,22 56:17 65:21 66:10 67:4, 19 77:2

**position** 9:14,15, 25 10:2,15 60:9

**possibly** 32:7,12

**post** 27:1,5,7,14, 15,25 28:3 53:19 55:8 61:6,12,18 62:2,5,12 65:15 83:8

**posted** 29:13 53:17,22,25 62:8 63:24 71:17 82:1

**posting** 53:19 82:9

**posts** 30:1 65:9 71:22 81:19,25 83:7

**present** 11:8

**pressure** 82:15

**pretty** 16:16

**previous** 34:7

**previously** 13:6 18:1 30:16 32:23

**primary** 65:22 67:17

**prior** 8:22,23 9:9 10:9 11:12 53:18

**privately** 82:19

**Pro-tem** 82:1

**problem** 58:1

**proceed** 7:1

**process** 10:25 11:5

**profoundly** 69:3

**proofread** 27:20

**properly** 36:13

**protect** 61:23 72:20 76:10 81:22

**protecting** 69:19

**provide** 34:6 43:11 74:12 76:4

**provided** 68:10, 11

**provisions** 67:13

**public** 48:14 69:20 72:20

**pull** 13:1 15:23

**pulled** 13:4 42:9

**pulling** 42:5

**put** 10:15 23:9 24:23 25:9 29:5, 10 31:1 79:2

---

**Q**

---

**question** 7:24 8:4,8 13:20,22 23:24 36:7 44:11 45:15 58:25 59:1, 12 76:12 78:25 82:11 83:6

**questions** 8:12 13:2 24:13 27:2 79:15 83:19,21, 22,25 84:2

**quick** 38:18 57:23 79:6

**quickly** 48:16

---

**R**

---

**rabid** 28:14 53:3 54:18,19

**rabies** 28:22,25 29:11 31:10

**Raechel** 39:25

**raise** 6:9

**reach** 17:13

**reached** 10:21 40:8 43:17

**reaching** 16:4

**reaction** 20:2

**reactions** 20:1,24 21:1

**read** 30:24 31:9, 11,12,13 34:11, 16,17 42:7 55:22 58:3 70:23 81:25 83:7

**reading** 40:12 50:19

**ready** 9:22 33:25

**reason** 8:2 19:24 42:9 53:13

**recall** 7:11 8:18 10:18 12:5,7,10, 16 13:2 15:24 16:3,6,7,15,22 17:1,5,23 19:1 22:7,12 23:1,13, 22,23 24:3,6 25:18,20,22,24 26:15 29:25 30:6,

11 35:13,16 37:3, 16 38:10 42:11, 13 51:10 52:11, 19 63:14,16,17, 19,20 65:5 67:25 69:11,13 76:1,6, 8,11,14 77:23 79:20 81:6

**receive** 30:2 48:4

**received** 15:25 28:10 65:3

**receiving** 23:25 59:21

**recent** 61:20 82:10

**recess** 14:5 38:23 79:9

**recipients** 26:20

**recognize** 14:18, 20 18:11,13,17 25:6 33:3 39:10, 21 41:17,23 42:25 49:1 50:4, 18 52:1,3 60:20, 25 64:12,13

**recollection** 7:15 22:17 25:14

**recollections** 12:17 36:25

**record** 6:7 14:1,4, 6 34:6 38:20,21, 24 39:3 79:6,7,10 85:15

**records** 30:2

**recourse** 32:8

**refer** 51:4

**reflect** 52:22 64:22 68:21

reflection 53:4 59:6,21

reflects 71:15

reiterate 19:9

related 17:2 30:3

remark 32:12

remember 11:5 17:4,15,17 21:24 22:18 23:19,25 24:2,16,19 26:3,4 30:13,23 34:22 35:10 37:9 50:19 51:12 52:2 53:21 57:7 62:16 66:3 71:25 73:3 75:8, 15 77:16,19 82:4, 5

remind 20:19

reminder 9:18 20:9 74:2

report 24:22 25:7 28:20 29:19 31:18 32:3,13,20 33:12 34:25 35:14 55:23 61:19 72:3,4

reporter 6:7,14, 25 9:18 13:20,22 14:3,6,11 17:16 18:3,14 20:5 25:1 26:8 28:16 30:18 31:21 32:25 38:21,24 39:11, 14,16 41:12,19 42:18 44:10 49:2, 22 50:5,11 51:19 58:21 60:21 64:7 70:5 73:14 79:7, 10 83:24 84:3,11, 14,19,20,24 85:3,

