

# NAEGELI
## DEPOSITION & TRIAL

**(800) 528 - 3335**
**NAEGELIUSA.COM**

*Nationwide*

**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**REMOTE DEPOSITIONS**

**TRIAL PRESENTATION**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**

*Powerful*
LITIGATION SUPPORT

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION

NICHOLAS HUNTER

      Plaintiff,

vs.

          Case No.  2:24-CV-04081-WJE

MYRON WOODSON, and CITY OF STURGEON, MISSOURI

      Defendants.

_____

REMOTE STREAMING DEPOSITION OF

THOMAS CRAWFORD

TAKEN ON

WEDNESDAY, JUNE 4, 2025

1:49 P.M.

VESSEL BRIDGES MURPHY LAW OFFICES

3901 SOUTH PROVIDENCE ROAD, SUITE D

COLUMBIA, MISSOURI 65203


# NAEGELI
DEPOSITION & TRIAL | **(800) 528-3335**
| NAEGELIUSA.COM

REMOTE APPEARANCES

Appearing on behalf of the Plaintiff:

ERIC C. CRINNIAN, ESQUIRE

Crinnian Law Offices

9212 North Garfield Avenue

Kansas City, Missouri 64155

(816) 459-0649

eric@crinnian.law

DANIEL J. KOLDE, ESQUIRE

Kolde Law Offices

9506 Olive Boulevard, Suite 418

Olivette, Missouri 63132

(636) 675-5383

daniel.kolde.law@gmail.com

REMOTE APPEARANCES (CONTINUED)

Appearing on behalf of Defendant Myron Woodson:

JACK FLEMMING, ESQUIRE

Vessel Bridges Murphy Law Offices

3901 South Providence Road, Suite D

Columbia, Missouri 65203

(573) 777-4488

jack.flemming@vbmlaw.com

Appearing on behalf of Defendant City of Sturgeon, Missouri:

WAYNE MICHAEL JORDAN, ESQUIRE

Newman Comley and Ruth

601 Monroe Street, Suite 301

Jefferson City, Missouri 65101

(573) 634-2266

laura@ncrec.com

Also Present:

Jess Bryan, Naegeli Technician

EXAMINATION INDEX

                                                          PAGE


EXAMINATION BY MR. CRINNIAN                                7

EXAMINATION BY MR. FLEMMING                              112

EXAMINATION BY MR. JORDAN                                113

FURTHER EXAMINATION BY MR. CRINNIAN                      116

EXHIBIT INDEX

EXHIBIT                                              PAGE


  9    EMAIL DATED 10.25.2023                       23

 10    EMAIL DATED 04.11.2024                       26

 11    EMAIL DATED 05.20.2024                       37

 12    INCIDENT INFORMATION                         39

 13    EMAIL DATED 05.23.2024                       51

 14    EMAIL DATED 05.23.2024                       53

 15    EMAIL DATED 05.23.2024                       56

 16    EMAIL DATED 05.29.2025                       70

 17    POLICIES                                     78

 18    EMAIL DATED 07.09.2024                       84

 19    LETTER OF RESIGNATION                        85

 20    RESIGNATION LETTER                          101

REMOTE STREAMING DEPOSITION OF

THOMAS CRAWFORD

TAKEN ON

WEDNESDAY, JUNE 4, 2025

1:49 P.M.

THE REPORTER:  We are on the record at 1:49 p.m.

Mr. Crawford, please raise your right hand.  Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  I do.

THE REPORTER:  Thank you.

Will each attorney please state their name and whom they represent.

MR. CRINNIAN:  Eric Crinnian, on behalf of Plaintiff Nicholas Hunter.

MR. KOLDE:  Dan Kolde, on behalf of Plaintiff Nicholas Hunter.

MR. FLEMMING:  Jack Flemming, on behalf of Defendant Myron Woodson.

MR. JORDAN:  Wayne Jordan, on behalf of Defendant City of Sturgeon, Missouri.

THE REPORTER:  Thank you.

Counsel, you may proceed.

THOMAS CRAWFORD, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. CRINNIAN:

Q.   All right.  Sergeant Crawford, thanks for being here.

Have you ever been deposed?

A.   No.

Q.   Okay.  The gist of it is these are under-oath questions.  She just swore you in.  And so the purpose is to perpetuate your testimony for the purpose of -- of getting this case, you know, to trial, or wrapped up, or whatever the case might be.

So, as she said, we need clear answers. Please be verbal about your answers.  No "uh-huhs" or "uh-uhs," head shakes, things like that.  Let's not speak over each other either.  So if you will wait until I finish my question, I will wait until you finish your answer before I continue.  Anything -- any issues there?

A.   No, sir.

Q.   Perfect.  If you do not understand the question, please ask me to rephrase it.  I'm happy

to do so.  But if you answer, I'm going to assume that you understood the question.  Is that fair?

A.   Yes, sir.

Q.   Okay.  Great.  You can take breaks anytime that you need to.  This should be a very short deposition.  But my only ask is that if you are going to take a break, that you wait until you have finished answering the question before you, you know, take a break.  So we don't want to leave in the middle of a question pending.

Finally, did you review any documents or recordings in preparation for today's deposition?

MR. JORDAN:  You can answer that.

THE DEPONENT:  Yes.

THE REPORTER:  And I apologize, who's -- who's directing "yes" to answer?

MR. JORDAN:  Jordan.

THE REPORTER:  Thank you.

MR. CRINNIAN:  Or no, sorry, the direct is Eric, that was Wayne Jordan just talking.

THE REPORTER:  Thank you.

BY MR. CRINNIAN:

Q.   Okay.  So what documents do you recall reviewing in preparation today?

A.   We discussed it yesterday at -- when we

met with the attorney for Sturgeon.  We kind of watched a couple of body cam footage, and then just kind of talked about a few things on the case.

Q.   Okay.  Have you spoken to Officer Woodson in the past 24 hours?

A.   I received a text from him, but have -- I have not talked to him directly.

Q.   Okay.  Did you -- did he text you today?

A.   No.

Q.   Okay.  Did he text you yesterday?

A.   Only turning in his resignation.

Q.   Okay.  Did he explain to you why he was resigning?

A.   No.

Q.   "No."  He just turned in his resignation?

A.   He talked to the Chief about it.

Q.   Okay.  So let's start with a little bit of background.  You are currently a sergeant at Hallsville, correct?

A.   Yes.

Q.   Okay.  And, previously, you were a sergeant at Sturgeon, correct?

A.   Yes.

Q.   In both of these situations, you have been superior officer for Myron Woodson, correct?

A.   Yes.

Q.   Okay.  In his time at Hallsville, under you -- actually, scratch that.  Let me rephrase that.  Earlier this year, did Officer Woodson get any type of disciplinary action or a talking to in regard to any complaints received by citizens from Hallsville?

A.   From Hallsville?

Q.   Yes.

A.   Yes.

Q.   Okay.  So, as his superior officer, I'm presuming you've been involved in disciplinary matters involving Officer Woodson?

A.   Yes.

Q.   Okay.  What is the disciplinary matter that he has been dealing with since earlier this year that he's had to handle?  Is it a civil rights violation that he was accused of?

A.   Not in Hallsville.

Q.   "Not in Hallsville."  Okay.  Do you know what the basis of the complaint was in Hallsville that he received?

A.   We didn't have a citizen complaint.

Q.   Okay.  Was there a complaint from another employee or another officer?

A.    From the chief, yes.

Q.    Okay.  So the chief complained about Officer Woodson?

A.    Via -- from protocol, yes.

Q.    Okay.  Did Officer Woodson do something to the chief or someone the chief knows?  Is that why the chief complained about him?

A.    No, it was his conduct at report writing.

Q.    Okay.  Okay.  Did he -- were you involved in any of the disciplinary action against Myron Woodson at Hallsville?

A.    I -- yes.

Q.    Okay.  So with regard to the report writing then, you have specific information about what it is that he did then, is that correct?

A.    Correct.

Q.    Okay.  What is it that he -- that the chief came down on him for?

A.    His reports constantly needed correction in regards to inaccurate or missing information.

Q.    Okay.  So Chief Schultz at Hallsville identified that there were deficiencies in his reports and held him accountable for it?

A.    Correct.

Q.    Okay.  Is that what he got a two-day

suspension for?

A. No.

Q. Okay. Do you know what he got a two-day suspension for?

A. Yes.

Q. What was that for?

A. He had an unauthorized ride-along.

Q. Okay. So he had somebody in the car he wasn't supposed to?

A. Correct.

Q. Okay. Okay. Did Officer Woodson ever give you any indication as to why he was resigning, or he just said, "I'm done"?

A. He was pending a trial -- a legal action that the City was going to possibly do against him come City Council Monday.

Q. The City of Hallsville?

A. Correct.

Q. Okay. And do you know what that's in relation to?

A. Personnel issues.

Q. Okay. Okay. So it sounds like in the past year or so, Officer Woodson has had an issue with, potentially, the chief because he's having issues with his reports. Is that correct?

A.   Yes.

Q.   He had an unauthorized ride-along, and he got in trouble for that?

A.   Yes.

Q.   And now you believe that there's potentially going to be some action from the City of Hallsville against him then, correct?

A.   Not anymore.

Q.   Well, now that he's resigned?

A.   Correct.

Q.   "Correct."  Okay.

All right.  How long have you been a police officer for?

A.   In total?

Q.   Yes.

A.   Just shy of 10 years.

Q.   Okay.  And did you start at Hallsville, or did you start somewhere else first -- or, I'm sorry -- Sturgeon?

A.   Somewhere else.

Q.   Okay.  So can you give me a quick walkthrough on -- on the departments you've worked for?

A.   So I worked for the Marine Corps as a military police officer; started that in 2009.  Then

when I got out of the Marine Corps in '14, and then I came back to the Marine Corps -- Marine Corps Civilian Law Enforcement Program in 2016, '17.  And then I left that in 2021 and came back here.

Q.  And when you say "came back here," did you come to Sturgeon?

A.  I went -- I had another job in between, but I started in Sturgeon '22, I believe -- August of '22.

Q.  Okay.  And when did you start at Hallsville?  Was that July of '24?

A.  Sounds right.

Q.  Okay.  Okay.  So you have a significant amount of law enforcement experience then.  When you were in the Marines as military police, were you given guidance on use of force?

A.  Yes.

Q.  And being in the military, I'm presuming you also had to deal with rules of engagement?

A.  Yes.

Q.  Right.  And would you agree that the purpose for rules of engagement and use of force instructions is to ensure that force is used appropriately?

A.  Yes.

Q. Okay. And then after the Marines, you went into -- so it was military police, but civilian side of things?

A. Correct.

Q. Okay. How does that work?

A. So the Marine Corps Law Enforcement Program came about during the big push for when we -- when we were going to Afghanistan. So they brought in civilians to offset the military personnel that couldn't stand the gates at that time.

Q. Okay. That makes sense.

And then you went to Sturgeon in 2022 and Hallsville in 2024. During your time in the Marines and the military police civilian program, did you have any leadership responsibilities?

A. Marine Corps, yes. The civilian side, unofficially.

Q. Okay. On the Marine -- on -- in the Marines, what was your leadership capacity?

A. I was a corporal and also a squad leader at times. So I had anywhere from four to 13 Marines directly underneath me.

Q. Okay. And then you said the civilian side, not formally?

A.   Correct.

Q.   Now, when you started at Sturgeon in 2022, did you come on right as a sergeant?

A.   I did not.

Q.   Okay.  So you started as a patrol officers -- officer?

A.   Yes.

Q.   Okay.  And, at that point, do you recall who the chief of police was?

A.   We didn't have one.

Q.   Did you have a sergeant that you reported to?

A.   No.

Q.   So you were just -- it was essentially just the mayor and then officers, right?

A.   Correct.

Q.   Okay.  How many officers do you recall having at that time?

A.   Just myself.

Q.   It was just you then.  Okay.

So at some point you get promoted as sergeant for Sturgeon, correct?

A.   Yes.

Q.   Okay.  And I presume Sturgeon was trying to rebuild its police force at that --

A.   At the time, yes.

Q.   And part of the reason for that, it sounds like -- based on just what I can tell -- is there was a lawsuit, and it seems like the City kind of took a break on having policing for a minute?

A.   Yes, sir.

Q.   Okay.  Do you recall when you became a sergeant for Sturgeon?

A.   The -- July 1st the following year.

Q.   '23.  Okay.

Now, what did that promotion process look like for you?  Was it just you said, "I want to build this up, and I want to be the leader," and they made you that, or was there -- did you have to apply for it?  How did that work?

A.   They -- the mayor at the time talked to me about it and wanted to grow the department, and for us to do that as a -- according to the ordinances -- they had to have a supervisor.  And so they promoted me that way.

Q.   Okay.  And when you got promoted then in July of 2023, is that when you started kind of working on getting the grants and building the things back up to get the police department going again?

A.   Yes, sir.

Q.   Okay.  And you didn't have any officers under you on -- as of July 1st, correct?

A.   Not as paid staff.

Q.   Okay.  Were they reserve officers?

A.   I had a few unofficial reserve, yes.

Q.   Okay.  And then beginning, I believe, in August of that year, I believe that there were a number of reservists?

A.   Yes.

Q.   There was Bryan Schultz?

A.   Yes.

Q.   I believe Jeff Voss?

A.   Yes.

Q.   And then Myron Woodson together?

A.   Yes.  Correct.

Q.   Myron Woodson immediately got hired as a full-time officer as well, correct?

A.   After he applied, yes.

Q.   "After he applied."

So you were the sergeant, he was the only other officer, and then you had the reserves, Voss and Schultz, correct?  And I think there was one more.

A.   I had one more, yes.

Q.   Okay.   Schultz has resigned, correct?

A.   Yes.

Q.   Did Voss resign?

A.   Verbally, yes.

Q.   Okay.   Do you know why Voss resigned?

A.   I left.

Q.   Okay.   So you left, and that's -- is that the reason that Schultz also left?

A.   Yes.

Q.   Okay.   That makes sense.

You didn't have any other employees that you supervised under you as the sergeant for Sturgeon, correct?

A.   Correct.

Q.   And you stayed on until a couple months after this whole situation with Woodson, and then you left and went to Hallsville permanently, correct?

A.   Yes.

Q.   Okay.   At Hallsville, did you transfer right in as a sergeant?

A.   I did.

Q.   So you immediately took leadership over the existing officers that were there?

A.   Yes, sir.

Q.   And that would include Myron Woodson?

A.   Yes, sir.

Q.   How -- how was Myron Woodson as a police officer, in your opinion, as his boss?

A.   He knew his information; he knew the laws.

Q.   Just generally speaking?

A.   Yeah.

Q.   Okay.  Do you feel like he had a good rapport with citizens of -- at Sturgeon?

A.   Depending on the citizen, but yes.

Q.   Okay.  And what do you mean "depending on the citizen"?

A.   There were some that didn't like him due to his color.

Q.   I understand that.

Do you think that most of the complaints about him were because of his race, or do you think it was because of his actions?

A.   I would probably say due to his color.

Q.   Okay.  Do you know which part -- like individual -- specific -- I -- the reason I ask, I've read through a lot of the stuff and I know, for example, Zach Dailey complained about a lot of things.  I see you shaking your head.

A.   Yes.

Q.    So he would be one, I presume, that you think does not have a particularly good reason for being upset with Officer Crawford or Woodson, correct?

A.    Correct.

Q.    Okay.  Did you ever follow up on any of Zach Dailey's complaints that he filed?

A.    Majority of them, yes.  Yeah.  Majority of them, yes.

Q.    Okay.  Now, Zach Dailey was not the only person who complained about Officer Woodson then?

A.    He was not.

Q.    Okay.  In fact, there were complaints about Officer Woodson pretty much from the get-go, weren't there?

A.    Yes.

Q.    Okay.  Beginning October of 2025, there was at least two complaints that he had, correct -- I -- I apologize -- October 25th, 2023 -- getting mixed up here.

A.    I would have to look at the complaints to confirm, but that sounds about accurate.

Q.    Okay.  When it came to complaints, did you record these complaints in any particular way?

A.    They were typically submitted on a

complaint form that we had.

Q. Did those become part of Officer Woodson's file?

A. I had a file of the complaints, yes.

Q. But they weren't in his actual employee filing?

A. Correct.

Q. Did you ever substantiate any complaints against Officer Woodson?

A. I think I had two that I had that I couldn't -- that I substantiated.

Q. Okay. And were those early on -- I -- I say early on in his -- his career with Sturgeon, he was there less than a year -- but was that early when he started or was that later towards the end?

A. Earlier.

MR. CRINNIAN: Okay. All right. I'm going to --

MR. KOLDE: That'll be Exhibit 9.

MR. CRINNIAN: What?

MR. KOLDE: Exhibit 9.

MR. CRINNIAN: Okay.

THE REPORTER: And I don't know who's talking, and I cannot hear you. If you could just speak up for the record.

MR. CRINNIAN: Yeah. Sorry. That was Eric Crinnian and Dan Kolde. We were just catching up on exhibit numbers.

THE REPORTER: Okay. Did -- if you want that on the record, I'll need you to restate it. If not, we can continue.

MR. CRINNIAN: No, that's fine. We can continue.

Okay. I'm going to hand you what is being marked as plaintiff's Exhibit 9.

(WHEREUPON, Exhibit 9 was marked for identification.)

BY MR. CRINNIAN:

**Q. If you'll take a look at that for me, please. Just let me know when you're done taking a look at that.**

A. I've read it. I'm trying to recall the -- oh, this is not regarding Myron. So I'm guessing we're talking about the second paragraph? About Dorrie?

**Q. Well, yeah, we'll talk about both of them --**

A. Okay.

**Q. -- about both parts of this email. I just want to make sure it's something that you at least**

have some familiarity with, even if you don't recognize the document, I want to ask you about kind of the underlying --

A. Okay.

Q. -- facts here. First of all, are you related to Dorrie Crawford?

A. That's my mom.

Q. Okay. That's what I was wondering.

So, on October 25th, Dorrie said, "Sergeant Crawford said there were two complaints on the new officer." I'm presuming that means that you spoke to her directly about this -- about the complaints about the officer?

A. I believe it was mentioned at City Council that following or that previous Monday.

Q. Okay. And she continued, "I understand they're not in writing at this time as there's something the Council needs to address." Do you know if those were ever committed to writing?

A. I do not recall.

Q. Okay. So let's go to Mayor Abrahamson's response. He says, "There has been two complaints, which I talked to Thomas about." Correct? And you recall these complaints, you think?

A. I have an idea what the complaints were,

but I don't -- I don't remember exactly what the complaints were.

Q.   That's fair.  I -- I just want to make sure that you -- you do remember that there was some kind of complaint or whatever.  Mayor Abrahamson says, "As for the Council addressing anything, I don't feel we need to, as of now.  Thomas is working with Myron, and I will be discussing everything with Thomas."

So it sounds like Mayor Abrahamson's setting out kind of the chain of command?

A.   Yes.

Q.   He's in charge, you're below him, but everybody else reports to you, correct?

A.   Yes.

Q.   Okay.  Did you believe that Mayor Abrahamson entrusted you to handle Myron as your subordinate?

A.   Yes.

Q.   Okay.  Did Mayor Abrahamson ever follow up with you about your coaching of Myron Woodson?

A.   I believe so.

Q.   Okay.  But you don't recall specifics about what that might have been -- been about or what he might have said to you?

A.   I don't, honestly.

MR. CRINNIAN:  And for the exhibits that we give you, if you'll just set them aside when you're done, because we'll have to collect them. I'm handing you what I'm marking as Exhibit 10.

(WHEREUPON, Exhibit 10 was marked for identification.)

BY MR. CRINNIAN:

Q.   If you'll take a look at that for me, please.  Tell me if you recognize that.

A.   Okay.

Q.   Do you recall receiving this email?

A.   I do.

Q.   Okay.  And this is essentially, again, Mayor Abrahamson setting up kind of the hierarchy in the reporting structure, right?

