IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

CASE NO.: 2:24-CV-04081-WJE

NICHOLAS S. HUNTER,

      Plaintiff,

vs.

MYRON WOODSON,

and

CITY OF STURGEON, MISSOURI,

      Defendants.

_____/

DEPOSITION OF

DR. JAMES CROSBY

VOLUME 1 (PAGES 1 - 68)

June 5, 2025
1:12PM - 2:50PM

ZOOM
Missouri

Reported by:
Stephanie L. Foley, CCR 1536

Job No.: 060525JF-SF-CROSBY

APPEARANCES:

On behalf of NICHOLAS S. HUNTER:

> The Crinnian Law Firm
> 9212 N Garfield Avenue
> Kansas City, Missouri 64155
> (816)237-0209
>
> BY: MR. ERIC CRINNIAN
> eric@crinnian.law
>
> Kolde Law
> 9506 Olive Boulevard
> Olivette, Missouri 63132
> (636)675-5303
>
> BY: MR. DANIEL J. KOLDE
> daniel.kolde.law@gmail.com

On behalf of MYRON WOODSON:

> Vessell Bridges Murphy Law Offices
> 3901 South Providence Road
> Suite D
> Columbia, Missouri 65203
> (573)777-4488
>
> BY: MR. JACK FLEMING
> jack.fleming@vbmlaw.com

On behalf of CITY OF STURGEON, MISSOURI:

> Newman, Comley & Ruth P.C.
> 601 Monroe Street, Suite 301
> PO BOX 537
> Jefferson City, Missouri 65102
> (573)634-2266
>
> BY: MR. WAYNE MICHAEL JORDAN III
> jordanw@ncrpc.com

SIGNATURE INSTRUCTIONS:

Signature waived.


EXHIBIT INSTRUCTIONS:

A scanned copy of Defendant's Deposition Exhibit A is attached to all electronic transcripts.


I N D E X

| Examination of DR. JAMES CROSBY: | Page: |
|---|---|
| Direct Examination by Mr. Fleming | 4 |
| Cross-Examination by Mr. Crinnian | 49 |
| Redirect Examination by Mr. Fleming | 62 |
| Recross-Examination by Mr. Crinnian | 63 |
| Court Memo | 67 |


E X H I B I T S

| Description: | Page: |
|---|---|
| Defendant's Exhibit A<br>Sturgeon Report | 8 |

Proceedings began at 1:12PM:

THE COURT REPORTER:  Would you raise your right hand?

Do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

Thereupon:

DR. JAMES CROSBY,

of legal age, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FLEMING:

Q.    Hi, Dr. Crosby.  My name is Jack Fleming, and I'm the attorney that represents the law enforcement officer here, defendant Myron Woodson.

So you've obviously been designated as an expert witness in the case by Plaintiff's counsel.

What documents and videos have you been sent to review in relation to this case?

A.    I don't have the full list of it in front of me.  It's all contained in my report.  But

pretty much all of the reports that were issued, the body -- body-worn camera video from Officer Woodson -- it -- like I said, it's all specifically spelled out in the Materials Examined section of my report.

I don't have -- I mean, I can dig that up if you really want me to, and go through that list because I've got it here, but I don't know if you want to spend that time.

Q. If you could just list them off for me.

A. Sure. Not a problem. Let me just get down the page to where that's listed.

The video of the encounter between Teddy and Officer Woodson by Officer Woodson's body-worn camera.

Since then, I have reviewed -- and let me find the file. Just a second. Come on, don't give me a hard time here. That case file, let's look for Woodson -- there we go. Okay.

I have, of course, my preliminary reports and so forth, and retainer letter. I have a file called First Production, which contains an audio file called Position 05-IEP 2024, city meeting minutes, Woodson employee information letter and a 5 dollar Re: Teddy PDF complaints, Re: Woodson

Sturgeon police.

Sturgeon Police -- let me see what that is -- Docs, which is the personnel documents from Sturgeon. Cranmer and Day texts, Dori texts, Kevin texts, group texts, emails from PD email, emails from mayor, emails Re: Woodson animal control CAD, which is the dispatch records. SPD Docs, which is a -- from the Sturgeon Police Department and incident report dated 5-1924.

The -- where'd I go here -- City's responses, index of documents -- three indexes of documents.

And in a second file, there is -- there are two body-worn camera videos; one of Officer Woodson and the other one -- I'm looking at it to make sure I remember exactly what this is because I've looked at it. But that this -- this one I haven't looked at recently.

Then there's also -- I'm getting that, but then there's also a dispatch screenshot, dog incident letter, Hunter Rule 26 Disclosures incident report from the Sturgeon police, response.pdf, and Missouri MO-PERM liability memorandum memoranda of coverage.

So the other video, other than the

primary one of the encounter between Officer Woodson and Teddy the dog -- the other video also appears to be from Officer Woodson. And this is his interactions with a gentleman in a blue t-shirt and kind of orangish, pink pants that I believe is Teddy's owner.

Q. Gotcha. I'm going to go ahead and share my screen here. Can you see that?

A. Yeah, that's my report.

Q. Okay. And the report stated 6 January, 2025. Is that correct?

A. That is correct.

Q. And you have not written any other reports since this January 6th, 2025, report?

A. Not in regard to this case, no.

Q. Okay. And in regards to this preliminary report -- I'm scrolling down here. It says, Materials examined at this juncture, the most substantial material to review is the video provided of the encounter between Teddy and Officer Woodson by Officer Woodson's body-worn camera.

So did you have the other documents that you listed before you wrote this report?

A. The documents have taken some time to come to be provided by the city of Sturgeon. I do

not believe we had all of the documents at that point. So I focused this report on my analysis of Officer Woodson's behavior, the analysis of Teddy's behavior.

And although I have not produced an additional declaration or report, I have reviewed the information as it came in -- that was in addition to the simple -- the basic stuff we had. I had the original incident report at the time of this, but it was -- that information, again, came in slowly.

Q. Okay. So is it fair to say that you're -- I mean, have you added any additional opinions based on any of the documents you've reviewed?

A. I have not written any additional opinion. Have my -- have there been opinions that have expanded from this, including about the processes and policies and actions of Officer Woodson and the Sturgeon Police Department? Yes.

I have -- as I have reviewed information I have developed other opinions regarding, again, the incident itself and the surrounding environment and policies and practices.

(WHEREIN; Exhibit A was marked for

identification.)

BY MR. FLEMING:

Q. What are those additional opinions that are not contained in this report here that I'm showing you, and which I'll mark as Exhibit A?

And I'll send that to the court reporter.

A. I would have to say that including the reports I have from yesterday's deposition of both Officer Woodson and the sergeant -- Crawford -- I think his last name is -- it appears that Officer Woodson has a history of falsifying police reports. That's been documented and acted upon in at least one occasion.