6,9,14

reporting 19:15

reports 30:11,12 35:8,15,18

represent 6:16 33:11 70:11

request 48:11

requested 30:5,9, 12

requester 34:6

requests 30:2 47:13

reserve 10:22

residential 32:17

resignation 81:15,19

resigned 37:15 38:5 57:7

resigning 73:22

resources 48:16

respond 34:10 47:12,21,23 48:20 65:20

responding 26:24 46:6

responds 34:24

response 15:11 16:14 27:3 31:19 34:11 48:9 59:24 63:11,15,18 64:16 65:8,12 71:11,15,16 72:25 76:15,17

responses 20:1,9 63:9,21 71:17,18

responsibilities

17:22 67:14,20, 24

responsibility 36:11,15

responsible 19:17 36:3 45:19 63:8 66:10 74:8 77:2,5,8

rest 62:2

restate 36:9

restates 65:8

reverse 34:15

review 28:21 42:22 48:25 50:15 62:8 70:19 74:23 84:13

reviewed 34:7 61:19 66:1 74:25 78:11

reviewing 80:12

reviews 72:7

revisions 26:25

Richards 42:1,3

Road 12:12

roadways 48:14

Rodgers 26:18,23 27:20 63:1 64:19

roughly 40:24

round 32:9

rundown 23:4

running 36:12 68:18

**S**

safety 48:14

screenshot 72:3

screwed 76:10

section 33:17

send 84:17

sending 33:25 52:11

sense 21:17

sentence 17:16 29:3 49:23 67:16 69:14

September 11:22 41:7

sequential 49:8

sergeant 9:11,24 15:5 16:8,10,13, 19 19:18 23:1,11 24:12 26:24 29:17 35:1,7,13, 21,23 36:12,16, 19,22,25 37:4,20 53:18 61:4,12 68:2,11 75:20 77:5 79:21

service 32:9 43:12 46:7 47:6, 11,13

services 44:18 47:7 74:12

Seth 52:13,14 56:8 73:5 80:10 81:2 82:23

sets 46:10 47:7

sheet 84:16

sheriff 52:18

ship 21:8

shoot 24:13

**shooting** 21:18 22:8,16,22 23:2 29:25 53:10

**shortly** 12:6 16:1 81:7

**shot** 21:21 24:10 72:16

**show** 77:11

**sick** 29:7 61:24 69:21 72:22

**side** 31:2 52:6

**sideways** 68:19

**sign** 66:4 84:17

**signature** 44:5 46:20 84:7,10,18

**signatures** 46:18

**signed** 46:22 66:13 81:16

**signing** 44:7

**signs** 28:12

**sir** 37:2

**sit** 56:22 59:25

**sitting** 11:10 75:3

**situation** 51:7 57:15,18 58:8 63:9,22 74:1

**slide** 23:18

**small** 65:18

**son** 40:4

**sort** 24:7

**sound** 11:23 57:11

**spaces** 48:15

**SPD** 29:5

**speak** 9:18 35:7

**SPEAKER** 12:11

**speaking** 25:18, 20 37:4 51:11,12

**specific** 12:16 13:3 22:3,13 36:24

**specifically** 28:5 35:16 51:11

**specifics** 15:24 17:6

**speculate** 78:5

**spellings** 84:15

**spoke** 25:22 37:1 62:16

**spoken** 37:6 38:8, 11 53:13 62:15

**stand** 14:3 53:12

**start** 23:18 33:8 39:23

**started** 40:25 41:6 83:4

**starting** 16:1

**starts** 68:14

**state** 6:15 43:5

**stated** 55:25

**statement** 28:8, 25 29:11,17 34:1 43:18 66:2

**stating** 78:20,21

**step** 23:24 82:15, 17

**stepped** 18:20

**stepping** 19:2 82:20

**stipulate** 59:14 70:15

**strangely** 28:12

**stray** 66:14

**stress** 81:13

**strike** 35:6 50:20

**structure** 19:15

**stuff** 13:10 23:9 38:19

**Sturgeon** 6:24 8:16 9:6 10:5,10 11:13,16,19 12:2 14:16 17:20 18:7 22:1 24:24 26:12 28:9 30:17 32:24 37:16 39:7 40:25 42:16 43:5,12,22 44:22 45:2 46:11 47:13 48:1,5,12, 24 51:23 58:15 60:18 64:5 65:20 66:10 67:4,12,19 69:25 70:1