A.   Yes.

Q.   And in his view, the first person that anybody should call as a department head is him if it needs -- if something needs to be addressed with the Board of Aldermen, right?

A.   That is correct.

Q.   Is that normally the way things operated in Sturgeon where if you had a situation, you would take it to the mayor, and he would take it to the

Board of Aldermen?

A. Yes.

Q. Okay. Now, at any point, were you under any assumption that you had autonomy to act without the mayor or the Board of Aldermen's approval?

A. In what regards?

Q. In -- in regard, for example, with training and disciplining your -- your employees, right? If you had an issue with an employee with, you know, Myron Woodson, for example, would you take that directly to Mayor Abrahamson or would you take that to, for example, Dorrie Crawford and the rest of the board members?

A. If I had a disciplinary thing, it would go to the mayor first.

Q. Okay. Did you ever report Officer Woodson to the mayor for discipline?

A. I think verbally. I don't think I ever did anything written.

Q. Do you recall what that might -- what that verbal communication might have been?

A. To the mayor or to Myron?

Q. Let's start with the mayor.

A. I told him we had the complaint, and I told him that this is what I did to correct the

action of Myron.

Q.    And do you know which complaint it was?

A.    I don't.

Q.    Okay.

A.    I -- I think it's reference to this first one with the two complaints.

Q.    Okay.  How would your correction or your coaching of Myron go?

A.    The actions that were in the complaint were typically the way he talked to people.  And I would reference -- first of all, I plainly would say, "You can't talk to people like that.  You have to treat them with respect.  They can call you whatever.  We cannot call them back anything.  We have to be professional."  So those kind of coaching techniques.

Q.    It seems like from a -- a lot of the complaints that I saw in the City meetings and everything, it sounds like a lot of it was about his kind of brashness.  Is that fair?

A.    What do you mean by "brashness"?

Q.    Brash, unpleasant, rude, you know, however you want to phrase it.

A.    I personally believe that some of the things that they took as brash, it was his attempt

to make -- crack a joke, ease the tension, and it just came off wrong.

Q. Okay. So let's move to the shooting on May 19th. Now, May 19th, you were not working, I do not believe, correct?

A. Correct.

Q. You got called in afterwards --

A. Correct.

Q. -- correct? Okay.

First of all, let me ask this: How often does the Sturgeon Police Department get called out for animals, whether it's a stray animal, injured animal, aggressive animal?

A. We typically would get at least one or two calls a week.

Q. Okay. And that's because the City of Sturgeon put animal control responsibilities onto the police officers too, correct?

A. Correct.

Q. Okay. So it was not -- it is not uncommon in Sturgeon, as a police officer -- at least it wasn't -- to be called out to deal with an animal?

A. Correct.

Q. Okay. Over the time that you -- that you were a Sturgeon officer, did you go out and have to

deal with any animal calls?

A.   Yes.

Q.   Okay.  Did you ever have to dispose of or -- or dispatch a -- a dog?

A.   Not in Sturgeon.

Q.   "Not in Sturgeon."  Okay.  Have you had to do that in Hallsville?

A.   Not in Hallsville, no.

Q.   Okay.  Where have you had to do that?

A.   When I was a federal police officer in North Carolina.

Q.   Okay.  The federal, is that when you were the -- in the Marine --

A.   In the club, yes.

Q.   Okay.  Got you.

Is that the only time you've ever had to shoot a dog?

A.   I never shot a dog.

Q.   Thought you said you had to dispatch a dog.

A.   You said animal.

Q.   Oh, an animal.  Okay.  I apologize.  What kind of animal was it?

A.   A deer.

Q.   "A deer."  Okay.  Have you had to shoot a

dog?

A.   Not in law enforcement capacity.

Q.   Okay.  And I know looking at some of the comments that were at the -- the meeting on Facebook, people had talked about they had seen you encounter dogs and you didn't react the way that Officer Woodson did, right?  Why do you not react with a trigger finger when you have a dog situation? I mean, you seem to find ways to handle the situation, right?

A.   Yes.

Q.   Okay.  How do you normally handle -- let's say you have a lost or a stray dog that you get called out for, how do you handle that?

A.   I would show up to where the call was reported and attempt to catch the animal if it's a stray.

Q.   Okay.  Have you ever used one of those things right there, a catchpole?

A.   I have.

Q.   Okay.  And how long have you been using a catchpole?

A.   Sturgeon was the first time I had used one.

Q.   So 2022 approximately --

A.    Yes.

Q.    -- first time you used one?

Did anybody at Sturgeon train you how to use the catchpole?

A.    No.

Q.    Did you look up how to use the catchpole?

A.    No.

Q.    How did you figure out how to use the catchpole?

A.    Trial and error.

Q.    Okay.  And you know how to use that catchpole now?

A.    I do.

Q.    Okay.  Without making you get up and pick it up, how do you close the loop on that catchpole?

A.    Pull the cord at the other end of the pole.

Q.    Okay.  When did you figure out how to use the catchpole?  How -- how long did it take you?

A.    10, 15 minutes, I think.

Q.    Okay.  And have you successfully used a catchpole in securing an animal while you're on a call?

A.    Yes.

Q.    Okay.  Now, do you have a catchpole at

Hallsville?

A.   I do.

Q.   Okay.  Have you been on animal calls since you've been at Hallsville?

A.   I have.

Q.   And you haven't had to dispatch a dog?

A.   No.

Q.   Okay.  Now, as the sergeant, you were responsible for training Officer Woodson, correct?

A.   Yes.

Q.   Okay.  And that's in the policy handbook, correct?

A.   Yes.

Q.   And it sounds like that's also something that you take seriously, is wanting that responsibility, correct?

A.   Yes.

Q.   I'll represent to you Officer Woodson has repeatedly indicated that he's never been trained on how to use that catchpole.  Can you explain why you never taught him?

A.   To be honest, I thought I had.  If I didn't, I didn't.

Q.   Okay.  Do you ever recall yourself receiving training, whether in the Marines, civilian

police, Sturgeon, or Hallsville on the appropriate ways to use force against animals?  When it's appropriate, when it's not?

A.   Yes.

Q.   Okay.  Has that varied between the Marines and when you were, you know, the civilian military police?  Does that differ from Sturgeon and Hallsville?

A.   Not really.

Q.   Okay.  What is the expectation with use of force in general?  We talked about rules of engagement earlier.  I mean, there's -- what -- what does that typically look like as far as what engagement and --

A.   Rules of engagement or use of force? They're two different things.

Q.   Use -- let's talk use of force.

A.   Use of force, use of minimal amount of force necessary.

Q.   Okay.  And only escalate to the next level of force if it's necessary to do so?

A.   Yes.

Q.   Is that typically -- is that need determined typically based on the circumstances of the situation?

A.    Yes.

Q.    And it depends on how imminent the danger is?

A.    Yes.

Q.    Okay.  Now, after the shooting on May 19th, did Officer Woodson call you?

A.    Yes.

Q.    Do you recall about when he called you -- about what time?

A.    I'd have to look at my call log.  I do not.

Q.    Okay.  Do you remember what it is that he called you about and what he told you?

A.    It was -- he told me he shot a dog.

Q.    Okay.  What was your response?

A.    "All right.  Do what we got to do."  I -- I don't remember everything I said nor what it all entailed.

Q.    Did you ask him why he did it?

A.    Not at the time.  I did not, I don't think.  I got that information from him later, I believe.

Q.    And that's from the incident report?

A.    I believe he called me later after -- later that evening.

Q.    Okay.

A.    I believe.

Q.    Okay.  So your belief is that he called you after it happened, and then he also called you later in the evening too?

A.    I believe so.

Q.    Okay.  Do you think that he would've called you before or after he wrote his incident report for you?

A.    Probably after, I would have to guess.  I don't know.

Q.    Okay.  Now, after the shooting on May 19th, he puts together his incident report that evening, and he sends it over to you that evening, correct?  Does that sound right?

A.    I -- maybe.  I don't remember when I received it initially.

Q.    But do you think you got it fairly quickly?

A.    I did.

Q.    Okay.  Do you think it was within 24 hours?

A.    More than likely, yes.

Q.    Okay.  Now, it appears that you were involved in the posting of a statement to the City's

Facebook page.  Is that right?

A.   "Involved"?  How so?

Q.   Well, that's what I'm trying -- I'm wanting to figure out, is what exactly --

A.   I remember sending something to the mayor, trying to spearhead it, because I knew it was going to be a -- not a fun time following this.

Q.   Right.

A.   It's going to be an issue.  I remember sending stuff to the mayor back and -- I don't remember if it was back and forth or if I sent it to him once and it was done.  I remember sending him something and then it went to the attorney, I believe, after that.

MR. CRINNIAN:  Okay.  I'm going to hand you what is being marked as plaintiff's Exhibit 10.

MR. KOLDE:  Exhibit 11.

MR. CRINNIAN:  Is it Exhibit 11?

MR. KOLDE:  Yeah.

MR. JORDAN:  Yeah.

MR. CRINNIAN:  Exhibit 11.  My apologies.  Plaintiff's Exhibit 11, document number 1600.

(WHEREUPON, Exhibit 11 was marked for identification.)

BY MR. CRINNIAN:

Q.   All right.  If you'll look at that document and tell me if you recognize it, please.

A.   It looks familiar, yes.

Q.   Okay.  That email was sent from Jackie Rodgers, the City attorney, correct?

A.   Yes.

Q.   It was sent to you?

A.   Yes.

Q.   The mayor?

A.   Mm-hmm.

Q.   The City email address?

A.   Yes.

Q.   And Jennifer Greenhoe, correct?

A.   Correct.

Q.   Okay.  And Jackie Rodgers is telling all of you that he's going to loop everybody together and that he has revised your Facebook post, correct? "Please find my revisions to your Facebook post."

A.   That's what it says, but I did not post on Facebook.

Q.   Let me be clear:  I don't -- I don't want to say that you posted on Facebook, just that I want to make sure I understand to the extent you were involved in the message.

A.   Yes, that I was.

MR. CRINNIAN:  Okay.  Excellent.  And that was Exhibit 11?

THE DEPONENT:  Yes, sir.

MR. CRINNIAN:  Okay.  I'm going to hand you what is being marked as Exhibit 12.  Take a look at that for me, please.

MR. JORDAN:  This is Attorney Jordan, and just for the record, Exhibit 12 is document number 1601.

THE REPORTER:  Thank you, Mr. Jordan.

(WHEREUPON, Exhibit 12 was marked for identification.)

THE DEPONENT:  I do recognize it.

BY MR. CRINNIAN:

Q.  Okay.  And you wrote at least part of this, correct?

A.  My shell is in there.  That is not the wordage I put in there.  No.

Q.  Right.  But Mr. Rodgers, Jackie Rodgers, rewrote --

A.  Portion of it a lot better, yes.

Q.  Okay.  So let's talk about this statement.  This statement was posted on Monday, May 20th, so a day after the incident --

A.  Correct.

Q.   -- correct?

And in this, it essentially says, "The animal was behaving strangely and displaying signs of possible injuries and/or what the officer perceived to be rabid behavior."  Do you see that?

A.   Yes.

Q.   Where did the language about rabies come from?

A.   I have to guess.  I couldn't tell you off the top of my head.

Q.   Here's the reason I ask:  is I'll represent to you during Officer Woodson's deposition, and we looked at his -- at the incident report -- we can do it again -- he never mentioned rabies in the incident report that he provided to you.

A.   Not that I recall.  Correct.

Q.   Okay.  So somehow the language about rabies did not come from Officer Woodson, correct?

A.   From my knowledge, correct.

Q.   Okay.  "The SPD officer made numerous attempts to catch the dog -- catch -- capture the dog using the catchpole."  Now, you watched the body camera footage?

A.   I have.

Q.   Did you watch the body camera footage shortly after it happened?

A.   "Shortly" as in later that week, yes.

Q.   So you didn't watch it within 24 hours of the incident?

A.   It -- it hadn't uploaded yet.

Q.   Okay.  So the statement here that we know is, at a base level, your, you know, communication, your content, you wrote this without ever having seen the body cam?

A.   Went off of what I was told by my officer over the phone, if I remember correctly.

Q.   So you publicly -- with the permission of the mayor -- essentially went out and defended Officer Woodson to the public within 24 hours of the incident without ever having seen the -- the body cam footage?

A.   I believe so, yes.

Q.   Why?

A.   The intent was to get ahead of anything that may have popped off on the media or people --

Q.   You -- you wanted to get ahead of the bad publicity, didn't you?

A.   To be honest, I believe so, yeah.

Q.   You didn't really care about what Officer

Woodson did or didn't do, did you?

A. That is not correct.

Q. Okay. So you defend him immediately, publicly?

A. Correct.

Q. Without ever having reviewed the evidence, despite public outcry about all this, correct?

A. There wasn't any public outcry at the time of this.

Q. That's a valid point. I -- I apologize. You're correct.

You didn't view the body cam footage until, you said, later in the week?

A. Possibly Monday or Tuesday, I would assume.

Q. And that would've been -- would that have been the 22nd probably? I'd have to go back and look.

A. I can help you. Monday would've been the 20th. Tuesday would've been the 21st. Wednesday would've been the 22nd.

Q. Okay. Thank you.

So you think that it was somewhere in that range?

A. I believe so, yeah.

Q.   Not the 20th, but probably midweek, later week?

A.   I would say more than likely by Tuesday I would've seen the footage.

Q.   Okay.  So your language that the behavior exhibited by the dog, which you believed to be severely injured and/or infected with rabies, that was all based on what Myron Woodson told you?

A.   The rabies, I'm not sure.  I don't remember everything that was -- he told me.  But I do recall something about it being injured, and, I believe, in the call log it also says it was injured.

Q.   Okay.  You also talk a lot about the lack of collar and tags influencing his decision.  Do you see that in there?

A.   I do.

Q.   Okay.  Now, again, I'll represent to you that I asked Officer Woodson about the lack of collar and tags this morning, and he said that did not influence his decision.  Where did you get the idea that it influenced his decision?

A.   I do not believe I put that in there initially when I sent it to the lawyer.

Q.   Okay.  You think that might have been the

lawyer's language?

A.   I believe so.  I'm guessing.  I don't know.

Q.   I -- I won't hold you to that.  I -- I -- I understand that's -- that's asking you to remember too many really specific things, so.

Okay.  So that was the post from the 20th.  Were you involved in the -- the subsequent post that the City made a couple of days later after reviewing the body cam footage?

A.   I don't know.  I don't believe so.  I think that was the mayor.

Q.   Okay.  So Officer Woodson on May 19th writes his first draft of his police report, his incident report.  Does he -- you said you're not sure when he sent it to you, but it was probably within about 24 hours or so?

A.   I would assume.

Q.   Okay.  Do you recall giving him feedback on that incident report and telling him that he needed to redo it?

A.   I would assume to probably ask for more details on it, but I'd have to look -- see if I could find the original report he submitted to me first to review it.

Q.    Okay.  Do you think that you would've communicated and sent those emails back and forth with Officer Woodson via email, or would you have communicated the need to make changes verbally?

A.    Typically, it would've been done via email -- well, correction, if -- I would've told him verbally that it needed to be done -- what corrections would need to be made, because he is usually there when I'm reviewing his report.

Q.    Okay.  Now, you got called in the evening of the shooting, correct, for a couple of hours?

A.    Correct.

Q.    Why did you get called in?  Do you remember?

A.    Well, what do you mean by "called in"?  I got called and I talked with the mayor.  I never physically went into the building.

Q.    Okay.  So you called and spoke to the mayor.  Do you recall if you clocked in for those -- for that amount of time that you --

A.    I don't believe I charged the City for that.

Q.    Okay.

A.    I -- I'd have to check my timecard.

Q.    I'll look at that when we're on our break.

So you -- I want to make sure I'm clear on the timeline -- Officer Woodson called you at some point, either right before or right after he probably finished his report. Did you talk to the mayor before or after that?

A. I remember talking to the mayor for -- shortly after Myron called me the first time, and I'm almost positive I would've called him after Myron gave me more details afterwards.

Q. Okay. And we talked about the chain of command email with -- with the mayor and how he wanted things to be funneled up --

A. Correct.

Q. -- so you would've funneled that up to him?

A. Yes.

Q. Do you recall what his reaction was when you told him, "Hey, Myron shot a Shih Tzu"?

A. At the time, I didn't know it was a Shih Tzu.

Q. Okay.

A. I believe he was in shock.

Q. The mayor was?

A. Yes.

Q. Okay. When you talked to Woodson, did he

explain to you exactly why he shot this dog?

A.  Not immediately, no.

Q.  Okay.  And what about subsequent conversations?  Did you guys ever talk about this?

A.  I would assume we would have.

Q.  Okay.  But you don't remember anything that he would've said as far as his justification?

A.  From my -- from what I remember, he told me the reason he did it, because he thought the dog was hurt, and the way he was acting, he thought it -- I hate to -- I don't know if I should phrase it this way -- just --

Q.  Put it out of its misery.  Is that correct?

A.  Thank you.  Yes.

Q.  Okay.  When you went back and watched the body cam footage, did Teddy seem like a dog with a serious injury to you?

A.  Did it look like there was something wrong with the dog?  Yes.

Q.  Okay.  What do you mean "it looked like there was something wrong with the dog"?

A.  Dogs don't typically walk around and act like that or have their tongue hanging out their mouth.

Q.   So the tongue hanging out the mouth was a big deal for you?

A.   No, but it -- its behavior was abnormal from what I usually see from dogs.

Q.   Now, you've never met Teddy before this?

A.   I have.

Q.   You have?  Okay.

A.   He was my -- Nick Hunter was my neighbor --

Q.   Okay.

A.   -- at the house I lived initially out in Sturgeon.

Q.   Okay.  So you had already -- had seen Teddy before?

A.   At the time of the shooting, I did not know it was Teddy --

Q.   Right.

A.   -- 'till later, yes, that I found out it was.

Q.   Had you assumed, prior to the shooting, that anything was wrong with Teddy when you'd see him out?

A.   No.

Q.   So you have no basis for saying that anything about Teddy was particularly odd or stood

out, correct?

A.   I never said there was something wrong with Teddy.  I said it was abnormal for dog behavior.

Q.   Okay.  Do you have any specialized training in animal behavior?

A.   Aside from interaction with dogs, no.

Q.   Okay.  Do you have any specialized veterinary training?

A.   From what -- besides working with dogs, no.

Q.   Okay.  So you have no way of -- with any level of qualification -- physically observing a dog and telling whether it's injured or ill?

A.   Except from growing up with dogs.

Q.   Okay.  And, I mean, unless it's an obvious bleeding wound or a bone sticking out, correct?

A.   Not any former schooling, no, I do not have any.

Q.   Okay.  And Myron didn't, to your knowledge, either?

A.   To my knowledge, no.

Q.   So you have Myron send you the report.  You think that you gave him some feedback on the report?

A.   More than likely.

Q.   And then he sends another report to you a couple of days later.  Do you recall that?

A.   I would assume.  But, at some point, yes, he would have.

Q.   Okay.  Do you go through all of Myron's reports before finalizing them, sending them up the chain, whatever you have to do with them?

A.   Yes.

Q.   Okay.  And that was both at Sturgeon and at Hallsville?

A.   Yes.

Q.   Okay.  Like you said, he's got a bit of an issue with his report writing?

A.   Correct.

MR. CRINNIAN:  We're going to go off the record real quick.  Okay?

THE REPORTER:  Sounds good.  Thank you.

The time is 2:32.  We're off the record.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 2:37.  We are on the record.

MR. CRINNIAN:  We're on Exhibit 13, right?

MR. JORDAN:  Yes.

MR. CRINNIAN:  All right.  Thank you.

All right.  Sergeant Crawford, going to hand you what has been marked as plaintiff's Exhibit 13.  I'll ask you to please take a look at that and tell me if you recognize it.

MR. JORDAN:  This is Attorney Jordan, and just for the record, we're looking at document number 1162.

THE REPORTER:  Thank you so much.

(WHEREUPON, Exhibit 13 was marked for identification.)

THE DEPONENT:  I recognize it.