He has been free and loose with his descriptions of incidents. He has multiple complaints of use of force, both deadly and non-deadly, has operated without, at times, being properly reported to the Police Officer Standards and Training Commission of the state of Missouri, that he has misrepresented or disrepresented or falsified reports of -- for instance, what he did with Teddy's body after the incident, whether it's allegedly placing the body in a box next to an abandoned business or throwing it in the woods or

leaving it in a ditch on the side of a road.

There -- it's apparent that Officer -- based on my experience as a police officer, a police commander, and both an officer and director of animal control agencies, it's a -- it's quite apparent that Officer Woodson was completely clueless with how to use the simple device of a catch pole to capture and restrain a dog, that he didn't apparently understand that you just pull the string on the end to make the loop get smaller.

It's apparent that the town of Sturgeon, according to Officer Woodson, did not provide even remotely adequate training on how to answer animal control calls or even, again, how to use a simple catch pole.

It seems that the town of Sturgeon has repeatedly issued varying conflicting statements about what they claim was done.

It's become quite apparent that Officer Woodson's early statements that he was somehow in fear for his life from this 13-pound dog is either a fantasy or has been misrepresented because there's no way a rational human adult -- human being is going to be afraid of a 13-pound, blind and deaf Lhasa Apso.

So there -- there've been a number of issues that have come up. If you have specific questions, I'll be glad to share my opinions on those issues.

Q. Sure. And those have not been formally written down. Is that correct?

A. No. I have -- I have not, again, produced an additional report, written report, or declaration.

But if -- as you'll notice at the end of the report you have up, in my reports, I reserve the right, explicitly, to add additional opinions or alter opinions based on either presentation of more evidence, new evidence, or looking into the evidence that's been presented that might change my opinions.

Q. Understood. And when you're talking about the summaries of depositions of Myron Woodson and Sergeant Crawford, those were summaries of the depositions provided to you by Plaintiff's attorneys. Correct?

A. That's correct. I don't think there's a transcript yet.

Q. Okay. Getting into your background here. I'm starting at the top.

Dear Mr. Kolde, this letter is a

preliminary response to your request for my professional expert opinion regarding the contact between a pet, domestic dog, named Teddy and a member of Sturgeon, Missouri, police department. That opinion is, among other things, to address the actions of Officer Myron Woodson, whilst dealing with a call for assistance regarding Teddy, and Officer Woodson's attempted use of a catch pole, and the deployment of deadly force against Teddy.

Is that your opinion that is contained in this report in Exhibit A?

A. Yes. That's the -- this letter is the preliminary response based on the information in my possession at that time. And, again, "among other things" addresses the actions of Officer Woodson while dealing with the call for assistance, that as the information was provided, expanded into the practices and actions of the Sturgeon Police Department including their apparently -- acceptance of altered or changed documentary reports, and other such -- other such things that have come up during, again, the slow release of the information.

Q. Understood. And can you just give me a quick summary of your educational background?

A. Sure. I received a bachelor of

science degree with a major in psychology as an adult student. I then went back to school and was accepted into the master of science program within the College of Veterinary Medicine at the University of Florida, wherein I completed a master of science degree in veterinary forensics.

And then I continued at the University of Florida through their College of Veterinary Medicine to obtain a PhD in veterinary medical science.

My specific topics of research for both of those degrees centered around not only veterinary forensics, which is the application of veterinary science and analysis to the legal field, but specifically specializing in dog bites, dog aggression, fatal dog attacks against humans, non-fatal attacks against humans, wound recognition and related subjects.

I also had advanced training in animal -- particularly, canine -- behavior.

Q. So one of your areas of research is not officers' uses of force against dogs?

A. Actually, that's not correct. I also have done substantial research into the use of force by police officers against domestic dogs. Part of

13

that was in the initial stages of looking at dog aggression and how police officers perceive and react to what they believe may be dog aggression.

And that led to further research, which wound up with the National Sheriffs' Association asking me to produce a training video for police officers of any department across the United States in police dog encounters, including recognizing behavior, recognizing the tools that were present for officers to safely deal with dogs -- aggressive or not -- proper handling techniques, proper use of catch pole and other tools such as nets, sedation, CEWs -- the electronic weapons such as tasers.

And eventually all this came together, was peer reviewed by the US Department of Justice and approved as the state-of-the-art training course for law enforcement officers across the United States. This is -- this intersected with my work on fatal dog attacks as to looking at the level of risk objectively provided to humans by dogs and their various behavior and actions and reactions.

Q.   Do you know how much you've billed in this case so far?

A.	I don't think I've billed anything yet.

Q.	Do you know how many hours have you've spent working on this case?

A.	Oh, probably 50 or 60 at this point.

Q.	What's your hourly fee?

A.	If I charge hourly -- for instance, like in this case today, it's $200 an hour.

What I tend to do with these cases because of the -- just for my own convenience, is to charge the basic work on the case up to and including either deposition or trial at a flat $7,500. Sometimes that works out to be a little cheaper; sometimes it's a little more expensive, but it's just -- it's just my preference.

Q.	Understood. Have you ever worked with Mr. Crinnian or Mr. Kolde before?

A.	Mr. Kolde and I have worked several cases together, yes. Mr. Crinnian, I have not actually actively worked a case with him.

Q.	How many cases have you worked with Mr. Kolde on?

A.	Well, let's see. We went -- actually went to trial on one case in St. Louis County.

We have discussed quite a few cases,

and I've given reports on -- I don't know, two or three other cases.

We have discussed cases that have come up, and I've assisted Mr. Kolde in deciding if or how or what he wants to look at in that particular case. And then he makes his decisions as to whether he's going to take it.

Q. Understood. What percentage of your cases do you testify for police officers?

A. It kind of depends. With use of force cases, unlike yourself or Mr. Kolde and Mr. Crinnian, I'm not in a situation where I have an obligation to take cases that I don't believe that I can stand behind. I'm not part of normal due process. So I only take those cases where I feel like I can stand behind with scientific backing, the opinions that the parties are asking me -- if I can provide.

When I first look at a case, I first look at the situation to decide, is this even a case that I'm willing to take?

Very few police departments -- only been a couple of them have contacted me to testify and support the fact that their officers properly and appropriately used force. Typically,

departments use their own in-house personnel to do that.

So most of the time, if I am testifying and agree to take the case, it is because the person challenging the police department's actions has a case that I can support.

But I do turn down quite a few where the police officers obviously were justified and I tell the attorneys or the clients, Sorry, you're gonna have to try somebody else or try something else because that officer was reasonable, and I'm glad he didn't get bitten.

Q. Understood. Have you ever talked to the plaintiff, Nicholas Hunter, in this case?

A. No, I have not.

Q. Okay. Have you ever testified in a case similar to this in which an officer shot a dog?

A. Yes. I've testified in quite a few cases where officers shot dogs.

Q. And killed them?

A. Killed and injured, depending on the case.

Q. How many such cases do you think you've testified in?

A. I'd have to go back and look through

17

the detailed CV to give you an accurate count, but probably accepted in court and provided either deposition or testimony, probably 20 or 30 of them.