**subject** 58:1 59:7 71:16

**submitted** 41:25

**subordinates** 36:16

**Subsection** 46:10,13

**subsequent** 81:19

**suffice** 27:2

**sufficiently** 67:21

**summarize** 17:6

**support** 55:4,12, 15 56:10 61:15

78:12

**supported** 56:17

**supporting** 60:15

**supposed** 23:8

**surprise** 68:6

**surprised** 38:3 68:1

**suspected** 34:1

**suspended** 42:6, 8

**suspicions** 32:6

**switched** 44:2

**T**

**tactically** 12:20

**tags** 29:5,23

**taking** 16:4 69:18 80:15

**talk** 16:17 21:17 24:22 35:14 38:16 39:4 52:16 55:11 67:2,3 81:9

**talked** 15:12,22 22:6 24:16 35:9, 12 36:2 37:15 39:5 52:8,17 62:23 66:24 67:3 73:10,20,24 79:22 80:6,11 82:24

**talking** 16:7 19:1 23:22,23 51:5 68:14 80:22 81:6

**targeting** 58:2

**team** 21:9

**Teddy** 50:25 51:3, 4 69:8,11

**teenager's** 16:5 40:9

**telling** 25:24

**testified** 7:4,15 29:9 38:4

**testimony** 6:11 7:20 68:2

**text** 37:12 52:3,9, 10,12,22 53:4,6, 7,11 55:6,11 61:15 73:5 78:11 79:16 81:3

**texted** 37:14

**texting** 80:10

**thing** 8:10 72:14 73:2

**things** 15:23 16:18 18:21 19:2 22:4 23:18 35:20 39:4 55:16 56:18 59:20 77:15 84:15,20

**thinking** 54:3,16 55:10

**Thomas** 9:9 10:1, 14 11:10 15:12, 14,15 18:24 22:9, 10 24:8,16 27:17, 23 40:21 42:12

**thought** 52:23

**threatened** 57:17

**threatening** 48:14

**threats** 83:4

**throwing** 83:16

**thrown** 32:1 34:2, 21 35:17

**Tiffany** 50:22 71:11

**time** 7:12 9:10,19 10:7,24 11:19,25 12:4 15:7 16:15 21:20 22:12,13 33:21 37:3 38:10 52:24 54:4 60:15 61:23 72:7 75:1,5 77:12 79:17 80:3

**times** 22:4 29:1 66:5

**timing** 73:21

**today** 7:20 56:22 59:25 66:2 79:18, 22 84:21

**told** 23:2,3 24:8 62:22 68:1 77:25

**top** 14:23 34:12, 13 35:3 40:22 44:15 46:2,20 47:2 52:8 65:18 70:10

**totality** 69:19

**totally** 53:23 55:14

**tote** 32:16

**tough** 69:22

**Traci** 75:13

**trained** 67:19 68:3

**training** 36:16,20 65:22 67:17,23 68:11

**transcript** 14:9 20:12 84:13

**transported** 32:16

**treated** 55:3 58:7 73:25

**trees** 68:19

**Truesdell** 52:14 56:8 73:6 75:9 81:2,6 82:1

**trust** 84:20,23

**truth** 6:12 7:4

**Tuesday** 38:4

**turn** 46:16 47:1 65:17 71:14

**turned** 81:14

**type** 76:4

**types** 21:1

---

**U**

**Uh-huh** 20:3 28:15 63:3

**Uh-huhs** 20:11

**ultimate** 74:14

**ultimately** 36:3 76:23 77:8

**undergo** 67:24

**undergone** 82:10

**understand** 7:20 8:8 15:7 51:4 53:24 57:19 58:1, 10 63:4 66:6 81:24

**understandable** 26:5

**understanding** 19:15 48:18

67:18

**understood** 8:4

**UNIDENTIFIED** 12:11

**unsure** 7:23

**Update** 61:18

**upset** 57:14 58:6, 11 73:25 83:6,11

---

**V**

**Vaguely** 24:5

**vehicle** 32:1 34:3 40:4

**verbal** 20:9

**version** 70:3,9,22

**versions** 34:8

**vicious** 48:13

**video** 23:12,15 75:25 76:2 77:12, 17,22

**view** 60:5

**viewed** 81:8

**virtually** 63:8,25

**visit** 81:3

---

**W**

**wait** 8:11 27:10 67:2

**waive** 84:21

**waiving** 84:18,23

**walking** 68:19

**wandering** 50:25 51:1

**wanted** 21:11 49:9,18

**Ware** 25:12 27:3 50:22 51:5,11 53:13 62:15,17 71:11

**Ware's** 63:15

**watch** 77:21 80:4

**watched** 23:12 69:1 75:25 77:13, 16

**watching** 60:8

**Wayne** 6:23 58:23 84:2

**weapon** 32:9

**Wednesday** 13:15

**Wednesday's** 13:11

**wildlife** 48:15

**Woodson** 6:22 10:18,21 11:12, 21 12:4,17 15:20, 25 16:4,20 21:21 24:23 25:9 28:20 35:25 37:25 38:4, 8 40:8,25 42:4 56:23 57:1 60:1 62:17 68:15 69:22 72:5,15 77:9

**Woodson's** 29:18 36:20 40:4 51:6 56:13 59:6,22 62:3 69:7 72:8

**word** 31:10

**words** 50:12 55:3 79:2

**work** 19:7 52:19

**worked** 55:16

**working** 15:14 38:1 68:16

**world** 59:5,21

**wrap** 38:19

**write** 27:6,16 29:9 62:5 69:14 72:10

**writing** 15:7

**written** 24:1 62:6 64:19

**wrong** 56:18 68:17 69:3 74:4, 22 76:21 78:1,17

**wrote** 18:12,15 27:18 33:4,5

---

**Y**

**yard** 50:25 51:2

**year** 8:21 12:2 37:7

---

**Z**

**Zach** 12:21,24

**Zach's** 13:3

**zoomed-in** 70:3, 9,12,22