BY MR. CRINNIAN:

Q.  Now let's look at the portion that you sent on May 23rd at 4:14 p.m.  You sent that to Jackie and Jose who are the City attorneys, correct?

A.  Correct.

Q.  And you also CC'd Kevin Abrahamson, the mayor?

A.  Correct.

Q.  And subject of your message is "Good afternoon, an updated report, cleaned up a little bit," correct?

A.  Correct.

Q.  And that was the second -- it's the cleaned up report that Officer Woodson came to you

with?

A.    Yes.

Q.    Okay.  Now, Jose Caldera responds about something specific in that report.  Do you see that at the top?

A.    Yes.

Q.    And he says, "Are we ready to defend this statement, 'I also suspected, based on its appearance, that the dog had been thrown from a moving vehicle'?"  Do you see that?

A.    I do.

Q.    Were you in the least bit concerned that Officer Woodson's incident report changed so dramatically from the first version to the second version?

A.    Concerned how so?

Q.    Well, obviously, the City attorney was concerned because they weren't sure if they would be able to defend that statement because they didn't know if there was any evidence for it.  Did you believe that there was evidence for it?

A.    I only had the information at the time, which was -- would've been -- would've been in his report.  So I would have to actually see his physical report to say whether it was evidence

there, because I didn't -- that's all I would've had.

Q.   Now, we've already established that Officer Woodson currently has an issue, or at least recently has had an issue with his report writing. Is that correct?

A.   That is correct.

Q.   Has that been something that you've had an issue with Myron Woodson about since he started?

A.   Yes.

Q.   Okay.  So you've known from the time that you hired him that he's not a good report writer?

A.   Correct.

MR. CRINNIAN:  All right.  I'm handing you what is being marked as plaintiff's Exhibit 14. This was Bates number 1171.

(WHEREUPON, Exhibit 14 was marked for identification.)

BY MR. CRINNIAN:

Q.   And can you please look at that document and tell me if you've ever seen it before.

A.   I don't recall seeing this.

Q.   Okay.  You see the email that we just talked about down in the lower third part from Jose Caldera, "Thanks for sending this over," correct?

A. I do.

Q. And so this is part of the same email chain that we just looked at. Do you understand that?

A. Yes.

Q. The two sections at the top are a side conversation with Mayor Abrahamson and Jose Caldera. Do you see that?

A. I do.

Q. And in that, they're expressing confusion and concern about Officer Woodson including that in his report. Do you see that?

A. I do.

Q. The very top, Jose Caldera tells Kevin Abrahamson that he will let Sergeant Crawford explain himself to you. "We should definitely follow up with him on that, though." Do you see that?

A. I do.

Q. Okay. Did Kevin Abrahamson ever follow up with you about what was contained in Officer Woodson's report?

A. I would have to assume that he probably did.

Q. But you have no reason to know that he

did?  You don't recall specifics?

A.  After this incident, leading up to everything, he was in and out of my office frequently, asking questions, talking about this.  I can't specifically recall exactly, following this email, what he would've said.

Q.  Can you tell me some of the things that he did say about this situation?

A.  He would constantly tell us that he had our backs.  He would help us out.  If we need something, let him know.  He constantly told us that he stands by his police department.  But specifics regarding the report, I know we've -- me and him have talked about what was written in it multiple times from -- I'm pretty sure from the original report, because I know he saw it too, to completion of the final one that was submitted.

I know he was -- he read every single one of those as well.  But particularly what he is writing here, I couldn't guess.

Q.  So you don't recall him specifically coming to you and saying, "Hey, I think Woodson lied in his incident report"?

A.  Not that I recall directly, no.

Q.  And he, Mayor Abrahamson, was your boss,

right?

A. Correct. Yeah.

Q. There's nobody else that would've come to you and said, "We have a problem about Myron Woodson," it would be him?

A. Correct.

MR. CRINNIAN: Was that Exhibit 14?

THE DEPONENT: Yes, sir.

MR. CRINNIAN: Thank you. I'm now handing you what is called plaintiff's Exhibit 15. It is Bates number 1746.

(WHEREUPON, Exhibit 15 was marked for identification.)

BY MR. CRINNIAN:

Q. Please take a look at that for me and tell me if you recognize it.

A. I do -- I do recall this one.

Q. Okay. What about this do you recall?

A. I remember sending the email because it was the two different reports, now that I'm reading it.

Q. Okay. And then down at the bottom we, again, see the message from Jose, "Thanks for sending this over."

A. Yup.

Q.   And in the middle, you respond, "Which one do you think sounds better?  We can go with the original if you think that is better," correct?

A.   I do.

Q.   Why are you deferring to the City's attorney on what the content of a police incident report is?

A.   Based -- I -- if I remember correctly, it was the verbiage that was used directly in the report.  I'm not a wordsmith.  Writing is also not my strong forte.  So I was deferring to him which one reads better.

Q.   Mr. Caldera specifically called out the, "I also suspected, based on its appearance, that the dog had been thrown from a moving vehicle" statement.  That's the -- that -- that's the sentence he's worried about, correct?

A.   That is correct.

Q.   Okay.  So you are essentially telling him, "We can either take that sentence out or leave it in, whichever sounds best to you."  Is that right?

A.   That sounds correct, yes.

Q.   And at the top of it, Jose responds, "If the revised one is true, then go with that.  But if we included it to cover ourselves, then go with the

original because the revised one seems suspicious and will invite criticism."

A.   That is correct.

Q.   Do you disagree with Mr. Caldera's assessment there?

A.   Not at all.

Q.   Okay.  Did you and Mr. Caldera ever speak about this incident report afterwards?

A.   I would assume probably.

Q.   Did you and Mr. Caldera ever speak about whether or not Myron Woodson lied on the incident report?

A.   I would have to guess.  I would say if it was probably -- if it was written in there and we, like he stated in this email, we're doing it to cover ourselves, then he was hinting at that he is lying about something.

Q.   Did you think that Officer Woodson was covering himself by changing the language in his report?

A.   At the time, I did not.

Q.   Okay.  What about now?

A.   I don't know.  I -- I -- I don't know.

Q.   Are you less certain about it than you were before?  Do I need to rephrase that?  Was that

poorly phrased?

A.    Please.

Q.    Let me strike that and I'll rephrase. Also not a wordsmith.  Now I don't remember what my question was.

MR. JORDAN:  Read it back.

MR. CRINNIAN:  What?

MR. JORDAN:  We can have her read it back.

MR. CRINNIAN:  Are you able to read that back by chance?

THE REPORTER:  Sure.  One second.  Stand by.

MR. CRINNIAN:  Want to make sure I don't screw it up again.

THE REPORTER:  Let me go back to the one previous.  Yeah?

MR. CRINNIAN:  Thank you.

(WHEREUPON, the record was played back.)

MR. CRINNIAN:  Okay.  I -- I think that makes sense now.

BY MR. CRINNIAN:

Q.    Okay.  So, at the time, you didn't necessarily believe that Officer Woodson was trying to cover for himself by putting that language in the report?

A.    At the time, yes.

Q.    Now you are maybe not as sure about that?

A.    I do -- I am kind of unsure of certain things.

Q.    Okay.  Now, did you ever discipline Officer Woodson for any of his report writing? Because you said that it was a problem from the get-go.

A.    Yes.

Q.    Did you ever discipline him for it?

A.    Verbally.

Q.    He never -- nothing ever ended up in his file written?

A.    Not that I recall putting in there, no.

Q.    What types of things were you talking to him about?  Was it lack of factual accuracy, lack of specificity?  What was it?

A.    More details were needed in his -- some of his reports.  Majority of the ones that he would submit to me were traffic citations, traffic tickets.  So something usually was more of you saw this and then you confirmed this, we need to know how you did that or how you saw something, whether you were sitting on the roadside or driving around. A little bit more details on the situation itself.

Q.    Now, when it came to this report, did you ever follow up on any of the facts or assertions that he made in the report?  Like did you go back and look at the body cam and say, "I -- I don't think that's what I see"?

A.    I watched that body cam multiple times. Yes.

Q.    Did you go talk to any witnesses?

A.    The only witness at the time was the caller.

Q.    Tiffany Ware?

A.    I'm -- I'm going to go with that's probably the name.

Q.    Did you ever follow up on the unknown white man that Officer Woodson put in his report and said that he encountered him right across the street from Teddy?

A.    I don't recall that part of it, about the white man.  It sounds familiar, but I don't recall it.

Q.    But you don't recall going out to the neighbor's house and knocking on doors asking who it was that talked to him?

A.    Talked to Myron?

Q.    Myron.

A.   I did not, no.

Q.   Okay.  When you watched the body cam footage -- you said you've watched it repeatedly since -- do you still stand by the defense that you made of Myron Woodson as part of your -- the Facebook post for the City on May 20th?

A.   It was according to policy, so yes.

Q.   Okay.  So let's talk about that policy. Is it the policy in the police department handbook that you're referring to that talks about when you can shoot animals?

A.   Yes.

Q.   Okay.  Now, I don't have the policy in front of me -- we can get it if we need to -- but from the testimony that Officer Woodson gave this morning is that language is the same language as is in Hallsville's police manual.

A.   That's correct.

Q.   "That's correct."  How do you know that's correct?

A.   Because I'm the one that wrote it from Hallsville's.

Q.   So you wrote the Sturgeon police manual?

A.   I did.

Q.   Okay.  Have you ever written a police

manual?

A.   I have not, no.

Q.   Okay.  Do you have any formal training in writing a police manual?

A.   No.

Q.   Do you have any formal training in constitutional law?

A.   Aside from college classes and what was required at -- or not LETI -- but the Marine Corps basic police school.

Q.   Okay.  Now, you --

THE REPORTER:  And I apologize for the interruption.  I'm sorry, I just want to make sure that I understood what Mr. Crawford just said.  You were referencing where you learned that, and you started to speak a name and you said, no, not that, something else.  Could you repeat the first one?

MR. CRINNIAN:  I think it was LETI.

THE DEPONENT:  Oh, I was about to say LETI, but I've only done that for Missouri Constitutional Law.  So I was changing it.

THE REPORTER:  Thank you.

BY MR. CRINNIAN:

Q.   Did you write all the language in that manual by hand?

A.   I did not.

Q.   Where did you get it from?

A.   Hallsville.

Q.   So you -- you just copied and pasted and put Sturgeon on it?

A.   In a sense.

MR. JORDAN:  Sorry, verbal responses.

MR. CRINNIAN:  Oh, yes.  Verbal responses, yeses or nos is the --

THE DEPONENT:  Oh, sorry.  Yes.

BY MR. CRINNIAN:

Q.   Did you work with anybody at Hallsville when you were taking those materials and using them for Sturgeon?

A.   I did, yes.

Q.   Okay.  Who did you talk to?

A.   Bryan Schultz, the chief, and then Sergeant Jeffrey Voss.

Q.   Okay.  Do you know who wrote the Hallsville manual?

A.   I believe it was a combination of both of them.

Q.   Okay.  So the Sturgeon manual is grabbed from the Hallsville manual, which you believe was written by two other people who were not you?

A.   Correct.

Q.   Okay.  You have no idea as to whether or not the content of those manuals is constitutional or legally sound, do you?

A.   I'm under the impression that they were, yes.

Q.   Because they're a department policy manual?

A.   Correct.

Q.   Now, you understand department policy manuals are different than ordinances, statutes, regulations, and laws, right?

A.   Yes.

Q.   Okay.  So your belief is that Myron Woodson acted within the department's policy, correct?

A.   Yes.

Q.   Even though he shot a dog that didn't pose a threat to him?

A.   In the policy it doesn't necessarily say it has to be a threat.

Q.   Okay.  Let's talk about that.  Officer Woodson indicated this morning that he never read the actual police department handbook.  He says what he had access to was, I presume, an intranet site

that has all of the different policies available.
So he could just go look for a specific policy
instead of look at the handbook.  Is that correct?

A.    That is inaccurate.

Q.    "That is inaccurate"?

A.    Yes.

Q.    Okay.  So it is in -- it is a paragraph
within the entire police department manual, correct?

A.    Yeah.  Yes.

Q.    Okay.  And that language, do you -- can
you give me a quick summary of what that language
says to you, to the best of your recollection?

A.    In regards to animals in general?

Q.    Yes.  With -- with regard to when it's
acceptable to shoot an animal.

A.    The language exactly -- what it says in
the manual, I can't tell you exactly what it says,
but I can tell you the gist of it.

Q.    Sure.  Yeah.  Let's -- let's do the gist
of it.

A.    From the gist of it, is if the dog is
injured or animal is injured, hurt, then it is
acceptable to shoot them.

Q.    To euthanize it.

A.    Thank you.  Euthanize it or just put them

out of misery.  Same thing like you do with a deer.

Q.  Now, does the manual or handbook put any qualifications on how serious the injury has to be?

A.  I don't recall.

Q.  Okay.  Are you aware as to whether or not the law treats people's personal animals, pets, differently than a wild animal?

A.  I would be guessing if I -- I don't know off the top of my head.

Q.  Okay.  Have you, at any point, been trained that people's animals are property for the purposes of the Constitution?

A.  I have.

Q.  Okay.  And do you recall where you've been taught that?

A.  After this incident.

Q.  Okay.  Was that at Sturgeon or Hallsville?

A.  I believe it would've been at Sturgeon.

Q.  Okay.

A.  I think it was probably from Jackie.

Q.  Okay.  So they -- they did some kind of training afterwards with you?

A.  I don't know about training.  They talked to me about it.

Q.  Yeah.  Refreshing it and -- okay.  I know

that you had tried to set up a training program with Boone County Animal Control after all of this happened, and you had scheduled it, right?

A.   Correct.

Q.   Did you end up attending that?

A.   I did.

Q.   Okay.  So you attended that; obviously, Officer Woodson was not there?

A.   He was not able to be, yes.

Q.   Okay.  What did you learn at that -- that class?

A.   They taught us how to use that and a couple other techniques, or a catchpole and a couple other techniques.

Q.   Okay.  All right.  Now, after Officer Woodson was, I guess, put on suspension, you contacted the Missouri Department of Public Safety or POST to let them know, correct?

MR. JORDAN:  If you could just rephrase on the suspension or at least ask him for a foundation because I think it'll clear up a lot later on.

MR. CRINNIAN:  That makes sense.

BY MR. CRINNIAN:

Q.   Okay.  Following the shooting, was Officer Woodson suspended?

A.   No.

Q.   He was not?

A.   No.

Q.   So he just never came back to work after that?

A.   I -- I told him to take a couple days off.

Q.   But he was ultimately put on administrative leave by the -- by the City?

A.   By the City, yes.

Q.   Right.  Okay.  And you didn't do that, that was the City?

A.   That was the City.  Correct.

Q.   Okay.  In your opinion, there was no reason to punish Officer Woodson?

A.   At the time, no.

Q.   Okay.  And your belief that there was no reason to punish Officer Woodson at that time was based upon the policy manual?

A.   Correct.

Q.   So you are basing your entire position that Officer Woodson's actions were justified based on the policy handbook you wrote?

A.   That I got from another agency, yes.

Q.   But you adopted it for Sturgeon?

A.   Correct.

Q.    And you were given the power to do that by the mayor, I presume?

A.    Correct.

Q.    Okay.  So you adopted a -- a set of policies and then evaluated Officer Woodson by those policies that you created, correct?

A.    Correct.

Q.    Now, following his administrative -- administrative suspension -- is that what we're calling it?  I'm not sure what you guys want to call it.  His -- when the City put him on leave --

A.    They put him on administrative leave.

Q.    Administrative leave.  Okay.

A.    Correct.

Q.    You -- did you submit a form to Missouri Department of Public Safety or the POST --

A.    I don't believe so.

MR. CRINNIAN:  You don't believe so.  Okay.

I'm handing you what has been marked as plaintiff's Exhibit 16.  It is document number 1001.

(WHEREUPON, Exhibit 16 was marked for identification.)

BY MR. CRINNIAN:

Q.    If you'll take a look at that for me,

please, Mr. Crawford.

A.   Yeah, I remember this.

Q.   Okay.  You remember this.  And this is dated May 29th, 2024, correct?

A.   That is correct.

Q.   Okay.  And it's in relation to Officer Myron Woodson?

A.   Correct.

Q.   It says his full-time date was September 1st, 2023?

A.   Yes.

Q.   Form submitted May 28th, 2024.  And this is sent from Jessica Rayl, the Licensing Section of Peace Officer and Standards Training.  Is that correct?

A.   Yes.

Q.   And this is sent to you?

A.   Correct.

Q.   Okay.  And this letter is letting you know that the City of Sturgeon -- you, as the chief executive officer of -- of the Sturgeon Police Department -- did not submit the proper paperwork to POST about Officer Woodson beginning, correct?

A.   That is correct.

Q.   So, in other words, you didn't let them

know he became a registered or a commissioned officer?

A.   That is correct.

Q.   Now, do you know what form you submitted on 5/28 that would prompt this response?

A.   Yes, it was adding him to the roster to Sturgeon Police Department on the Missouri POST website.

Q.   So you added him to the roster on May 28th?

A.   That is correct.

Q.   Okay.  Okay.  I understand.  I apologize. I was a little confused.  I thought you had gone to remove him from the roster and they said he was never on it in the first place.

A.   No.

Q.   Why did you go to add him on May 28th?

A.   Because I was told that I hadn't done it yet, and so I needed to.

Q.   Do you know who told you that?

A.   I think it was -- or not LETI, sorry -- Missouri POST.

Q.   So they contacted you and said, "Hey, we don't have Myron Woodson in our commissioning list for you"?

A.   Correct.  Due to all the media.

Q.   Oh.  Did you ever have any conversations with anybody at POST or Missouri Department of Public Safety about Officer Woodson?

A.   Yes.

Q.   Okay.  Who -- who did you speak to about it?

A.   I don't remember -- I don't remember the gentleman's name.

Q.   Would it be Jeffrey Collins by chance?

A.   Probably.  If you know his name, probably.

Q.   You spoke to somebody there?

A.   Yes, I did.

Q.   Was that person conducting an investigation into Officer Wilson?

A.   I believe so.  That's what they said they were doing.

Q.   Okay.  Do you recall what it was that you two spoke about?

A.   Citizen complaints and his performance while working as a police officer.

Q.   Do you recall what type of feedback you gave to POST about Woodson?

A.   I told them that we had complaints or citizen complaints, and they wanted a copy of them.

Q.   Did you tell them that you had issues with his report writing?

A.   I don't believe so.

Q.   Okay.  Did you tell them any -- give them any information about the Teddy shooting or just about the prior complaints?

A.   They told me they didn't want any information from -- if I remember correctly, they said they didn't want anything from that because of everything that's going on with it.  They're looking at the conduct of him, not his actions at that time.

Q.   Oh, so they were looking for a larger pattern of conduct with him?

A.   From my understanding, correct.

Q.   Right.  From your understanding.  Perfect.

Now, earlier I asked you about your belief that Officer Woodson did not commit any misconduct because he was following the -- the guidebook essentially you put together.  Have you changed your opinion on Officer Woodson with regard to whether he committed misconduct with regard to Teddy?

A.   In regards to this incident?  No.

Q.   So you still think he was justified?

A.   According to the policy, yes.

Q.   Okay.  Again, we keep talking about this

policy, right?  And you understand that the policy and laws are not synonymous, right?

A.   Yes.

Q.   One guides the way that you internally operate within your police department?

A.   Correct.

Q.   The other gives a much larger thing that guides all of us?

A.   Yes.

Q.   Correct.  Is it possible that your handbook policy about shooting animals is inadvertently unconstitutional?

A.   There's a chance --

MR. JORDAN:  Well, I guess, I'm -- I should -- I have to object.  Calls for speculation and a legal conclusion.

To the extent you have an answer, you can give it.

THE DEPONENT:  I assume there's a chance.

BY MR. CRINNIAN:

Q.   You said you took some education in Constitutional law, correct?

A.   Yes.

Q.   You probably covered the Fourth Amendment search and seizure, correct?

A.   Yes.

Q.   Okay.  And you know that there's constitutional protection for citizens from unreasonable search and seizures, which is why you have to have warrants for a good reason to do something?