I've been accepted as an expert in such in, I think, 13 states, five or six federal districts, a large number of municipal cases of varying types, and also in the United Kingdom, Australia, and I hadn't had to examine Singapore because they don't particularly shoot dogs. So quite a few.

Q. What's your knowledge of the city of Sturgeon?

A. It's a town of about 872 people, according to Wikipedia, that's in the state of Missouri. Beyond that, I've never been there.

Q. And does the fact that it's a small, rural police department -- how does that -- if it does -- you know, change your opinions on officers you know, handling stray animals or, you know, an animal that's out in the open?

A. It doesn't. Police officers are and should be held to particular standards across the United States. That includes any use of firearms or force, whether it's lethal or non-lethal.

And animal control officers are held

to pretty much similar standards across most of the United States, including in -- in Missouri.

So I expect professional behavior based on appropriate training and appropriate decision-making capabilities across both the police and animal control field.

Q. Have your opinions ever been struck by a court before or not?

A. No.

Q. Never?

A. Never.

Q. How long did you work as a police officer?

A. Twenty-two and a half years from 1977 to '19 -- to September of 1999.

Q. What police department?

A. With the Jacksonville Sheriff's Office, which is both a municipal police department and a sheriff's department. So during that time, I was both a sworn city police officer and a deputy sheriff in the county because we have a combined city county government. So all of us officers were both deputies and police officers.

Q. And as you're in your time as a police officer, did you ever have to shoot or kill a

dog in the line of duty?

A. No.

Q. What were your animal control responsibilities while employed as a police officer?

A. The animal control responsibilities came after my career as a police officer. As a police officer, in that capacity, we did get called to injured animals on the street, or animals running at large, or animal cruelty on the criminal side. A lot of that was handled by our local animal control department.

But if it was a situation where there was something going on that needed them, we would secure the scene and -- and/or secure the animals until they got there.

Q. Sure. What's your understanding of the condition of Teddy the dog in this case?

A. My understanding is he was blind and deaf, five or six years old, generally healthy. From my observations of the body camera, Teddy appeared to be relatively well-groomed, you know, not show ready, but at a level, groomed.

He -- his gait was normal, especially as Officer Woodson was approaching. You could see him kind of prancing around the field and sniffing

and checking things out.

There doesn't seem to be any physical defects. He did have a little bit of a tilt to his head, which makes sense because that, in humans and dogs, is common among blind people or dogs.

He did not seem to be in pain. There was no visible substance of anything that looked like blood.

Like I said, his gait was normal, so there didn't seem to be any visible defect or injury that was apparent.

He seemed to be somebody's relatively healthy pet dog walking around and bumping into a couple of things like plants and so forth because he couldn't see.

Q. Do you know if Officer Woodson was aware that he was blind or deaf?

A. I don't know whether Officer Woodson was aware of that. However, I do understand that Officer Woodson has a history with animals.

And any of us who've worked in the rescue field and so forth have come across blind and or deaf animals in our careers. And that kind of head tilt and wandering around immediately makes you think, Oh, this dog is probably blind, especially

21

when you watch them bump into something once or twice and they walk off in a different direction.

Q. And did you -- when you reviewed the bodycam footage, did you notice if he was wearing a collar or not -- Teddy?

A. I don't recall seeing a collar in the video. I, frankly, didn't specifically look for a collar.

Q. Would that affect your opinions at all, whether it was a, you know, clearly just a lost, domesticated dog, or a dog that was a stray dog and, you know, had been out in the wilderness for some time.

A. It wouldn't change it. Number one, he hadn't -- by visual inspection, had not been out in the wilderness or running stray for some time. His fur didn't appear to be particularly matted or tangled. Dogs such as Shih Tzus or Lhasa Apsos, those small, long-coated dogs, they tend to mat very quickly.

I could see Teddy's face clearly, his eyes. And the face and eyes are areas that very quickly mat up.

And when you find those small, long-hair dogs that have not been shaved, that have

been running around in the woods that are running around on the streets for any length of time, they get dirty and matted very, very quickly.

So the presence or absence of a collar would not have particularly made a difference, especially because some owners choose not to put collars on -- particularly -- those small dogs because of the potential for tracheal damage by them pulling or getting a collar caught in something.

Q. But sitting here today, you don't know how long Teddy was outside of his home?

A. According to the reports that I've seen, it was a matter of less than a few hours.

Q. Do you know what report --

A. My understanding -- I don't remember exactly -- exactly how long, but I do -- am aware that the owner had reached out to whoever it is that runs the Facebook page for the city of Sturgeon and had put out a notice that his dog, Teddy, was missing.

Q. Is there any -- so you're testifying that there's no real difference between handling a stray dog that's loose and a domestic dog -- domesticated dog that's loose?

A. There are differences in handling -- between dogs based on the behavior they show. If the -- if the pet dog is fearful and runs away or takes a defensive stance and is snapping and snarling and growling, you know, a dog under those circumstances -- doesn't matter whether it's stray or somebody's pet, you're going to want to take more effort to try and keep the interaction safe.

If the dog looks nice and -- and is just kind of wandering around at your feet, it really doesn't matter whether it's a stray or a person's pet. You judge your reactions by the actions of the dog.

And you know, there have been plenty of times in my career, both with animal control and doing disaster response in New Orleans after Hurricane Katrina, and in all kinds of other circumstances where, if a dog is as calm and -- just simply bopping around, if you will, as Teddy was, you just reach over and pick up the dog. I mean, that's -- doesn't matter whether it's a stray or not.

Q. I mean, is there -- you have to be cautious of rabies, though. Correct?

A. You have to be aware of rabies. But

for instance, in the entire United States, there are only -- there are less than ten, usually only two or three actual rabies cases that are trans- -- that -- where humans become infected.

And of those, nearly all of them, most years, are from people who foolishly handled things like foxes or bats or raccoons. It's very rare for a domesticated mammal to transmit rabies to a human in this country.

And as far as to police officers, no police officer has ever been infected or died from a rabies -- or other infection from a dog bite -- since 1932.

So the risk of contracting rabies, even for those of us in the animal control field, is extremely small. And even animal control officers across the country -- the thousands and thousands and thousands -- many of them are not pre-exposure vaccinated. And I've never heard of an animal control officer who deals with many animals every day ever being infected with rabies.

Q. And then, taking a look here at your report, obviously, we mentioned the materials examined. The only thing you list in here is the bodycam footage. Correct?

A. Right. Cause that's primarily what I had at that point.

Q. Okay. And can you explain to me the proper use of force in canine encounters? Is there kind of, like, a use of force continuum like there is with, you know, police officers interacting with suspects?

A. Generally, yes. It's -- basically, you use the least amount of force necessary to complete your mission or do your job.