A.   Correct.  Yes.

Q.   Were you aware that Officer Woodson was on probation as part of his first year of employment with the City?

A.   Yes.

Q.   Okay.  So you knew that that was a policy, that every officer had a 365-day probationary window?

A.   Yes.

Q.   Okay.  Did you believe that Officer Woodson's conduct, in total -- let's take not just the Teddy situation, everything -- do you think that Officer Woodson's conduct was satisfactory for a probationary officer?

A.   Yes.

Q.   So within his first year, he had repeated citizen complaints.  That's acceptable?

A.   It's part of our job, we're getting complaints.

Q.    How many complaints do you get about yourself?

A.    There in Sturgeon?

Q.    Mm-hmm.

A.    I had complaints, verbally, that I was told about within the first month of being there.

Q.    Okay.  And who handled those with you?

A.    The mayor at the time, Steve Crosswhite.

Q.    Okay.  And Steve Crosswhite, he's on the Board of Aldermen --

A.    He is --

Q.    Okay.

A.    -- yes.

Q.    What did Mr. Crosswhite talk to you about?

A.    He brought the complaints to my attention.

Q.    And did he tell you to do better?

A.    He just let me -- let me know that there was complaints.

Q.    Okay.  You never used physical force against a person that complained about you.  Is that fair to say?

A.    I have not, no.

Q.    You never shot somebody's dog and they got upset about it, and that's why they're complaining?

A.    No.

Q.   Okay.  Now, we talked earlier about how you were the supervisory officer and you were responsible for training Officer Woodson, correct?

A.   Yes.

Q.   And you said you pretty much didn't have a good reason why you hadn't trained him?

A.   Like I said earlier, I thought I did at one point, but I don't recall everything I did or didn't show him or teach him.

MR. CRINNIAN:  Okay.  Is this Exhibit 17?

THE DEPONENT:  Yes, sir.

MR. CRINNIAN:  I'm handing you Exhibit 17. This is document 071.

(WHEREUPON, Exhibit 17 was marked for identification.)

BY MR. CRINNIAN:

Q.   And what I want to focus here on is the training section, Sergeant Crawford.  "Specialized on-the-job training of employees is the responsibility of each department head," correct?

A.   Yes, sir.

Q.   Okay.  "All employees will be provided an opportunity for additional training for advancement within their department."  Do you see that?

A.   Yes, sir.

Q. "Such training will be recommended by the department head and approved by the mayor." You see that?

A. Yes, sir.

Q. Okay. You never conducted any on-the-job training with Officer Woodson about his animal control responsibilities, did you?

A. I know it was discussed, but like physically, "Hey, this is how you do this," I don't recall.

Q. Do you recall what you would've discussed with him?

A. "That's our responsibility. Animal control doesn't respond here."

Q. Okay. Now, when you say animal control doesn't respond there, you mean Boone County doesn't actually come to Sturgeon, correct?

A. Correct.

Q. You are aware, though, that you -- Sturgeon was able to bring animals to Boone County Animal Control, correct?

A. Yeah. I draft that up, yes.

Q. Right. Because you were actually present at the meeting where the board adopted that --

A. Correct.

Q.   -- in 2023, correct?

So you were well aware that animals from Sturgeon could be taken here to Columbia?

A.   That is correct.

Q.   Okay.  Did you ever tell Myron Woodson that?

A.   Yes.

Q.   Okay.  You're certain about that?

A.   Yes.

Q.   Okay.  Do you know when you would've told him that?

A.   Probably shortly after he was hired, because I had to explain that, unlike Hallsville, he -- we took it to Animal Control, Hallsville meets at the Casey's gas station, usually, right there by it.

Q.   Okay.  But it was your responsibility to make sure that he was trained on that, right?

A.   That is correct.

Q.   It's your responsibility to make sure he was trained on the catchpole?

A.   That is correct.

Q.   It was your responsibility to watch that body cam footage to make sure he followed the law, wasn't it?

A.   That is correct.

Q. And you put out a public post defending him before you watched the body cam footage?

A. That sounds correct. Yes.

Q. Do you think that's an effective way of training, supervising, and disciplining your employee?

A. Obviously not effective.

Q. Steve Crosswhite pulled you aside and said, "Hey, here's the complaint. Let's -- let's work on this." You've had other people, I'm assuming, teach you how to work through complaints, correct?

A. Yes.

Q. Did you ever do that with Officer Crawford?

A. With myself?

Q. I -- that's the second time we've done that today. Officer Woodson.

Did you ever work through any of the complaints or issues with Officer Woodson or did you just tell him you got another complaint?

A. Yes, I have.

Q. You -- you've worked through them?

A. Some of them, yes.

Q. Okay. What types of things have you

worked through with him?

A.   We had a -- like complaint-wise?

Q.   Yes.

A.   Or -- okay.  We had a complaint where he reached in and took a kid's cell phone out of their hand because they were playing music too loud at the park.  So I went through and said, "You can't do that.  And that's a clear violation that you're taking somebody's stuff away from them in a public space."

And he formally, at that point, realized that that was stupid of himself.  And -- and from my understanding, it was -- it hadn't happened since.

Q.   Okay.  Okay.  Now, on May 20th, we already talked about the documents with Jackie Rodgers and your Facebook post, and everything -- the -- the Facebook post that you drafted and he then revised --

A.   Yes, sir.

Q.   -- right?  Why did you send the lawyer's spin on it to a police chief in a different town?

A.   So he could look at it and see it.

Q.   Is there -- did -- did he have any responsibility for editing it?

MR. JORDAN:  Eric, can you clarify

"responsibility"?  I think that's going to trip him up.

MR. CRINNIAN:  Sure.

BY MR. CRINNIAN:

Q.   Well, Bryan Schultz was not the chief of police for Sturgeon, was he?

A.   He was not.

Q.   He was a reserve officer?

A.   That he was.

Q.   "That he was."  And yet you were sending him communications, things that you had gotten from the City's attorney to his Hallsville email address. Why?

A.   Because of his position down there.  I took a lot of advice from him due to his position of being a chief and his experience of being a police officer a lot longer than myself to get his guidance.

Q.   What guidance did you need from him?

A.   At the -- during this whole shooting, like what's going to happen, what's -- where it's going, what -- more or less, what's going to be coming down the pipeline from this entire incident, because I hadn't ran into anything like this prior to this.

Q.   And what did he tell you?

A.   All sorts of information, things that he's went through from his -- the previous departments, examples of things that have happened, lawsuits that have come out of it.

Q.   But he didn't tell you to discipline Myron Woodson?

A.   I don't recall, but I don't believe so.

Q.   Now, aside from the fact that you were dealing with Chief Schultz about the issues that were going on within Sturgeon, you were also dealing with Chief Schultz about your own unhappiness with Sturgeon, weren't you?

A.   Yes.

MR. CRINNIAN:  Okay.  And we're going to talk about that real quick.  You don't have Exhibit 18?

THE DEPONENT:  Yes.

MR. CRINNIAN:  I'm going to hand you plaintiff's Exhibit 18.  This is document 1013.

(WHEREUPON, Exhibit 18 was marked for identification.)

BY MR. CRINNIAN:

Q.   Do you recognize this email?

A.   I do.

Q.   July 9th you send Bryan Schultz a -- an

email asking him to look this over and let him know what you think.  "I'm not trying to be bitchy, but I also want them to know I'm leaving because of them," correct?

A.   That is correct.

Q.   This was a draft of your resignation letter?

A.   That is correct.

Q.   That first draft of your resignation letter was from July 9th, right?

A.   Sounds --

Q.   Ish.  9th-ish?

A.   This was July -- yes.

MR. CRINNIAN:  Okay.  All right.  I'm going to hand you what will be marked as plaintiff's Exhibit 19.  This is document 1669.

(WHEREUPON, Exhibit 19 was marked for identification.)

BY MR. CRINNIAN:

Q.   Do you recognize this document?

A.   I do.

Q.   This is the draft of your resignation letter?

A.   This is the first one, yes.

Q.   The first draft.  And this you sent to not

only Chief Schultz, but also to Mr. Voss as well too, right?

A. That is correct, yes.

Q. Okay. And Voss is now at Hallsville. He used to be at Ashland?

A. Reverse.

Q. "Reverse." So he is at Ashland now; he used to be at Hallsville?

A. That is correct.

Q. Okay. And you were just asking them as, I presume, mentors to kind of review?

A. Yes.

Q. Okay. Let's talk about your letter. How the -- you say that one of the biggest issue is, "How the situation was handled with the shooting of the dog, how the Council acted, and the information that was released to the public before it was even told to the employees." Let's start there.

A. Okay.

Q. What did the Council do about this situation that upset you?

A. They put on Facebook that he was on administrative leave before I knew that he was on administrative leave, before he knew he was on administrative leave. They did all that prior to me

even being notified.

Q.   Okay.  So they didn't loop you in at all from May 20th until May 23rd when they put him on leave, whatever the date was?

MR. JORDAN:  Just to clarify, they put him on leave on May 28th.

MR. CRINNIAN:  Okay.  May 28th.  Okay.

BY MR. CRINNIAN:

Q.   So they -- they -- it was over a week then before they put him on leave.  Does that sound right?

A.   That sounds right, correct.

Q.   Okay.  And you were upset because over the course of over a week, they put him on leave without coming to you first?

A.   Correct.

Q.   Okay.  Is that the information that was released to the public that you're talking about?

A.   Yes.

Q.   Okay.  The fact that he was on administrative leave.

Is there any reason that a City Council can't tell the public that an employee's on administrative leave for potentially committing misconduct?

A.   In reality, the City can do what they want.

Q.   You were just upset they didn't go through -- run it through you first?

A.   As his supervisor, it would've been nice.

Q.   Right.  Okay.  "Second, I do not have confidence in the -- in this board to not hang me out to dry the next time something happens in this town."  Why do you think the board would hang you out to dry?

A.   Because it seemed like that's what they were doing to Myron.  They had a Council meeting -- not really a Council meeting, but a --

Q.   Public hearing, May 28th?

A.   The complaint -- citizen complaint that they came in and just let everybody come in and bash Myron, more or less.  And I didn't think that was appropriate.  And I had a feeling that, God forbid, something like this were to happen again, that they're not even -- they're going to go walls up and leave me out there by myself.

Q.   Okay.  So the citizens of Sturgeon pay your salaries with their taxes.

A.   Yes, they do.

Q.   And you're upset that the citizens of

Sturgeon went to a public meeting and complained about a publicly paid police officer with the power of government power shooting a Shih Tzu.  You don't think that that's -- you -- you think that's unacceptable for them to be upset about that?

A.   No, they can be upset.  That's fine.

Q.   But you were afraid that the board would hang you out to drive by putting you in the pillory if -- if you did something, right?

A.   I think anybody would have.

Q.   So you saw them punishing Officer Woodson by allowing these people to talk about him and you were afraid that would happen to you?

A.   I mean, they're going to complain -- people can complain, that -- I had no issue with that part.  It's more of them not looking at the complaint and seeing if it was a factual complaint or if it was people jumping on the bandwagon to bash on Myron.

Q.   Okay.  Well, again, the -- the meeting itself was held specifically following the shooting, and that's where most of it came from.

A.   That is correct.

Q.   Clearly, you have a difference of opinion as to whether or not shooting a Shih Tzu is, you

know, unconscionable and against your rules or not. But surely the citizens have a right to be outraged about their publicly paid officers doing something like this.

A.   No, they can.  That's fine.

Q.   Then why were you upset with the City for hosting this?

A.   Not the hosting it in general, it's them reacting off of what -- the complaints they had without doing the research to see if the complaints that the citizens gave them were actually true complaints or just people complaining to complain.

Q.   Okay.  In October of 2023, you were given two complaints by the mayor --

A.   Correct.

Q.   -- told to deal with them, that he would follow up with you.  You put no documentation in Myron Woodson's file.  You don't even remember if you had a verbal conversation.  You think you did. You didn't document anything, disciplinarily. There's nothing in his file, disciplinarily.  And you sat here and you told me this guy can't write a report.

A.   Correct.

Q.   You are mad because you felt like this

should have been your responsibility to handle.  It doesn't sound like you handled it well from the get-go, does it?  It -- it doesn't sound like you supervised and trained Officer Woodson, did you?

A.   I disagree on that sense.  But --

Q.   You never held him accountable for anything, did you?

A.   Again, it was -- like I have stated, it was verbally.  Did I physically write anything, I'd say no.  I thought, at the time, my verbal corrections seemed to have improvement on his actions as well as, in some cases, his report writing seemed to improve some, yes.

Q.   Okay.  So you believe that his report writing improved, and then you had a conversation with the City employee about how he's potentially lying in an incident report, and you think that his report writing's gotten better?

A.   Up until that point, yes.

Q.   Okay.  But then you didn't do anything after he gave you an embellished report, did you?

A.   He got put on administrative leave.  There's not much I could have done after that at that point.

Q.   So your -- so your position is they

completely took all the authority away from you to do anything whatsoever as soon as they put him on administrative leave?

A. That's almost -- if I remember correctly, that's what I was told by Jackie, is they're taking this out of my hands. They're doing the investigation themselves with an outside party.

Q. And do you think that maybe they took it out of your hands because you hadn't done a great job disciplining and supervising Officer Woodson?

MR. JORDAN: I'm going to have to object. It calls for him to speculate someone else's mind.

But if you have an answer, you can give it.

THE DEPONENT: From what I was told, no.

BY MR. CRINNIAN:

Q. Okay. Did they give you any reason why they took this authority away from you?

A. They told me that it was for public opinion.

Q. Okay. And I'm -- I'm presuming you didn't like that -- the fact that it was about public opinion?

A. I understood where they were coming from. It made sense. I didn't agree with it, but it made

sense.

Q.   Okay.  But in the same way, on May 20th, you created the Facebook post that came to Officer Woodson's defense before you'd even seen the body cam, correct?

A.   That's correct.

Q.   You continue in your resignation letter saying you've been doing everything to help the City and the department, and your input has fallen on deaf ears, correct?

A.   Correct.

Q.   You do not agree with what the Council's continuing to do to Officer Woodson, and that was presumably putting him on the administrative leave?

A.   Yes.

Q.   Okay.  Did you believe that the City should not have even been investigating him in the first place?

A.   Investigating how so?

Q.   In relation to this -- this shooting.  I know they instituted a Section 5 or a Chapter 590 investigation, and do you feel like they never should have done that?

A.   They told me when they conducted the -- you said 590?

Q.   Yeah.

A.   -- the 590 investigation, it was not due to the shooting, it was due to his conduct and all the complaints they heard at that board meeting that they had.  They told me that they couldn't touch that dog shooting because it was already such a big media outlook that they didn't want to include that into their complaint -- at least from what I was told.

**Q.   Okay.  So the -- to -- to your understanding, the investigation that they were going to perform was solely on everything that was not related to Teddy?**

A.   That -- from what I was told, that is correct.

**Q.   Okay.  You say that you pointed out multiple occasions that the information you were given was not accurate and, in some cases, false. What types of information was that?**

A.   Some of the complaints that were given about Myron.  There was -- I can recall a complaint that he pulled somebody over, started berating them, yelling at them.  I watched the body cam footage, it was him talking like we are right now, maybe a little bit more -- like stern voice, but not -- he

wasn't berating them, he wasn't talking down to them.  He was talking a little bit more authoritative than we are currently.

Q.  Do you think it's possible for people to have different perceptions of a situation?

A.  I -- I can agree to that.

Q.  Okay.  For example, you and I have very different perceptions about the body cam footage of the shooting of Teddy, right?

A.  Yes, sir.

Q.  Okay.  It also stands to reason that it's entirely possible you have a very different opinion than a citizen who had a run-in with Officer Woodson where they felt he was being mean or unkind or abusing his authority, right?

A.  I can see where you come from.  Yes.

Q.  So you take the position that that is the City Council believing information that is not accurate and, in some cases, false when it's something that it sounds like we have kind of a -- a disagreement about?

A.  I disagree with that statement.

Q.  Okay.  That's fair.

You say you and the Council did not give Officer Woodson proper notification.  Proper

notification for what?

A.   The administrative leave.

Q.   What proper notification are they required to give?

A.   I believe they have to in-person deliver -- according to the Police Officer Bill of Rights, if I understand it correctly -- a letter saying, "Hey, pending this investigation, you're on administrative leave" --

Q.   And --

A.   -- in a nutshell.

Q.   And you -- it is your understanding that Officer Woodson did not receive that?

A.   He did after the fact.  It was on Facebook.  He found out on Facebook he was on administrative leave prior to getting that notification.

Q.   And that was, for some reason, an issue for you?

A.   I -- they're getting onto him for violating and not doing things according to the right rules, they can't do the same thing.

Q.   Okay.  You say, "You continue to prolong a situation that no longer needs to happen."  Is that with regard to the investigation into Officer

Woodson?

A. Yes.

Q. Okay. Now, that became such a prolonged deal, it seems like in part because the City never found an outside third party to do the investigation?

A. From my understanding, yes.

Q. Okay. So you were upset because it became this big, protracted thing, and they should have just come to a decision and let Woodson deal with it, right?

A. From my -- yes.

Q. Okay. You do not feel like the City of Sturgeon's truly ready for a police department the way they treat their cops. Now, obviously, Sturgeon's had its issues with policing in the past.

A. Correct.

Q. You seem like you have the opinion that Sturgeon didn't treat its cops very well at all.

A. From what I've heard from people and other departments referring to cops that were prior to me, yes.

Q. Okay. And you felt like you didn't have the support of Council aside from just the words?

A. Correct.

Q.   How much of your resignation was due to Myron Woodson?

A.   I believe most of it is -- this entire incident pushed me to the point where I wanted to. I was already on the fence prior to that.

Q.   So you were on the fence prior to the -- the Woodson situation?

A.   Yes.

Q.   Okay.  This was just kind of the -- the straw that broke the camel's back?

A.   That is correct.

Q.   Okay.  Were you ever told that they -- that they could not perform an investigation into Myron about this shooting or just that they didn't want to because of the publicity around it?

A.   You're talking about from the 590 investigation or just in general?

Q.   The -- well, 590 investigation.

A.   So I was understanding from, I believe it was Jose at that meeting, that they weren't going to do Teddy -- the -- the dog investigation as part of this conduct investigation they're doing because of it being such -- so publicly blown up at that point.

Q.   Now, it sounds like you were very upset with just everything that the City kind of did

around Officer Woodson.  We talked earlier, though, about how all these officers in the first year are probationary, right?

A.   That's correct.

Q.   In theory, there should be no reason why the City of Sturgeon couldn't just get rid of them, right?

MR. JORDAN:  I'm going to have to object to that as a legal conclusion.  And I don't know if there's any way around it because I also just currently have a lawsuit about that exact issue.

MR. CRINNIAN:  Okay.

MR. JORDAN:  I just don't think he can answer that one.

MR. CRINNIAN:  That's fair.  Yeah.

BY MR. CRINNIAN:

Q.   Did anybody from the City ask you to participate in the investigation?

A.   No.

Q.   "No."

Did you ever take any initiatives to begin an investigation?

A.   I did, early on, trying to look into the situation itself.

Q.   Okay.  And what were you trying to look

into?

A.   The call that came in, where it was located, how the dog would've perceived to get there.  But this meeting came up pretty quick, so I didn't get to really get too far into it.

**Q.   So you were ready to dig into how this dog got lost, and how it ended up where it ended up, and all of this stuff, but you didn't investigate your police officer that you're responsible --**

A.   That would've been in that -- part of that, yes.  It would've been throughout -- because watching the body cam, I heard him get out and sigh, and all that.  So I was going to look into the hours he worked, and all that stuff to see if -- what was going on.  Because I don't remember what time he clocked in that day, so I was going to have to look at all that.

MR. CRINNIAN:  Okay.

THE REPORTER:  And I apologize for the interruption, I just can't hear who's ever (sic) speaking, so if you want that on the record, you need to speak up.