And as such, there are many techniques that I teach to police and animal control officers -- and that are readily available everywhere from the internet to basic training, to talking to other officers -- that go from physical presence through body language with dogs, through the use of a low-level tool such as a leash, or simply picking up an animal through -- from that through to, eventually, the use of catch poles, which is a bit of an escalation, to the use of chemical deterrents such as pepper spray or oleoresin capsicum spray, to the use of tasers, to the use of batons as either redirection tools or, in worst case scenarios, as striking and defense tools, to the use of other objects and articles such as

blankets, tarps, buckets, a cooler to contain smaller animals, to the last option, which is the use of deadly force.

And that progression is supported by organizations such as the International Association of Chiefs of Police, the National Sheriff's Association, the US Department of Justice, the American Veterinary Medical Association, several of the police fraternal organizations, the National Animal Control Association -- or it's now the National Animal Care and Control Association, every State animal control agency organization or regional organization that I've dealt with both in this country and in Canada and in other places like Australia and the UK, as well.

Q.    Do you know if the kind of what you just described about officer uses of force in regards to animals is part of basic training in Missouri for police officers?

A.    I don't know.  I don't believe it's part of Missouri law requiring such training.  I know we've got six -- six or seven now, states that mandate all police officers receive such training.

Such training is recommended nationwide by the Department of Justice, the

National Sheriff's Association, the other -- and some of the other organizations that I've mentioned, it's recognized very widely as best practices. There are -- I don't believe there is a statute in Missouri that requires that particular training.

Q.    I noticed in your certifications and training on your CV that you're a certified euthanasia technician.   What does that mean?

A.    That means that while I was working for both of the agencies that I ran as animal control -- as their animal control chief, I was certified by the state of Florida in the proper, lawful, and humane euthanasia of animals.

And the only method of euthanasia of animals permitted in the state of Florida as far as -- especially for pet animals, is to use an intravenous injection of a sedative, usually ketamine, in order to sedate the animal.

And then the intravenous administration of sodium pentobarbital at a common dosage of one milliliter per 10 pounds of body weight of the animal, plus one additional milliliter or CC of the sodium pentobarbital on top of that.

So a 13-pound dog, you would administer 14 to 15 CCs of sodium pentobarbital.

Prior to that, you'd use four or five CCs of ketamine, xylosine, or other sedative to sedate the animals so that they're -- so that their passing was as painless and untraumatic as we could make it.

Q. Are there different standards for euthanasia for wild animals or stray dogs?

A. Stray dogs, no. The euthanasia of wild animals depends. If you have, for instance, a deer that is struck by a car, number one, in rural areas, there aren't vets close by usually that you can call to the scene, and the animal is visibly injured, bleeding, suffering, immobile. And so the law in most all states permits the use of a firearm to quickly and humanely dispatch such an animal.

I've seen it done with deer. I've seen it done with bears. I've seen it done with horses that were injured, rather -- where the officers were unable to have a veterinarian respond to the scene. I've seen it done with alligators. Typically, it's with wild animals.

We don't just run around shooting dogs. Even though in an emergency, depending on one's department, I guess, depending on your state laws, you could think about it, but that's not a common practice.

Q. Do you know if Officer Woodson and the city of Sturgeon had the capabilities to call a veterinarian out to scenes for animal control purposes?

A. I don't know if they had the ability to call. I've been informed that there was a veterinarian's office maybe 20 minutes away from the location this occurred. I don't know if they have 24/7 availability.

So I don't know if they have the ability, but I do know from personal experience that a veterinarian would not just euthanize a stray dog before conducting a full examination of the dog or at least a physical examination of the dog.

And then only in accord with whatever the animal control rules and regulations and code and so forth were for that area.

Q. Do you know what those rules and codes were for the city of Sturgeon?

A. I don't remember it off the top of my head. I could look it up. But typically those rules have to do with an animal that might be visibly suffering from severe pain or was a clear danger to a human being.

Q. And are -- I mean, would a stray

animal be considered dangerous to human beings in the sense that they can wander into highways or streets and cause car accidents?

A. Stray animals can potentially wander into streets. They don't necessarily understand the roads. People may make choices to divert around them. However, in a field near some houses, that's -- that's not even -- not even a concern.

Q. I mean, would it be more of a concern with a dog that's blind and deaf wandering into a road or highway?

A. If it was already in the middle of a road or highway that would be a concern. However, both in my own duties and in cases where I've looked at other animal control agencies across the country, the typical response is to have the police block off the road and then safely remove the animal so the animal doesn't get hurt and the people are controlled.

Q. Understood.

Getting to your report here, which analyzes the video. You mentioned that Woodson exits the vehicle and goes to the rear hatch of the vehicle. Woodson dons a pair of black gloves, apparently gloves consistent with the personal

protective nitrile gloves many police officers and others use for protection against possible bloodborne pathogen contamination.

A. Yes.

Q. What is the possible bloodborne pathogen contamination? What kind of diseases or anything are you talking about there?

A. The bloodborne pathogens, dogs do potentially carry a couple of what are known as zoonotic diseases that can be transferred to humans. Babesia would be one. It's not fatal, but it's annoying. Ringworm is a contact-transferred disease.

We've discussed rabies, and that comes from, not contact with -- well, could -- usually comes from contact with saliva.

And so it's fully reasonable to pick up an animal with a pair of rubber gloves on until you have an opportunity to examine it more closely if it's not already displaying visible -- visible symptoms of one of the forms of rabies.

There's other things that you don't really want contact with, such as maybe a dog has rolled in a -- an animal that's decomposing and may present an issue with perhaps staff or strep

bacterial infections. That's why you put on the nitrile gloves just like Officer Woodson did.

Q. So that was a reasonable response from Officer Woodson and dealing with a dog at large?

A. Sure.

Q. Is one of the signs of rabies the dog looking unsteady or disoriented?

A. Depends on which kind you're talking about, whether it's furious rabies or dumb rabies.

Q. Dumb rabies, in this case.

A. Disorientation, among others, is one of the potential symptoms of dumb rabies.

Simple disorientation, however, can be caused by a number of things, anything from lack of nutrition to having suffered an impact injury, to -- on that again, extremely rare possibility of rabies, to being blind and deaf, to having an ear infection that affects their vestibular system.

Unsteadiness could be from age. It's -- that is not what we'd call a pathogenic or diagnostic absolute indicator of rabies or any other particular disease or disorder.

Q. Do you know if Missouri police, you know -- basic training involves any you know,

teaching on spotting rabies in dogs or animals?

A.    I would hope so.

Q.    But you don't know?

A.    I don't know.  I haven't been through the Academy or in-service training in Missouri.

Q.    And going down a few paragraphs.  I'm just highlighting here.

It's when Woodson makes the statement to himself, Neck is broken.

Do you disagree with Myron Woodson's comment that possibly this dog's neck's broken?

A.    Yeah, I would disagree with that. There's no symptomology that shows anything remotely related to a broken neck.  And I would expect Mr. Woodson with his past medical training in the military to recognize that it was highly unlikely that a -- an organism, human or otherwise, with a broken neck would be capable of walking around with the easy gait that Teddy showed bopping across the field.