MR. CRINNIAN:  That -- that's fine.  It's not on -- it's not on the record.  We're actually going to take a step off for just five minutes,

okay?

THE REPORTER:  Sure.  Okay.  Thank you.

The time is 3:27.  We're off the record.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 3:31, and we are on the record.

MR. CRINNIAN:  Thank you.

BY MR. CRINNIAN:

Q.  Sergeant Crawford, we're back on the record.  Again, you're still under oath.  We're going to wrap up here.  We're just about done.

A.  Yes, sir.

MR. CRINNIAN:  I'm going to hand you what is plaintiff's Exhibit 20.  This is document 1496.

(WHEREUPON, Exhibit 20 was marked for identification.)

BY MR. CRINNIAN:

Q.  If you could take a look at that for me, please.  Tell me if you recognize that.

A.  Yes, I do.

Q.  Okay.  Now, is this a revised version of your separation letter --

A.  Yes, it is.

Q.  -- from the City?

Do you know who helped you edit this?

A.    I do.

Q.    Who was that?

A.    Bryan Schultz.

Q.    "Bryan Schultz."  Okay.  Mr. Schultz is good with words, right?

A.    Very much so.

Q.    He fills out things in -- in much greater detail, it seems like, right?

A.    Yeah, he does.

Q.    Okay.  So looking at this, a lot of the -- again, like you said earlier, your ideas are there, it's just you have a wordsmith build around it for you, right?

A.    Yes.

Q.    Okay.  So a lot of the things are kind of the same in here, but I want to focus on a couple of specific things.  You feel the Council acted too hastily, and the information was released to the public, and he was placed on leave.  So there is a little bit different -- I -- I kind of feel like -- from your prior language.

Here, your concern is how quickly the City Council moved and acted in doing these things.  Is that fair?  Or is your concern just so that they did it at all?

A.    Not that they did it at all.  It's -- they jumped to conclusions prior to seeing everything.

Q.    Okay.  You jumped to conclusions prior to seeing everything too, though, didn't you?

A.    Prior to seeing everything, yes.  But when -- at the time when I made the decision, I thought I had a gist of what was going on.

Q.    Okay.  Do you think it's possible the board did too?

A.    Possibly.

Q.    Okay.  The second paragraph is largely the same lack of confidence in the board.  You feel that they gave into the pressure of social media while ignoring the advice of its paid legal counsel --

A.    Yes.

Q.    -- is that right?

When you say that they ignored the advice of its paid legal counsel, do you mean that the attorneys, obviously, agreed with you and the City Council members were still wanting to try to make things right with the public?

A.    Yes.

Q.    Okay.  So you were upset that you and the attorneys agreed and the City Council didn't and were putting Woodson through all this?

A.    Correct.

Q.    Okay.  In the third paragraph, you say that the Council decided to ignore your advice and the advice of its own paid -- paid legal counsel, again, and continued to proceed down its own path, which in my opinion has no legal standing.

A.    Yes.

Q.    Is that your language or is that Bryan Schultz's language?

A.    We talked on the phone over that paragraph.  I remember -- I don't remember everything we talked about.  But I do remember when we talked about this.  And I -- those were his words, but we got to those words by me -- me and him talking it out.

Q.    Okay.  So you have no independent reason for having any belief that the City lacked legal standing to put Woodson on administrative leave?

A.    I did in a sense from his -- from his knowledge, corresponding with me over the phone.

Q.    But, again, you didn't do any independent research or education, you got it from Bryan Schultz and you took that as your belief?

A.    That is correct.

Q.    Okay.  And, finally, in the last

paragraph, where you talk, again, about they're not ready for a police department, we've already covered that. But then down towards the bottom, you say, "Despite my knowledge of numerous past incidents of improper conduct by the Board of Aldermen towards police officers," that wasn't language that was in the prior version?

A. That is not, no.

Q. Okay. That almost seems like a threat to me. Does that seem like a threat to you?

A. No.

Q. Okay. What types of knowledge of numerous past incidents of improper conduct by the Board of Aldermen toward its police officers do you know about, aside from what prompted the lawsuit with the last chief, because I'm aware of all that?

A. Aside from that, they were using their police officers as gophers to deliver stuff to the different aldermen, instead of making aldermen bring stuff to them. They would use them for -- this one, I -- from my understanding, they used them as a taxi service at times for certain aldermen in the past.

Q. Before you?

A. Before me, yes.

Q. Okay.

A.   I -- they tried to get me to do the delivery thing and I told them no.  That's not part of my duties as a law enforcement, and things along those lines.

Q.   Okay.  Now, we talked about the meeting with Jose before we went to break.

A.   Yes.

Q.   And you talked about how they were not going -- the impression you got was that they were not going to do an investigation because of all the publicity and, assumedly, the lawsuit.  Do you recall what meeting that was where they said, "We're going to investigate everything but the Teddy situation"?

A.   That -- it was in a closed session -- I can talk about closed session, correct?

MR. JORDAN:  Yes.

THE DEPONENT:  It was in that closed session.  After they had all the citizens come in and complain, they went into closed session.  Then I got a phone call, "Hey, come up here.  We need to talk to you."  And that's when I got told of they're going to do the investigation into the complaints, not into the Teddy situation.

BY MR. CRINNIAN:

Q.   Okay.  So it was the closed session on the May 28th meeting then?

A.   Yes.

Q.   Okay.  So I want to make sure I'm clear who was present.  Obviously, the Board of Aldermen, I believe everybody was there for that meeting.  And then --

A.   I believe so.

Q.   -- Mayor -- that would've been Truesdell being Mayor -- Mayor Pro Tem, correct?

A.   Correct.

Q.   Okay.  And then you were there, was there -- and then the City attorney?

A.   That's correct.

Q.   Was there anybody else?

A.   Not in the room.

Q.   Okay.  And during that meeting they told you they were doing this investigation, did you push back?

A.   I did at the time.

Q.   What did you tell them?

A.   That "If you have complaints, I would like to hear them.  And I can tell you if they're real complaints or just people being on the bandwagon."

Q.   Okay.  Do you know if they mentioned this

lawsuit during the closed session of that meeting that you attended?

A.    Which lawsuit?

Q.    This lawsuit, the one that we filed.

A.    Not that I recall.  I don't think there was one at that time.

Q.    Well, we filed the same day as the -- as the meeting.  So I don't know if they talked about it in the meeting -- meeting afterwards.

A.    No, I don't think so.  I -- I don't remember.

Q.    Did anybody indicate that this lawsuit was the reason that they were not going to investigate the Teddy shooting?

A.    Not to my knowledge.

Q.    Okay.  I want to ask you about something that we found out during Officer Woodson's deposition this morning, and that is what he did with Teddy afterwards.  Did -- did he ever tell you what he did with Teddy's body after he shot him?

A.    Unfortunately.

Q.    Okay.  Why do you say "unfortunately"?

A.    I didn't agree with it.

Q.    Okay.  What -- why didn't you agree with it?

A.   I like my -- I love my dogs, and that's not what -- when I have to put my dogs down, that's not how I do that.

Q.   And what is it that he explained to you that he did with Teddy's body?

A.   All I was told is he tossed him into the woods.

Q.   Okay.  So he didn't tell you that he put him in a container and left him outside a tire shop?

A.   No, not that detailed, no.

Q.   Okay.  Is there -- is there a -- a defunct tire shop in Sturgeon?

A.   Just outside of city limits.

Q.   Okay.  Is that -- is that normal to go dispose of dead animals there?

A.   No, not to my knowledge.

Q.   Okay.  So you're -- what you say is that you're aware that he threw Teddy into the woods, is what he told you?

A.   Yes.

Q.   Did he indicate off what road or where he would've done that?

A.   He told me he didn't want -- he told me he didn't want to tell me just so that I wouldn't know.

Q.   Right.  Has he -- how many dogs did

Officer Woodson shoot while he worked for Sturgeon?

A.   From my understanding, just the one.

Q.   "Just the one."  Okay.

How many did he shoot while he was at Hallsville?  Any idea?

A.   From my understanding, none.

Q.   Okay.  Have you had any other officers shoot and kill a citizen's dog before?

A.   My personal officers, no.

Q.   Okay.  Have you ever heard of an officer killing a stray dog or a citizen's dog and pitching it in the woods?

A.   Not pitching in the woods, no.

Q.   Okay.  So Woodson would've been the only one that -- if what he said was correct -- the only one that you heard of that's done that?

A.   That is correct.

Q.   Okay.  All right.  Last thing I want to -- last thing I want to cover is, we talked about your self-training on the catchpole.

A.   Yes.

Q.   You figured it out in 10 to 15 minutes, right?  It is not a difficult contraption --

A.   It is not.

Q.   -- to use.  When you watched the body cam

footage, were you in the least bit shocked, or bothered, or concerned at the way that Officer Woodson was using that catchpole?

A. Yes.

Q. Okay. What about it concerned you?

A. I hate to say it this way: I thought he could put a little bit more effort into it.

Q. He was one-handing it, kind of being lazy, just trying to put it over Teddy's head?

A. Correct.

Q. Did you ever see him in the video manage to pull the retractor back and tighten the noose?

A. You can't see that from the video, from my knowledge, or from my remembrance.

Q. Okay. Did you -- when you watched the video, did you see where it was that he was grabbing on -- on the pole to activate the -- the lasso?

A. I don't recall. No.

Q. Okay. But you know how to operate that?

A. I do.

Q. Okay. Was it concerning or upsetting that Officer Woodson clearly didn't know how?

A. It was.

MR. CRINNIAN: Okay. No further questions.

MR. FLEMMING:  Yeah, I just have a few.

THE DEPONENT:  Yes, sir.

EXAMINATION

BY MR. FLEMMING:

Q.  So you testified earlier that based on your experience working with Officer Woodson, that he -- he knew the law, correct?

A.  Laws in general, yes.

THE REPORTER:  And I apologize for the interruption, I just want to make sure I understand who's talking.  Is that Mr. Flemming?

MR. FLEMMING:  Yes, it is.

THE REPORTER:  Just making sure.  Thank you very much.  Please continue.

BY MR. FLEMMING:

Q.  You also testified that based on your experience working with Myron Woodson, he was a satisfactory police officer?

A.  In Sturgeon, he was, yes.

Q.  And, finally, in regards to the shooting of Teddy, you believe that Officer Woodson followed the City of Sturgeon Police Department policy?

A.  Yes.

MR. FLEMMING:  All right.  That's all I have.  Thank you.

MR. JORDAN:  Wayne Jordan.  I had just a couple of follow-ups.

EXAMINATION

BY MR. JORDAN:

Q.  Sergeant Crawford, you, I believe, testified that at one point you were the neighbor of the plaintiff, Nicholas Hunter.  Is that correct?

A.  That is correct.

Q.  And so prior to the shooting or prior to May 19th, 2024, you did have interactions with Teddy, is that right?

A.  Yes.

Q.  When you -- the shooting happened and you first watched the body cam footage, did you recognize that dog to be Teddy?

A.  Not at the time, no.

Q.  And then, I believe, you had -- did you testify that you had concerns of the dog's behavior?

A.  From the footage, yes.

MR. KOLDE:  Objection.  It misstates the previous testimony.

THE REPORTER:  And I'm sorry, who's that objecting?

MR. KOLDE:  If you could rephrase -- if you could rephrase the question as -- a question

rather than that.  I think you're misstating what he previously said, Wayne.  So if you could ask -- if it's question maybe? Because you said, you know, you said that there were; and I don't think that was testified.

MR. JORDAN:  Well, I said "did you."  So I'll just ask -- I'm laying it as a foundation either way -- either way, it's a foundation question, so.

THE REPORTER:  And was that Mr. Crinnian objecting?  I apologize.

MR. KOLDE:  Mr. Kolde.

THE REPORTER:  Thank you.

MR. KOLDE:  Mr. Kolde objecting.

THE REPORTER:  Thank you.

MR. KOLDE:  Or, you know, maybe you rephrase it --

MR. JORDAN:  Give me one second.  Just give me a second, Dan.

MR. KOLDE:  Okay.

BY MR. JORDAN:

Q.   Did you have any impressions about the dog's behavior from watching the body cam footage?

A.   Yes.

Q.   And what were those impressions?

MR. KOLDE:  Objection.  Calls for speculation.  Not a -- not a designated expert.

MR. FLEMMING:  I'll object to you objecting.  It's only one attorney allowed to question or object.

MR. KOLDE:  Well, only one of us is objecting.  I'm only objecting.  He was questioning, I was the one objecting.

MR. FLEMMING:  Yeah.  We'll -- we'll get with it -- we'll let it go.

BY MR. JORDAN:

**Q.   So what were your observations about the dog's behavior?  Can you identify those for us?**

MR. FLEMMING:  Eric, if there's an objection now, you should make it apparent.

MR. KOLDE:  I'm -- I'm -- yeah, I'll -- we're -- we're good here.

THE DEPONENT:  I can answer?

MR. JORDAN:  You can -- you can answer.

THE DEPONENT:  From what I've seen from dogs in general or from this dog in particular?

BY MR. JORDAN:

**Q.   From this dog in particular.**

A.   From the body cam footage?

**Q.   Yes.**

A.    It looked like it was -- I don't know -- it looked injured from what I could tell in the video.  It was wandering, and it had no apparent direction where it was going.  Most dogs, when they're going somewhere, they have a point, they're going towards it, or they're sniffing.  This dog just looked confused.  It looked -- just looked injured to me.

Q.    And when you're saying "this dog," at that time, when you first watched the body cam footage, did you -- just to clarify, did you know, one way or the other, whether that was Teddy?

A.    Not -- not the -- from the first viewing, no.

MR. JORDAN:  Okay.  That's all I have.

FURTHER EXAMINATION

BY MR. CRINNIAN:

Q.    Okay.  Just a couple quick redirects.  You said that Teddy didn't have any sense of direction in the video, just kind of wandering around?

THE REPORTER:  And -- and I apologize.  I'm sorry.  There was just so many people talking.  Who -- who's questioning?

MR. CRINNIAN:  This is Eric Crinnian.

THE REPORTER:  Okay.  Thank you.  Please

continue.

MR. CRINNIAN:  Thank you.

BY MR. CRINNIAN:

Q.  So, again, you said Teddy didn't seem like he had any direction on the video?

A.  From the video, it looked like he didn't know where he was going.

Q.  Okay.  He looked confused?

A.  To me, he did, yes.

Q.  Okay.  Is confusion and a lack of direction a sign of an injury?

A.  It can be.

Q.  Okay.  In the video, did you see him pouring blood?

A.  A head injury doesn't always do blood.

Q.  So you're assuming that he had a head injury?

A.  I don't know.  I'm just saying that not all injuries produce blood.

Q.  Not all -- scratch that.  When you watched the video, please explain to me any signs of aggression or danger that Teddy posed to Officer Woodson?

A.  From what I could tell, I didn't see any aggression in the, you know, in the video.

Q. Okay. And you read Officer Woodson's report that said that there were no people nearby, correct?

A. In the direction of the shooting, correct.

Q. Okay. And, ostensibly, there was nobody in the immediate vicinity for Teddy to bite, other than Officer Woodson, that you can tell from the body camera?

A. That I can tell, yes.

Q. Okay. Do you believe that Officer Woodson was in imminent harm by Teddy?

A. I mean, that's up to a matter of opinion.

Q. Well, I'm asking you, you were his boss who cleared him on this. Do you think that Teddy posed an imminent threat to him?

A. I don't think so.

Q. And Teddy didn't probably pose an imminent threat to anybody else around either, did he?

A. I - you know, unless -- I don't know that for a fact, because if there's something wrong with the dog -- I'm not saying there was -- but if there was, then it possibly could. Right.

Q. And you weren't there, you were watching this through video camera, correct?

A. That's correct.

MR. CRINNIAN:  All right.  No further questions.

Good?

MR. JORDAN:  Nothing further.

MR. CRINNIAN:  All right, guys.

MR. JORDAN:  So --

THE REPORTER:  Oh, go ahead.

MR. JORDAN:  -- can I give him the instruction?  Jennifer?

THE REPORTER:  Yes.

MR. JORDAN:  I said, can I go ahead and give him the instruction for signature?

THE REPORTER:  Yes, please.  Go ahead.

MR. JORDAN:  So you have the option to go back and read through the transcript, correct any spellings or potential inaccuracies through what's called an errata sheet.  You have to sign off on that, send it back, or you have the option to do what's called waiving signature, which is trusting that the court reporter took down everything today accurately.  The option is technically yours.  Most people waive signature.

THE DEPONENT:  Let's -- waive it.

THE REPORTER:  Okay.  Thank you very much.

Mr. Crinnian, would you like the original?

MR. CRINNIAN:  Sure.

THE REPORTER:  All right.  Mr. Flemming, a copy?

MR. FLEMMING:  Yes.  E-Tran, please.

THE REPORTER:  You got it.

Mr. Jordan, a copy?

MR. JORDAN:  Yes.  PDF with attachments, please.

THE REPORTER:  All right.  Mr. Kolde, not now, right?

MR. KOLDE:  No.  No.

THE REPORTER:  Okay.  Thank you very much. The time is 3:50.  We are off the record.

(WHEREUPON, the deposition of THOMAS CRAWFORD was concluded at 3:50 p.m.)

CERTIFICATE

I, Jennifer Cotton, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 7th day of July, 2025.

Jennifer Cotton, #4280

CORRECTION SHEET

Deposition of: Thomas Crawford      Date: 6/4/25

Regarding: Hunter vs. Woodson et al.

Reporter: Cotton/Adoyo

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet and the line provided.

Page   Line   Reason for Change

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

        Signature: _____

                    Thomas Crawford

DECLARATION

Deposition of: Thomas Crawford    Date: 06/04/2025

Regarding: NICHOLAS HUNTER vs MYRON WOODSON ET AL.

Reporter:  Jennifer Cotton

_____


I declare under penalty of perjury the following to be

true:


I have read my deposition and the same is true and

accurate save and except for any corrections as made

by me on the Correction Sheet herein.


Signed at _____, _____

on the _____ day of _____, 20_____.