Q.    What about somebody that didn't have medical training, just a run-of-the-mill law enforcement officer?

A.    I doubt that any law enforcement officer that had been around for any length of time

in any department would assume that an animal showing the behavior that Teddy showed somehow was suffering from a broken neck. It just doesn't make sense.

Q. Do you know whether in Missouri the use of a catch pole is taught in basic training for law enforcement officers?

A. I don't know whether that's taught in Missouri. I do know that, in my experience in many police departments across the country, tools are not issued to police officers to use in any way unless they're approved by their departments.

And in my experience, departments do not approve the use of tools that the officer has not been trained in. To the point that in my own department, there was a time where the officers were allowed to purchase things from pepper spray to specialty batons to different firearms. But in every case the officer had to successfully keep -- complete training and certification in that particular tool before they were permitted or especially asked to use that tool.

Q. Is it unusual in your experience for police officers such as Myron Woodson to be a city's animal control person?

A.    No.    That happens in a lot of small towns where the police share animal control duties. In fact, there's many jurisdictions, in my experience, where, at animal control conferences, law enforcement officers also are either sent by their departments or voluntarily come in order to improve their animal control skills because they're in a jurisdiction that has assigned dual responsibilities to them.

Q.    And did it inform your opinions in your report at all -- the 9-1-1 call about Teddy or the dispatch notes that mentioned that this was a call out to an injured animal?

A.    I considered that.    However, in my experience, both in animal control and police, we get a lot of 9-1-1 calls that are not completely accurate.    So each call has to be approached with the officer evaluating what they see with an open mind.

We don't just assume that the caller is completely accurate.    Instead, every time, you have to assess what it is you see and make decisions based on that.

So the -- I'm aware of the presence of the call.    I'm aware that the dispatcher gave

partial information. But I'm also aware that it's not only reasonable, but the responsible and necessary thing to assess that information in real time.

Q. Sure. But it's not unreasonable to go into the call or situation with those notes that this is an injured animal. Correct?

A. It's certainly expected that you're aware of the information you're given, yes.

Q. And going down to your current opinions.

One is, The dog known as Teddy was a small, reportedly 13-pound dog. A dog of that size did not present a credible threat to any relatively healthy adult human, including but not limited to Woodson. A properly, well-trained officer should have recognized the lack of credible threat of the infliction of any meaningful injury by Teddy.

Is that your first opinion?

A. Correct. That is.

Q. And you say a "properly, well-trained officer." Would it be the same for just a normally-trained officer, maybe not well-trained?

A. I think we expect all of our police officers to be well-trained. I don't think we send

officers out deliberately that are poorly trained. That would be something that the department would either avoid or very rapidly correct.

So a well-trained -- the properly, well-trained police officer is the legal standard across the country in federal court for judging the reasonableness of a police officer's actions.

Q. But it's fair to say that animal control training, in regards to police officers, differs across the country. Correct?

A. Yes. And I said -- and I said a properly, well-trained officer, not an animal control officer.

Q. Okay. Two, Teddy did not present any threat to any civilians. Is that correct?

A. Correct.

Q. In the video provided, Teddy did not show any gross symptoms of rabies-consistent behavior.

What are the gross symptoms --

A. That's cor- --

Q. Oh, sorry.

A. I'm sorry. Go ahead.

Q. I was just going to ask, what are the gross symptoms of rabies-consistent behavior?

A. In dumb rabies, it's typically immobility, inability to react to the situations or the environment around them.

Very often one of the symptoms is lethargy.

One of the symptoms is being unable to stand or move.

In furious rabies, the typical symptoms are the dog acting either extremely fearful or in an extremely offensive manner, snapping, biting, chasing after people or other animals.

Both of them eventually result in the animal becoming immobile and then suffering catastrophic seizure that contributes directly to their, usually, pretty immediate death.

Q. Fourth opinion, Woodson obviously failed to quarantine Teddy for possible rabies. If he believed that Teddy exhibited such a condition.

Additionally, Woodson failed to submit Teddy's body to the Missouri State Veterinary Lab for testing for the presence of rabies as required under Missouri statute.

What's the proper way to have quarantined Teddy if Myron Woodson have suspected he had rabies?

A. The proper way to quarantine Teddy while alive would be to have him taken to -- or to take him to either a shelter or a veterinarian's office and have him placed in isolation for observation for the -- for the period of about ten days to see if Teddy actually exhibited any true symptoms.

With a deceased animal, if you thought the animal was deceased, there is a responsibility to deliver the animal to either a veterinarian for beheading or delivered to the State laboratory so that you can assist in the mandatory rabies vector control that states are very careful about.

Even if you, for instance, see a raccoon or you -- you get a raccoon that somebody says, Yeah, the raccoon was out in the middle of the day stumbling around and growling and biting at things. Then, the proper response to that is to deliver the animal's body to the State laboratory so that they can go back to that area and be aware of any emerging rabies threats.

So yes, if the animal is alive, you quarantine it at a veterinarian's office or a shelter. If the animal's alive, you do not shoot

the animal because the possibility of body fluids being transferred in that impact could pose a risk. If you don't know that it's rabid, then you just quarantine it for observation.

Q. Does that just mean picking it up with your hands?

A. With a small animal like Teddy? Yeah. With -- with the protector -- protected gloves on, if you just simply reached over and picked Teddy up behind the four legs and held him out in front of you, the ability of the dog to bite you is extremely, extremely small.

And then, if the animal -- even if the animal did inflict a minor bite or a bite, period, there's a period of at least 72 hours in which the animal can be observed by a veterinarian to -- or shelter -- to determine whether the animal was contagious.

You have to understand that an animal in the contagious stage for rabies is typically within less than 72 hours of death. The virus has to move into the saliva from the brain. And the lifespan of an animal that is capable of transmitting rabies is very, very short. The window needed to give human prophylaxis against rabies is

substantially longer, 72 hours to ten days.

Q. Your fifth opinion is again, related to rabies exposure and warning, I guess, the reporting party that the dog could possibly have had rabies. Is that correct?

A. Yes.

Q. So the 9-1-1 caller?

A. Yeah. He -- if he honestly believed that Teddy was rabid, then he should have contacted the complaining party and also the health department to alert them that there might be a potential rabies vector. The reporting party should have been informed so they could then seek advice from a physician or their physician as to whether there was a credible exposure to Teddy's bodily fluids.

And based on their personal medical history, whether prophylaxis would have been justified or recommended.

Q. Your sixth opinion, Woodson failed to use any method, tool, or non-lethal means to try and attempt to restrain Teddy, including but not limited to the proper deployment of the catch pole or simply a physical restraint of the non-threatening dog. Properly, well-trained officers should have recognized that Teddy could have been easily

42

contained by using any number of strategies including simply picking the dog up.

Is that correct?

A. Yes.

Q. And seven, Woodson's progression to the use of deadly force in this encounter was clearly reckless outside of the proper actions of any well-trained and thoughtful officer and amounted to the needless and cruel killing of a 13-pound dog for no justifiable reason.

And that's your final opinion that's contained in this report?