            Signature: _____

                       Thomas Crawford

## Exhibits

**EX009 EMAIL DATED 10.25.2023**
22:19,21 23:10, 11

**EX010 EMAIL DATED 04.11.2024**
26:5,6 37:16

**EX011 EMAIL DATED 05.20.2024**
37:17,18,21,22, 23 39:2

**EX012 INCIDENT INFORMATION**
39:5,8,11

**EX013 EMAIL DATED 05.23.2024**
50:23 51:2,3,9

**EX014 EMAIL DATED 05.23.2024**
53:15,17 56:7

**EX015 EMAIL DATED 05.23.2024**
56:10,12

**EX016 EMAIL DATED 05.29.2025**
70:21,22

**EX017 POLICIES**
78:10,12,14

**EX018 EMAIL DATED 07.09.2024**
84:15,16,19,20

**EX019 LETTER OF RESIGNATION**
85:16,17

**EX020 RESIGNATION LETTER**

101:14,15

---

**0**

**071** 78:13

---

**1**

**10** 13:16 26:5,6 32:20 37:16 110:22

**1001** 70:21

**1013** 84:19

**11** 37:17,18,21, 22,23 39:2

**1162** 51:7

**1171** 53:16

**12** 39:5,8,11

**13** 15:22 50:23 51:3,9

**14** 14:1 53:15,17 56:7

**1496** 101:14

**15** 32:20 56:10,12 110:22

**16** 70:21,22

**1600** 37:22

**1601** 39:9

**1669** 85:16

**17** 14:3 78:10,12, 14

**1746** 56:11

**18** 84:16,19,20

**19** 85:16,17

**19th** 29:4 35:6

36:13 44:13 113:10

**1:49** 6:8

**1st** 17:9 18:3 71:10

---

**2**

**20** 101:14,15

**2009** 13:25

**2016** 14:3

**2021** 14:4

**2022** 15:13 16:2 31:25

**2023** 17:22 21:19 71:10 80:1 90:13

**2024** 15:14 71:4, 12 113:10

**2025** 21:17

**20th** 39:23 42:20 43:1 44:7 62:6 82:14 87:3 93:2

**21st** 42:20

**22** 14:8,9

**22nd** 42:17,21

**23** 17:10

**23rd** 51:14 87:3

**24** 9:5 14:11 36:21 41:4,15 44:17

**25th** 21:19 24:9

**28th** 71:12 72:10, 17 87:6,7 88:14 107:2

**29th** 71:4

**2:32** 50:19

**2:37** 50:21

---

**3**

**365-day** 76:13

**3:27** 101:3

**3:31** 101:5

**3:50** 120:13

---

**4**

**4:14** 51:14

---

**5**

**5** 93:21

**5/28** 72:5

**590** 93:21,25 94:2 98:16,18

---

**9**

**9** 22:19,21 23:10, 11

**9th** 84:25 85:10

**9th-ish** 85:12

---

**A**

**abnormal** 48:3 49:3

**Abrahamson** 25:5,17,20 26:15 27:11 51:17 54:7, 15,20 55:25

**Abrahamson's** 24:21 25:10

**abusing** 95:15

**acceptable** 66:15, 23 76:23

**access** 65:25

**accountable** 11:23 91:6

**accuracy** 60:16

**accurate** 21:22 94:18 95:19

**accurately** 119:21

**accused** 10:18

**act** 27:4 47:23

**acted** 65:15 86:16 102:17,23

**acting** 47:10

**action** 10:5 11:10 12:14 13:6 28:1

**actions** 20:18 28:9 69:21 74:11 91:12

**activate** 111:17

**actual** 22:5 65:24

**add** 72:17

**added** 72:9

**adding** 72:6

**additional** 78:23

**address** 24:18 38:11 83:12

**addressed** 26:20

**addressing** 25:6

**administrative** 69:8 70:8,9,12,13 86:23,24,25 87:21,24 91:22

92:3 93:14 96:2, 8,16 104:18

**adopted** 69:24 70:4 79:24

**advancement** 78:23

**advice** 83:15 103:14,17 104:3, 4

**affirm** 6:10

**affirmed** 7:2

**Afghanistan** 15:8

**afraid** 89:7,13

**afternoon** 51:21

**agency** 69:23

**aggression** 117:22,25

**aggressive** 29:13

**agree** 14:21 92:25 93:12 95:6 108:23,24

**agreed** 103:19,24

**ahead** 41:20,22 119:7,11,13

**aldermen** 26:21 27:1 77:10 105:5, 14,19,22 107:5

**Aldermen's** 27:5

**allowed** 115:4

**allowing** 89:12

**Amendment** 75:24

**amount** 14:14 34:18 45:20

**and/or** 40:4 43:7

**animal** 29:12,13, 17,22 30:1,21,22, 23 31:16 32:22 33:3 40:3 49:6 66:15,22 67:7 68:2 79:6,13,15, 21 80:14

**animals** 29:12 34:2 62:11 66:13 67:6,11 75:11 79:20 80:2 109:15

**answering** 8:8

**answers** 7:16,17

**anymore** 13:8

**anytime** 8:4

**apologies** 37:21

**apologize** 8:15 21:19 30:22 42:10 63:12 72:12 100:19 112:9 114:11 116:21

**apparent** 115:15 116:3

**appearance** 52:9 57:14

**appears** 36:24

**applied** 18:19,20

**apply** 17:15

**appropriately** 14:24

**approval** 27:5

**approved** 79:2

**approximately** 31:25

**Ashland** 86:5,7

**assertions** 61:2

**assessment** 58:5

**assume** 8:1 42:15 44:18,22 47:5 50:4 54:23 58:9 75:19

**assumed** 48:20

**assumedly** 106:11

**assuming** 81:11 117:16

**assumption** 27:4

**attachments** 120:7

**attempt** 28:25 31:16

**attempts** 40:22

**attended** 68:7 108:2

**attending** 68:5

**attention** 77:15

**attorney** 6:15 9:1 37:13 38:5 39:7 51:5 52:17 57:6 83:12 107:13 115:4

**attorneys** 51:15 103:19,24

**August** 14:8 18:8

**authoritative** 95:3

**authority** 92:1,18 95:15

**autonomy** 27:4

**aware** 67:5 76:8 79:19 80:2

105:16 109:18

**B**

**back** 14:2,4,5 17:24 28:14 37:10,11 42:17 45:2 47:16 59:6, 8,10,15,18 61:3 69:4 98:10 101:9 107:19 111:12 119:15,18

**background** 9:18

**backs** 55:10

**bad** 41:22

**bandwagon** 89:18 107:24

**base** 41:8

**based** 17:3 34:24 43:8 52:8 57:8,14 69:18,21 112:5, 16

**bash** 88:16 89:18

**basic** 63:10

**basing** 69:20

**basis** 10:21 48:24

**Bates** 53:16 56:11

**begin** 99:21

**beginning** 18:7 21:17 71:23

**behalf** 6:17,19,21, 23

**behaving** 40:3

**behavior** 40:5 43:5 48:3 49:4,6 113:18 114:23

115:13

**belief** 36:3 65:14 69:16 74:16 104:17,23

**believed** 43:6

**believing** 95:18

**berating** 94:22 95:1

**big** 15:7 48:2 94:6 97:9

**biggest** 86:14

**Bill** 96:6

**bit** 9:17 50:13 51:22 52:12 60:25 94:25 95:2 102:20 111:1,7

**bitchy** 85:2

**bite** 118:6

**bleeding** 49:17

**blood** 117:14,15, 19

**blown** 98:23

**board** 26:21 27:1, 5,13 77:10 79:24 88:7,9 89:7 94:4 103:9,12 105:5, 13 107:5

**body** 9:2 40:23 41:1,10,16 42:12 44:10 47:17 61:4, 6 62:2 80:23 81:2 93:4 94:23 95:8 100:12 108:20 109:5 110:25 113:14 114:23 115:24 116:10 118:8

**bone** 49:17

**Boone** 68:2 79:16,20

**boss** 20:4 55:25 118:13

**bothered** 111:2

**bottom** 56:22 105:3

**brash** 28:22,25

**brashness** 28:20, 21

**break** 8:7,9 17:5 45:25 106:6

**breaks** 8:4

**bring** 79:20 105:19

**broke** 98:10

**brought** 15:9 77:15

**Bryan** 18:11 64:17 83:5 84:25 102:3,4 104:8,22

**build** 17:13 102:12

**building** 17:23 45:17

**C**

**Caldera** 52:3 53:25 54:7,14 57:13 58:7,10

**Caldera's** 58:4

**call** 26:19 28:13, 14 31:15 32:23 35:6,10 43:12 70:10 100:2

106:21

**called** 29:7,11,22 31:14 35:8,13,24 36:3,4,8 45:10, 13,15,16,18 46:2, 7,8 56:10 57:13 119:17,19

**caller** 61:10

**calling** 70:10

**calls** 29:15 30:1 33:3 75:15 92:12 115:1

**cam** 9:2 41:10,17 42:12 44:10 47:17 61:4,6 62:2 80:23 81:2 93:5 94:23 95:8 100:12 110:25 113:14 114:23 115:24 116:10

**camel's** 98:10

**camera** 40:24 41:1 118:8,24

**capacity** 15:20 31:2

**capture** 40:22

**car** 12:8

**care** 41:25

**career** 22:13

**Carolina** 30:11

**case** 7:14,15 9:3

**cases** 91:12 94:18 95:19

**Casey's** 80:15

**catch** 31:16 40:22

**catching** 23:2

**catchpole** 31:19, 22 32:4,6,9,12, 15,19,22,25 33:20 40:23 68:13 80:20 110:20 111:3

**CC'D** 51:17

**cell** 82:5

**chain** 25:11 46:10 50:8 54:3

**chance** 59:10 73:10 75:13,19

**changed** 52:13 74:19

**changing** 58:19 63:21

**Chapter** 93:21

**charge** 25:13

**charged** 45:21

**check** 45:24

**chief** 9:16 11:1,2, 6,7,18,21 12:24 16:9 64:17 71:20 82:21 83:5,16 84:9,11 86:1 105:16

**circumstances** 34:24

**citations** 60:20

**citizen** 10:23 20:10,12 73:20, 25 76:23 88:15 95:13

**citizen's** 110:8,11

**citizens** 10:6 20:9 76:3 88:22,25 90:2,11 106:19

**city** 6:24 12:15, 16,17 13:6 17:4 24:14 28:18 29:16 38:5,11 44:9 45:21 51:15 52:17 62:6 69:8, 9,11,12 70:11 71:20 76:10 87:22 88:1 90:6 91:16 93:8,16 95:18 97:4,13 98:25 99:6,17 101:24 102:22 103:19,24 104:17 107:13 109:13 112:22

**City's** 36:25 57:5 83:12

**civil** 10:17

**civilian** 14:3 15:2, 15,17,24 33:25 34:6

**civilians** 15:9

**clarify** 82:25 87:5 116:11

**class** 68:11

**classes** 63:8

**cleaned** 51:21,25

**clear** 7:16 38:21 46:1 68:21 82:8 107:4

**cleared** 118:14

**clocked** 45:19 100:16

**close** 32:15

**closed** 106:15,16, 18,20 107:1 108:1

**club** 30:14

**coaching** 25:21 28:8,15

**collar** 43:15,20

**collect** 26:4

**college** 63:8

**Collins** 73:10

**color** 20:14,19

**Columbia** 80:3

**combination** 64:21

**command** 25:11 46:11

**comments** 31:4

**commissioned** 72:1

**commissioning** 72:24

**commit** 74:17

**committed** 24:19 74:21

**committing** 87:24

**communicated** 45:2,4

**communication** 27:21 41:8

**communications** 83:11

**complain** 89:14, 15 90:12 106:20

**complained** 11:2, 7 20:23 21:11 77:20 89:1

**complaining** 77:24 90:12

**complaint** 10:21, 23,24 22:1 25:5 27:24 28:2,9 81:9,21 82:4 88:15 89:17 94:8, 21

**complaint-wise** 82:2

**complaints** 10:6 20:16 21:7,13,18, 21,23,24 22:4,8 24:10,13,22,24, 25 25:2 28:6,18 73:20,24,25 74:6 76:23,25 77:1,5, 15,18 81:11,20 90:9,10,12,14 94:4,20 106:23 107:22,24

**completely** 92:1

**completion** 55:16

**concern** 54:11 102:22,24

**concerned** 52:12, 16,18 111:2,5

**concerns** 113:18

**conclusion** 75:16 99:9

**conclusions** 103:2,3

**conduct** 11:8 74:11,13 76:17, 19 94:3 98:22 105:5,13

**conducted** 79:5 93:24

**conducting** 73:14

**confidence** 88:7

103:12

**confirm** 21:22

**confirmed** 60:22

**confused** 72:13 116:7 117:8

**confusion** 54:10 117:10

**constantly** 11:19 55:9,11

**Constitution** 67:12

**constitutional** 63:7,21 65:3 75:22 76:3

**contacted** 68:17 72:23

**contained** 54:21

**container** 109:9

**content** 41:9 57:6 65:3

**continue** 7:21 23:6,8 93:7 96:23 112:14 117:1

**continued** 24:16 104:5

**continuing** 93:13

**contraption** 110:23

**control** 29:17 68:2 79:7,14,15, 21 80:14

**conversation** 54:7 90:19 91:15

**conversations** 47:4 73:2

**copied** 64:4

**cops** 97:15,19,21

**copy** 73:25 120:3, 6

**cord** 32:16

**corporal** 15:21

**Corps** 13:24 14:1, 2 15:6,17 63:9

**correct** 9:19,22, 25 11:15,16,24 12:10,18,25 13:7, 10,11 15:4 16:1, 16,22 18:3,16,18, 23 19:1,13,14,18 21:4,5,18 22:7 24:23 25:14 26:22 27:25 29:5, 6,8,9,18,19,23 33:9,12,16 36:15 38:5,13,14,17 39:16,25 40:1,17, 19,20 42:2,5,7,11 45:11,12 46:13 47:14 49:1,17 50:15 51:15,16, 19,22,23 53:6,7, 13,25 56:2,6 57:3,17,18,22 58:3 62:18,19,20 65:1,9,16 66:3,8 68:4,18 69:12,19, 25 70:3,6,7,14 71:4,5,8,15,18, 23,24 72:3,11 73:1 74:14 75:6, 10,22,25 76:7 78:3,20 79:17,18, 21,25 80:1,4,18, 21,25 81:3,12 85:4,5,8 86:3,9 87:12,16 89:23 90:15,24 93:5,6, 10,11 94:15

97:17,25 98:11 99:4 104:1,24 106:16 107:10, 11,14 110:15,17 111:10 112:7 113:7,8 118:3,4, 24,25 119:15

**correction** 11:19 28:7 45:6

**corrections** 45:8 91:11

**correctly** 41:12 57:8 74:8 92:4 96:7

**Council** 12:16 24:14,18 25:6 86:16,20 87:22 88:12,13 95:18, 24 97:24 102:17, 23 103:20,24 104:3

**Council's** 93:12

**counsel** 7:1 103:14,18 104:4

**County** 68:2 79:16,20

**couple** 9:2 19:15 44:9 45:11 50:3 68:13 69:6 102:16 113:2 116:18

**court** 119:20

**cover** 57:25 58:16 59:24 110:19

**covered** 75:24 105:2

**covering** 58:19

**crack** 29:1

**Crawford** 6:9 7:2, 7 21:3 24:6,10 27:12 51:1 54:15 63:14 71:1 78:18 81:15 101:9 113:5

**created** 70:6 93:3

**Crinnian** 6:17 7:6 8:19,22 22:17,20, 22 23:1,2,7,13 26:2,8 37:15,18, 21,25 39:1,4,14 50:16,23,25 51:12 53:14,19 56:7,9,14 59:7,9, 13,17,19,21 63:18,23 64:8,11 68:22,23 70:18, 24 75:20 78:10, 12,16 83:3,4 84:14,18,22 85:14,19 87:7,8 92:16 99:12,15, 16 100:18,23 101:7,8,13,17 106:25 111:24 114:10 116:17,24 117:2,3 119:1,5, 25 120:1

**criticism** 58:2

**Crosswhite** 77:8, 9,14 81:8

---

**D**

---

**Dailey** 20:23 21:10

**Dailey's** 21:7

**Dan** 6:19 23:2 114:19

**danger** 35:2 117:22

**date** 71:9 87:4

**dated** 71:4

**day** 39:24 100:16 108:7

**days** 44:9 50:3 69:6

**dead** 109:15

**deaf** 93:10

**deal** 14:19 29:22 30:1 48:2 90:16 97:4,10

**dealing** 10:16 84:9,10

**decided** 104:3

**decision** 43:15, 21,22 97:10 103:6

**deer** 30:24,25 67:1

**defend** 42:3 52:7, 19

**Defendant** 6:22, 24

**defended** 41:14

**defending** 81:1

**defense** 62:4 93:4

**deferring** 57:5,11

**deficiencies** 11:22

**defunct** 109:11

**deliver** 96:5 105:18

**delivery** 106:2

**department** 17:17,24 26:19 29:11 55:12 62:9 65:7,10,24 66:8 68:17 70:16 71:22 72:7 73:3 75:5 78:20,24 79:2 93:9 97:14 105:2 112:22

**department's** 65:15

**departments** 13:22 84:2 97:21

**depending** 20:10, 11

**depends** 35:2

**DEPONENT** 6:13 8:14 39:3,13 51:11 56:8 63:19 64:10 75:19 78:11 84:17 92:15 106:18 112:2 115:18,20 119:23

**deposed** 7:9

**deposition** 8:6,12 40:13 108:18

**designated** 115:2

**detail** 102:8

**detailed** 109:10

**details** 44:23 46:9 60:18,25

**determined** 34:24

**differ** 34:7

**difference** 89:24

**differently** 67:7

**difficult** 110:23

**dig** 100:6

**direct** 8:19

**directing** 8:16

**direction** 116:4, 19 117:5,11 118:4

**directly** 9:7 15:23 24:12 27:11 55:24 57:9

**disagree** 58:4 91:5 95:22

**disagreement** 95:21

**disciplinarily** 90:20,21

**disciplinary** 10:5, 12,15 11:10 27:14

**discipline** 27:17 60:5,10 84:5

**disciplining** 27:8 81:5 92:10

**discussed** 8:25 79:8,11

**discussing** 25:8

**dispatch** 30:4,19 33:6

**displaying** 40:3

**dispose** 30:3 109:15

**document** 24:2 37:22 38:2 39:8 51:6 53:20 70:21 78:13 84:19 85:16,20 90:20 101:14

**documentation** 90:17

**documents** 8:11, 23 82:15

**dog** 30:4,17,18,20 31:1,8,13 33:6 35:14 40:22,23 43:6 47:1,9,17, 20,22 49:3,13 52:9 57:15 65:18 66:21 77:23 86:16 94:6 98:21 100:3,6 110:8,11 113:15 115:21,23 116:6,9 118:21

**dog's** 113:18 114:23 115:13

**dogs** 31:6 47:23 48:4 49:7,10,15 109:1,2,25 115:21 116:4

**doors** 61:22

**Dorrie** 23:20 24:6, 9 27:12

**draft** 44:14 79:22 85:6,9,22,25

**drafted** 82:17

**dramatically** 52:14

**drive** 89:8

**driving** 60:24

**dry** 88:8,10

**due** 20:13,19 73:1 83:15 94:2,3 98:1

**duly** 7:2

**duties** 106:3

# E

**E-TRAN** 120:4

**earlier** 10:4,16 22:16 34:12 74:16 78:1,7 99:1 102:11 112:5

**early** 22:12,13,14 99:23

**ears** 93:10

**ease** 29:1

**edit** 101:25

**editing** 82:24

**education** 75:21 104:22

**effective** 81:4,7

**effort** 111:7

**else's** 92:12

**email** 23:24 26:12 38:4,11 45:3,5 46:11 53:23 54:2 55:6 56:19 58:15 83:12 84:23 85:1

**emails** 45:2

**embellished** 91:21

**employee** 10:25 22:5 27:9 81:6 91:16

**employee's** 87:23

**employees** 19:11 27:8 78:19,22 86:18

**employment** 76:9

**encounter** 31:6

**encountered** 61:16

**end** 22:15 32:16 68:5

**ended** 60:12 100:7

**enforcement** 14:3,14 15:6 31:2 106:3

**engagement** 14:19,22 34:12, 14,15

**ensure** 14:23

**entailed** 35:18

**entire** 66:8 69:20 83:23 98:3

**entrusted** 25:17

**Eric** 6:17 8:20 23:2 82:25 115:14 116:24

**errata** 119:17

**error** 32:10

**escalate** 34:20

**essentially** 16:14 26:14 40:2 41:14 57:19 74:19

**established** 53:3

**euthanize** 66:24, 25

**evaluated** 70:5

**evening** 35:25 36:5,14 45:10

**evidence** 42:6 52:20,21,25

**exact** 99:11

**EXAMINATION** 7:5 112:3 113:3 116:16

**examined** 7:3

**examples** 84:3

**Excellent** 39:1

**executive** 71:21

**exhibit** 22:19,21 23:3,10,11 26:5,6 37:16,17,18,21, 22,23 39:2,5,8,11 50:23 51:2,9 53:15,17 56:7,10, 12 70:21,22 78:10,12,14 84:15,19,20 85:16,17 101:14, 15