A. That's the final opinion that's contained in this report. As I've said, I have gotten more information since, and so have developed some other related opinions that we talked about earlier.

Q. And can you just restate for me what the related opinions are?

A. To summarize them a bit, to -- in fact, to go back to what we were just talking about a few moments ago, the abandonment of Teddy's body. If Officer Woodson had been honestly concerned about rabies out in a public place where other animals or humans could have easily been exposed to them was

completely irresponsible.

And even non-rabid animals, police officers and animal control officers, you don't just leave animals out next to abandoned buildings. You don't throw them in the woods.

If he was concerned about rabies, at least he could have put the dog's body in a plastic bag and put that in a dumpster to reduce the possibility of infecting anybody or anything else.

The fact that he was completely clueless in the proper deployment of the catch pole, that indicates a horrible, horrible failure of training, and also, I would think, negligence on Woodson's part in trying to use something he didn't know how to use or understand. Or if he had been trained, he would have had a responsibility to say, Excuse me, I don't know how this works. And, Do I pull the string on the end or not?

The actions of Woodson in going -- like I said, going to the deadly force, there was absolutely no credible threat and there was no reason to go to deadly force.

And he had many options. I have learned, for instance, that he did not call the other, the sergeant -- again, I believe his name was

Crawford -- to ask for assistance, even though according to the sergeant's testimony yesterday, apparently he was -- had made himself available for others to control or capture animals.

Apparently, Officer Woodson had experience in picking up an injured German shepherd and carrying him to a veterinary office before the dog's ultimate demise. And so he had those -- some skills and abilities, at least when it came to a large dog, that he didn't use in this.

There are a number of issues, and those are just part of them, that as the investigation of cases gone on, have become obvious deficiencies in the -- in Officer Woodson's behavior.

Further problems are, for instance, that Officer Woodson's initial report was edited by others. That is completely unthinkable. As an officer, as a supervisor, as a commanding officer, when a report is submitted other than correcting spelling or grammar, editing is not -- is just simply not done.

If something's missing or needs to be changed, then a properly completed supplementary report clarifying those issues is the way that that

has to be done.

Attorneys and legal advisors are never part of the process of the officer's initial reporting. That reporting is the officer's observations and the officer's expression of what they saw, what they heard, what they smelled, what they felt at the time during the handling of a call and should never be edited for content. That's an additional problem that exists here.

So there are a number of different issues that are extremely problematic.

Q. Have you ever testified in court about proper police incident report writing?

A. Yes. Both police and animal control officers' reports writing.

Q. How many cases?

A. Oh, I don't remember right off. But that was also a very common question when in trial, as a police officer, in criminal cases.

Is this the report that you wrote?

Yes.

Is this a true and accurate copy of what you, of what you wrote and experienced?

Yes, it is.

Has anyone changed this report or

edited it?

No. They have not.

So that was a common line of questioning, both in my career since, and throughout my career as a police officer.

Q. Any other opinions that don't appear in this report that I'm going to be marking as Exhibit A?

A. Nothing particularly specific comes to mind. The -- there seems to have been a number of issues and I'm not sure if I've touched on every one of them today.

Q. Would it be helpful if you actually had the deposition transcripts of Officer Woodson and Sergeant Crawford informing your opinions?

A. Certainly. I'd be happy to look at them.

Q. And just, again, when you wrote this opinion or this report -- the January 6th, 2025 -- you do not know what documents, if any, you had at the time of writing beyond the bodycam footage?

A. Not off the top of my head, no. I'd have to go back through the exchanges between myself and counsel. And as counsel received documents from the town of Sturgeon, he then updated me.

So there was a -- there was a process of additional information that was provided over time that, in some cases, was not providing it in a particularly timely manner.

Q.   Would it be your normal practice that if you did review, say, the incident reports or the dispatch notes that it would be included in the Materials Examined portion of your report?

A.   Yes, very much.

MR. FLEMING:  Okay.  That's all the questions I have.  Thanks, Dr. Crosby.

THE WITNESS:  Sure.

MR. CRINNIAN:  I apologize.  Are you waiting for me or Wayne?

THE WITNESS:  Whoever.

MR. CRINNIAN:  Does Wayne have any questions?

MR. FLEMING:  Do you have any questions, Wayne?

MR. JORDAN:  Can you hear me now?

THE WITNESS:  Yes.

MR. JORDAN:  Okay.  Sorry about that. Unmuting was an issue and my audio seemed to be an issue.

All that to say I didn't have any

follow-up questions for you. Jack went through everything that I would have gone through.

THE WITNESS: Okay.

CROSS-EXAMINATION

BY MR. CRINNIAN:

Q. Okay. Dr. Crosby, I've just got some short follow-up questions for you based on what you answered to Mr. Fleming.

First of all, let's talk about the catch pole itself. You mentioned it's not a particularly complex piece of equipment. When you trained and taught animal control and police, how long did the process for training on the catch pole typically take?

A. The actual demonstration of the mechanics of the catch pole took maybe a minute or so. We then, typically, had officers practice on a large -- they call them stuffies -- but a large, stuffed toy dog or teddy bear or unicorn or whatever we had on hand to make sure they understood how to put the loop over the end.

We also made it a point to very specifically describe the fact that when they pulled the end, the pulling of the neural knob on the end was how the cable released, and that they had to be

cautious not to tighten the -- the pole too much because the use of the pole was to control not to choke to death.

So, still, we're talking including practice time, less than 10 minutes.

Q. And are most catch poles operated fundamentally the same way?

A. Every catch pole that I've ever dealt with operates the same way. Some of them are extensible, some of them are rigid in their length.

But, typically, every one I've run across -- whether it's from the Ketch-All company, which this one appears to be, because I'm extremely familiar with seeing those -- or others, even -- even makeshift catch poles that I've seen in some cases have involved a hollow tube with a rope or cable of some kind attached to one end that then ran down the middle.

And even when it was jury-rigged and homemade, it involved just simply pulling the rope or cable that was there and securing the dog's head up against the other end of the pole so it couldn't bite or escape.

Q. Now, in your report you and Mr. Fleming talked about your use of the phrase

"properly, well-trained officer." Do you recall that?

A. Yes.

Q. Now, when you're talking about a properly, well-trained officer, are you referring to an officer, for example, who's trained how to use the catch pole?

A. That would be included, yes.

Also officers that are taught how to drive properly, how to turn on their emergency lights. All of those things are things that officers need to be taught.

Q. Now you talked about Officer Woodson putting on those black nitrile gloves and how there's a number of different reasons. That's a pretty standard practice, particularly protection against bloodborne pathogens. Correct?

A. Correct.

Q. And you talked about a number of zoonotic diseases. You mentioned rabies could be one of them, but there's also a number of things that the officer could come in contact with on the dog that are not zoonotic, but the dog might just be dirty. Right?

A. Yes. When I mentioned rolling on

51

something dead, nobody -- even those of us in the forensic field -- you don't want to be touching the leftover remains of something that's been laying around dead, whether it's human or non-human; it's just nasty.