**exhibited** 43:6

**exhibits** 26:2

**existing** 19:24

**expectation** 34:10

**experience** 14:14 83:16 112:6,17

**expert** 115:2

**explain** 9:12 33:20 47:1 54:16 80:13 117:21

**explained** 109:4

**expressing** 54:10

**extent** 38:23 75:17

# F

**Facebook** 31:5

37:1 38:17,18,20, 22 62:6 82:16,17 86:22 93:3 96:15

**fact** 21:13 84:8 87:20 92:22 96:14 118:20

**facts** 24:5 61:2

**factual** 60:16 89:17

**fair** 8:2 25:3 28:20 77:21 95:23 99:15 102:24

**fairly** 36:18

**fallen** 93:9

**false** 94:18 95:19

**familiar** 38:3 61:19

**familiarity** 24:1

**federal** 30:10,12

**feedback** 44:19 49:24 73:22

**feel** 20:8 25:7 93:22 97:13 102:17,20 103:12

**feeling** 88:18

**felt** 90:25 95:14 97:23

**fence** 98:5,6

**figure** 32:8,18 37:4

**figured** 110:22

**file** 22:3,4 60:13 90:18,21

**filed** 21:7 108:4,7

**filing** 22:6

fills 102:7

final 55:17

finalizing 50:7

finally 8:11
104:25 112:20

find 31:9 38:18
44:24

fine 23:7 89:6
90:5 100:23

finger 31:8

finish 7:20,21

finished 8:8 46:4

Flemming 6:21
112:1,4,11,12,15,
24 115:3,9,14
120:2,4

focus 78:17
102:16

follow 21:6 25:20
54:17,20 61:2,14
90:17

follow-ups 113:2

footage 9:2 40:24
41:1,17 42:12
43:4 44:10 47:17
62:3 80:23 81:2
94:23 95:8 111:1
113:14,19 114:23
115:24 116:10

forbid 88:18

force 14:16,22,23
16:25 34:2,11,15,
17,18,19,21
77:19

form 22:1 70:15
71:12 72:4

formal 63:3,6

formally 15:25
82:11

forte 57:11

found 48:18
96:15 97:5
108:17

foundation 68:20
114:7,8

Fourth 75:24

frequently 55:4

front 62:14

full-time 18:18
71:9

fun 37:7

funneled 46:12,
14

### G

gas 80:15

gates 15:10

gave 46:9 49:24
62:15 73:23
90:11 91:21
103:13

general 34:11
66:13 90:8 98:17
112:8 115:21

generally 20:6

gentleman's 73:9

get- 60:7 91:2

get-go 21:14

gist 7:11 66:18,
19,21 103:7

give 6:11 12:12
13:21 26:3 66:11
74:4 75:18 92:13,
17 95:24 96:4
114:18,19 119:8,
12

giving 44:19

God 88:18

good 20:8 21:2
50:18 51:20
53:12 76:5 78:6
102:5 115:17
119:3

gophers 105:18

government 89:3

grabbed 64:23

grabbing 111:16

grants 17:23

great 8:4 92:9

greater 102:7

Greenhoe 38:13

grow 17:17

growing 49:15

guess 36:10 40:9
55:20 58:13
68:16 75:14

guessing 23:18
44:2 67:8

guidance 14:16
83:18,19

guidebook 74:18

guides 75:4,8

guy 90:22

guys 47:4 70:10
119:5

### H

Hallsville 9:19
10:2,7,8,19,20,21
11:11,21 12:17
13:7,17 14:11
15:14 19:17,20
30:7,8 33:1,4
34:1,8 50:11
64:3,12,20,24
67:17 80:13,14
83:12 86:4,8
110:5

Hallsville's 62:17,
22

hand 6:10 23:9
37:15 39:4 51:2
63:25 82:6 84:18
85:15 101:13

handbook 33:11
62:9 65:24 66:3
67:2 69:22 75:11

handing 26:5
53:14 56:9 70:20
78:12

handle 10:17
25:17 31:9,12,14
91:1

handled 77:7
86:15 91:2

hands 92:6,9

hang 88:7,9 89:8

hanging 47:24
48:1

happen 83:21
88:19 89:13
96:24

happened 36:4

41:2 68:3 82:13 84:3 113:13

**happy** 7:25

**harm** 118:11

**hastily** 102:18

**hate** 47:11 111:6

**head** 7:18 20:24 26:19 40:10 67:9 78:20 79:2 111:9 117:15,16

**hear** 22:24 100:20 107:23

**heard** 94:4 97:20 100:12 110:10,16

**hearing** 88:14

**held** 11:23 89:21 91:6

**helped** 101:25

**Hey** 46:18 55:22 72:23 79:9 81:9 96:7 106:21

**hierarchy** 26:15

**hinting** 58:16

**hired** 18:17 53:12 80:12

**hold** 44:4

**honest** 33:22 41:24

**honestly** 26:1

**hosting** 90:7,8

**hours** 9:5 36:22 41:4,15 44:17 45:11 100:13

**house** 48:11 61:22

**Hunter** 6:18,20 48:8 113:7

**hurt** 47:10 66:22

---

**I**

---

**idea** 24:25 43:22 65:2 110:5

**ideas** 102:11

**identification** 23:12 26:7 37:24 39:12 51:10 53:18 56:13 70:23 78:15 84:21 85:18 101:16

**identified** 11:22

**identify** 115:13

**ignore** 104:3

**ignoring** 103:14

**ill** 49:14

**immediately** 18:17 19:23 42:3 47:2

**imminent** 35:2 118:11,15,17

**impression** 65:5 106:9

**impressions** 114:22,25

**improper** 105:5, 13

**improve** 91:13

**improved** 91:15

**improvement** 91:11

**in-person** 96:5

**inaccuracies** 119:16

**inaccurate** 11:20 66:4,5

**inadvertently** 75:12

**incident** 35:23 36:8,13 39:24 40:13,15 41:5,16 44:15,20 52:13 55:2,23 57:6 58:8,11 67:16 74:22 83:23 91:17 98:4

**incidents** 105:4, 13

**include** 20:1 94:7

**included** 57:25

**including** 54:11

**independent** 104:16,21

**indication** 12:12

**individual** 20:21

**infected** 43:7

**influence** 43:21

**influenced** 43:22

**influencing** 43:15

**information** 11:14,20 20:5 35:21 52:22 74:5, 8 84:1 86:16 87:17 94:17,19 95:18 102:18

**initially** 36:17 43:24 48:11

**initiatives** 99:21

**injured** 29:12 43:7,11,13 49:14 66:22 116:2,8

**injuries** 40:4 117:19

**injury** 47:18 67:3 117:11,15,17

**input** 93:9

**instituted** 93:21

**instruction** 119:9, 12

**instructions** 14:23

**intent** 41:20

**interaction** 49:7

**interactions** 113:10

**internally** 75:4

**interruption** 63:13 100:20 112:10

**intranet** 65:25

**investigate** 100:8 106:13 108:13

**investigating** 93:17,19

**investigation** 73:15 92:7 93:22 94:2,11 96:8,25 97:6 98:13,17,18, 21,22 99:18,22 106:10,23 107:18

**invite** 58:2

**involved** 10:12 11:9 36:25 37:2

38:24 44:8

**involving** 10:13

**Ish** 85:12

**issue** 12:23 27:9 37:9 50:14 53:4, 5,9 86:14 89:15 96:18 99:11

**issues** 7:22 12:21,25 74:1 81:20 84:9 97:16

**it's** 114:3

## J

**Jack** 6:21

**Jackie** 38:4,15 39:19 51:15 67:20 82:15 92:5

**Jeff** 18:13

**Jeffrey** 64:18 73:10

**Jennifer** 38:13 119:9

**Jessica** 71:13

**job** 14:7 76:24 92:10

**joke** 29:1

**Jordan** 6:23 8:13, 17,20 37:20 39:7, 10 50:24 51:5 59:6,8 64:7 68:19 75:14 82:25 87:5 92:11 99:8,13 106:17 113:1,4 114:6,18,21 115:11,19,22 116:15 119:4,6,8, 11,14 120:6,7

**Jose** 51:15 52:3 53:24 54:7,14 56:23 57:23 98:20 106:6

**July** 14:11 17:9, 22 18:3 84:25 85:10,13

**jumped** 103:2,3

**jumping** 89:18

**justification** 47:7

**justified** 69:21 74:23

## K

**Kevin** 51:17 54:14,20

**kid's** 82:5

**kill** 110:8

**killing** 110:11

**kind** 9:1,3 17:4,22 24:2 25:5,11 26:15 28:15,20 30:23 60:3 67:21 86:11 95:20 98:9, 25 102:15,20 111:8 116:20

**knew** 20:5 37:6 76:12 86:23,24 112:7

**knocking** 61:22

**knowledge** 40:20 49:21,22 104:20 105:4,12 108:15 109:16 111:14

**Kolde** 6:19 22:19, 21 23:2 37:17,19 113:20,24

114:12,14,16,20 115:1,6,16 120:9, 11

## L

**lack** 43:14,19 60:16 103:12 117:10

**lacked** 104:17

**language** 40:7,18 43:5 44:1 58:19 59:24 62:16 63:24 66:10,11, 16 102:21 104:8, 9 105:6

**largely** 103:11

**larger** 74:12 75:7

**lasso** 111:17

**law** 14:3,14 15:6 31:2 63:7,21 67:6 75:22 80:23 106:3 112:7

**laws** 20:5 65:12 75:2 112:8

**lawsuit** 17:4 99:11 105:15 106:11 108:1,3,4, 12

**lawsuits** 84:3

**lawyer** 43:24

**lawyer's** 44:1 82:20

**laying** 114:7

**lazy** 111:8

**leader** 15:21 17:13

**leadership** 15:16, 20 19:23

**leading** 55:2

**learn** 68:10

**learned** 63:15

**leave** 8:9 57:20 69:8 70:11,12,13 86:23,24,25 87:4, 6,10,14,21,24 88:21 91:22 92:3 93:14 96:2,9,16 102:19 104:18

**leaving** 85:3

**left** 14:4 19:6,7,8, 17 109:9

**legal** 12:14 75:16 99:9 103:14,18 104:4,6,17

**legally** 65:4

**LETI** 63:9,18,20 72:21

**letter** 71:19 85:7, 10,23 86:13 93:7 96:7 101:22

**letting** 71:19

**Let's** 119:23

**level** 34:20 41:8 49:13

**Licensing** 71:13

**lied** 55:22 58:11

**limits** 109:13

**lines** 106:4

**list** 72:24

**lived** 48:11

**located** 100:3

**log** 35:10 43:12

**long** 13:12 31:21 32:19

**longer** 83:17 96:24

**looked** 40:13 47:21 54:3 116:1, 2,7 117:6,8

**loop** 32:15 38:16 87:2

**lost** 31:13 100:7

**lot** 20:22,23 28:17,19 39:21 43:14 68:21 83:15,17 102:10, 15

**loud** 82:6

**love** 109:1

**lower** 53:24

**lying** 58:17 91:17

**M**

**mad** 90:25

**made** 17:14 40:21 44:9 45:8 61:3 62:5 92:25 103:6

**Majority** 21:8 60:19

**make** 23:25 25:3 29:1 38:23 45:4 46:1 59:13 63:13 80:17,19,23 103:20 107:4 112:10 115:15

**makes** 15:12 19:10 59:20 68:22

**making** 32:14 105:19 112:13

**man** 61:15,19

**manage** 111:11

**manual** 62:17,23 63:1,4,25 64:20, 23,24 65:8 66:8, 17 67:2 69:18

**manuals** 65:3,11

**Marine** 13:24 14:1,2 15:6,17,19 30:13 63:9

**Marines** 14:15 15:1,14,20,22 33:25 34:5

**marked** 23:10,11 26:6 37:16,23 39:5,11 51:2,9 53:15,17 56:12 70:20,22 78:14 84:20 85:15,17 101:15

**marking** 26:5

**materials** 64:13

**matter** 10:15 118:12

**matters** 10:13

**mayor** 16:15 17:16 24:21 25:5, 10,16,20 26:15, 25 27:5,11,15,17, 22,23 37:5,10 38:9 41:14 44:12 45:16,19 46:5,6, 11,23 51:18 54:7 55:25 70:2 77:8 79:2 90:14 107:9, 10

**means** 24:11

**media** 41:21 73:1 94:7 103:13

**meeting** 31:4 79:24 88:12,13 89:1,20 94:4 98:20 100:4 106:5,12 107:2,6, 17 108:1,8,9

**meetings** 28:18

**meets** 80:14

**members** 27:13 103:20

**mentioned** 24:14 40:14 107:25

**mentors** 86:11

**message** 38:24 51:20 56:23

**met** 9:1 48:5

**middle** 8:10 57:1

**midweek** 43:1

**military** 13:25 14:15,18 15:2,9, 15 34:6

**mind** 92:12

**minimal** 34:18

**minute** 17:5

**minutes** 32:20 100:25 110:22

**misconduct** 74:17,21 87:25

**misery** 47:13 67:1

**missing** 11:20

**Missouri** 6:24 63:20 68:17 70:15 72:7,22

73:3

**misstates** 113:20

**misstating** 114:1

**mixed** 21:20

**Mm-hmm** 38:10 77:4

**mom** 24:7

**Monday** 12:16 24:15 39:23 42:14,19

**month** 77:6

**months** 19:15

**morning** 43:20 62:16 65:23 108:18

**mouth** 47:25 48:1

**move** 29:3

**moved** 102:23

**moving** 52:10 57:15

**multiple** 55:14 61:6 94:17

**music** 82:6

**Myron** 6:22 9:25 11:10 18:15,17 20:1,3 23:18 25:8,17,21 27:10, 22 28:1,8 43:8 46:7,9,18 49:20, 23 53:9 56:4 58:11 61:24,25 62:5 65:14 71:7 72:24 80:5 84:5 88:12,17 89:19 90:18 94:21 98:2, 14 112:17

**Myron's** 50:6

**N**

**nearby** 118:2

**necessarily** 59:23 65:20

**needed** 11:19 44:21 45:7 60:18 72:19

**neighbor** 48:8 113:6

**neighbor's** 61:22

**nice** 88:5

**Nicholas** 6:18,20 113:7

**Nick** 48:8

**noose** 111:12

**normal** 109:14

**North** 30:11

**nos** 64:9

**notification** 95:25 96:1,3,17

**notified** 87:1

**number** 18:9 37:22 39:8 51:7 53:16 56:11 70:21

**numbers** 23:3

**numerous** 40:21 105:4,12

**nutshell** 96:11

**O**

**oath** 7:12 101:10

**object** 75:15 92:11 99:8 115:3, 5

**objecting** 113:23 114:11,14 115:4, 7,8

**objection** 113:20 115:1,15

**observations** 115:12

**observing** 49:13

**obvious** 49:16

**occasions** 94:17

**October** 21:17,19 24:9 90:13

**odd** 48:25

**office** 55:3

**officer** 9:4,25 10:4,11,13,25 11:3,5 12:11,23 13:13,25 16:6 18:18,22 20:4 21:3,11,14 22:2,9 24:11,13 27:16 29:21,25 30:10 31:7 33:9,18 35:6 40:4,12,19,21 41:11,15,25 43:19 44:13 45:3 46:2 51:25 52:13 53:4 54:11,21 58:18 59:23 60:6 61:15 62:15 65:22 68:8,15,24 69:14,17,21 70:5 71:6,14,21,23 72:2 73:4,15,21 74:17,20 76:8,13, 16,19,20 78:2,3 79:6 81:14,18,20

83:8,17 89:2,11 91:4 92:10 93:3, 13 95:13,25 96:6, 13,25 99:1 100:9 108:17 110:1,10 111:2,22 112:6, 18,21 117:22 118:1,7,10

**officers** 16:5,15, 17 18:2,5 19:24 29:18 90:3 99:2 105:6,14,18 110:7,9

**offset** 15:9

**on-the-job** 78:19 79:5

**one-handing** 111:8

**operate** 75:5 111:19

**operated** 26:23

**opinion** 20:4 69:13 74:20 89:24 92:20,23 95:12 97:18 104:6 118:12

**opportunity** 78:23

**option** 119:14,18, 21

**ordinances** 17:18 65:11

**original** 44:24 55:15 57:3 58:1 119:25

**ostensibly** 118:5

**outcry** 42:7,8

**outlook** 94:7

**outraged** 90:2

**P**

**p.m.** 6:8 51:14

**paid** 18:4 89:2 90:3 103:14,18 104:4

**paperwork** 71:22

**paragraph** 23:19 66:7 103:11 104:2,11 105:1

**park** 82:7

**part** 17:2 20:20 22:2 39:15 53:24 54:2 61:18 62:5 76:9,24 89:16 97:4 98:21 100:10 106:2

**participate** 99:18

**parts** 23:24

**party** 92:7 97:5

**past** 9:5 12:23 97:16 105:4,13, 22

**pasted** 64:4

**path** 104:5

**patrol** 16:5

**pattern** 74:13

**pay** 88:22

**PDF** 120:7

**Peace** 71:14

**penalty** 6:10

**pending** 8:10 12:14 96:8

people 28:10,12
31:5 41:21 64:25
81:10 89:12,15,
18 90:12 95:4
97:20 107:24
116:22 118:2
119:22

people's 67:6,11

perceived 40:5
100:3

perceptions 95:5,
8

Perfect 7:24
74:15

perform 94:12
98:13

performance
73:20

perjury 6:10

permanently
19:17

permission 41:13

perpetuate 7:13

person 21:11
26:18 73:14
77:20

personal 67:6
110:9

personally 28:24

personnel 12:21
15:10

pets 67:6

phone 41:12 82:5
104:10,20 106:21

phrase 28:23
47:11

phrased 59:1

physical 52:25
77:19

physically 45:17
49:13 79:9 91:9

pick 32:14

pillory 89:8

pipeline 83:23

pitching 110:11,
13

place 72:15 93:18

plainly 28:11

plaintiff 6:18,20
113:7

plaintiff's 23:10
37:16,22 51:2
53:15 56:10
70:21 84:19
85:15 101:14

played 59:18

playing 82:6

point 16:8,21
27:3 42:10 46:3
50:4 67:10 78:8
82:11 91:19,24
98:4,23 113:6
116:5

pointed 94:16

pole 32:17 111:17

police 13:13,25
14:15 15:2,15
16:9,25 17:24
20:3 29:11,18,21
30:10 34:1,7
44:14 55:12 57:6
62:9,17,23,25
63:4,10 65:24

66:8 71:21 72:7
73:21 75:5 82:21
83:6,16 89:2 96:6
97:14 100:9
105:2,6,14,18
112:18,22

policies 66:1
70:5,6

policing 17:5
97:16

policy 33:11 62:7,
8,9,13 65:7,10,
15,20 66:2 69:18,
22 74:24 75:1,11
76:12 112:22

poorly 59:1

popped 41:21

portion 39:21
51:13

pose 65:18
118:17

posed 117:22
118:15

position 69:20
83:14,15 91:25
95:17

positive 46:8

possibly 12:15
42:14 103:10
118:22

post 38:17,18,19
44:7,8 62:6 68:18
70:16 71:23 72:7,
22 73:3,23 81:1
82:16,17 93:3

posted 38:22
39:23

posting 36:25

potential 119:16

potentially 12:24
13:6 87:24 91:16

pouring 117:14

power 70:1 89:2,3

preparation 8:12,
24

present 79:23
107:5

pressure 103:13

presume 16:24
21:1 65:25 70:2
86:11

presuming 10:12
14:18 24:11
92:21

pretty 21:14
55:15 78:5 100:4

previous 24:15
59:16 84:2
113:21

previously 9:21
114:2

prior 48:20 74:6
83:24 86:25
96:16 97:21 98:5,
6 102:21 103:2,3,
5 105:7 113:9

Pro 107:10

probation 76:9

probationary
76:13,20 99:3

problem 56:4
60:7

proceed 7:1
104:5

process 17:11

produce 117:19

professional 28:15

program 14:3 15:7,15 68:1

prolong 96:23

prolonged 97:3

promoted 16:21 17:19,21

promotion 17:11

prompt 72:5

prompted 105:15

proper 71:22 95:25 96:3

property 67:11

protection 76:3

protocol 11:4

protracted 97:9

provided 40:15 78:22

public 41:15 42:7, 8 68:17 70:16 73:4 81:1 82:9 86:17 87:18,23 88:14 89:1 92:19, 22 102:19 103:21

publicity 41:23 98:15 106:11

publicly 41:13 42:4 89:2 90:3 98:23

pull 32:16 111:12

pulled 81:8 94:22

punish 69:14,17

punishing 89:11

purpose 7:13,14 14:22

purposes 67:12

push 15:7 107:18

pushed 98:4

put 29:17 39:18 43:23 47:13 61:15 64:5 66:25 67:2 68:16 69:7 70:11,12 74:19 81:1 86:22 87:3, 5,10,14 90:17 91:22 92:2 104:18 109:2,8 111:7,9

puts 36:13

putting 59:24 60:14 89:8 93:14 103:25

Q

qualification 49:13

qualifications 67:3

question 7:20,25 8:2,8,10 59:5 113:25 114:3,9 115:5

questioning 115:7 116:23

questions 7:12 55:4 111:25 119:2

quick 13:21 50:17 66:11 84:15 100:4 116:18

quickly 36:19 102:22

R

rabid 40:5

rabies 40:7,15,19 43:7,9

race 20:17

raise 6:9

ran 83:24

range 42:24

rapport 20:9

Rayl 71:13

reached 82:5

react 31:6,7

reacting 90:9

reaction 46:17

read 20:22 23:17 55:18 59:6,8,9 65:23 118:1 119:15

reading 56:20

reads 57:12

ready 52:7 97:14 100:6 105:2

real 50:17 84:15 107:23

reality 88:1

realized 82:11

reason 17:2 19:8 20:21 21:2 40:11 47:9 54:25 69:14, 17 76:5 78:6 87:22 92:17 95:11 96:18 99:5