Q. And so the putting on of the nitrile gloves is not a specific prophylactic against rabies. It's just a general good practice for health and hygiene in these situations. Correct?

A. Correct. If you were really worried about rabies, there are specific, heavy, protective gloves that are commonly found in shelters and veterinarians offices. They -- they look like giant lobster claws. And if you're worried about rabies, that's -- those over the nitrile gloves would be the appropriate way to physically handle such an animal.

Q. Okay. And with regard to the black nitrile gloves -- just stepping back for a moment, in your experience, while you were a police officer and, you know, in supervisory capacities, did officers also put on black nitrile gloves to deal with humans?

A. Oh, all the time. Humans are nasty with diseases.

And especially dating back to the --

we really started doing it back in the early '80s when the bloodborne pathogen and AIDS and hepatitis concerns became prevalent. Some people did it before that when dealing with IV drug users because their hygiene was typically not what we would prefer.

Within the animal field, just like in the medical field, gloves have been used by veterinarians and vet techs and forensics people for -- gosh -- forever to just simply keep the nasty stuff off you.

Q. So on the topic of diseases, then let's talk about the rabies aspect for a second.

Mr. Fleming went through with you and talked about some of the different symptoms and characteristics of both furious and dumb rabies. Do you recall that?

A. Yes.

Q. And I want to make sure I'm clear here.

The furious rabies frequently can have a number of symptoms and the dog is typically still active during those symptoms. Is that correct?

A. The dog is typically still very

active during those -- the ones that I've observed and the ones that I was trained on when I received specific training on rabies, both in the university environment and also in the animal control environment, that's very active. And the dogs are snapping and snarling and they'll -- they'll be biting at people or our tires. It's -- it's very active. Yes.

Q. Is that why it's referred to as furious rabies?

A. Yes. That's -- my understanding is that's the -- the etymology or origin of that term is because of the very combative behavior shown by those animals.

Q. Now, one of the things that most people know about rabies is what they've learned from cartoons, and that's the foaming at the mouth. Right?

A. That's -- that's very often portrayed in, like, cartoons. Or if I remember correctly, the movie Cujo, Cujo had foam and stuff everywhere. That's actually not a common visible sign until the dog is basically about to die.

Q. So at that point it's in the dumb rabies stage. Is that correct?

A. Well, at that point, it's neurologically so impaired that it may be seizing. It may be lying there foaming at the mouth. That's -- that's in advanced rabies -- extremely advanced.

Q. But in all of the symptoms and factors that you and Mr. Fleming spoke about earlier, is any one of them dispositive in determining whether or not an animal has rabies? Can you rely on one specific symptom or observation and have any level of reasonable certainty that you may be dealing with rabies?

A. No. The only dispositive method of finding out if an animal had rabies is to literally cut their head off and -- and crack open their skull and harvest tissue from the midbrain and examine it under a microscope and through some tests to determine whether the rabies virus is present. That's the only reliable way to absolutely say, This animal was rabid.

Q. And you talk about the need to get material from the midbrain area. Is that one of the other reasons why shooting an animal that's suspected of having rabies is not advisable?

A. That's basically the main reason why shooting an animal is -- that you believe to be

rabid is -- is not wise because it's easy to damage that tissue. And if you've blown bits of brain all over the ground, then that can't be tested.

Q. Now, earlier you mentioned the picking up of a dog, and you alluded to Officer Woodson's testimony about picking up a German shepherd. Do you remember that?

A. Yes.

Q. And with regard to handling a seriously injured animal, one that has obvious signs of trauma, like being hit by a car, is picking that animal up advisable, generally?

A. Generally, no. Unless you happen to have, like, a stretcher or a backboard to be able to properly and humanely move the animal.

If you do have an injured animal that you absolutely need to move, then the proper way and reasonable way -- it was actually reflected in Officer Woodson's comments on his bodycam that, Maybe I should get a towel or something and throw it over the animal. That is what is taught to police officers and animal control officers.

And if you watch when Officer Woodson was putting on his gloves, there was a -- what appeared to be a black tarp right there in the back

of his vehicle that would have been -- as far as I can tell -- would have been effective to do that.

And again, Officer Woodson mentions getting a towel. So he may have had another towel in the vehicle or something. That's a much safer and more reasonable way.

And especially with a small dog, if you've got a tarp over them or a towel or a blanket or something, it -- it's very easy to roll them up and restrain them and you don't have to be in contact with getting bit, or in contact with their fur, or saliva, or blood they might have on them, or anything.

Q.     Now, Mr. Fleming asked you about the dispatch call log. Do you recall that?

A.     Yes.

Q.     And you had mentioned -- and correct me if I'm misstating you here -- but how it's important to be aware of the call. Correct? Like, the content in the call. So the caller saying, This dog may be injured, is an important piece of information for the officer to have?

A.     Certainly.

Q.     However, is the officer expected to use their own senses, their own eyes, their own

reason to determine whether a situation on the ground reflects the situation they were called in to handle?

A. Absolutely. And in fact, it's very important not only with police calls, but with animal control calls -- over the many years, people will make things up. They will say they saw somebody with a gun who doesn't have a gun or anything else. Now, you have to be aware of that, but you have to evaluate the situation whenever you go into it.

People will call in complaining that X, Y, Z dog is running up the street biting people. And you get to the scene and you find someone's poodle sitting there quietly. And you find out eventually that it's a neighborhood dispute and one neighbor is afraid of a dog or doesn't like the other neighbor.

So you have to pay attention to that information in the call, but you also have to very firmly base your actions and decisions on what you see and what you find as you investigate and examine what's really going on.

Q. And finally, Mr. Fleming talked a lot about how this was a preliminary report and has not

been -- you have not updated or added anything to it since January. Correct?

A. Correct.

Q. Normally, when you would complete a report for attorneys as an expert in a case, do you normally complete -- issue a final report before you've received deposition transcripts and all the discovery? Or do you normally do a preliminary report and then finish it once you have everything?

A. Very often, I initial- -- that's why I call it a preliminary report because as -- I think all of us sitting here know, depositions take time to get together, to get transcripts of -- to corral all the people you need. I think that's probably one of the most frustrating parts of your job is getting all those people together and getting them to sit down and answer questions.

So it's very common for me to get initial information and be provided with as much information as we have to start.

And then to -- for instance, in this case, to analyze the video footage and -- because that really doesn't require any documentary evidence outside of the four walls of that footage. And then produce a preliminary set of opinions, which again,

as time goes on, that preliminary opinion may be added to or modified as more information comes through.

Or in this case, if we've suddenly got documentation that before Officer Woodson contacted Teddy, Teddy had killed three children in a playground down the street, that information would be important to add into the appraisal here, especially if Officer Woodson knew about that.

Q. Now that we've essentially completed the depositions, if you have the opportunity to review the deposition transcripts, you could come up with a final report that's -- would you believe that it's going to be largely similar to the preliminary report that you already issued?