104:16 108:13

rebuild 16:25

recall 8:23 16:8, 17 17:7 23:17 24:20,24 25:23 26:12 27:20 33:24 35:8 40:17 43:11 44:19 45:19 46:17 50:3 53:22 55:1,5,21, 24 56:17,18 60:14 61:18,19, 21 67:4,14 73:18, 22 78:8 79:10,11 84:7 94:21 106:12 108:5 111:18

receive 96:13

received 9:6 10:6, 22 36:17

receiving 26:12 33:25

recently 53:5

recess 50:20 101:4

recognize 24:2 26:10 38:2 39:13 51:4,11 56:16 84:23 85:20 101:19 113:15

recollection 66:12

recommended 79:1

record 6:7 21:24 22:25 23:5 39:8 50:17,19,22 51:6 59:18 100:21,24 101:3,6,10

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

120:13

**recordings** 8:12

**redirects** 116:18

**redo** 44:21

**reference** 28:5,11

**referencing** 63:15

**referring** 62:10 97:21

**Refreshing** 67:25

**regard** 10:6 11:13 27:7 66:14 74:20, 21 96:25

**registered** 72:1

**regulations** 65:12

**related** 24:6 94:13

**relation** 12:20 71:6 93:20

**released** 86:17 87:18 102:18

**remember** 25:1,4 35:12,17 36:16 37:5,9,11,12 41:12 43:10 44:5 45:14 46:6 47:6,8 56:19 57:8 59:4 71:2,3 73:8 74:8 90:18 92:4 100:15 104:11,12 108:11

**remembrance** 111:14

**remove** 72:14

**repeat** 63:17

**repeated** 76:22

**repeatedly** 33:19

62:3

**rephrase** 7:25 10:3 58:25 59:3 68:19 113:24,25 114:17

**report** 11:8,13 27:16 35:23 36:9, 13 40:14,15 44:14,15,20,24 45:9 46:4 49:23, 25 50:2,14 51:21, 25 52:4,13,24,25 53:5,12 54:12,22 55:13,16,23 57:7, 10 58:8,12,20 59:25 60:6 61:1, 3,15 74:2 90:23 91:12,14,17,18, 21 118:2

**reported** 16:11 31:16

**reporter** 6:7,14, 25 8:15,18,21 22:23 23:4 39:10 50:18,21 51:8 59:11,15 63:12, 22 100:19 101:2, 5 112:9,13 113:22 114:10, 13,15 116:21,25 119:7,10,13,20, 24 120:2,5,9,12

**reporting** 26:16

**reports** 11:19,23 12:25 25:14 50:7 56:20 60:19

**represent** 6:16 33:18 40:12 43:18

**required** 63:9 96:3

**research** 90:10 104:22

**reserve** 18:5,6 83:8

**reserves** 18:22

**reservists** 18:9

**resign** 19:3

**resignation** 9:11, 15 85:6,9,22 93:7 98:1

**resigned** 13:9 19:1,5

**resigning** 9:13 12:12

**respect** 28:13

**respond** 57:1 79:14,16

**responds** 52:3 57:23

**response** 24:22 35:15 72:5

**responses** 64:7,8

**responsibilities** 15:16 29:17 79:7

**responsibility** 33:16 78:20 79:13 80:16,19, 22 82:24 83:1 91:1

**responsible** 33:9 78:3 100:9

**rest** 27:12

**restate** 23:5

**retractor** 111:12

**Reverse** 86:6,7

**review** 8:11 44:25 86:11

**reviewed** 42:6

**reviewing** 8:24 44:9 45:9

**revised** 38:17 57:24 58:1 82:17 101:21

**revisions** 38:18

**rewrote** 39:20

**rid** 99:6

**ride-along** 12:7 13:2

**rights** 10:17 96:6

**road** 109:21

**roadside** 60:24

**Rodgers** 38:5,15 39:19 82:15

**room** 107:16

**roster** 72:6,9,14

**rude** 28:22

**rules** 14:19,22 34:11,15 90:1 96:22

**run** 88:4

**run-in** 95:13

## S

**Safety** 68:17 70:16 73:4

**salaries** 88:23

**sat** 90:22

**satisfactory** 76:19 112:18

**scheduled** 68:3

**school** 63:10

**schooling** 49:18

**Schultz** 11:21 18:11,23 19:1,8 64:17 83:5 84:9, 11,25 86:1 102:3, 4 104:22

**Schultz's** 104:9

**scratch** 10:3 117:20

**screw** 59:14

**search** 75:25 76:4

**section** 71:13 78:18 93:21

**sections** 54:6

**securing** 32:22

**seizure** 75:25

**seizures** 76:4

**self-training** 110:20

**send** 49:23 82:20 84:25 119:18

**sending** 37:5,10, 12 50:7 53:25 56:19,24 83:10

**sends** 36:14 50:2

**sense** 15:12 19:10 59:20 64:6 68:22 91:5 92:25 93:1 104:19 116:19

**sentence** 57:17, 20

**separation** 101:22

**September** 71:9

**sergeant** 7:7 9:18,22 16:3,11, 22 17:8 18:21 19:12,21 24:10 33:8 51:1 54:15 64:18 78:18 101:9 113:5

**service** 105:22

**session** 106:15, 16,19,20 107:1 108:1

**set** 26:3 68:1 70:4

**setting** 25:11 26:15

**severely** 43:7

**shakes** 7:18

**shaking** 20:24

**sheet** 119:17

**shell** 39:17

**Shih** 46:18,19 89:3,25

**shock** 46:22

**shocked** 111:1

**shoot** 30:17,25 62:11 66:15,23 110:1,4,8

**shooting** 29:3 35:5 36:12 45:11 48:15,20 68:24 74:5 75:11 83:20 86:15 89:3,21,25 93:20 94:3,6 95:9 98:14 108:14 112:20 113:9,13 118:4

**shop** 109:9,12

**short** 8:5

**shortly** 41:2,3 46:7 80:12

**shot** 30:18 35:14 46:18 47:1 65:18 77:23 108:20

**show** 31:15 78:9

**shy** 13:16

**sic** 100:20

**side** 15:3,17,25 54:6

**sigh** 100:12

**sign** 117:11 119:17

**signature** 119:12, 19,22

**significant** 14:13

**signs** 40:3 117:21

**single** 55:18

**sir** 7:23 8:3 17:6 18:1 19:25 20:2 39:3 56:8 78:11, 21,25 79:4 82:19 95:10 101:12 112:2

**site** 65:25

**sitting** 60:24

**situation** 19:16 26:24 31:8,10 34:25 55:8 60:25 76:18 86:15,21 95:5 96:24 98:7 99:24 106:14,24

**situations** 9:24

**sniffing** 116:6

**social** 103:13

**solely** 94:12

**somebody's** 77:23 82:9

**sorts** 84:1

**sound** 36:15 65:4 87:10 91:2,3

**sounds** 12:22 14:12 17:2 21:22 25:10 28:19 33:14 50:18 57:2, 21,22 61:19 81:3 85:11 87:12 95:20 98:24

**space** 82:10

**SPD** 40:21

**speak** 7:19 22:25 58:7,10 63:16 73:6 100:22

**speaking** 20:6 100:21

**spearhead** 37:6

**specialized** 49:5, 8 78:18

**specific** 11:14 20:21 44:6 52:4 66:2 102:17

**specifically** 55:5, 21 57:13 89:21

**specificity** 60:17

**specifics** 25:23 55:1,12

**speculate** 92:12

**speculation** 75:15 115:2

**spellings** 119:16

**spin** 82:21

spoke 24:12 45:18 73:12,19

spoken 9:4

squad 15:21

staff 18:4

stand 15:10 59:11 62:4

Standards 71:14

standing 104:6, 18

stands 55:12 95:11

start 9:17 13:17, 18 14:10 27:23 86:18

started 13:25 14:8 16:2,5 17:22 22:15 53:9 63:16 94:22

state 6:15

stated 58:15 91:8

statement 36:25 39:22,23 41:7 52:8,19 57:16 95:22

station 80:15

statutes 65:11

stayed 19:15

step 100:25

stern 94:25

Steve 77:8,9 81:8

sticking 49:17

stood 48:25

strangely 40:3

straw 98:10

stray 29:12 31:13, 17 110:11

street 61:16

strike 59:3

strong 57:11

structure 26:16

stuff 20:22 37:10 82:9 100:8,14 105:18,20

stupid 82:12

Sturgeon 6:24 9:1,22 13:19 14:6,8 15:13 16:2,22,24 17:8 19:13 20:9 22:13 26:24 29:11,17, 21,25 30:5,6 31:23 32:3 34:1,7 48:12 50:10 62:23 64:5,14,23 67:17,18 69:24 71:20,21 72:7 77:3 79:17,20 80:3 83:6 84:10, 12 88:22 89:1 97:19 99:6 109:12 110:1 112:19,22

Sturgeon's 97:14,16

subject 51:20

submit 60:20 70:15 71:22

submitted 21:25 44:24 55:17 71:12 72:4

subordinate

25:18

subsequent 44:8 47:3

substantiate 22:8

substantiated 22:11

successfully 32:21

summary 66:11

superior 9:25 10:11

supervised 19:12 91:4

supervising 81:5 92:10

supervisor 17:19 88:5

supervisory 78:2

support 97:24

supposed 12:9

surely 90:2

suspected 52:8 57:14

suspended 68:25

suspension 12:1, 4 68:16,20 70:9

suspicious 58:1

swore 7:12

synonymous 75:2

---

**T**

tags 43:15,20

taking 23:15

64:13 82:9 92:5

talk 23:21 28:12 34:17 39:22 43:14 46:4 47:4 61:8 62:8 64:16 65:22 77:14 84:15 86:13 89:12 105:1 106:16,22

talked 9:3,7,16 17:16 24:23 28:10 31:5 34:11 45:16 46:10,25 53:24 55:14 61:23,24 67:23 78:1 82:15 99:1 104:10,12,13 106:5,8 108:8 110:19

talking 8:20 10:5 22:24 23:19 46:6 55:4 60:15 74:25 87:18 94:24 95:1, 2 98:16 104:15 112:11 116:22

talks 62:10

taught 33:21 67:15 68:12

taxes 88:23

taxi 105:21

teach 78:9 81:11

technically 119:21

techniques 28:16 68:13,14

Teddy 47:17 48:5, 14,16,21,25 49:3 61:17 74:5,21 76:18 94:13 95:9

98:21 106:13,24 108:14,19 109:18 112:21 113:11,15 116:12,19 117:4, 22 118:6,11,14, 17

**Teddy's** 108:20 109:5 111:9

**telling** 38:15 44:20 49:14 57:19

**tells** 54:14

**Tem** 107:10

**tension** 29:1

**testified** 7:3 112:5,16 113:6 114:5

**testify** 113:18

**testimony** 6:11 7:13 62:15 113:21

**text** 9:6,8,10

**That'll** 22:19

**theory** 99:5

**thing** 27:14 67:1 75:7 96:22 97:9 106:2 110:18,19

**things** 7:18 9:3 15:3 17:24 20:24 26:23 28:25 31:19 34:16 44:6 46:12 55:7 60:4, 15 81:25 83:11 84:1,3 96:21 102:7,15,17,23 103:21 106:3

**Thomas** 7:2 24:23 25:7,9

**thought** 30:19 33:22 47:9,10 72:13 78:7 91:10 103:6 111:6

**threat** 65:19,21 105:9,10 118:15, 18

**threw** 109:18

**thrown** 52:9 57:15

**tickets** 60:21

**Tiffany** 61:11

**tighten** 111:12

**till** 48:18

**time** 10:2 15:11, 14 16:18 17:1,16 24:17 29:24 30:16 31:23 32:2 35:9,20 37:7 42:8 45:20 46:7,19 48:15 50:19,21 52:22 53:11 58:21 59:22 60:1 61:9 69:15,17 74:11 77:8 81:17 88:8 91:10 100:15 101:3,5 103:6 107:20 108:6 113:16 116:10 120:13

**timecard** 45:24

**timeline** 46:2

**times** 15:22 55:15 61:6 105:22

**tire** 109:9,12

**today** 8:24 9:8 81:18 119:20

**today's** 8:12

**told** 27:24,25 35:13,14 41:11 43:8,10 45:6 46:18 47:8 55:11 69:6 72:18,20 73:24 74:7 77:6 80:10 86:18 90:16,22 92:5,15, 19 93:24 94:5,9, 14 98:12 106:2, 22 107:17 109:6, 19,23

**tongue** 47:24 48:1

**top** 40:10 52:5 54:6,14 57:23 67:9

**tossed** 109:6

**total** 13:14 76:17

**touch** 94:5

**town** 82:21 88:9

**traffic** 60:20

**train** 32:3

**trained** 33:19 67:11 78:6 80:17, 20 91:4

**training** 27:8 33:9,25 49:6,9 63:3,6 67:22,23 68:1 71:14 78:3, 18,19,23 79:1,6 81:5

**transcript** 119:15

**transfer** 19:20

**treat** 28:13 97:15, 19

**treats** 67:6

**trial** 7:15 12:14 32:10

**trigger** 31:8

**trip** 83:1

**trouble** 13:3

**true** 57:24 90:11

**Truesdell** 107:9

**trusting** 119:19

**truth** 6:12 7:3

**Tuesday** 42:14,20 43:3

**turned** 9:15

**turning** 9:11

**two-day** 11:25 12:3

**type** 10:5 73:22

**types** 60:15 81:25 94:19 105:12

**typically** 21:25 28:10 29:14 34:13,23,24 45:5 47:23

**Tzu** 46:18,20 89:3,25

---

**U**

---

**uh-huhs** 7:17

**uh-uhs** 7:18

**ultimately** 69:7

**unacceptable** 89:5

**unauthorized** 12:7 13:2

**uncommon** 29:20

**unconscionable** 90:1

**unconstitutional** 75:12

**under-** 7:11

**underlying** 24:3

**underneath** 15:23

**understand** 7:24 20:15 24:16 38:23 44:5 54:3 65:10 72:12 75:1 96:7 112:10

**understanding** 74:14,15 82:13 94:11 96:12 97:7 98:19 105:21 110:2,6

**understood** 8:2 63:14 92:24

**unhappiness** 84:11

**unkind** 95:14

**unknown** 61:14

**unlike** 80:13

**unofficial** 18:6

**unofficially** 15:18

**unpleasant** 28:22

**unreasonable** 76:4

**unsure** 60:3

**updated** 51:21

**uploaded** 41:6

**upset** 21:3 77:24 86:21 87:13 88:3, 25 89:5,6 90:6 97:8 98:24

103:23

**upsetting** 111:21

---

**V**

---

**valid** 42:10

**varied** 34:5

**vehicle** 57:15

**vehicle'** 52:10

**verbal** 7:17 27:21 64:7,8 90:19 91:10

**verbally** 19:4 27:18 45:4,7 60:11 77:5 91:9

**verbiage** 57:9

**version** 52:14,15 101:21 105:7

**veterinary** 49:9

**vicinity** 118:6

**video** 111:11,13, 16 116:3,20 117:5,6,13,21,25 118:24

**view** 26:18 42:12

**viewing** 116:13

**violating** 96:21

**violation** 10:18 82:8

**voice** 94:25

**Voss** 18:13,22 19:3,5 64:18 86:1,4

---

**W**

---

**wait** 7:20 8:7

**waive** 119:22,23

**waiving** 119:19

**walk** 47:23

**walkthrough** 13:22

**walls** 88:20

**wandering** 116:3, 20

**wanted** 17:17 41:22 46:12 73:25 98:4

**wanting** 33:15 37:4 103:20

**Ware** 61:11

**warrants** 76:5

**watch** 41:1,4 80:22

**watched** 9:2 40:23 47:16 61:6 62:2,3 81:2 94:23 110:25 111:15 113:14 116:10 117:20

**watching** 100:12 114:23 118:23

**Wayne** 6:23 8:20 113:1 114:2

**ways** 31:9 34:2

**website** 72:8

**Wednesday** 42:20

**week** 29:15 41:3 42:13 43:2 87:9,

**14**

**whatsoever** 92:2

**whichever** 57:21

**white** 61:15,19

**wild** 67:7

**Wilson** 73:15

**window** 76:14

**witnesses** 61:8

**wondering** 24:8

**woods** 109:7,18 110:12,13

**Woodson** 6:22 9:4,25 10:4,13 11:3,5,11 12:11, 23 18:15,17 19:16 20:1,3 21:3,11,14 22:9 25:21 27:10,16 31:7 33:9,18 35:6 40:19 41:15 42:1 43:8,19 44:13 45:3 46:2,25 51:25 53:4,9 54:11 55:22 56:5 58:11,18 59:23 60:6 61:15 62:5, 15 65:15,23 68:8, 16,25 69:14,17 70:5 71:7,23 72:24 73:4,23 74:17,20 76:8 78:3 79:6 80:5 81:18,20 84:6 89:11 91:4 92:10 93:13 95:13,25 96:13 97:1,10 98:2,7 99:1 103:25 104:18 110:1,14 111:3, 22 112:6,17,21

**NAEGELI**
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

117:23 118:7,10

**Woodson's** 22:2
40:12 52:13
54:22 69:21
76:17,19 90:18
93:4 108:17
118:1

**wordage** 39:18

**words** 71:25
97:24 102:5
104:14

**wordsmith** 57:10
59:4 102:12

**work** 15:5 17:15
64:12 69:4 81:10,
11,19

**worked** 13:22,24
81:23 82:1
100:14 110:1

**working** 17:23
25:7 29:4 49:10
73:21 112:6,17

**worried** 57:17

**would've** 36:7
42:16,19,20,21
43:4 45:1,5,6
46:8,14 47:7
52:23 53:1 55:6
56:3 67:18 79:11
80:10 88:5 100:3,
10,11 107:9
109:22 110:14

**wound** 49:17

**wrap** 101:11

**wrapped** 7:15

**write** 63:24 90:22
91:9

**writer** 53:12

**writes** 44:14

**writing** 11:8,14
24:17,19 50:14
53:5 55:20 57:10
60:6 63:4 74:2
91:13,15

**writing's** 91:18

**written** 27:19
55:14 58:14
60:13 62:25
64:25

**wrong** 29:2
47:19,22 48:21
49:2 118:20

**wrote** 36:8 39:15
41:9 62:21,23
64:19 69:22

---

**Y**

**year** 10:4,17
12:23 17:9 18:8
22:14 76:9,22
99:2

**years** 13:16

**yelling** 94:23

**yeses** 64:9

**yesterday** 8:25
9:10

**Yup** 56:25

---

**Z**

**Zach** 20:23 21:7,
10