A. Yes. It's going to be largely similar with the exception that it's going to be expanded. And I expect to be -- frankly, to be provided with the transcripts of those depositions so that I can go through and see if there is any information presented by the officers that would change or affect my opinion.

Again, for instance, if the officer testified that, Oh, by the way, we forgot to tell you, Teddy killed three children down the street

just before this, that would certainly affect my appraisal.

And if that information was only provided in the deposition, then I would be foolish to issue a final report before seeing that.

Q. And finally, as it stands right now with the information you do have -- obviously without the deposition transcripts -- has anything changed from your core opinion from your preliminary report that you formed largely based off the bodycam video?

A. No. My opinions based on the bodycam video have remained steady that Teddy was a little, white, fluffy dog that posed no threat to humans, that posed no threat to Officer Woodson of any credible nature, that was bopping about in a nice, green, grass field and occasionally bumping into things because he was blind, and that couldn't respond to the -- the attempts Officer Woodson made to say, Oh, come here, buddy. And he made kissy sounds and whistled. And then for some unfathomable reason, pulled his firearm and discharged two rounds into Teddy.

Q. Okay. Great.

Last question. If Officer Woodson

knew how to use the catch pole, do you think there would have been a different outcome here?

A. Certainly. If he'd understood that he just -- just pulled the string on the end of the pole, even if he didn't know how to release it by pulling the knob, he could have walked Teddy back to his car or -- heaven forbid, it's not recommended -- but even carried Teddy back to the car on the end of the pole.

He could have put him in that black tub that he had that he eventually did put Teddy in. He could have put him in his back seat. He could have even stuck Teddy on the pole in the passenger side of the front seat and just driven to wherever he was going to go with Teddy.

Yeah, he didn't even have to know how to release it. If he had just been able to pull the string, the entire outcome would have been completely different.

MR. CRINNIAN: Thank you, Dr. Crosby. No further questions.

REDIRECT EXAMINATION

BY MR. FLEMING:

Q. I just have one quick follow-up.

You haven't inspected the catch pole

in this case, have you Dr. Crosby?

A. I have not physically inspected that catch pole, no. I understand that in the depositions yesterday for both of the officers, it was demonstrated. So it sounds like it works fine.

Q. But you're not aware if that was the specific catch pole involved in the incident?

A. I haven't examined the catch pole, but I'd be more than happy to look at it.

MR. FLEMING: All right. That's all I've got. Thank you.

MR. JORDAN: Wayne Jordan. No follow-up.

MR. CRINNIAN: Eric Crinnian, and I actually do have a follow-up.

RECROSS-EXAMINATION

BY MR. CRINNIAN:

Q. Dr. Crosby, you've explained that this is an easy tool. The catch pole is an easy tool to learn how to use. Right?

A. Yes, it is. In my -- in my experience and in all of the training I've done, yes. It's a very simple tool.

Q. I have the catch pole right here. Could you walk me through how to utilize it on

camera?

A.      Certainly.

Q.      Okay.

A.      So just to kind of instruct you -- I'm right-handed, so I would grab the dark, black, rubber part with my right hand, and I would put my left hand on the forward -- forward of that.  I would put my left hand towards the front -- in front of, yeah, like that.

With the right hand, slide it back up to the black grip.  Bring your hands closer together.  Bring your -- there you go.  I had to -- things are reversed here.

Then using both hands, you walk up and you loop the loop on the end around the animal.

And then with my right hand, at that point, because I'm right-handed, I would slide my hand back and pull on the string.  Zoop.  And you pull on the string far enough to close it around the dog's neck, but not to choke them.  So you're not going to -- you know, it's made to be able to hold different-sized animals.

Then you'd put your -- I would put my right hand back up on the handle, and use both hands to walk the dog back to my truck or car or wherever

I was going.  Whether it was -- even if it was in a shelter and we were moving it from kennel to kennel, you put two hands on the pole and you move the dog.

With a little dog, it's easy.  If you've got a 170-pound, irritated Rottweiler, you're gonna have to have both hands on it.

When you then get to where you're going and you have the animal properly behind a fence or whatever, you pull the neural knob back.

So pull the knob back, and voila, the loop is suddenly gotten big enough that the -- either the animal can pull their head out of it, or you can pull the catch pole off the -- off the end of the animal.  Simple.

Q.    Now, Dr. Crosby, I am going to pull the loop here.  Can you tell me that the loop is working properly?

A.    It's -- it certainly appears to be. You pulled on that string and the other end got smaller, and you pulled on the knob and the other end got bigger.  They're -- they're not complicated. It's basically a string on a stick.

Q.    Thank you, Dr. Crosby.

Does it appear that that catch pole works properly?

A. From what you just demonstrated, it absolutely does.

MR. CRINNIAN: Thank you. No further questions.

MR. FLEMING: Nothing further.

THE COURT REPORTER: Did someone want to talk about signature?

MR. FLEMING: Oh, do you want to copy a read and sign or do you want to waive signature, Dr. Crosby?

THE WITNESS: That's up to Eric and Mr. Kolde as to what they would prefer.

MR. FLEMING: Jim, we don't really have -- or Dr. Crosby, we don't really have a preference. If you want to read and sign, you're welcome to. If you want to waive, you're welcome to too.

THE WITNESS: Yeah, I'll go ahead and waive because I'm sure that I'll get a transcript of it anyway.

(Proceedings ended at 2:50PM.)

(SIGNATURE WAIVED.)

(OFF THE RECORD.)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

CASE NO.: 2:24-CV-04081-WJE

NICHOLAS S. HUNTER,

Plaintiff,

vs.

MYRON WOODSON,

and

CITY OF STURGEON, MISSOURI,

Defendants.


CERTIFICATE OF OFFICER & STATEMENT OF COSTS

RULE 57.03 (g) (2) (a) & SECTION 492.590 RSMo. 1985.

Transcript and Deposition OF DR. JAMES CROSBY

JUNE 5, 2025


Name and address of person or firm having custody of the original transcript: Mr. Jack Fleming, Vessell Bridges Murphy Law Offices, 3901 South Providence Road, Suite D, Columbia, Missouri 65203

TAXED IN FAVOR OF: Defendant, represented by MR. FLEMING: Attendance, PDF original transcript with electronically attached exhibits,

TOTAL $_____

COURT MEMO CONTINUED

TAXED IN FAVOR OF:  Defendant, represented by MR. JORDAN: PDF copy transcript with electronically attached exhibits.

TOTAL $_____

TAXED IN FAVOR OF:  Plaintiff, represented by MR. CRINNIAN: PDF copy transcript with electronically attached exhibits.

TOTAL $_____

Upon delivery of transcript, the above charges had not yet been paid.  It is anticipated that all charges will be paid in the normal course of business.

Ballew Reporting Services
2213 State Route W
Fayette, Missouri 65248
573-864-3014

IN AFFIRMATION THEREOF, I have hereunto set my hand on this 11th day of June, 2025.

_____

/s /STEPHANIE L. FOLEY, CCR 1536